1   Douglas J. Dennington (State Bar No. 173447)
    ddennington@rutan.com
2   John A. Ramirez (State Bar No. 184151)
    jramirez@rutan.com
3   Peter J. Howell (State Bar No. 227636)
    phowell@rutan.com
4   Kelsey E. Quist (State Bar No. 309876)
    kquist@rutan.com
5   RUTAN & TUCKER, LLP
    611 Anton Boulevard, Suite 1400
6   Costa Mesa, California 92626-1931
    Telephone:   714-641-5100
7   Facsimile:   714-546-9035

8   Attorneys for Plaintiff
    Apartment Association of Los Angeles County,
9   Inc., dba Apartment Association of Greater Los
    Angeles

10

11                 UNITED STATES DISTRICT COURT

12                 CENTRAL DISTRICT OF CALIFORNIA

13

14  APARTMENT ASSOCIATION OF           Case No.
    LOS ANGELES COUNTY, INC., dba
15  "APARTMENT ASSOCIATION OF          Judge:
    GREATER LOS ANGELES,"
16                                     **COMPLAINT FOR DECLARATORY
                  Plaintiff,           AND INJUNCTIVE RELIEF**
17
         vs.
18                                     **JURY TRIAL DEMANDED**
    CITY OF LOS ANGELES; ERIC
19  GARCETTI, in his official capacity as
    Mayor of Los Angeles; and CITY
20  COUNCIL OF THE CITY OF LOS
    ANGELES, in its official capacity;
21  DOES 1 through 25, inclusive,

22                Defendants.

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................9

JURISDICTION AND VENUE .........................................................14

PARTIES ...........................................................................................14

STANDING ........................................................................................15

FACTUAL ALLEGATIONS ..............................................................16

    A.    The Outbreak of COVID-19 ..............................................16

    B.    The Governor's Eviction-Related Executive Orders ..........17

    C.    The City's Eviction Moratorium.........................................18

    D.    The City's Rent Freeze Ordinance......................................20

    E.    The Alleged Statutory Basis for the City's Eviction Moratorium ........................................................................21

    F.    The CARES Act and Increased Availability of Unemployment Benefits ..................................................21

    G.    The City's Ordinances Violate California Law and the Constitutional Rights of Plaintiff's Members.....................25

FIRST CLAIM FOR RELIEF ...........................................................29

    Violation of the Contracts Clause of the United States Constitution/42 U.S.C. § 1983 (U.S. Const. Art. 1, § 10) .................29

SECOND CLAIM FOR RELIEF .......................................................32

    Violation of the Contracts Clause of the California Constitution (Cal. Const. Art. 1, § 9)..........................................................32

THIRD CLAIM FOR RELIEF ..........................................................34

    Violation of the Takings Clause of the Fifth Amendment to the United States Constitution/42 U.S.C. § 1983 ....................................34

FOURTH CLAIM FOR RELIEF .......................................................38

    Violation of the Takings Clause of the California Constitution (Cal. Const. Art. 1, § 19).........................................................38

FIFTH CLAIM FOR RELIEF ...........................................................40

    Violation of the Due Process Clause of the Fourteenth Amendment/42 U.S.C. § 1983 ............................................................40

**Page**

SIXTH CLAIM FOR RELIEF ...............................................................42

    Preemption by State Law .............................................................42

SEVENTH CLAIM FOR RELIEF........................................................44

    Violation of the Tenth Amendment to the United States
    Constitution.............................................................................44

REQUESTED RELIEF .........................................................................46

DEMAND FOR JURY TRIAL .............................................................48

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**FEDERAL CASES**

*Bridge Aina Le'a, LLC v. Land Use Comm'n*,
   950 F.3d 610 (9th Cir. 2020) ....................................................... 36

*Duncan v. Louisiana*,
   391 U.S. 145 (1968) ..................................................................... 41

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972) ..................................................................... 41

*Ex Parte Young*,
   209 U.S. 123 (1908) ..................................................................... 15

*F.C.C. v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ..................................................................... 40

*Grisworld v. Connecticut*,
   381 U.S. 479 (1965) ..................................................................... 41

*Guggenheim v. City of Goleta*,
   638 F.3d 1111 (9th Cir. 2010) (en banc) ..................................... 36

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934) ............................................................... 26, 41

*Hunt v. Wash. State Apple Adver. Comm'n* (1977)
   432 U.S. 333 ................................................................................ 15

*In re Abbott*,
   954 F.3d 772 (5th Cir. 2020) ....................................................... 25

*Lingle v. Chevron Corp.*,
   544 U.S. 528 (2005) ................................................. 34, 35, 37, 40

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982) ..................................................................... 35

*Panhandle E. Pipe Line Co. v. St. Highway Comm'n of*
   Kansas, 294 U.S. 613 (1935) ....................................................... 40

**Page(s)**

*Penn Central Transp. Co. v. New York City,*
    438 U.S. 104 (1978) ....................................................................... 35, 37

*Pennell v. City of San Jose,*
    485 U.S. 1 (1988) .................................................................................. 31

*Rea v. Matteucci,*
    121 F.3d 483 (9th Cir. 1997) ............................................................... 40

*Southern California Gas Co. v. City of Santa Ana,*
    336 F.3d 885 (9th Cir. 2003) ............................................................... 29

*Sveen v. Melin,*
    138 S.Ct. 1815 (2018) ..................................................................... 30, 31

*United States v. Bell,*
    464 F.2d 667 (2d Cir. 1972) ................................................................ 25

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................................ 40

**FEDERAL STATUTES**

28 U.S.C.
    section 1331 ......................................................................................... 14
    section 1343 ......................................................................................... 14
    section 1343(a) ..................................................................................... 14
    section 1367(a) ..................................................................................... 14
    section 1391(b)(1)................................................................................ 14
    section 1391(b)(2)................................................................................ 14
    section 2201 ......................................................................................... 14

42 U.S.C.
    section 1983.............................................13, 14, 27, 28, 29, 34, 37, 39, 42, 46, 47
    section 1983 *et seq.*............................................................................. 32
    section 1988............................................................................ 14, 37, 42, 47
    section 1988(b) .................................................................................... 32

United States Constitution
    .............................................................11, 12, 13, 14, 28, 29, 31, 32, 42, 46, 47

**Page(s)**

United States Constitution
    Fifth Amendment.................................................14, 27, 28, 34, 36, 37, 45, 46, 47
    Tenth Amendment .................................................................................. 44
    Fourteenth Amendment .......................................13, 14, 28, 39, 40, 42, 45, 46, 47
    Article I, section 9 ................................................................................. 46
    Article I, section 10 ........................................13, 14, 27, 29, 30, 31, 32, 33, 46

**CALIFORNIA CASES**

*Action Apartment Assn., Inc. v. City of Santa Monica,*
    41 Cal.4th 1232 (2007)........................................................................... 44

*Associated Home Builders etc., Inc. v. City of Livermore,*
    18 Cal.3d 582 (1976)............................................................................. 45

*Baker v. City of Santa Monica,*
    181 Cal.App.3d 972 (1986) .................................................................... 31

*Big Creek Lumber Co. v. City of Santa Cruz,*
    38 Cal.4th 1139 (2006)........................................................................... 43

*Birkenfeld v. City of Berkeley,*
    17 Cal.3d 129 (1976).......................................................31, 37, 41, 43, 45

*Candid Enters., Inc. v. Grossmont Union High Sch. Dist.,*
    39 Cal.3d 878 (1985)............................................................................. 43

*City of Carlsbad v. Rudvalis,*
    109 Cal.App.4th 667 (2003) .................................................................. 38

*Emeryville Redevelopment v. Harcros Pigments, Inc.,*
    101 Cal.App.4th 1083 (2002) ................................................................ 39

*Galland v. City of Clovis,*
    24 Cal.4th 1003 (2001)........................................................................... 41

*House v. Los Angeles County Flood Control Dist.,*
    25 Cal.3d 384 (1944)............................................................................. 44

*Interstate Marina Dev. Co. v. City of Los Angeles,*
    155 Cal.App.3d 435 (1984) .................................................................... 30

**Page(s)**

*Jefferson Street Ventures, LLC v. City of Indio,*
    236 Cal.App.4th 1175 (2015) ................................................................. 38

*Sherwin-Williams Co. v. City of Los Angeles,*
    4 Cal.4th 893 (1993) ............................................................................. 43

*Water Quality Assn. v. City of Santa Barbara,*
    44 Cal.App.4th 732 (1996) .................................................................... 43

CALIFORNIA STATUTES

California Civil Code
    section 47 ....................................................................................... 13, 44

California Code of Civil Procedure
    section 1021.5 ........................................................................................ 39
    section 1036 .......................................................................................... 39
    sections 1159-1179a .............................................................................. 43

California Constitution ........................................... 11, 12, 13, 14, 33, 38, 45

California Constitution
    Article I, section 9 ....................................................... 13, 14, 27, 32
    Article I, section 9(a) .......................................................................... 34
    Article I, section 19 ............................................................ 13, 38, 47
    Article XI, section 7 ............................................................................ 43

California Government Code
    section 7060-7060.7 .............................................................................. 19

OTHER STATE AUTHORITIES

Executive Order
    No. N-28-20 ..................................................................... 17, 21, 43, 44
    No. N-33-20 ........................................................................................ 16
    No. N-37-20 ................................................................................. 17, 21
    No. N-66-20 ........................................................................................ 17

**Page(s)**

**OTHER AUTHORITIES**

https://fivethirtyeight.com/features/many-americans-are-getting-more-
money-from-unemployment-than-they-were-from-their-jobs/ ............................ 24

https://home.treasury.gov/policy-issues/cares/assistance-for-american-
workers-and-families ................................................................................................ 22

https://home.treasury.gov/policy-issues/cares/preserving-jobs-for-
american-industry .................................................................................................... 22

Ordinance
   No. 186606 ........................................................................................................ 20
   No. 186607 ........................................... 9, 11, 15, 20, 21, 30, 31, 36, 37, 41, 42, 45
   No. 186585 ........................................ 9, 10, 11, 13, 18, 19, 20, 21, 26, 30, 31, 36,
   ........................................................................................ 37, 39, 41, 42, 43, 44, 45

Plaintiff Apartment Association of Los Angeles County, Inc. dba the "Apartment Association of Greater Los Angeles" ("Plaintiff" or "AAGLA") alleges as follows:

### INTRODUCTION

1.     In the wake of the novel coronavirus, Defendants City of Los Angeles, City Council of the City of Los Angeles, and Mayor Eric Garcetti (collectively "City" or "Defendants") hastily instituted a series of ordinances which prohibit lessors and landlords, such as Plaintiff's members, from exercising their contractual remedies where tenants refuse to pay rent on the asserted grounds that they were impacted by the COVID-19 pandemic ("Pandemic").  While purportedly intended to provide relief to tenants so impacted, the ordinances are not tailored to a tenant's actual inability to pay rent and significantly (and needlessly) infringe on the constitutional rights of all lessors and landlords within the City.

2.     This Action challenges the implementation of the City's Eviction Moratorium (Ordinance No. 186585) and Rent Freeze Ordinance (Ordinance No. 186607) (collectively the "Ordinances") adopted by the City Council on March 27, 2020 and March 30, 2020, respectively.

3.     Plaintiff's members are sympathetic to tenants who have actually suffered hardship due to the Pandemic.  Plaintiff's members have every incentive to work with those tenants who do not have the financial means to pay all or some portion of their rent.  As set forth below, however, the Ordinances actively undermine any such attempts at cooperation and allow tenants who actually have the ability to pay all or some of their rent to ignore their contractual obligations for the foreseeable future.

4.     The Eviction Moratorium, among other things, contains provisions that **_indefinitely_** prohibit landlords and property owners from initiating or continuing residential eviction proceedings based upon non-payment of rent.  Although it ostensibly only applies if a tenant is unable to pay due to circumstances related to the

Pandemic, it does not require tenants to provide notice, let alone documentation, of their inability to pay.  While the Eviction Moratorium provides no relief for owners and landlords and requires them to continue meeting their contractual and statutory obligations as "lessors," it completely abrogates the material obligations of lessees and eliminates all of the contractual remedies lessors ordinarily have when tenants breach their lease provisions.  Lessors are forbidden not only from commencing eviction proceedings for failure to pay rent, but from charging any late fees or interest to which they are contractually entitled.  Under the Eviction Moratorium, tenants may continue to occupy their respective premises at no charge, utilizing the water, power, trash, sewage, and other fees that the landlords must continue to pay without reimbursement.  By stripping all remedies away from owners – without requiring tenants to demonstrate an inability to pay rent – the Eviction Moratorium discourages tenants who can pay all or some of what they owe from doing so.

5.     The Eviction Moratorium also gives tenants a full twelve months following expiration of the "Local Emergency Period"—which seems likely to last many months, at a minimum—to repay back rent, irrespective of the tenant's ability to pay some or all rent, the term of the lease, any agreed plan or schedule for repayment, or any evidence demonstrating that the tenant will actually be capable of paying back rent at the expiration of the one-year grace period.  For many, if not most "qualifying" tenants, the "rent deferral" provision will operate as rent forgiveness, as it is unlikely that tenants who do not pay rent during the Local Emergency Period will be in a position to pay back rent, in addition to their normal rent, at the conclusion of the grace period (whenever that may be).  The Eviction Moratorium also fails to address how a landlord or property owner would actually be able to collect rent from those tenants who take advantage of the Eviction Moratorium, but move to a different location by the end of the one-year grace period.  Indeed, the City has banned owners from pursuing their primary remedy (eviction) needed to mitigate damages where the tenant fails to pay rent.  Every month a landlord is prevented from renting its unit to

a paying tenant is a month for which the landlord cannot mitigate any damages.  The Eviction Moratorium would force owners to allow tenants who have stopped paying – and may never pay again – to continue to occupy their units for many months and likely well into 2021.  While owners can theoretically eventually sue such tenants for back rent (but not for any interest or late fees), their likelihood of ever actually collecting on a judgment for many months of back rent is minimal, at best.  As for those tenants who move prior to the time owners may sue to recover back rent, there is simply no chance to recover such rent and, even if there was, the owner would incur a tremendous (and likely unrecoverable) litigation expense just to get that to which the owner is entitled.

6.    The Eviction Moratorium further prohibits all evictions based on the presence of unauthorized occupants or pets, as well as for undefined "nuisance[s] related to COVID-19."  Incredibly, the Eviction Moratorium creates a private right of action in favor of *only* tenants whereby tenants are allowed to sue for alleged violations of the moratorium, subjecting landlords to civil penalties of up to *$15,000 per violation.*  Thus, while the Eviction Moratorium bars lessors and landlords, like Plaintiff's members, from utilizing their primary contractual remedy to secure payment of rent, it provides a new weapon for tenants to use against landlords and lessors who seek only that to which they are entitled under their existing leases.

7.    The Rent Freeze Ordinance prohibits property owners from raising rent on any property subject to the City's Rent Stabilization Ordinance for a period of one year following the end of the "Local Emergency" as declared by the Mayor, thus preventing property owners from implementing even the modest increases ordinarily allowed on properties pursuant to their respective lease agreements.  The Rent Freeze Ordinance was adopted without any mechanism to determine whether rent increases are necessary for landlords to obtain a fair return, as required under the U.S. and California Constitutions.   The impact of the two Ordinances together is thus particularly devastating, as property owners are not only forced to forbear collecting

rent and effectively give interest-free loans to tenants who assert any Pandemic-related inability to pay, but are also prohibited from making normal rent adjustments with respect to tenants that do not claim any financial hardship.  The Ordinances also require property owners to financially support their tenants during the Local Emergency by subsidizing tenants' rent, utilities and other charges without any support to the property owner or landlord.  The City notably has refused to provide any financial relief to landlords and property owners, despite the hardship they have and are suffering.

8.     As set forth below, this action seeks to nullify the Ordinances as violative of the United States and California Constitutions, on the grounds that they improperly interfere with Plaintiff's members' contracts and due process rights and constitute an improper uncompensated taking of the fundamental property rights of Plaintiff's members.  The Ordinances are further preempted by California law and the unlawful detainer statutes, which are intended to fully occupy the field of eviction procedures.

9.     If allowed to stand, the Ordinances will not only continue to violate Plaintiff's members' rights under both the California and United States Constitutions, but will continue to inflict massive and widespread economic damage on property owners and landlords throughout the City, while unconstitutionally placing the entire economic burden of the Pandemic on the backs of property owners and landlords, including Plaintiff's members, who have already been financially crippled by the Pandemic.  Many of Plaintiff's members have mortgages on their properties that they are unable to pay without a steady stream of rental income.  Plaintiff's members similarly rely on rental income to maintain and secure their properties and pay employees, among other operating and personal expenses, including payment for food and housing for their own families.  Plaintiff's members are also required to pay the substantial property taxes, utility fees and other assessments on their respective properties, which taxes, fees and assessments cannot be paid in the absence of rental income.  Most of Plaintiff's members cannot financially survive if a significant

number of their tenants do not pay rent for a prolonged period of time.  The effect of the Ordinances will thus be to put many of Plaintiff's members out of the rental business, either through foreclosure and/or bankruptcy, ultimately reducing the badly needed supply of rental housing within the City and further driving up the cost of housing.  The City was fully aware of this when enacting the Eviction Moratorium, with some officials openly hoping to convert private distressed properties to public housing.  The stakes for immediate relief from this Court could not be higher.

10.     Accordingly, Plaintiff brings this action challenging the constitutionality of the Ordinances, which have deprived Plaintiff's members of their fundamental rights and liberties embodied in both the California and United States Constitutions. In doing so, Plaintiff seeks the following remedies:

    a.    Equitable and injunctive relief to enjoin the City's enforcement of the Ordinances;

    b.    Declaratory relief from this Court that the Ordinances violate Plaintiff's members' civil rights under 42 U.S.C. § 1983 of the Federal Civil Rights Act ("Section 1983"), the Contract Clauses of the California and United States Constitutions, the Takings Clauses of the California and United States Constitutions, and the Fourteenth Amendment for violation of Plaintiff's due process rights. Additionally, Plaintiff seeks a declaration that the City's Ordinances are fully preempted by California's unlawful detainer statutes and California's litigation privilege set forth in California Civil Code § 47;

    c.    Attorney's fees and costs for the work performed by Plaintiff's counsel in this lawsuit in an amount according to proof; and

    d.    For such other and further relief as this Court deems just and appropriate.

1

**JURISDICTION AND VENUE**

2       11.    This action arises under 42 U.S.C. § 1983 in relation to Defendants'

3 deprivation of Plaintiff's members' constitutional rights to due process under the Fifth

4 and Fourteenth Amendments to the United States Constitution, as well as their

5 constitutional rights pursuant to Article I, Section 9 of the California Constitution and

6 Article I, Section 10 (collectively "Contracts Clauses") of the United States

7 Constitution.  Accordingly, this Court has federal question jurisdiction pursuant to

8 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the claims asserting

9 violations of the California Constitution through supplemental jurisdiction pursuant

10 to 28 U.S.C. § 1367(a).  This Court has authority to award the requested declaratory

11 relief pursuant to 28 U.S.C. § 2201; the requested injunctive relief pursuant to

12 28 U.S.C. § 1343(a); and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

13       12.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and

14 (2), because Defendant City of Los Angeles is located within this district and a

15 substantial part of the events giving rise to Plaintiff's claims occurred in this district.

16

**PARTIES**

17       13.    Plaintiff Apartment Association of Los Angeles County, Inc., doing

18 business as "Apartment Association of Greater Los Angeles" ("Plaintiff" or

19 "AAGLA") at all relevant times, is and was a California mutual benefit Corporation

20 organized and authorized to do business and doing business in the State of California.

21 Founded in 1917, AAGLA is comprised of over 10,000 members that own or manage

22 over 150,000 rental housing units throughout the counties of Los Angeles, Ventura,

23 and San Bernardino.  For over 100 years, AAGLA has served as an advocate for rental

24 housing providers at the local, county, state, and federal levels of government.

25       14.    Defendant City of Los Angeles ("City" or "Defendant") is a municipal

26 corporation, organized under its Charter and the laws of the State of California.

27       15.    Defendant Eric Garcetti ("Garcetti" or "Mayor") is made a party to this

28 Action in his official capacity as the Mayor of Los Angeles in the State of California.

Garcetti is sued herein in his official capacity under the rule of *Ex Parte Young* to enjoin the enforcement of the City's Eviction Moratorium and Rent Freeze Ordinance. *Ex Parte Young*, 209 U.S. 123, 152-154 (1908).

16.     Defendant City Council of the City of Los Angeles ("City Council") is made a party to this Action in its official capacity as City Council of the City of Los Angeles for the State of California.

17.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 25 and therefore sues Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously-named Defendants is in some manner responsible or liable for the events and happenings referred to herein, and that each such fictitiously named Defendant caused injury and damage to Plaintiff's members as alleged in this Complaint.  Plaintiff will seek leave of court to amend this Complaint to allege the true names and capacities of such fictitiously-named Defendants when the same are ascertained.

18.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times hereto, each of the Defendants was the agent of each of the remaining Defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency or employment.

## STANDING

19.     As stated above, Plaintiff's members own and manage rental properties throughout the greater Los Angeles area, including numerous properties within the City of Los Angeles.  Thousands of Plaintiff's members are "Owners," or "Property Owners" as those terms are used in the City's Eviction Moratorium and Rent Freeze Ordinance, whose contractual and ownership rights in their respective properties are directly impacted by the City's Ordinances, and who would thus have standing to challenge such Ordinances in their own right.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

20.     Plaintiff has standing to bring its claims since it is an aggrieved

1  association that is the subject of enforcement of the City's overboard and
2  unconstitutional Ordinances, which have the effect of forcing Plaintiff's members to
3  alone bear a public burden by entirely eviscerating Plaintiff's members' ability to
4  contractually collect rent and/or otherwise use their properties as they rightfully so
5  choose.

6  **FACTUAL ALLEGATIONS**

7  **A.    The Outbreak of COVID-19**

8      21.    The global COVID-19 pandemic ("Pandemic") brought on by the
9  Wuhan Coronavirus has caused catastrophic and unprecedented economic damage
10  across the globe, and with it, significant loss of life and fundamental changes to both
11  world and national economies.  The Coronavirus outbreak has turned the world
12  upside-down, causing profound damage to the lives of all Americans and to the
13  national economy.  To be sure, State and U.S. officials have faced tremendous
14  adversity in planning, coordinating, and at times, executing effective nationwide and
15  statewide policies to protect the general public's health, safety and welfare during this
16  time of crisis.  However, the Ordinances, as well-intentioned as they may be, have
17  had an unlawful and disparate impact on landlords and property owners to the point
18  of jeopardizing Plaintiff's members' businesses and livelihoods.

19      22.    In response to the outbreak in the State of California, on March 4, 2020,
20  Governor Newsom issued a "State of Emergency" Order to address the threat of the
21  spread of the Pandemic throughout California's communities.  Governor Newsom
22  subsequently issued Executive Order No. N-33-20 on March 19, 2020, which, among
23  other things, mandated that "all individuals living in the State of California" were to
24  "stay home or at their place of residence except as needed to maintain the continuity
25  of operations of the federal critical infrastructure sectors as outlined at
26  https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19."

27      23.    On March 13, 2020, President Donald J. Trump proclaimed a National
28  State of Emergency as a result of the threat of the Pandemic.

24.     On March 15, 2020, Garcetti issued a Public Order under the City of Los Angeles's Emergency Authority entitled "New City Measures to Address COVID-19." Among other things, the Mayor's Order mandated that "no landlord shall evict a residential tenant in the City of Los Angeles during this local emergency period if the tenant is able to show an inability to pay rent due to circumstances related to the COVID-19 pandemic." The Mayor's Order additionally provided that such circumstances include "loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a member of the tenant's household who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures." Of note, there were no provisions mandating any sort of documentation be retained by tenants who claim an inability to pay rent due to COVID-19. Nor were there any protections provided for landlords or property owners rightfully attempting to continue collecting rent.

### B.     The Governor's Eviction-Related Executive Orders

25.     On March 16, 2020, Governor Newsom issued Executive Order No. N-28-20. In relevant part, the Order suspended provisions of state law that would "preempt or otherwise restrict a local government's exercise of its police power to impose substantive limits on residential or commercial evictions," but only to the extent that "[t]he basis for the eviction is nonpayment of rent . . . arising out of a substantial decrease in household or business income" caused by the Pandemic or the government response thereto. The order also required that the decrease in income be "documented." While the Order provided that such protections would only be in effect through May 31, 2020, Executive Order No. N-66-20, issued on May 29, 2020, extended the protections for an additional 60 days from the date of such order.

26.     On March 27, 2020, Governor Newsom issued Executive Order No. N-37-20, restricting evictions, though May 31, 2020, if certain conditions are met, including that the tenant has notified the landlord in writing of their "inability to

pay the full amount due to reasons related to COVID-19," within 7 days of the date the rent is due.  The Order also requires that tenants retain "verifiable documentation" explaining their changed financial circumstances, as an affirmative defense to an unlawful detainer action.

## C.    The City's Eviction Moratorium

27.    On March 27, 2020, the City Council for Defendant City of Los Angeles enacted Ordinance No. 186585 ("Eviction Moratorium") mandating a "temporary"[1] moratorium on evictions for non-payment of rent for tenants who are unable to pay rent due to circumstances related to the COVID-19 pandemic.  The Eviction Moratorium was signed by the Mayor on March 31, 2020, but retroactively applied to "non-payment eviction notices, no-fault eviction notices, and unlawful detainer actions based on such notices, served or filed on or after March 4, 2020."  The Eviction Moratorium applies to both commercial real property and residential real property, both of which are broadly defined in the ordinance.  The Eviction Moratorium is not set to expire until "the end of the Local Emergency period."  The Local Emergency period is defined as the period of March 4, 2020 to the end of the local emergency as declared by the Mayor.  Over three months into the Local Emergency, the Mayor and City Council have given no indication that the emergency period will end in the foreseeable future.  To the contrary, it seems exceedingly likely based on statements from Los Angeles officials that the declared emergency will extend well into 2021.

28.    The City's Eviction Moratorium prohibits landlords from terminating tenancies based on (1) non-payment of rent due to COVID-19 related inability to pay (without requiring documentation of such inability); (2) any "no fault" reason for termination; (3) certain lease violations related to unauthorized occupants,

---

[1] The word "temporary" is somewhat misleading, as the Eviction Moratorium has no specified end date, and extends certain protections an additional 12-months beyond the "end of the Local Emergency."

unauthorized pets, and nuisance; and (4) the Ellis Act[2].  The ordinance also allows for an extended repayment schedule – allowing tenants up to 12-months after the end of the Local Emergency to repay the delayed rent, without any interest or late penalties having accrued.[3]  Further, while it provides that tenants "may" agree to a repayment plan, they are not required to do so.  Thus, a tenant who fails to pay rent during the emergency period can refuse to pay *any* of that back rent for another full year after the emergency order is lifted, before the landlord has any recourse.  Nevertheless, the Eviction Moratorium purports to compel landlords and property owners to continue paying for the tenants' utilities, and to continue maintaining secure and habitable living units pursuant to the terms of the leases.  The Eviction Moratorium fails to provide any protection for the property owners who are unable to pay their mortgages, utilities and operating expenses needed to continue providing habitable units to their tenants.

29.    While the Eviction Moratorium ostensibly protects tenants who are unable to pay rent due to circumstances related to the COVID-19 pandemic, it arbitrarily shifts the financial burden onto property owners, many of whom were already suffering financial hardship as a result of the Pandemic and have no equivalent remedy at law.

30.    Notably, the Eviction Moratorium *does not require* tenants to provide notice of COVID-19-related inability to pay to the landlord or to provide documentation to the landlord, in contrast to the requirements of Newsom's Executive Orders.  While the City provides an *optional* form tenants can use to notify their landlords of a COVID-19-related inability to pay, the form is not mandatory.  The Eviction Moratorium nonetheless prohibits owners from endeavoring to evict any tenant with such an inability, in addition to providing that qualifying inability to pay

---

[2] Landlords are prohibited from removing any occupied units from the rental market as would otherwise be allowed by the Ellis Act until 60 days after the end of the Local Emergency period.
[3] The ordinance prohibits an owner from charging interest or a late fee on rent not paid under its provisions.

serves as an affirmative defense to eviction for non-payment.

31.     The Eviction Moratorium fails to provide any tribunal or mechanism by which property owners and landlords may challenge a tenant's claimed "inability to pay," effectively forcing property owners to accept such claims without question. Indeed, the City Council did everything in its power to eliminate all remedies available to property owners.

32.     The City also created a private right of action in favor of tenants only, which allows tenants to sue their landlords for violating the Eviction Moratorium, after providing notice to the landlord and 15-day period to cure the violation.  A tenant may bring an action for civil penalties of up to $10,000 per violation (plus up to an additional $5,000 if the tenant is senior citizen or disabled).  The private right of action applies from May 12, 2020 forward.  Thus, while landlords have been stripped of all remedies and any tribunal, such as a court to protect their rights, tenants are free to go to court to assert monetary claims against their landlords.

33.     On May 6, 2020, the City enacted Ordinance No. 186606 as an update to the Eviction Moratorium.  The update includes a prohibition on the influencing or attempting to influence, "through fraud, intimidation or coercion, a residential tenant to transfer or pay to the Owner any sum received by the tenant as part of any government relief program."  The City did so notwithstanding the fact that, as discussed in more detail below, such government relief programs were specifically designed to allow individuals to continue meeting their monthly expense obligations such as rent.

**D.     The City's Rent Freeze Ordinance**

34.     On March 30, 2020, the Mayor enacted Ordinance No. 186607 ("Rent Freeze Ordinance"), prohibiting owners from increasing rents on occupied rental units that are subject to the City's rent control provisions beginning on the date of the order. As a result, property owners, like Plaintiff's members, are prohibited from increasing rents on occupied rental units subject to the Ordinance through sixty (60) days after

1  the expiration of the local emergency period.

2      35.    On May 6, 2020, the City Council extended the Rent Freeze Ordinance

3  to *one year* after the expiration of the Local Emergency period.

4      36.    The Rent Freeze Ordinance freezes all rents without any consideration

5  of the impact of such rent freezes on the legally required mandate that rent control

6  ordinances allow for a "fair return."

7      **E.    The Alleged Statutory Basis for the City's Eviction Moratorium**

8      37.    The City's Eviction Moratorium cites the Governor's Executive Order

9  No. N-28-20 as allegedly authorizing the City to establish additional measures to

10 promote housing security and stability to protect public health and mitigate the

11 economic impacts of COVID-19.  The Rent Freeze Ordinance is notably silent as to

12 any statutory basis for its enactment, but otherwise states the ordinance is "required

13 for the immediate protection of the public peace, health and safety for the following

14 reasons:  the City of Los Angeles will suffer irreparable damage, including loss of life

15 and property, should the devastating effects of COVID-19 not be quickly mitigated."

16     38.    Notably, the City's Ordinances do not impose the same obligations on

17 tenants as do Newsom's eviction-related Executive Orders, such as mandating tenants

18 "retain verifiable documentation" to support a "substantial decrease in household or

19 business income related to COVID-19."  *See* Newsom's Executive Order

20 No. N-37-20.  Additionally, Newsom's Executive Order No. N-37-20 specifically

21 states, "Nothing in this Order shall prevent a tenant who is able to pay all or some of

22 the rent due from paying that rent in a timely manner or relieve a tenant of liability

23 for unpaid rent."

24     **F.    The CARES Act and Increased Availability of Unemployment**

25          **Benefits**

26     39.    To combat the growing financial losses suffered by many Americans

27 during the Pandemic, Congress passed the Coronavirus Aid, Relief, and Economic

28 Security ("CARES") Act, signed into law by President Trump on March 27, 2020.

The CARES Act provides over $2 trillion in direct economic assistance for American workers, families, and small businesses, and preserves jobs for American industries.[4]

40.     Specifically, the CARES Act expands the scope of individuals who are eligible for unemployment benefits, including those who are "furloughed" or otherwise unemployed as a direct result of COVID-19, including self-employed individuals, independent contractors, gig workers/freelancers, and those who have exhausted state and federal unemployment benefits.  It provides for Economic Impact Payments to American households of up to $1,200 per adult for individuals whose income was less than $99,000 (or $198,000 for joint filers) and $500 per child under 17 years old – or up to $3,400 for a family of four.  The Act adds $600 per week from the federal government on top of whatever base amount a worker receives from the state.

41.     Under the CARES Act, employers of all sizes that face closures or suffer economic hardship due to COVID-19 are incentivized to keep employees on the payroll through a 50% credit on up to $10,000 of wages paid or incurred from March 13, 2020 through December 31, 2020.[5]

42.     To be eligible for unemployment benefits under the CARES Act, individuals must provide self-certification to the state that they are (1) partially or fully unemployed, or (2) unable and unavailable to work because:

            a.      They have been diagnosed with COVID-19 or have symptoms of it and seeking diagnosis;

            b.      A member of their household has been diagnosed with COVID-19;

            c.      They are providing care for a family or household member diagnosed with COVID-19;

---

[4]   https://home.treasury.gov/policy-issues/cares/assistance-for-american-workers-and-families
[5]   https://home.treasury.gov/policy-issues/cares/preserving-jobs-for-american-industry

d.    A child or other person in the household for whom they have primary caregiving responsibility is unable to attend school or another facility that is closed as a direct result of the COVID-19 health emergency, and such school or facility care is required for the individual to work;

e.    They cannot reach the place of employment because of a quarantine imposed as a direct result of the COVID-19 health emergency;

f.    They were scheduled to start employment and do not have a job or cannot reach their place of employment as a result of the COVID-19 public health emergency;

g.    They have become the breadwinner or major support for a household because the head of household has died as a direct result of COVID-19;

h.    They had to quit their job as a direct result of the COVID-19 public health emergency;

i.    Their place of employment is closed as a direct result of the COVID-19 public health emergency; or

j.    They meet other criteria established by the Secretary of Labor.

43.    The CARES Act allows for substantial unemployment benefits for virtually every American directly or indirectly impacted by the Pandemic.  Individuals who meet the above criteria will receive the weekly benefit as determined by their state for a maximum of 39 weeks, plus Pandemic Unemployment Compensation ("PUC") equal to $600 per week on top of the normal unemployment benefit. Individuals who were previously approved for unemployment benefits will continue to receive their weekly unemployment benefit for a maximum of 39 weeks.  Since most states provide 26 weeks of unemployment benefits, the CARES Act effectively expands coverage for an additional 13 weeks.

44.    One of the more notable "loopholes" of the CARES Act is the "windfall" received by many employees, where individuals actually receive **_higher wages_** through available unemployment benefits in comparison to their wages pre-Pandemic. For example, if an employer places an employee on a reduced schedule, depending on the employee's rate of pay, he or she may receive a "windfall" by receiving PUC. That is, the employee may receive more through unemployment benefits than he or she would have at work.  The CARES Act does not address whether a state has the authority to adjust PUC for employees who are considered "partially unemployed" under state law.

45.    While the stated goal of the CARES Act was to replace employee wages that had been impacted by COVID-19, the result is many individuals may now be eligible for substantially more money while unemployed than they made while working.

46.    A new analysis by Peter Ganong, Pascal Noel and Joseph Vavra, economists at the University of Chicago, uses government data from 2019 to estimate that 68% of unemployed workers who can receive tax-free benefits are eligible for payments that are greater than their lost earnings.[6]  They also found that the estimated median replacement rate – the share of a worker's original weekly salary that is being replaced by unemployment benefits – is 134%, or more than 1/3 above their original wage.  A substantial minority of those workers, particularly in low-wage professions like food service and janitorial work, may end up receiving more than 150% of their previous weekly salary.

47.    In addition to the CARES Act and PUC, there are several additional financial resources available to individuals as a result of the Pandemic, such as the Families First Coronavirus Response Act ("FFCRA"), new paid leave laws under the Family and Medical Leave Act ("FMLA"), and relief from federal student loans, to

---

[6] https://fivethirtyeight.com/features/many-americans-are-getting-more-money-from-unemployment-than-they-were-from-their-jobs/

name a few. Thus, the premise behind the Ordinances—*i.e.*, that dramatic action by the City was necessary to prevent huge numbers of Los Angeles residents from being removed from their housing due to Pandemic-related financial hardship—is simply false.

48. While the financial resources available to tenants impacted by COVID-19 abound, the remedies available to landlords and property owners are noticeably absent. Landlords and property owners, like Plaintiff's members, are still responsible for paying mortgages, property taxes, utilities, security, managers, government-imposed fees, employee salaries, and a host of other expenses needed to maintain and operate their rental properties.

## G. The City's Ordinances Violate California Law and the Constitutional Rights of Plaintiff's Members

49. As a result of the issuance and enforcement of the City's Ordinances, the City has violated Plaintiff's members' constitutional rights to the free use of their properties. The Ordinances abrogate Plaintiff's members' contractual rights in that they permit tenants to unilaterally violate the terms of their leases, without the landlords' or lessors' consent.

50. "To be sure, individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020). Fundamental and unalienable rights are by their very nature "essential" – they are the essential rights which led to the founding of this country and this state. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. But the ultimate strength of our constitutional guarantee lies in the unhesitating application in times of crisis and tranquility alike." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring).

51. "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or

reserved.  The Constitution was adopted in a period of grave emergency.  Its grants of power to the federal government and its limitations of the power of the States were determined in light of emergency, and they are not altered by emergency.  What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-426 (1934) ("*Blaisdell*").

52.    Plaintiff's members desire to protect their properties, while at the same time giving reasonable opportunity for their tenants to maintain their tenancies.  In order to do so, Plaintiff's members must have the ability to commence a residential non-payment proceeding before a Court of competent jurisdiction.  Any relief afforded to tenants that is justified by the public health emergency, in order not to contravene Plaintiff's members' constitutional rights, can only be of character appropriate to that emergency, and granted only upon reasonable conditions. *Blaisdell, supra,* 290 U.S. at 445.  In cases of leases, the Supreme Court has observed that relief may be appropriate where "the relief afforded was temporary and conditional; that it was sustained because of the emergency due to scarcity of housing; ***and that provision was made for reasonable compensation to the landlord during the period he was prevented from regaining possession***." *Id.* at 441-442 (emph. added).

53.    Here, however, the City's Ordinances are neither "appropriate," nor granted upon "reasonable conditions."  The relief afforded is neither temporary nor conditional.  Nor do the Ordinances provide for "reasonable compensation" to the landlords or lessors, during the indefinite period by which the Ordinances are in effect.  Indeed, the Eviction Moratorium expressly allows tenants to remain in possession without paying any rent during the emergency period.  The Ordinances are not addressed to a legitimate end and the measures taken by the City are not reasonable or appropriate to that end. *Blaisdell, supra,* 290 U.S. at 438.

54.     The City's Ordinances have caused widespread and catastrophic financial damage to landlords and lessors, like Plaintiff's members, who have no remedies available to them by which to recover the losses caused by their tenants' non-payment of rent.  There exist hundreds of thousands of rental properties subject to the Ordinances within the City.  Even a modest reduction in rent payments as a result of the Ordinances would equate to tens of millions of dollars in lost rent per month.  A year's worth of lost rent City-wide would easily equate to billions of dollars in losses borne exclusively by property owners with rental properties in the City.  Accordingly, Plaintiff complains against the City for violations of the United States and California Constitutions and the Federal Civil Rights Act, 42 U.S.C. § 1983 ("FCRA"), to declare and enjoin the enforcement of the City's Ordinances, due to the following circumstances:

> a.     The Ordinances further violate the Contracts Clauses of Article I, Section 10 of the United States Constitution and Article I, Section 9 of the California Constitution.

> b.     The Ordinances effectively amount to an impermissible "partial" or "complete" taking in violation of the Takings Clause of the Fifth Amendment of the United States Constitution in that the prohibition on Plaintiff's members' ability to collect rent constitutes a regulatory taking of private property, for public purpose, without providing just compensation therefor.  Furthermore, the Ordinances violate the Takings Clause of the Fifth Amendment in that the complete prohibition on Plaintiff's ability to collect rent constitutes an irrational, arbitrary, and capricious law bearing no rational basis to any valid government interest.  The notion that the Ordinances are absolutely necessary to protect tenants from losing their homes amidst the wide availability of financial resources, unemployment benefits, and

other reasonable alternatives, demonstrates the gross overreach by the City at the unconstitutional expense of the property owners.

c.  The Ordinances further violate the substantive and procedural due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

d.  The Ordinances subject the City to liability under 42 U.S.C. § 1983 as a deprivation of Plaintiff's rights, privileges, and immunities secured by the United States Constitution and/or laws of the United States to which Plaintiff's members are and were legitimately entitled.

55.   Moreover, the City's Ordinances are not "narrowly tailored" to further any compelling governmental interest.  On the contrary, while the Ordinances were ostensibly intended to protect tenants from being evicted due to their inability to pay rent, this goal could have been achieved by far less intrusive means, including, but not limited to:  (a) permitting the courts to hear each case on its own merits and fashion relief appropriate to the specific positions of the affected landlords and tenants, thereby protecting tenants from immediate eviction but also providing protection to landlords from excessive periods of non-payment; (b) requiring tenants to substantiate the criteria for qualifying for protection under the Ordinances through documentation or other evidence; (c) providing landlords a tribunal or other forum to challenge a tenant's claimed qualification for protection under the Ordinances; (d) providing tenants with the means to pay rent in order to satisfy the City's tenant protection goals, without requiring landlords to bear the burden and threat of significant non-payment of rent to implement the City's tenant protection program; and/or (e) compensating landlords and property owners directly when a tenant fails to pay rent in order to continue occupying the premises to slow the spread of the virus.

56.   Instead, the City's Ordinances give tenants a present sense that they are not contractually bound to pay *any* portion of rent for an indefinite period of time,

1  e.g., up to twelve (12) months *after* the Local Emergency Period ends.  Nor do the

2  City's Ordinances provide a vehicle by which landlords or lessors, like Plaintiff's

3  members, can continue to collect rent from those with an ability to pay (including

4  even a portion of their rent) or a forum within which lessors and landlords could

5  challenge tenant claims.

6  57.  Without immediate relief, Plaintiff's members are subject to

7  administrative penalties and massive fines based on the enforcement of the City's

8  Ordinances.  Unless and until injunctive relief is granted, Plaintiff's members will

9  continue to suffer irreparable harm for which they are left without an adequate remedy

10  at law.

11  **FIRST CLAIM FOR RELIEF**

12  **Violation of the Contracts Clause of**

13  **the United States Constitution/42 U.S.C. § 1983**

14  **(U.S. Const. Art. 1, § 10)**

15  **(*By Plaintiff against All Defendants*)**

16  58.  Plaintiff incorporates herein by reference each and every allegation

17  contained in the preceding paragraphs of this Complaint as though fully set forth

18  herein.

19  59.  The Contracts Clause, Art. 1, § 10, of the United States Constitution,

20  provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."

21  The Contracts Clause applies to cities and prohibits cities from enacting ordinances

22  that substantially impair Plaintiff's members' existing, lawful contracts.

23  60.  The Ninth Circuit has ruled that Contracts Clause violations are indeed

24  actionable under 42 U.S.C. § 1983.  Specifically, the Ninth Circuit has stated, "The

25  right of a party not to have a State, or a political subdivision thereof, impair its

26  obligations of contract is a right secured by the first article of the United States

27  Constitution.  A deprivation of that right may therefore give rise to a cause of action

28  under section 1983." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d

885, 887 (9th Cir. 2003).

61.    In determining whether a contractual impairment is substantial, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S.Ct. 1815, 1822 (2018).  If a court determines that a law works a substantial impairment, it then considers "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen, supra*, 138 S.Ct. at 1822 (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411-12 (1983); *see also Interstate Marina Dev. Co. v. City of Los Angeles*, 155 Cal.App.3d 435, 445 (1984) ("A substantial impairment can only be justified by a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem.")

62.    Where, as here, a law substantially impairs a contract, the public entity bears the burden of showing that the impairment is both reasonable and necessary. "The government must use the least intrusive means to achieve its goals.  It is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *Interstate Marina Dev. Co, supra,* 155 Cal.App.3d 435, at 445-46 (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 31 (1977).

63.    Under these standards, the Ordinances violate the Contracts Clause of the United States Constitution.  The Eviction Moratorium and Rent Freeze Ordinance fundamentally upend the contractual bargains struck between Plaintiff's members and their tenants by effectively relieving the tenants of their obligation to pay rent and comply with certain other provisions of their leases, and leaving owners, like Plaintiff's members, without any recourse for an undetermined period of time.  Under the Eviction Moratorium, Plaintiff's members, as well as other property owners and/or landlords, are required to allow tenants to remain on the properties rent free for an unspecified duration of time, thus depriving Plaintiff's members of the

opportunity to collect any portion of rent from their current tenants, or otherwise rent their properties to tenants who can pay rent.  Such an ordinance is the quintessential "substantial" impairment, as it "undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Sveen, supra,* 138 S.Ct. at 1822.

64.   A rent control measure – like the City's Rent Freeze Ordinance – is constitutionally infirm on its face if it operates to deprive owners of a "just and reasonable" return on their property by foreclosing all avenues for a "fair return" increase in rents, or inviting arbitrary, capricious, and/or unreasonably dilatory rent board decisions on landlord applications for same.  *Birkenfeld v. City of Berkeley* 17 Cal.3d 129, 169-173 (1976); *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988); *Baker v. City of Santa Monica*, 181 Cal.App.3d 972, 985 (1986).

65.   The Eviction Moratorium further unilaterally rewrites all residential leases within the City to delete restrictions on pets and on who is authorized to occupy the leased property—without any attempt to tie such revisions to the Pandemic.  Even if there were a legitimate purpose behind the City's Ordinances, which there is not, the complete obliteration of Plaintiff's members' contracts and tenants' obligations to pay rent under such contracts is not a reasonable way of achieving that purpose.  Accordingly, the contractual impairments effectuated by the enactment and enforcement of the City's Ordinances violate the Contracts Clause and are unconstitutional.

66.   In applying the City's Ordinances to Plaintiff's members, the City has acted under color of statute, ordinance, regulation and policy of the municipality.  The City's conduct has deprived Plaintiff's members of the rights, privileges, and immunities secured by the United States Constitution and/or laws of the United States to which Plaintiff's members are and were legitimately entitled.

67.   Plaintiff's members have no adequate remedy at law to prevent or redress the irreparable injuries alleged herein.

68.     Unless the City is enjoined and restrained from enforcing or threatening to enforce the City's Ordinances, Plaintiff's members will be irreparably injured. Plaintiff's members will be deprived of rights guaranteed under the United States Constitution, and will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which will be extremely difficult or impossible to ascertain.  While Plaintiff's members are free to sue the City for damages stemming from the continuous and sustained loss of rent over the as yet undefined period of time, by the time the rent payment obligations are restored in the future, many will have lost their properties to foreclosure.  As the City's constitutional violations are ongoing, Plaintiff's members are also entitled to injunctive relief now.

69.     Finally, the City's conduct has required Plaintiff to incur attorneys' fees and costs of suit to bring this action, and Plaintiff is entitled to attorneys' fees and costs under, *inter alia*, 42 U.S.C. § 1983 *et seq.* and 42 U.S.C. § 1988(b).

## SECOND CLAIM FOR RELIEF

### Violation of the Contracts Clause of

### the California Constitution

### (Cal. Const. Art. 1, § 9)

### (*By Plaintiff against All Defendants*)

70.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

71.     The California Contracts Clause, Article I, Section 9 of the California Constitution, provides:  "A bill of attainder, ex post facto law, or law impairing the obligation of contracts may not be passed."  Like its federal counterpart, the California Contracts Clause applies to cities.   The clause prohibits a city from enacting ordinances that substantially impair individuals' obligations under existing, lawful contracts except under extraordinary circumstances.

72.     The City's Ordinances substantially impair Plaintiff's members' rights

and the tenants' obligations under existing leases and/or rental agreements.  By allowing tenants to withhold rent payments, the City has unlawfully impaired the tenants' contractual obligations, leaving no recourse for landlords or lessors, such as Plaintiff's members.

73.    The City effectively seeks to condemn Plaintiff's members' lease agreements and contract rights and to shift the entire cost of the condemnation onto Plaintiff's members.  In doing so, the City seeks to substantially impair the obligations of the existing lease and/or rental agreements without justification, and in direct violation of the Contracts Clause.

74.    In applying the City's Ordinances to Plaintiff's members, the City has acted under color of statute, ordinance, regulation and policy of the municipality.

75.    An actual controversy exists between Plaintiff's members and the City in that Plaintiff's members contend, and the City disputes, that the City's Ordinances are unconstitutional under the California Contracts Clause.

76.    Plaintiff desires an immediate declaration of its rights arising out of all the facts and circumstances alleged herein and the concomitant obligations of its tenants to pay rent.  Such declaration is necessary and appropriate at this time inasmuch as Plaintiff's members are being irreparably injured and will continue to suffer irreparable injury in the form of lost constitutional rights, and loss of use of their properties until a declaration of their rights is made.

77.    Additionally, unless the City is enjoined and restrained from enforcing or threatening to enforce the City's Ordinances, Plaintiff's members will be irreparably injured.  Plaintiff's members will be deprived of rights guaranteed under the California Constitution, and will continue to suffer substantial loss of rents and profits, the nature and extent of which will be extremely difficult or impossible to ascertain.  Plaintiff's members have no adequate remedy at law to prevent or redress the irreparable injury alleged herein.

### THIRD CLAIM FOR RELIEF

**Violation of the Takings Clause of the Fifth Amendment**

**to the United States Constitution/42 U.S.C. § 1983**

***(By Plaintiff against All Defendants)***

78.    Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

79.    The Takings Clause, present in the Fifth Amendment to the United States Constitution, provides that private property shall not "be taken for public use, without just compensation."   U.S. Const., amend. V; *see also* Cal. Const., Art. I, § 9(a) ("[p]rivate property may be taken or damaged for a public use . . . only when just compensation . . . has first been paid to . . . the owner.").

80.    The purpose of the Takings Clause is to "bar [] Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Lingle v. Chevron Corp.*, 544 U.S. 528, 537 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).  Government action may violate the Takings Clause where it is "the functional [] equivalent [of] the classic taking in which government directly appropriates private property or ousts the owner from his domain."  *Id*. At 539.

81.    The United States Supreme Court has repeatedly acknowledged that takings liability under the Fifth Amendment to the United States Constitution may be redressed under 42 U.S.C. § 1983.

82.    The Ordinances in this case fall squarely within the "physical occupation" line of cases the United States Supreme Court has held constitute "per se" categorical takings for which the government is required to pay "just compensation."   The Ordinances force property owners and lessors to accept the occupation of tenants without any payment of rent concurrent with the occupancies. While the Ordinances purport to allow owners to recover rent from such individuals

at some point in the future, they do nothing to protect property owners from losses they will undoubtedly sustain when such tenants are unable to pay their rental obligations in the future or to compensate property owners for the rent they could have obtained from new paying tenants if the City did not indefinitely ban evictions. The City has thus eliminated the property owners' fundamental constitutional right to exclude nonpaying tenants from their respective properties. As Justice Thurgood Marshall proclaimed in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 436 (1982), "property law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property" and "[t]o require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury." As the Supreme Court acknowledged, "our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal impact on the owner." *Id.* at 435.

83. The Ordinances also constitute a taking under the "ad hoc" test embodied in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). To determine whether a particular governmental action rises to this level, courts weigh (1) "the economic impact of the regulation;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the 'character of the governmental action' – for instance, the action amounts to a physical invasion or instead merely affects property interest through 'some program adjusting the benefits and burdens of economic life to promote the common good.'" *Lingle, supra,* 544 U.S. at 537 (quoting *Penn Central Transp. Co., supra,*, 438 U.S. at 124). This three-part inquiry is "essentially ad hoc," but "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle, supra,* 544 U.S. at 540.

84. The Ordinances and the enforcement thereof have caused both a complete and total regulatory and physical taking of Plaintiff's members' properties

without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

85.    First, the economic impact of the Ordinances is severe and ruinous to property owners and/or landlords, such as Plaintiff's members, who are contractually entitled to receive rent from their tenants on a monthly basis and cannot long survive if tenants are permitted to continue occupying the properties rent-free for a sustained and indefinite period of time.

86.    Second, the Ordinances undermine the "reasonable investment-backed expectations" of property owners and/or landlords, like Plaintiff's members, who purchased these properties and got into business with the "objectively reasonable" expectation that they would be able to charge rent for their units and have legal recourse if the renters failed to pay rent. *See Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 634-35 (9th Cir. 2020) (distinct investment-backed expectations must be "objectively reasonable" and "unilateral expectation[s]'or 'abstract need[s]' cannot form the basis of a claim that the government has interfered with property rights.")  In fact, Plaintiff's members made their business investments against the backdrop of a decades-old statutory scheme designed to resolve disputes between owners and tenants who do not pay rent. *Cf. Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc).

87.    Further, while the Eviction Moratorium theoretically allows property owners to eventually try to collect the rent deferred under the ordinance, it does not allow any interest or late fees to be charged on such rent, thereby depriving property owners of their constitutional right to the time value of their money.  In reality, practical implications are much more severe, both because: (1) the odds of actually recovering many months of back rent from tenants a year after the fact are extremely low; and (2) many property owners will lose their property as a result of their inability to pay their mortgages and property taxes due to non-payment of rent.

88.    Additionally, where the effect of the City's Rent Freeze Ordinance

would necessarily be to lower rents more than could reasonably be considered to be required for the Ordinance's stated purpose, such Ordinance is unconstitutionally confiscatory. *Birkenfeld, supra,* 17 Cal.3d at 165 (citing *Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585-586 (1942).  Here, the effect of the City's Rent Freeze Ordinance is confiscatory as tenants may never be able to repay back rent, nor are they obligated to repay interest or late fees that would have otherwise accrued.

89.     Finally, the "character of governmental action" constitutes a clear physical invasion of private property.  *Lingle, supra,* 544 U.S. at 537.  After all, the Ordinances would effectively require Plaintiff's members to allow their tenants to continue to occupy the properties free of charge *and* requires Plaintiff's members to allow their tenants to remain there for the foreseeable future.

90.     At a minimum, the effect of the Ordinances constitutes a taking under the *Penn-Central* three-factor test.  *Penn Central Trans. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  As a result, the City's blatant violation of the Takings Clause of the Fifth Amendment has caused proximate and legal harm to Plaintiff's members.

91.     Plaintiff and its members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the City is enjoined from implementing and enforcing the Eviction Moratorium.

92.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Eviction Moratorium.

93.     Plaintiff found it necessary to engage the services of private counsel to vindicate the rights of its members under the law.  Plaintiff is therefore entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**

**Violation of the Takings Clause of**

**the California Constitution**

**(Cal. Const. Art. 1, § 19)**

***(By Plaintiff against all Defendants)***

94.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

95.     Article I, Section 19 of the California Constitution provides, in pertinent part:

> Article I, Section 19:
>
> Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner.  The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings from deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.

96.     California courts have routinely held that the California Constitution provides just compensation to property owners when their land is taken for public use because the law seeks to bar the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *Jefferson Street Ventures, LLC v. City of Indio*, 236 Cal.App.4th 1175 (2015).

97.     Moreover, the principle behind the concept of just compensation for property taken for public use is to put the owner in as good a position pecuniarily as he or she would have occupied if his or her property had not been taken.  *City of Carlsbad v. Rudvalis*, 109 Cal.App.4th 667 (2003).

98.    Finally, the constitutional guarantee of just compensation for property taken by the government is not only intended to protect the landowner (or business owner), but it also protects the public by limiting its liability to losses that can fairly be attributed to the taking.  *Emeryville Redevelopment v. Harcros Pigments, Inc.* 101 Cal.App.4th 1083 (2002).

99.    Prohibiting Plaintiff's members from rightfully collecting rent from their tenants in the State of California, in exchange for the tenants' lawful possession of Plaintiff's properties, despite other compliance measures being taken to satisfy the public health interests at stake and to financially compensate those affected by COVID-19, violates Plaintiff's fundamental Constitutional rights.

100.   Plaintiff and its members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the City is enjoined from implementing and enforcing the Eviction Moratorium.

101.   Plaintiff has found it necessary to engage the services of private counsel to vindicate its rights under the law.  Plaintiff is therefore entitled to an award of attorney's fees and costs pursuant to California Code of Civil Procedure §§ 1021.5 and 1036.

## FIFTH CLAIM FOR RELIEF

### Violation of the Due Process Clause of

### the Fourteenth Amendment/42 U.S.C. § 1983

### (*By Plaintiff against All Defendants*)

102.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

103.   The Due Process Claus of the Fourteenth Amendment to the United States Constitutions stands as an additional constitutional hurdle to the City's enactment of the Ordinances.  The Due Process Clause "provides heightened

protection against government interference with certain fundamental rights and liberty interests," including the "specific freedoms protected by the Bill of Rights" and "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'" such as property rights. *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (quoting *Moore V. E.* Cleveland, 431 U.S. 494, 502 (1977)). Thus while the "police power" of the government may be broad, it "must be exercised within a limited ambit and is subordinate to constitutional limitations." *Panhandle E. Pipe Line Co. v. St. Highway Comm'n of* Kansas, 294 U.S. 613, 622 (1935).

104. The City's police power therefore does not afford "unrestricted authority to accomplish whatever the public may presently desire." *Panhandle E. Pipe Line Co. v. St. Highway Comm'n of* Kansas, 294 U.S. 613, 622 (1935). Instead, "[i]t is the governmental power of self-protection and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury." *Id.*

105. Therefore, "a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle, supra,* 544 U.S. at 542; *Rea v. Matteucci*, 121 F.3d 483, 485 (9th Cir. 1997) (under Due Process Clause a "federal interest remains in protecting the individual citizen from state action that is wholly arbitrary or irrational"). Furthermore, a law violates the Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that is authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).

106. The Ordinances and enforcement thereof, violate Plaintiff's members' substantive due process rights secured by the Fourteenth Amendment to the U.S. Constitution. Under the Due Process Clause of the Fourteenth Amendment, no State

1  shall "deprive any person of life, liberty, or property, without due process of law."
2  The fundamental liberties protected by this Clause include most of the rights
3  enumerated in the Bill of Rights. *Duncan v. Louisiana*, 391 U.S. 145, 147-149 (1968).
4  In addition, these liberties extend to certain personal choices central to individual
5  dignity and autonomy, including intimate choices that define personal identity and
6  beliefs. *See, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Grisworld v.*
7  *Connecticut*, 381 U.S. 479, 484-486 (1965).

8      107.   The Ordinances, which expressly deprive Plaintiff's members' of their
9  rights and liberties in the use of their properties, did not afford Plaintiff's members
10  with a constitutionally adequate hearing to present their case to disallow the Eviction
11  Moratorium and Rent Freeze Ordinance, and specifically the unreasonable prohibition
12  on the collection of rent and termination of rightful eviction processes.  As a result of
13  the Ordinances, Plaintiff's members are unjustifiably prevented from being able to
14  rightfully use their properties and mitigate damages where tenants fail to pay rent.  At
15  a minimum, Plaintiff avers that its members should be able to continue to collect rent
16  from those tenants that are able to pay even a reasonable portion of the total amount
17  of rent due and owing, and should be allowed a forum to contest a tenant's claim
18  concerning qualifications for protections under the Ordinances. *Home Bldg. & Loan*
19  *Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934).

20      108.   Moreover, where a rent control law, such as the City's Rent Freeze
21  Ordinance, produces unreasonable delay or unnecessarily cumbersome procedural
22  requirements for obtaining approval of a rent increase, such law violates the landlord's
23  procedure due process rights.  *Birkenfeld, supra,* 17 Cal.App.3d at 169-173 ["[R]ent
24  adjustment mechanisms must operate without a substantially greater incidence and
25  degree of delay than is practically necessary."]; see also *Galland v. City of Clovis*, 24
26  Cal.4th 1003, 1039 (2001).  The City's Rent Freeze Ordinance is not set to expire
27  until a **full year** after the end of the local emergency, a prime example of unreasonable
28  and unconstitutional delay.

109.   The City failed to comply with the procedural and substantive requirements of the United States Constitution in connection with Plaintiff's members' rights and liberties as they relate to their respective properties, which would have given Plaintiff and its members a meaningful opportunity to respond to the proposed ordinances and explain how and why they were so deeply flawed and unconstitutional.

110.   Because the City's decision in issuing the Eviction Moratorium and Rent Freeze Ordinance was made in reliance on procedurally deficient and substantively unlawful processes, Plaintiff's members were directly and proximately deprived of the rightful use of their properties, and consequently, their ability to lawfully operate their properties without unconstitutional government overreach.

111.   Because the City's decisions were made without regard to the United States and California Constitutions, or any "law" for that matter, Plaintiff's members were directly and proximately deprived of their property rights absent substantive due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

112.   Plaintiff and its members have no adequate remedy at law and will suffer continued serious and irreparable harm to their constitutional rights unless the City is enjoined from implementing and enforcing the Eviction Moratorium and Rent Freeze Ordinances.

113.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Ordinances.

114.   Plaintiff found it necessary to engage the services of private counsel to vindicate its rights under the law. Plaintiff is therefore entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988.

## SIXTH CLAIM FOR RELIEF

### Preemption by State Law

### (*By Plaintiff against All Defendants*)

115.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

116.   A city ordinance "will not be given effect to the extent that it conflicts with general laws either directly or by entering a field which general laws are intended to occupy to the exclusion of municipal regulation." *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 140 (1976).   A conflict "exists if the local legislation 'duplicates, contradicts, or enters an area fully occupied by general law either expressly or by legislative implication.'" *Candid Enters., Inc. v. Grossmont Union High Sch. Dist.*, 39 Cal.3d 878, 885 (1985).  That is precisely the case here.

117.   When a California statutory scheme so comprehensively regulates a subject, as here, there is no room for supplementation or alteration by cities – let alone an abolition of rights and remedies as the Eviction Moratorium threatens.  Cal. Const., Art. XI, § 7; *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal.4th 893, 897 (1993); *Big Creek Lumber Co. v. City of Santa Cruz*, 38 Cal.4th 1139, 1166 (2006); *Water Quality Assn. v. City of Santa Barbara* 44 Cal.App.4th 732, 741 (1996).

118.   California's unlawful detainer statutes (Code of Civil Procedure sections 1159 though 1179a) are designed to "provide landlords with a summary procedure for exercising their rights of repossession against tenants" and fully occupy the field with respect to that procedure.  *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 151 (1976).  Thus, any ordinance that raises "procedural barriers between the landlord and the judicial proceeding" is preempted.  *Id*. at 151.

119.   While Executive Order No. N-28-20 purported to suspend provisions of state law that would "preempt or otherwise restrict a local government's exercise of its police power to impose substantive limits on residential or commercial evictions,"

it was expressly limited to circumstances where a tenant is unable to pay rent due to a documented substantial decrease in income or substantial increase in medical expenses as a result of the Pandemic.  The Eviction Moratorium goes far beyond what was contemplated by the executive order in numerous respects, and imposes procedural and substantive limitations on the unlawful detainer process that are not permitted under the order.  As such, the Eviction Moratorium is preempted by the unlawful detainer statutes and Executive Order No. N-28-20.

120.   In addition, in prohibiting property owners from serving eviction notices and/or filing unlawful detainer actions in various circumstances—and providing for penalties against owners who make such communications—the Eviction Moratorium conflicts with the litigation privilege set forth in California Civil Code section 47.  *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1249-52 (2007).  The Eviction Moratorium is thus preempted by multiple provisions of state law.

### SEVENTH CLAIM FOR RELIEF

**Violation of the Tenth Amendment**

**to the United States Constitution**

**(*By Plaintiff against All Defendants*)**

121.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

122.   The California Supreme Court has found that "While the police power is very broad in concept, it is ***not within restrictions*** in relation to the taking of damaging of property.  When it passes ***beyond proper bounds in its invasion of property rights***, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation."  *House v. Los Angeles County Flood Control Dist.*, 25 Cal.3d 384 (1944) (Emphasis added).

123.   In this case, the City mandated that property owners allow tenants to

continue to occupy rental units without paying rent, and without providing any mechanism for owners to be made whole.  Such a mandate completely and unconstitutionally deprived Plaintiff's members of all economically beneficial use of their properties without just compensation.

124.  A government's "police power" is restricted by Constitutional considerations, including the Fifth Amendment's "Takings Clause," as well as the Due Process and Equal Protection Clauses.  The California Constitution requires that a municipality's exercise of its police power must bear a "reasonable relation to the public welfare." *Associated Home Builders etc., Inc. v. City of Livermore*, 18 Cal.3d 582, 604–605 (1976).  The ordinance must have a real and substantial relation to the public welfare," and "[t]here must be a reasonable basis in fact, not in fancy, to support the legislative determination." *Id*. at 609.

125.  The Ordinances go beyond a legitimate exercise of police power in numerous respects.  For example, the Eviction Moratorium bars evictions that are necessary to maintain the public welfare, including evictions for lease breaches that have nothing to do with the Pandemic—like unauthorized occupants and pets.  It likewise bans evictions for other unspecified "nuisance related to COVID."  Thus, landlords are prohibited from taking necessary actions to stop nuisances if such measures are "related to COVID."  These restrictions not only prevent owners from protecting their own property, but from protecting their other tenants from such nuisance, thus harming, rather than promoting, the public welfare.

126.  Additionally, the City's Rent Freeze Ordinance falls outside the bounds of a legitimate exercise of police power, since it is not reasonably calculated to relieve excessive rents while simultaneously providing landlords with just and reasonable return on their property. *Birkenfeld, supra,* 17 Cal.3d at 165 (citing *Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585-586 (1942).  Here, Plaintiff's members are not provided any returns on their property for as long as the Ordinances remain in effect.  Where such provisions would necessarily lower rent more than

could be reasonably considered to be required, they are unconstitutionally confiscatory. *Id.*

127. Likewise, as described above, numerous other provisions of the Ordinances are not tailored to further a legitimate public purpose and will harm the public welfare. As such, they are not proper exercises of the police power.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff requests that this Court:

1. Issue a declaratory judgment that the City's Ordinances are null and void, and of no effect, as:

    a.    unconstitutional under the Fifth Amendment;

    b.    unconstitutional under the Fourteenth Amendment;

    c.    arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the United States and/or California Constitutions as violative of the Contracts Clauses of Article I, Section 10 and Article I, Section 9 of the United States and California Constitutions;

    d.    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in violation of the United States and/or California Constitutions;

    e.    wholly preempted by State law;

    f.    a violation of 42 U.S.C. § 1983 as a deprivation of Plaintiff's members' rights, privileges, and immunities secured by the United States Constitution and/or laws of the United States.

2. Set aside and hold unlawful the City's Ordinances;

3. Permanently enjoin the City and all persons and entities in active concert or participation with the City from implementing and enforcing the City's Ordinances;

4. Issue a preliminary injunction preventing the City from enforcing or

implementing the Ordinances until this Court decides the merits of this lawsuit;

5. Permanently enjoin the City and all persons and entities in active concert or participation with the City from enforcing the Ordinances unless the ordinance is issued in accordance with all procedural and substantive due process requirements of the United States Constitution;

6. Award Plaintiff damages arising out of its Section 1983 Claims, and specifically under the Fourteenth Amendment and the Fifth Amendment of the United States Constitution, and Article I, Section 19 of the California Constitution's Takings Clause(s);

7. Award Plaintiff at least nominal damages;

8. Award Plaintiff its costs and reasonable attorney's fees incurred in this action pursuant to 42 U.S.C. § 1988 and other applicable law; and

9. Grant all other such relief to Plaintiff as the Court may deem proper and just.

Dated: June 11, 2020

RUTAN & TUCKER, LLP
DOUGLAS J. DENNINGTON
JOHN A. RAMIREZ
PETER J. HOWELL
KELSEY E. QUIST

By: _____ s/ Douglas J. Dennington _____
Douglas J. Dennington
Attorneys for Plaintiff
Apartment Association of Greater Los Angeles

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a jury trial as to all claims and causes for which a

3

jury trial is available.

4

5

Dated:  June 11, 2020

RUTAN & TUCKER, LLP

6

DOUGLAS J. DENNINGTON
JOHN A. RAMIREZ
PETER J. HOWELL

7

KELSEY E. QUIST

8

By:＿＿＿＿/s/ Douglas J. Dennington＿＿＿＿

9

Douglas J. Dennington
Attorneys for Plaintiff

10

APARTMENT ASSOCIATION OF
GREATER LOS ANGELES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND REQUEST FOR
PRELIMINARY INJUNCTION