KATHRYN A. EIDMANN (268053)
keidmann@publiccounsel.org
FAIZAH MALIK (320479)
fmalik@publiccounsel.org
GIGI LAM (284233)
glam@publiccounsel.org
ALISA RANDELL (293490)
arandell@publiccounsel.org
LAUREN ZACK (321497)
lzack@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:   (213) 385-2977
Facsimile:    (213) 385-9089

NISHA N. VYAS (228922)
nvyas@wclp.org
MATTHEW WARREN (305422)
mwarren@wclp.org
RICHARD ROTHSCHILD (67356)
rrothschild@wclp.org
WESTERN CENTER ON LAW AND
POVERTY
3701 Wilshire Blvd. #208
Los Angeles, California 90010
Telephone:   (213) 487-7211
Facsimile:    (213) 487-0242

MICHAEL RAWSON (95868)
mrawson@pilpca.org
CRAIG CASTELLANET (176054)
ccastellanet@pilpca.org
PUBLIC INTEREST LAW PROJECT
449 15th Street #301
Oakland, California 94612
Telephone:   (510) 891-9794
Facsimile:    (510) 891-9727

Attorneys for Intervenor-Defendants, ALLIANCE OF CALIFORNIANS FOR
COMMUNITY EMPOWERMENT ACTION and STRATEGIC ACTIONS FOR A
JUST ECONOMY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APARTMENT ASSOCIATION OF LOS ANGELES COUNTY, INC., dba "APARTMENT ASSOCIATION OF GREATER LOS ANGELES,"<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES; ERIC GARCETTI, in his official capacity as Mayor of Los Angeles; and CITY COUNCIL OF THE CITY OF LOS ANGELES, in its official capacity; DOES 1 through 25, inclusive, Defendants. | Case No. 2:20-cv-05193-DDP-JEM<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE AS DEFENDANTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Date: August 3, 2020**<br>**Courtroom: 9C, 9th Floor**<br>**Judge: Hon. Dean D. Pregerson** |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 3, 2020 or as soon thereafter as they may be heard in Courtroom 9C of the above-entitled court, located at 350 West 1st Street, Los Angeles, California 90012, the Alliance of Californians for Community Empowerment Action ("ACCE" or "ACCE Action") and Strategic Actions for a Just Economy ("SAJE") (collectively "Proposed Intervenors") will move this Court for entry of an order permitting Proposed Intervenors to intervene as a matter of right in the above-captioned matter for the purpose of defending the rights of low-income tenants under Ordinance No. 186585, amended by Ordinance No. 186606, and Ordinance No. 186607 (collectively the "Ordinances") adopted by the City Council of the City of Los Angeles to prevent mass displacement, homelessness, and greater endangerment to public health posed by the COVID-19 pandemic.

This motion is made pursuant to Federal Rules of Civil Procedure Rule 24(a)(2) for intervention of right on the grounds that 1) this motion is timely, 2) Proposed Intervenors claim a significant protectable interest relating to the subject of the action, 3) disposition of the action may impair or impede Proposed Intervenors' ability to protect their interests, and 4) the existing parties do not adequately represent the Proposed Intervenors' interests.

In the alternative, Proposed Intervenors seek permissive intervention pursuant to Federal Rules of Civil Procedure Rule 24(b)(1)(B) on the grounds that 1) Proposed Intervenors have a claim or defense that shares with the main action a common question of law or fact, 2) there exist independent grounds for jurisdiction, and 3) this motion is timely.

This motion is based upon this Notice of Motion; the supporting Memorandum of Points and Authorities; the supporting declarations of directors of Proposed Intervenors Joseph Delgado (Ex. A – hereinafter Delgado Decl.) and Cynthia Strathmann (Ex. B – hereinafter Strathmann Decl.); the supporting expert declaration of Dr. Ranit Mishori (Ex. C – hereinafter Mishori Decl.); the supporting declaration

of tenant David D. (Ex. D – hereinafter David D. Decl.); the supporting declaration of Proposed Intervenors' counsel Kathryn Eidmann (Ex. E – hereinafter Eidmann Decl.); all documents and pleadings on file in this action; and such other oral and documentary evidence and argument as may be presented at the hearing on this motion.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on June 24, 2020 with Plaintiff's counsel and June 19, 2020 with Defendants' counsel. Eidmann Decl. at ¶¶ 2–3. Defendants do not oppose this motion. Eidmann Decl. at ¶ 3.

NOTICE OF MOTION AND MOTION TO INTERVENE

Dated: July 1, 2020

PUBLIC COUNSEL

By: */s/ Kathryn Eidmann*
    Kathryn Eidmann
    Faizah Malik
    Gigi Lam
    Alisa Randell
    Lauren Zack
    610 S. Ardmore Avenue
    Los Angeles, California 90005
    Telephone: (213) 385-2977
    Facsimile:  (213) 385-9089
    Email: keidmann@publiccounsel.org
        fmalik@publiccounsel.org
        glam@publiccounsel.org
        arandell@publiccounsel.org
        lzack@publiccounsel.org

WESTERN CENTER ON LAW AND POVERTY

By: */s/ Nisha Vyas*
    Nisha Vyas
    Matthew Warren
    Richard Rothschild
    3701 Wilshire Blvd. #208
    Los Angeles, CA 90010
    Telephone:  (213) 487-7211
    Facsimile:   (213) 487-0242
    Email: nvyas@wclp.org
        mwarren@wclp.org
        rrothschild@wclp.org

PUBLIC INTEREST LAW CENTER

By: */s/ Michael Rawson*
    Michael Rawson
    Craig Castellanet
    449 15th Street #301
    Oakland, California 94612

NOTICE OF MOTION AND MOTION TO INTERVENE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone:      (510) 891-9794
Facsimile:       (510) 891-9727
Email: mrawson@pilpca.org
              ccastellanet@pilpca.org

Attorneys for Intervenor-Defendants,
ALLIANCE OF CALIFORNIANS FOR
COMMUNITY EMPOWERMENT ACTION
and STRATEGIC ACTIONS FOR A JUST
ECONOMY

NOTICE OF MOTION AND MOTION TO INTERVENE

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................... 1

II.    FACTS ...................................................................................................... 2

    A.    The COVID-19 Pandemic Disproportionately Impacts the
        Unhoused and Housing Unstable. ................................................... 2

    B.    The City Enacted the Ordinances to Prevent Further
        Homelessness and Housing Instability in the Face of the
        COVID-19 Pandemic. ..................................................................... 3

    C.    Plaintiffs Seek to Void Lawful and Necessary Protections for
        Tenants. ......................................................................................... 11

    D.    Proposed Intervenors Represent Los Angeles's Most Vulnerable
        Tenants. ......................................................................................... 13

III.   ARGUMENT ......................................................................................... 15

    A.    Proposed Intervenors Are Entitled To Intervene as a Matter of
        Right. ............................................................................................. 15

        1.    The Motion Is Timely. ....................................................... 16

        2.    Intervenors Have a Significant Protectable Interest. ........ 17

        3.    A Judgment for Plaintiff Would Impair Intervenors'
            Ability to Protect Their Interest. ........................................ 18

        4.    The Parties Do Not Adequately Represent Prospective
            Intervenors' Interests. ........................................................ 19

    B.    Proposed Intervenors Meet the Standards for Permissive
        Intervention. ................................................................................. 20

IV.    CONCLUSION ..................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arakaki v. Cayetano*,
   324 F.3d 1078 (9th Cir. 2003) ........................................................... 19

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
   966 F.2d 470 (9th Cir. 1992) ............................................................. 16

*California v. Tahoe Reg'l Planning Agency*,
   792 F.2d 775 (9th Cir.1986) .............................................................. 19

*Citizens for Balanced Use v. Montana Wilderness Ass'n*,
   647 F.3d 893 (9th Cir. 2011) ........................................................ 16, 19

*Donnelly v. Glickman*,
   159 F.3d 405 (9th Cir. 1998) ........................................................ 17, 20

*Forest Conservation Council v. U.S. Forest Serv.*,
   66 F.3d 1489 (9th Cir. 1995) (abrogated on other grounds) ............... 15

*Freedom from Religion Found., Inc. v. Geithner*,
   644 F.3d 836 (9th Cir. 2011) ............................................................. 20

*Fresno Cty. v. Andrus*,
   622 F.2d 436 (9th Cir. 1980) ............................................................. 17

*League of United Latin Am. Citizens v. Wilson*,
   131 F.3d 1297 (9th Cir. 1997) ........................................................... 16

*California ex rel. Lockyer v. United States*,
   450 F.3d 436 (9th Cir. 2006) ........................................................ 17, 18

*In re Lopez-Soto*,
   764 F.2d 23 (1st Cir. 1985) ............................................................... 17

*Nw. Forest Res. Council v. Glickman*,
   82 F.3d 825 (9th Cir. 1996) ............................................................... 16

*Orange Cty. v. Air California*,
   799 F.2d 535 (9th Cir. 1986) ............................................................. 20

*Presidio Golf Club v. Nat'l Park Serv.*,
    155 F.3d 1153 (9th Cir. 1998) ......................................................... 21

*Smith v. Pac. Properties & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ......................................................... 21

*Sw. Ctr. for Biological Diversity v. Berg*,
    268 F.3d 810 (9th Cir. 2001) .............................................. 15, 17, 18

*United States v. City of Los Angeles*,
    288 F.3d 391 (9th Cir. 2002) ..................................................*passim*

*W. States Trucking Ass'n v School*,
    No. 2:18-cv-1989-MCE-KJN, 2018 U.S. Dist. LEXIS 193481 (E.D.
    Cal. Nov. 13, 2018) .......................................................................... 16

*Washington State Bldg. & Const. Trades Council, AFL-CIO v.*
    *Spellman*,
    684 F.2d 627 (9th Cir. 1982) ........................................................... 19

**Statutes**

Cal. Gov. Code § 8630 ........................................................................... 10

CARES Act, Pub. L. No. 116-136 (2020) § 4022 .................................. 13

**Ordinances**

Ordinance No. 186607, CITY OF LOS ANGELES (May 6, 2020) ............... 1, 7, 9

Ordinance No. 186585, CITY OF LOS ANGELES (May 27, 2020) .......*passim*

Ordinance No. 186606, CITY OF LOS ANGELES (May 6, 2020) .......... 1, 7, 8, 10

Ordinance No. 20-0377, CITY OF OAKLAND (May 19, 2020) .................... 9

Rent Stabilization Ordinance, CITY OF LOS ANGELES ................................ 9

**Rules**

Fed. R. Civ. P.  24 ...................................................... 15, 18, 20, 21

Local Rule 7-3 .......................................................................... 16

**Other Authorities**

*The 2018 Annual Homeless Assessment Report (AHAR) to Congress*,
    THE U.S. DEP'T OF HOUS. AND URBAN DEV. 20 (December 2018).
    https://www.novoco.com/sites/default/files/atoms/files/hud_ahar_2
    018_121718.pdf ............................................................... 10

Alissa Anderson & Aureo Mesquita, *California Industries Hit Hardest
    by COVID-19 Economic Shutdown*, CAL. BUDGET AND POLICY CTR.
    (March 2020), https://calbudgetcenter.org/resources/covid19-
    industries-hit-hardest ........................................................ 6

Aurand, A *et al.*, *NLIHC Research Note: The Need for Emergency
    Rental Assistance During the COVID-19 and Economic Crisis* ................. 4, 12

Blasi, G., *UD Day: Impending Evictions and Homelessness in Los
    Angeles*, UCLA LUSKIN INST. ON INEQUALITY AND DEMOCRACY 7
    (May 28, 2020) ............................................................. 5, 18

COAL. 2–3 (April 3, 2020), https://nlihc.org/sites/default/files/Need-
    for-Rental-Assistance-During-the-COVID-19-and-Economic-
    Crisis.pdf ...................................................................... 5

*Communication from Public*,
    http://clkrep.lacity.org/onlinedocs/2020/20-0147-S19_PC_AB_03-
    26-2020.pdf ................................................................... 10

*COVID-19 in Los Angeles County*, CITY OF L.A. PUBLIC HEALTH (June
    30, 2020) http://publichealth.lacounty.gov/media/Coronavirus .............. 2

*COVID-19 Statewide Update*, STATE OF CAL. (June 30, 2020),
    https://update.covid19.ca.gov ............................................... 2

Daniel Flaming *et al.*, *Escape Routes: Meta-Analysis of Homelessness
    in L.A.*, ECONOMIC ROUNDTABLE (April 24, 2018),
    https://economicrt.org/publication/escape-routes ........................... 4

Desmond, M. & Kimbro, R, *Eviction's Fallout: Housing, Hardship,
    and Health*, SOC. FORCES 1—30 at 2 (February 24, 2015) .................... 4

Emily Guerin, *Which LA Industries Have Been Hardest Hit by
    Coronavirus?*, LAIST (May 29, 2020),
    https://laist.com/latest/post/20200529/coronavirus-jobs-los-angeles ....... 6

Esmeralda Bermudez, *As Demand for Food Skyrockets due to Coronavirus, Food Banks Play Catch Up* ...................................................... 6

Executive Order N-29-20, EXECUTIVE DEP'T STATE OF CALIFORNIA (March 16, 2020) ........................................................................................... 7

Executive Order N-33-20, EXECUTIVE DEP'T STATE OF CALIFORNIA (March 19, 2020) ........................................................................................... 2

Fifth Revised First Supplement to the Executive Order of the Director of Emergency Services Declaring the Existence of a Local Emergency, CITY OF SANTA MONICA (June 17, 2020) .......................................... 9

Gale Holland, *Racism is the Reason Black People are Disproportionately Homeless in L.A., Report Shows*, L.A. TIMES (June 12, 2020), https://www.latimes.com/california/story/2020-06-12/racism-making-more-black-people-la-homeless ............................................... 5

*Governor Gavin Newsom Announces Major Financial Relief Package: 90-Day Mortgage Payment Relief During COVID-19 Crisis*, OFFICE OF GOVERNOR GAVIN NEWSOM (March 25, 2020), https://www.gov.ca.gov/2020/03/25/governor-gavin-newsom-announces-major-financial-relief-package-90-day-mortgage-payment-relief-during-covid-19-crisis ................................................ 13

Governor's Executive Order N-28-20 ......................................................... 7

*2020 Greater Los Angeles Homeless Count Results*, LOS ANGELES HOMELESS SERVICES AUTHORITY (June 12, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results .......................................................................... 3

*2020 Homeless Count Results Key Messages*, LOS ANGELES HOMELESS SERVS. AUTH. 1, https://www.lahsa.org/documents?id=4561-2020-homeless-count-key-messages .................................................................. 5

*Housing Table 2b. Confidence in Ability to Make Next Month's Payment for Renter-Occupied Housing Units, by Select Characteristics: California*, U.S. CENSUS BUREAU, https://www.census.gov/data/tables/2020/demo/hhp/hhp7.html .......................... 5

Inglis, A. & Preston, D., *California Evictions Are Fast and Frequent*,
TENANTS TOGETHER: CALIFORNIA'S STATEWIDE ORG. for
RENTERS' RIGHTS 6 (May 2018),
https://www.tenantstogether.org/sites/tenantstogether.org/files/CA_
Evictions_are_Fast_and_Frequent.pdf .................................................. 4

Jaclyn Cosgrove, *Less than Half of L.A. County Residents Still Have
Jobs Amid Coronavirus Crisis*, L.A. TIMES (April 17, 2020),
https://www.latimes.com/california/story/2020-04-17/usc-
coronavirus-survey. ............................................................................... 6

Kim Parker *et al.*, *About Half of Lower-Income Americans Report
Household Job or Wage Loss Due to COVID-19*, PEW RESEARCH
CTR. (April 21, 2020),
https://www.pewsocialtrends.org/2020/04/21/about-half-of-lower-
income-americans-report-household-job-or-wage-loss-due-to-
covid-19. ............................................................................................... 6

*L.A. Rent Rose 65% Over Last Decade, Study Shows*, L.A. TIMES (Dec.
27, 2019), https://www.latimes.com/business/real-
estate/story/2019-12-27/l-a-rent-rose-65-percent-over-the-last-
decade-study-shows. ............................................................................. 4

L.A. TIMES (June 19, 2020),
https://www.latimes.com/business/story/2020-06-19/coronavirus-
unemployment-california-jobs-may ....................................................... 6

L.A. TIMES (May 9, 2020),
https://www.latimes.com/california/story/2020-05-09/as-demand-
for-food-skyrockets-due-to-coronavirus-food-banks-play-catch-up .................... 6

Laura Grace Tarpley, *29 Banks That May Help You With Your
Mortgage Payments during the COVID-19 Outbreak*, BUS. INSIDER
(May 15, 2020), https://www.businessinsider.com/personal-
finance/banks-help-with-mortgage-payments-coronavirus-2020-4 ................... 13

*Los Angeles County 2020 Affordable Housing Needs Report*, CAL.
HOUS. P'SHIP CORP. 1 (May 2020), https://chpc.net/resources/los-
angeles-county-housing-need-report-2020 ............................................. 4

*Los Angeles County Annual Affordable Housing Outcomes Report*,
  CAL. HOUS. P'SHIP CORP. 4 (April 30, 2018),
  https://1p08d91kd0c03rlxhmhtydpr-wpengine.netdna-ssl.com/wp-
  content/uploads/2018/06/Full-LA-County-Outcomes-Report-with-
  Appendices.pdf ................................................................................. 4

Margot Roosevelt, *Despite Gradual Reopening, California's
  Unemployment Rate Remains Stagnant*, L.A. TIMES (June 19,
  2020), https://www.latimes.com/business/story/2020-06-
  19/coronavirus-unemployment-california-jobs-may ............................ 6

NMHC Rent Payment Tracker, NAT'L MULTIFAMILY HOUS. COUNCIL
  (June 27, 2020), https://www.nmhc.org/research-insight/nmhc-rent-
  payment-tracker ................................................................................. 6

Paul Ong, *et al.*, *Left Behind During a Global Pandemic: An Analysis
  of Los Angeles County Neighborhoods at Risk of Not Receiving
  COVID-19 Individual Rebates under the CARES Act*, UCLA CTR.
  FOR NEIGHBORHOOD KNOWLEDGE 3 (April 13, 2020) ...................... 12

*Report and Recommendations of the Ad Hoc Committee on Black
  People Experiencing Homelessness*, LOS ANGELES HOMELESS
  SERVS. AUTH. 19–20, 24 (December 2018) ........................................ 5

*Report from City Attorney (R20-0121)* (April 28, 2020),
  http://clkrep.lacity.org/onlinedocs/2020/20-0147-
  S19_rpt_ATTY_04-28-2020.pdf ........................................................ 8

*Statewide Update*, STATE OF CAL. (June 30, 2020),
  https://update.covid19.ca.gov ............................................................. 2

Twelfth Supplement to Mayoral Proclamation Declaring the Existence
  of a Local Emergency Dated February 25, 2020, OFFICE OF THE
  MAYOR SAN FRANCISCO (April 30, 2020) ........................................... 9

*Tracking the Coronavirus in California*, L.A. TIMES (June 30, 2020),
  https://www.latimes.com/projects/california-coronavirus-cases-
  tracking-outbreak ................................................................................ 2

*Tracking the Coronavirus in California*, L.A. TIMES (June 30, 2020),
  https://www.latimes.com/projects/california-coronavirus-cases-
  tracking-outbreak ................................................................................ 2

NOTICE OF MOTION AND MOTION TO INTERVENE

U.S. Const. amend. X .................................................................. 11

U.S. Const. art. III...................................................................... 21

U.S. Const. Due Process Clause ................................................. 11

Will Parker & Konrad Putzier, *Landlords Were Never Meant to Get Bailout Funding. Many Got It Anyway.*, WALL ST. J. (May 26, 2020), https://www.wsj.com/articles/landlords-were-never-meant-to-get-bailout-funds-many-got-it-anyway-11590494400.................................. 12

NOTICE OF MOTION AND MOTION TO INTERVENE

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The Alliance of Californians for Community Empowerment Action ("ACCE" or "ACCE Action") and Strategic Actions for a Just Economy ("SAJE") (collectively "Proposed Intervenors") are membership organizations comprised of thousands of Los Angeles's most vulnerable tenants whose housing and health are endangered by Plaintiff's attempt to eliminate the emergency eviction and rent protections enacted by the City of Los Angeles during the COVID-19 public health emergency. Proposed Intervenors are dedicated to housing justice and tenants' rights in Los Angeles. They work to help families stay in their homes, preserve affordable housing, and advance equitable housing practices. Both organizations engaged in advocacy that led to the adoption of Ordinance No. 186585, amended by Ordinance No. 186606, and Ordinance No. 186607 (collectively the "Ordinances") challenged by Plaintiffs. Proposed Intervenors seek to intervene in this matter to defend the Ordinances, which are critical to protect their members and other Los Angeles tenants directly impacted by COVID-19 from being forcibly displaced from their homes amidst the instant public health, housing, and economic crisis.

Proposed Intervenors and their members are essential participants in this action and are well-situated to defend the legality of the Ordinances passed by Los Angeles City Council to protect tenants. Proposed Intervenors represent an interest distinct from, and are differently situated than, Defendant City of Los Angeles and City officials. Proposed Intervenors' members— primarily Latinx and Black individuals and families at the lowest income levels—are the parties who will suffer imminent loss of their homes and potentially devastating health consequences if Plaintiff's effort to enjoin the Ordinances is successful. As membership organizations representing thousands of tenants, Proposed Intervenors have unique ability to provide the Court with critical facts and evidence to which both Plaintiff and Defendants lack access, including the impact of the Ordinances on tenants and the

imminent harm to tenants that enjoining the Ordinances would cause. Proposed Intervenors have timely moved to intervene, approximately three weeks after the filing of Plaintiffs' action and before any responsive pleading. The Court should grant Proposed Intervenors' motion under the standard for intervention of right or, in the alternative, permissive intervention.

## II.   FACTS

### A.   The COVID-19 Pandemic Disproportionately Impacts the Unhoused and Housing Unstable.

The COVID-19 pandemic is an ongoing public-health emergency that has hit California especially hard and has caused widespread disruptions in civic life. As of June 30, 2020, over 230,000 Californians had tested positive for COVID-19 and over 6,000 have died of the disease.[1] The number of cases in California continues to rise, with over 2,000 new cases reported in each day of June.[2] Los Angeles County has over 100,000 confirmed cases[3] – almost half of California's total – and has seen a recent surge in new infections, with over 27,000 new cases in the past two weeks alone.[4]

The statewide Stay at Home order,[5] now in place for over three months, requires all Californians to remain at their place of residence except for permitted work, necessary errands, or as otherwise authorized. But Californians can only stay at home if they have a home. Families without stable home environments cannot effectively practice social distancing, optimal hygiene practices, or quarantining – the top three interventions recommended by the Centers for Disease Control and

---

[1] *Tracking the Coronavirus in California*, L.A. TIMES (June 30, 2020), https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak.
[2] *COVID-19 Statewide Update*, STATE OF CAL. (June 30, 2020), https://update.covid19.ca.gov.
[3] *COVID-19 in Los Angeles County*, CITY OF L.A. PUBLIC HEALTH (June 30, 2020) http://publichealth.lacounty.gov/media/Coronavirus.
[4] *Tracking the Coronavirus in California*, L.A. TIMES (June 30, 2020), https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak.
[5] Executive Order N-33-20, EXECUTIVE DEP'T STATE OF CALIFORNIA (March 19, 2020).

Prevention (CDC). Mishori Decl. at ¶¶ 16–19. For example, families who "couch-surf" or "double-up" in cramped quarters with other families create cross-exposure between households, families who turn to homeless shelters face overcrowded conditions with poor ventilation and risks similar to those presented by carceral settings, and families forced to live on the streets cannot control exposure to the public and contaminated surfaces. Mishori Decl. at ¶¶ 17–19. These low-income households were already at higher risk of disease because of chronic preexisting conditions associated with poor access to medical care, education, quality housing, and nutritional food. Mishori Decl. at ¶¶ 20–25. For these reasons, unhoused and housing insecure individuals and families have suffered and will continue to suffer from COVID-19 at disproportionate rates. Mishori Decl. at ¶ 26.

**B.**   **The City Enacted the Ordinances to Prevent Further Homelessness and Housing Instability in the Face of the COVID-19 Pandemic.**

Even before the immense loss of jobs and income due to the pandemic, homelessness and housing instability represented a mass crisis in Los Angeles. Advocates and the City foresaw that the pandemic portended looming escalation of this ongoing catastrophe, and the City Council enacted the Ordinances to prevent further devastation.

Even before the pandemic, despite numerous interventions and public investments, homelessness has continued to increase in the city. According to the most recent homeless count conducted in January 2020, on any given night in the City of Los Angeles, 41,290 people are experiencing homelessness – an increase of 14.2% from the previous year.[6]

The shortage of housing affordable to lower income adults and families also

---

[6] *2020 Greater Los Angeles Homeless Count Results*, LOS ANGELES HOMELESS SERVICES AUTHORITY (June 12, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results.

had grown increasing severe in recent years. Across America, the majority of poor renting households spend over half of their income on rent, leaving insufficient funds for adequate food, medical care, transportation, household items, and other necessities.[7] In Los Angeles County, the average rent increased by 65% from 2010 to 2019.[8] According to the most recent data from the California Housing Partnership, Los Angeles County is facing a shortage of more than 509,000 units affordable to renters at or below median income.[9]

Vulnerable people who manage to access housing often struggle to maintain it. Over 50,000 unlawful detainer actions are filed against Los Angeles County households each year.[10] Nearly all low-income households in Los Angeles County spend more than 50% of their income on housing costs,[11] and nearly 600,000 households spend 90% or more of their income on housing costs,[12] leaving these households vulnerable to becoming homeless if income is disrupted or if unexpected emergency costs arise.

Evictions, housing instability, and homelessness were associated with a range of adverse health conditions long before COVID-19.[13] Unhoused and housing

---

[7] Desmond, M. & Kimbro, R, *Eviction's Fallout: Housing, Hardship, and Health*, SOC. FORCES 1—30 at 2 (February 24, 2015).
[8] *L.A. Rent Rose 65% Over Last Decade, Study Shows*, L.A. TIMES (Dec. 27, 2019), https://www.latimes.com/business/real-estate/story/2019-12-27/l-a-rent-rose-65-percent-over-the-last-decade-study-shows.
[9] *Los Angeles County 2020 Affordable Housing Needs Report*, CAL. HOUS. P'SHIP CORP. 1 (May 2020), https://chpc.net/resources/los-angeles-county-housing-need-report-2020.
[10] Inglis, A. & Preston, D., *California Evictions Are Fast and Frequent*, TENANTS TOGETHER: CALIFORNIA'S STATEWIDE ORG. FOR RENTERS' RIGHTS 6 (May 2018), https://www.tenantstogether.org/sites/tenantstogether.org/files/CA_Evictions_are_Fast_and_Frequent.pdf.
[11] *Los Angeles County Annual Affordable Housing Outcomes Report*, CAL. HOUS. P'SHIP CORP. 4 (April 30, 2018), https://1p08d91kd0c03rlxhmhtydpr-wpengine.netdna-ssl.com/wp-content/uploads/2018/06/Full-LA-County-Outcomes-Report-with-Appendices.pdf.
[12] Daniel Flaming *et al.*, *Escape Routes: Meta-Analysis of Homelessness in L.A.*, ECONOMIC ROUNDTABLE (April 24, 2018), https://economicrt.org/publication/escape-routes.
[13] Aurand, A *et al.*, *NLIHC Research Note: The Need for Emergency Rental Assistance During the COVID-19 and Economic Crisis*, DISASTER HOUS. RECOVERY

---

insecure individuals and families are more likely to have high blood pressure, diabetes, hepatitis C, HIV, and chronic heart and lung disease, as well as asthma and other conditions caused by environmental risks such as mold, lead, poor air quality, and poor ventilation. Mishori Decl. at ¶¶ 23–24.

Moreover, homelessness and housing instability are not race-neutral. Systemic racism has led to a disproportionate number of Black people becoming homeless.[14] Black people are 4 times more likely than all others to experience homelessness:[15] while they comprise only 8 percent of the general population in Los Angeles County, they represent 34 percent of the population experiencing homelessness.[16] Compared to the White population of Los Angeles County, Black people are about 11 times as likely to be homeless.[17] Black people seeking housing face numerous barriers such as higher poverty rates, overt and implicit housing discrimination, and tenant screening practices based on criminal records, which disproportionally impact Black people.[18] Latinx families are also at high risk; nearly four times more renting Latinx families in California reported "no confidence" in their ability to make their July rent payment compared to renting white families.[19]

The COVID-19 pandemic has exacerbated the City's already desperate housing and homelessness crisis. Fewer than 50% of Los Angeles County residents

COAL. 2–3 (April 3, 2020), https://nlihc.org/sites/default/files/Need-for-Rental-Assistance-During-the-COVID-19-and-Economic-Crisis.pdf.

[14] *2020 Homeless Count Results Key Messages*, LOS ANGELES HOMELESS SERVS. AUTH. 1, https://www.lahsa.org/documents?id=4561-2020-homeless-count-key-messages.

[15] *Id.* at 3.

[16] Gale Holland, *Racism is the Reason Black People are Disproportionately Homeless in L.A., Report Shows*, L.A. TIMES (June 12, 2020), https://www.latimes.com/california/story/2020-06-12/racism-making-more-black-people-la-homeless.

[17] Blasi, G., *UD Day: Impending Evictions and Homelessness in Los Angeles*, UCLA LUSKIN INST. ON INEQUALITY AND DEMOCRACY 7 (May 28, 2020).

[18] *Report and Recommendations of the Ad Hoc Committee on Black People Experiencing Homelessness*, LOS ANGELES HOMELESS SERVS. AUTH. 19–20, 24 (December 2018).

[19] *See Housing Table 2b. Confidence in Ability to Make Next Month's Payment for Renter-Occupied Housing Units, by Select Characteristics: California*, U.S. CENSUS BUREAU, https://www.census.gov/data/tables/2020/demo/hhp/hhp7.html.

had a job in mid-April,[20] and recent data shows that the disastrous April rates of unemployment and job stagnation have remained steady through June.[21] Low-income workers in industries like food service, retail, clothing manufacturing, hotel services, and childcare have been hardest hit.[22]

Low-income households have no savings or security net to accommodate for the drastic loss of work or hours; less than a quarter of low-income households can sustain their expenses for three months of income disruption.[23] Yet these families in crisis are continuing to pay rent – even at the expense of feeding themselves and their children.[24] *See, e.g.*, Strathmann Decl. at ¶ 14 (describing many families' prioritization of rent over food and their reliance on LAUSD school lunches); David D. Decl. ¶ 16 ("I had to cut my food budget and limit myself to only one meal a day.").

In response to the housing crisis, and to prevent the pandemic from further devastating public health, the Los Angeles City Council adopted Ordinance No.

---

[20] Jaclyn Cosgrove, *Less than Half of L.A. County Residents Still Have Jobs Amid Coronavirus Crisis*, L.A. TIMES (April 17, 2020), https://www.latimes.com/california/story/2020-04-17/usc-coronavirus-survey.

[21] Margot Roosevelt, *Despite Gradual Reopening, California's Unemployment Rate Remains Stagnant*, L.A. TIMES (June 19, 2020), https://www.latimes.com/business/story/2020-06-19/coronavirus-unemployment-california-jobs-may.

[22] *See* Emily Guerin, *Which LA Industries Have Been Hardest Hit by Coronavirus?*, LAIST (May 29, 2020), https://laist.com/latest/post/20200529/coronavirus-jobs-los-angeles; Alissa Anderson & Aureo Mesquita, *California Industries Hit Hardest by COVID-19 Economic Shutdown*, CAL. BUDGET AND POLICY CTR. (March 2020), https://calbudgetcenter.org/resources/covid19-industries-hit-hardest.

[23] Kim Parker *et al.*, *About Half of Lower-Income Americans Report Household Job or Wage Loss Due to COVID-19*, PEW RESEARCH CTR. (April 21, 2020), https://www.pewsocialtrends.org/2020/04/21/about-half-of-lower-income-americans-report-household-job-or-wage-loss-due-to-covid-19.

[24] *See also* NMHC Rent Payment Tracker, NAT'L MULTIFAMILY HOUS. COUNCIL (June 27, 2020), https://www.nmhc.org/research-insight/nmhc-rent-payment-tracker (finding that 94.2 percent of apartment households nationwide made a full or partial rent payment by June 27, 2020); Esmeralda Bermudez, *As Demand for Food Skyrockets due to Coronavirus, Food Banks Play Catch Up*, L.A. TIMES (May 9, 2020), https://www.latimes.com/california/story/2020-05-09/as-demand-for-food-skyrockets-due-to-coronavirus-food-banks-play-catch-up (noting that food shelters in Los Angeles have been unable to keep up with skyrocketing food insecurity, as the need for food countywide has shot up 80% since mid-March).

186585, amended by Ordinance No. 186606, and Ordinance No. 186607 (collectively the "Ordinances").

Ordinance No. 186585 was enacted on March 27, 2020 pursuant to the Governor's Executive Order N-28-20 authorizing local jurisdictions to suspend certain evictions of renters and homeowners, among other protections.[25] The interest of the City in enacting the Ordinance is clearly laid out in the preamble, which states: "WHEREAS, during this local emergency and in the interest of protecting the public health and preventing transmission of COVID-19, it is essential to avoid unnecessary housing displacement to protect the City's affordable housing stock and to prevent housed individuals from falling into homelessness."[26]

Ordinance No. 186585 prohibits evictions for nonpayment of rent where the tenant "is unable to pay rent due to circumstances related to the COVID-19 pandemic."[27] "These circumstances include loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health-care expenses related to being ill with COVID-19 or caring for a member of the tenant's household or family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures."[28] Ordinance No. 186585 states that tenants may use the protections as an affirmative defense in an unlawful detainer action. Ordinance No. 186585 expressly does not "eliminate[ ] any obligation to pay lawfully charged rent," but does provide tenants a grace period up to 12 months following the expiration of the local emergency period to repay all past due rent. Ordinance No. 186585 provides that the tenant and landlord "may, prior to the expiration of the Local Emergency Period or within 90 days of the first missed payment, whichever comes first, mutually agree to a plan for repayment of unpaid

---

[25] Executive Order N-29-20, EXECUTIVE DEP'T STATE OF CALIFORNIA (March 16, 2020).
[26] Ordinance No. 186585, CITY OF LOS ANGELES (March 27, 2020).
[27] *Id.*
[28] *Id.*

rent selected from options promulgated by the Housing and Community Investment Department for that purpose."[29] In addition to prohibiting evictions for nonpayment of rent, Ordinance No. 186585 also prohibits no-fault evictions and evictions based on the presence of unauthorized occupants or pets, or for nuisance related to COVID-19 for the duration of the local emergency period. Finally, Ordinance No. 186585 prohibits the charging of late fees or interest and affirmatively requires landlords to provide tenants with notice of the protections of the ordinance.

Ordinance No. 186606, enacted on May 6, 2020, amended Ordinance No. 186585 in its entirety to strengthen the protections provided to tenants. As detailed in a report from the City Attorney to the City Council, the City Council felt compelled to strengthen the ordinance because of reports of owners "employing unscrupulous tactics to intimidate and coerce their tenants in ways designed to negate the protections of the City's new law."[30] Ordinance No. 186606 specifically added provisions that landlords may not evict or "endeavor to evict" tenants.[31] "Endeavor to evict" is defined as "conduct where the Owner lacks a good faith basis to believe that the tenant does not enjoy the benefits of [the Ordinance] and the Owner serves or provides in any way to the tenant: a notice to pay or quit, a notice to perform covenant or quit, a notice of termination, or any other eviction notice."[32] Further, Ordinance No. 186606 specifies the form and timing of the notice that landlords must provide to tenants of the protections in the Ordinance. In addition, Ordinance No. 186606 states that landlords may not "influence or attempt to influence, through fraud, intimidation or coercion" a tenant to pay or transfer to the landlord any money received by the tenant as part of any governmental relief program.[33] Finally, in order to provide tenants with a means of enforcing their rights, Ordinance No. 186606

---

[29] *Id.*
[30] *See Report from City Attorney (R20-0121)* (April 28, 2020), http://clkrep.lacity.org/onlinedocs/2020/20-0147-S19_rpt_ATTY_04-28-2020.pdf.
[31] Ordinance No. 186606, CITY OF LOS ANGELES (May 6, 2020).
[32] *Id.*
[33] *Id.*

provides them with a private right of action to enforce the ordinance.

Ordinance No. 186607 was enacted on May 6, 2020 to pause rent increases for units subject to the City's Rent Stabilization Ordinance ("RSO") for one year following the expiration of the local emergency period, "unless necessary to obtain a just and reasonable return."[34]

These Ordinances are a reasonable response to the pandemic, tailored to the specific public health crisis and the vulnerabilities of immediately impacted individuals and families. They are comparable to several ordinances enacted by several other cities and counties across California.[35] Indeed, some jurisdictions have enacted ordinances that are far more protective; the Oakland City Council, for example, issued a moratorium on *all* evictions for the duration of the local emergency, exempting only evictions based on an imminent public health necessity.[36]

Los Angeles property owners have nonetheless engaged in illegal conduct in response to these necessary regulations. Tenants are enduring illegal lockouts, excessive notices, demands to sign repayment agreements, refusals to conduct necessary repairs, and other intimidation tactics. For example, one landlord wrapped a chain around a tenant's door and removed her possessions from the apartment when she left for the grocery store; another landlord knocked down the tenants' outdoor plants and threatened to tow their vehicle from the driveway due to nonpayment of rent; and many landlords have refused to conduct repairs necessary for habitability due to nonpayment. Delgado Decl. at ¶ 11; Strathmann Decl. at ¶¶ 12–13.

Proposed Intervenors, who have been engaged in ongoing advocacy for protective policies, know firsthand that these Ordinances are necessary and yet far

---

[34] Ordinance No. 186607, CITY OF LOS ANGELES (May 6, 2020).
[35] *See, e.g.*, Fifth Revised First Supplement to the Executive Order of the Director of Emergency Services Declaring the Existence of a Local Emergency, CITY OF SANTA MONICA (June 17, 2020); Twelfth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020, OFFICE OF THE MAYOR SAN FRANCISCO (April 30, 2020).
[36] *See* Ordinance No. 20-0377, CITY OF OAKLAND (May 19, 2020).

from sufficient to protect Los Angeles's most vulnerable tenants. Proposed Intervenors testified and mobilized in support of the Ordinances and continued expansions. On March 27, 2020, Proposed Intervenors as members of the Healthy LA Coalition submitted to the City Council a six-page letter expressing support for the draft of Ordinance No. 186585 and advocating for several expansions,[37] a number of which were adopted in the finally enacted version. In April, when Councilmembers Michael Bonin and David Ryu sought to strengthen the emergency eviction protections and adopt an expanded rent freeze, Proposed Intervenors mobilized their members to offer public comment in support. Proposed Intervenors further advocated for Ordinance No. 186606, the May 6, 2020 proposal responsive to widespread fraud, intimidation and coercion tactics by property owners. Proposed Intervenors continue to bear witness to the lengths to which landlords will go to displace tenants who cannot pay. Delgado Decl. at ¶ 11; Strathmann Decl. at ¶¶ 12–13. Proposed Intervenors have been and continue to be on the front lines to protect themselves and their communities from housing displacement and homelessness.

The Ordinances create only temporary protections for vulnerable tenants directly impacted by the pandemic. These emergency protections will not and cannot last forever; California Government Code Section 8630 mandates that the City Council must review the ongoing need to continue the local emergency at least once every 60 days until it terminates the emergency. But if the Ordinances are voided, the public health emergency will only escalate throughout Los Angeles, which already has one of the highest rates of homelessness in the country.[38] A recent study from UCLA estimates that over 360,000 residential evictions will occur in Los Angeles County when eviction protections are lifted, and approximately 120,000 of

[37] *See Communication from Public*, http://clkrep.lacity.org/onlinedocs/2020/20-0147-S19_PC_AB_03-26-2020.pdf.
[38] *The 2018 Annual Homeless Assessment Report (AHAR) to Congress*, THE U.S. DEP'T OF HOUS. AND URBAN DEV. 20 (December 2018). https://www.novoco.com/sites/default/files/atoms/files/hud_ahar_2018_121718.pdf.

NOTICE OF MOTION AND MOTION TO INTERVENE

those households (including 184,000 children) will become homeless.[39] Even without a raging pandemic, the result would be perhaps the most catastrophic sudden displacement of people from urban housing in American history. In the midst of the worsening deadly pandemic, permitting Plaintiff's members to resume the full range of unlawful detainer actions in the short term will greatly exacerbate the public health impacts of eviction and compound both the public health and the homelessness crises in Los Angeles.

**C.     Plaintiffs Seek to Void Lawful and Necessary Protections for Tenants.**

On June 11, 2020, Plaintiff filed this lawsuit challenging the Ordinances. Plaintiff brings claims under the Contracts Clause of the U.S. and California Constitutions, the Takings Clause of the U.S. and California Constitutions, the Due Process Clause of the U.S. Constitution, the preemption doctrine, and the Tenth Amendment of the U.S. Constitution. Plaintiff seeks injunctive and declaratory relief that would nullify the Ordinances and leave tenants without these necessary and reasonable protections despite the ongoing pandemic.

Plaintiff alleges that property owners "have every incentive to work with those tenants who do not have the financial means to pay all or some portion of their rent." But Proposed Intervenors know these to be empty words. Both Proposed Intervenors have had to expand their tenant clinics to respond to all the new reports of landlord harassment. Delgado Decl. at ¶¶ 9–10; Strathmann Decl. at ¶¶ 10, 12.

Plaintiff further suggests that, in many circumstances, tenants are insulated from rent obligations while reaping financial rewards on Unemployment Insurance. Nothing could be further from the truth. Though unemployment benefits have necessarily expanded to accommodate rising needs in the present crisis, these expansions last only through July and are insufficient to meet the housing costs of

---

[39] Blasi, *supra* note 17, at 6.

many low-income households.[40] Further, these unemployment benefits are not available to the large portion of the tenant population in Los Angeles who are undocumented[41] or do not work in traditional jobs. *See* Strathmann Decl. at ¶ 15 ("[SAJE's] community members are street vendors, garment industry workers, construction workers, day laborers, and maintenance workers. They cleaned homes, provided childcare, and worked in non-essential service jobs at stores like Ross or Staples. Largely, these tenants do not receive unemployment benefits."); Delgado Decl. at ¶ 15 (noting that some members worked jobs that paid only cash under the table). Generally, Proposed Intervenors' members who can work are working, even if that means exposing themselves to COVID-19 while collecting recyclables on the street or street vending without a permit. Delgado Decl. at ¶ 16. Moreover, nothing in the Ordinances shields tenants from legal action to recover unpaid rent when the protections expire, no matter how vulnerable they remain in the aftermath of the pandemic. *See* Delgado Decl. at ¶ 15 ("Many ACCE Action members work in service and tourism industries that are not going to come back anytime soon at a level that will sustain all former employees. . . . [O]ur members will continue to feel the economic impact of the pandemic for a long time.").

Plaintiff, by contrast, does not represent a population remotely comparable in terms of vulnerability. Property owners may still borrow against their properties, sell their properties, and benefit from their properties' appreciation in value. Property owners affected by the pandemic have also sought federal subsidies[42] and are also

---

[40] *See* Aurand, *supra* note 13, at 6.

[41] Twenty percent of Los Angeles County's population is either undocumented or lives in a household with an undocumented family member. Paul Ong, *et al.*, *Left Behind During a Global Pandemic: An Analysis of Los Angeles County Neighborhoods at Risk of Not Receiving COVID-19 Individual Rebates under the CARES Act*, UCLA CTR. FOR NEIGHBORHOOD KNOWLEDGE 3 (April 13, 2020). In addition to being ineligible for federal relief, these households were already at great risk of eviction; nearly two-thirds of undocumented Angelenos lived below 200% of the federal poverty level before the pandemic. *Id.*

[42] Will Parker & Konrad Putzier, *Landlords Were Never Meant to Get Bailout Funding. Many Got It Anyway.*, WALL ST. J. (May 26, 2020),

able to obtain mortgage relief under the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act for federally backed mortgages,[43] under the California mortgage payment forbearance program,[44] and through the voluntary programs of most of the large banks.[45] Because these programs add deferred mortgage payments to the end of the mortgage term, property owners' missed payments will not be due within the first year after the emergency is declared over, unlike tenants' back rent under the Ordinances. Property owners are largely insulated from the financial devastation, family destruction, health risks, and homelessness that imminently threaten tenants represented by Proposed Intervenors.

### D.    Proposed Intervenors Represent Los Angeles's Most Vulnerable Tenants.

Proposed Intervenors are organizations that serve and represent Los Angeles tenants. Both have advocated for the passage of the Ordinances and have monitored its enforcement in addition to engaging in myriad other work to protect tenants impacted by COVID-19.

Alliance of Californians for Community Empowerment ("ACCE") Action is a 501(c)(4) statewide multi-racial, grassroots membership organization dedicated to raising the voices of everyday Californians to fight and stand for economic, racial, and social justice. Delgado Decl. at ¶ 2. ACCE Action's campaigns center around housing justice, worker justice, and sustainable communities, and their members

---

https://www.wsj.com/articles/landlords-were-never-meant-to-get-bailout-funds-many-got-it-anyway-11590494400.

[43] CARES Act, Pub. L. No. 116-136 (2020) § 4022.

[44] *Governor Gavin Newsom Announces Major Financial Relief Package: 90-Day Mortgage Payment Relief During COVID-19 Crisis*, OFFICE OF GOVERNOR GAVIN NEWSOM (March 25, 2020), https://www.gov.ca.gov/2020/03/25/governor-gavin-newsom-announces-major-financial-relief-package-90-day-mortgage-payment-relief-during-covid-19-crisis.

[45] At least 29 different financial institutions across the country have voluntarily publicized support available to residential mortgage holders. *See* Laura Grace Tarpley, *29 Banks That May Help You With Your Mortgage Payments during the COVID-19 Outbreak*, BUS. INSIDER (May 15, 2020), https://www.businessinsider.com/personal-finance/banks-help-with-mortgage-payments-coronavirus-2020-4.

13

engage in rallies, town halls, and other actions to make their voices heard. *Id.* The organization's housing justice work focuses on helping families stay in their homes, preserving affordable housing, and pushing for equitable housing practices across California, including in Los Angeles. *Id.* Statewide, ACCE Action has over 16,000 dues-paying members, and about 6,000 of those members live in the Los Angeles County area. *Id.* at ¶ 3. Their work reaches 20,000 to 30,000 Angelenos per year. *Id.* ACCE Action organizes citywide, but predominantly in low-income and very low-income communities of color. *Id.* Their membership is predominately Black and Brown, including a significant number of undocumented Angelenos. *Id.*

Strategic Actions for a Just Economy ("SAJE") is a 501(c)(3) non-profit organization that strives to bring economic justice to, and build community power in, South Los Angeles by advocating for tenant rights, healthy housing, and equitable development. Strathmann Decl. at ¶ 2. Founded in 1996, SAJE promotes policy and system change that increases the development of low income and affordable housing, promotes fair housing and tenant rights, promotes the achievement of healthy housing, and promotes development and policies that prevent displacement. *Id.* In 2019, SAJE had approximately 650 members and in total served 3,438 tenants. *Id.* at ¶ 3. SAJE serves predominantly low-income people of color renting homes in South Central Los Angeles. *Id.* at ¶ 4. The majority of SAJE's community members are Non-Black Latinx immigrants, often undocumented monolingual Spanish speakers living in multigenerational households. *Id.* The other notable demographic SAJE serves is older, single Black persons living alone. *Id.*

Proposed Intervenors seek intervention by right to advocate for the interests of their members and all Los Angeles tenants in upholding the protections granted by the Ordinances to keep Los Angeles's most vulnerable tenants safe and housed for the duration of the crisis. In the alternative, Proposed Intervenors seek permissive leave to intervene to lend a voice in this matter to those most impacted by the outcome.

## III. __ARGUMENT__

The Court should grant Proposed Intervenors permission to intervene in this action for the purpose of defending the legality of the Ordinances and securing the ongoing shelter, health, and safety of tenants impacted by COVID-19.

### A. __Proposed Intervenors Are Entitled To Intervene as a Matter of Right.__

Federal Rule 24(a) of the Federal Rules of Civil Procedure is construed liberally in favor of intervenors, and the Court's decision is guided primarily by practical considerations rather than technical distinctions. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001). "A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court." *United States v. City of Los Angeles*, 288 F.3d 391, 397–98 (9th Cir. 2002) (quoting *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) (abrogated on other grounds)). A district court is required to accept as true the non-conclusory allegations made in support of an intervention motion, particularly where the propriety of intervention must be determined before discovery. *Berg*, 268 F.3d at 819–20.

Federal Rule 24(a)(1) provides for intervention as of right when intervenors satisfy a four-part test: (1) the application for intervention is timely; (2) the applicant has a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest is not adequately represented by the existing parties in the lawsuit. *Id.* at 818–19.

### 1.     The Motion Is Timely.

Courts consider three factors in determining whether a motion to intervene is timely: (1) the stage of the proceeding, (2) the prejudice to other parties, and (3) the reason for and length of the delay. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).

All three factors here weigh heavily in favor of the timeliness of this motion. First, this motion to intervene comes at "the very outset of litigation." *See W. States Trucking Ass'n v School*, No. 2:18-cv-1989-MCE-KJN, 2018 U.S. Dist. LEXIS 193481, at 3–4 (E.D. Cal. Nov. 13, 2018). The complaint was filed on June 9, 2020. Proposed Intervenors gave notice to the parties of their intent to intervene only ten days later on June 19, and filed this motion on July 1, the earliest date permitted by Local Rule 7-3. Eidmann Decl. at ¶¶ 2–3. Second, there can be no prejudice to other parties where the motion to intervene is filed without delay at the earliest stage of the proceedings. Third, there is no delay to consider, as Prospective Intervenors file this motion approximately three weeks after the filing of the complaint. *See Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (finding all "traditional features of a timely motion" satisfied where intervenors filed their motion "less than three months after the complaint was filed"). This motion predates the Defendants' responsive pleading, any proceedings, and any substantive rulings by the Court. *See Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996). Proposed Intervenors do not file a responsive pleading at this time in order to intervene expeditiously and consistent with the existing litigation deadlines in the case, but ask for the Court's leave to do so by the deadline to file a responsive pleading which the parties have currently stipulated is August 3, 2020. *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992) ("Courts, including this one, have approved intervention motions without a pleading where the court was otherwise apprised of the grounds for the motion.").

### 2.     Intervenors Have a Significant Protectable Interest.

"An applicant has a 'significant protectable interest' in an action if (1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims." *United States v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (quoting *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998)).

Prospective Intervenors assert a significant protectable interest in the ongoing applicability of the Ordinances' protections. The City Council enacted the Ordinances challenged by Plaintiff for the specific benefit of tenants—including the members of, and those represented by, Proposed Intervenors. *See California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) (reversing the lower court and finding a significant protectable interest asserted by two organizations that represented members of the group protected by the challenged policy); *see also Fresno Cty. v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980).

Prospective Intervenors' legally protected interest in the Ordinances' protections is more than merely related to Plaintiff's claims; it is wholly contingent on the outcome of Plaintiff's claims. If Plaintiff were successful in enjoining the Ordinances, many of Proposed Intervenor's members and the tenants they represent would lose the legal right to remain in their homes, be pushed into homelessness, and be exposed to greater risk from the COVID-19 virus. *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001) ("The connection between this interest and the claims in the action is sufficiently clear because the [agreement creating protective policies] is threatened."). At a minimum, there can be no question that tenants have a significant, legally protected property interest in remaining in their homes. *See In re Lopez-Soto*, 764 F.2d 23, 26–27 (1st Cir. 1985) (finding a right to intervene by a residing tenant who had "a legal right to remain in the house good against most of the world. This would seem an adequate 'interest in the property.'").

**3.     A Judgment for Plaintiff Would Impair Intervenors' Ability to Protect Their Interest.**

The relevant inquiry for the third prong of the test for intervention as of right is not whether the opposed outcome will "necessarily" impair Prospective Intervenors' rights, but whether such an outcome "'may' impair rights 'as a practical matter.'" *United States v. City of Los Angeles*, Cal., 288 F.3d 391, 401 (9th Cir. 2002); *see also Berg*, 268 F.3d at 822 ("We follow the guidance of Rule 24 advisory committee notes that state that '[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'").

For the reasons explained in the prior section, both as a practical matter and necessarily, a judgment for Plaintiff would potentially eliminate the rights secured by the Ordinances. *See California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006) ("Having found that appellants have a significant protectable interest, we have little difficulty concluding that the disposition of this case may, as a practical matter, affect it."). Without the protection of the Ordinances, residential evictions would swell to upwards of 360,000 across Los Angeles County,[46] and members of Proposed Intervenors would be evicted en masse. Strathmann Decl. at ¶¶ 17, 19; Delgado Decl. at ¶¶ 13–14, 18. Many evicted tenants would be rendered homeless.[47] Moreover, because of the risks of exposure associated with all outcomes of displacing tenants who cannot pay rent from their homes (from moving in with another household to relocating to a homeless shelter to living outdoors), *all* evicted tenants would be at increased risk of contracting COVID-19. Mishori Decl. at ¶¶ 16–19, 26. In addition, Proposed Intervenors both lobbied and advocated for the passage of the Ordinances; an outcome voiding the Ordinances would overturn what Prospective

---

[46] Blasi, *supra* note 17, at 6.
[47] *Id.* (finding that approximately 120,000 of the 360,000 estimated evicted households are expected to become homeless, including 184,000 children).

Intervenors have recently achieved. *See Washington State Bldg. & Const. Trades Council, AFL-CIO v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982) (holding that a public interest group had the right to intervene in an action challenging the legality of a measure which it had supported).

## 4. The Parties Do Not Adequately Represent Prospective Intervenors' Interests.

There are three factors determining the adequacy of representation: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervener's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervener would offer any necessary elements to the proceeding that other parties would neglect." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (quoting *California v. Tahoe Reg'l Planning Agency*, 792 F.2d 775, 778 (9th Cir.1986)). "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898. (quoting *Arakaki*, 324 F.3d at 1086).

Proposed Intervenors represent an interest distinct from, and are differently situated than, Defendant City of Los Angeles and City officials. It is far from certain that Defendants will make all of Proposed Intervenors' arguments; indeed, Defendants lack the information to be able to do so. Proposed Intervenors represent Los Angeles's most vulnerable tenants, primarily Latinx and Black individuals and families at the lowest income levels, who are particularly likely to be harmed if the Ordinances are rendered void by this Court. The views and circumstances of these tenants cannot be adequately represented or expressed by the City, the Mayor, or the City Council, as these Defendants work on behalf of all Los Angeles residents—both landlord members associated with Plaintiff and tenant members associated with Prospective Intervenors. The City in its role as Defendant also has an interest in reducing time and costs. Defendants must balance multiple interests and strike

19

1  compromises. But the stakes are far higher for Proposed Intervenors, whose members
2  fear imminent loss of their homes and exposure to COVID-19.

3         Proposed Intervenors also offer necessary elements to the proceeding, as they
4  have access to facts and evidence that Defendants do not. As membership
5  organizations representing thousands of tenants impacted and protected by the
6  Ordinances, Proposed Intervenors are singularly situated to provide the Court with
7  facts and evidence regarding the protection that the Ordinances have provided and
8  the harm that voidance of the Ordinances would cause. *See, e.g.*, David D. Decl.
9  (declaration by SAJE member describing the impact of COVID-19 on his housing
10 stability and the necessity of the Ordinances to prevent his eviction). This information
11 is vital to the Court's balancing of the equities in any forthcoming consideration of
12 injunctive relief.

13    **B.    Proposed Intervenors Meet the Standards for Permissive**
14           **Intervention.**

15        In the alternative, Proposed Intervenors move for permissive intervention
16 under Federal Rule of Civil Procedure Rule 24(b)(1)(B). The Ninth Circuit applies
17 three threshold requirements to a motion for permissive intervention: (1) the
18 intervenor's claim must share a common question of law or fact with the main action;
19 (2) the motion must be timely; and (3) the court must have an independent basis for
20 jurisdiction over the applicant's claims. *Donnelly v. Glickman*, 159 F.3d 405, 412
21 (9th Cir. 1998). Permissive intervention is in the "broad discretion of the district
22 court." *Orange Cty. v. Air California*, 799 F.2d 535, 539 (9th Cir. 1986).

23        All of these requirements are satisfied here, as described above. Prospective
24 Intervenors seek to litigate the lawfulness and ongoing enforceability of the
25 Ordinances, in direct response to Plaintiff's claims. The motion, filed approximately
26 three weeks after Plaintiff's Complaint, is timely. Standing is not required where
27 Proposed Intervenors seek only to respond to the federal questions raised by Plaintiff.
28 *See Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844–45 (9th Cir.

2011).[48]

In addition to satisfying the Rule 24(b) requirements, Prospective Intervenors offer an invaluable perspective in this litigation. As membership organizations comprised of thousands of vulnerable tenants, Proposed Intervenors have access to facts and evidence about the impact of the Ordinances that Defendants do not. *See, e.g.*, David D. Decl. To the extent this Court considers Plaintiff's request for injunctive relief, the Court will need to balance the equities, including a fact-intensive evaluation of what harm would result if the Ordinances were enjoined. The Court will be aided by the inclusion of Prospective Intervenors, who bring into the courtroom the voices of those who have the most at stake in this matter.

## IV.   **CONCLUSION**

Proposed Intervenors respectfully request that this Court grant the Motion to Intervene as a matter of right or, alternatively, permissively. Low-income tenants, primarily households of color and immigrant families, would be most adversely impacted if Plaintiff succeeds with its lawsuit. As organizations that serve, represent, and comprise of these tenants, Proposed Intervenors are critical participants in this action and are well-situated to defend the legality of the challenged ordinances as shown above.

---

[48] If it were necessary, however, Proposed Intervenors satisfy Article III standing requirements. ACCE and SAJE are both membership organizations with tenants impacted by the Ordinances, who would otherwise have standing to sue in their own right but whose participation is not required. *See Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998). Moreover, both organizations would need to divert resources to relocation, rent assistance, and legal support for tenants to defend against the sudden outbreak of eviction proceedings if Plaintiff secured injunctive relief. *See Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105–06 (9th Cir. 2004).

Dated: July 1, 2020                    PUBLIC COUNSEL

                                       By: */s/ Kathryn Eidmann*
                                           Kathryn Eidmann
                                           Faizah Malik
                                           Gigi Lam
                                           Alisa Randell
                                           Lauren Zack
                                           610 S. Ardmore Avenue
                                           Los Angeles, California 90005
                                           Telephone: (213) 385-2977
                                           Facsimile:  (213) 385-9089
                                           Email: keidmann@publiccounsel.org
                                                  fmalik@publiccounsel.org
                                                  glam@publiccounsel.org
                                                  arandell@publiccounsel.org
                                                  lzack@publiccounsel.org

                                       WESTERN CENTER ON LAW AND
                                       POVERTY

                                       By: */s/ Nisha Vyas*
                                           Nisha Vyas
                                           Matthew Warren
                                           Richard Rothschild
                                           3701 Wilshire Blvd. #208
                                           Los Angeles, CA 90010
                                           Telephone: (213) 487-7211
                                           Facsimile:  (213) 487-0242
                                           Email: nvyas@wclp.org
                                                  mwarren@wclp.org
                                                  rrothschild@wclp.org

                                       PUBLIC INTEREST LAW CENTER

                                       By: */s/ Michael Rawson*
                                           Michael Rawson
                                           Craig Castellanet
                                           449 15th Street #301
                                           Oakland, California 94612

NOTICE OF MOTION AND MOTION TO INTERVENE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone:    (510) 891-9794
Facsimile:    (510) 891-9727
Email: mrawson@pilpca.org
          ccastellanet@pilpca.org

Attorneys for Intervenor-Defendants,
ALLIANCE OF CALIFORNIANS FOR
COMMUNITY EMPOWERMENT ACTION
and STRATEGIC ACTIONS FOR A JUST
ECONOMY

NOTICE OF MOTION AND MOTION TO INTERVENE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I attest that the other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Kathryn Eidmann*
Kathryn Eidmann

24