1  Douglas J. Dennington (State Bar No. 173447)
   ddennington@rutan.com
2  John A. Ramirez (State Bar No. 184151)
   jramirez@rutan.com
3  Peter J. Howell (State Bar No. 227636)
   phowell@rutan.com
4  Kelsey E. Quist (State Bar No. 309876)
   kquist@rutan.com
5  RUTAN & TUCKER, LLP
   611 Anton Boulevard, Suite 1400
6  Costa Mesa, California 92626-1931
   Telephone:   714-641-5100
7  Facsimile:    714-546-9035

8  Attorneys for Plaintiff
   Apartment Association of Los Angeles County,
9  Inc., dba Apartment Association of Greater Los
   Angeles

10

11                    UNITED STATES DISTRICT COURT

12                    CENTRAL DISTRICT OF CALIFORNIA

13

14  APARTMENT ASSOCIATION OF            Case No. 2:20-cv-05193-DDP-JEM
    LOS ANGELES COUNTY, INC., dba
15  "APARTMENT ASSOCIATION OF           Judge:   *Hon. Dean D. Pregerson*
    GREATER LOS ANGELES,"
16                                      **SECOND AMENDED COMPLAINT
                 Plaintiff,             FOR DECLARATORY AND
17                                      INJUNCTIVE RELIEF**
             vs.
18
    CITY OF LOS ANGELES; ERIC
19  GARCETTI, in his official capacity as   **JURY TRIAL DEMANDED**
    Mayor of Los Angeles; and CITY
20  COUNCIL OF THE CITY OF LOS          Date Action Filed:  June 11, 2020
    ANGELES, in its official capacity;   Trial Date:  Not set
21  DOES 1 through 25, inclusive,

22               Defendants.

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR
                                        DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

JURISDICTION AND VENUE ..................................................................... 5

PARTIES ......................................................................................................... 6

STANDING ..................................................................................................... 7

FACTUAL ALLEGATIONS ......................................................................... 9

    A.    The Outbreak of COVID-19 ............................................... 9

    B.    The Governor's Eviction-Related Executive Orders ......... 10

    C.    The City's Eviction Moratorium ...................................... 11

    D.    The City's Rent Freeze Ordinance ................................... 13

    E.    The Alleged Statutory Basis for the City's Eviction
        Moratorium ...................................................................... 14

    F.    The CARES Act and Increased Availability of
        Unemployment Benefits ................................................... 14

    G.    The City's Ordinances Violate the Constitutional Rights of
        Plaintiff's Members .......................................................... 18

FIRST CLAIM FOR RELIEF ..................................................................... 22

SECOND CLAIM FOR RELIEF ................................................................ 25

THIRD CLAIM FOR RELIEF .................................................................... 28

FOURTH CLAIM FOR RELIEF ................................................................ 34

REQUESTED RELIEF ................................................................................ 35

DEMAND FOR JURY TRIAL ................................................................... 38

Plaintiff Apartment Association of Los Angeles County, Inc. dba the "Apartment Association of Greater Los Angeles" ("Plaintiff" or "AAGLA") alleges as follows:

## **INTRODUCTION**

1.     In the wake of the novel coronavirus, Defendants City of Los Angeles, City Council of the City of Los Angeles, and Mayor Eric Garcetti (collectively "City" or "Defendants") hastily instituted a series of ordinances which prohibit lessors and landlords, such as Plaintiff's members, from exercising their contractual remedies where tenants refuse to pay rent on the asserted grounds that they were impacted by the COVID-19 pandemic ("Pandemic").  While purportedly intended to provide relief to tenants so impacted, the ordinances are not tailored to a tenant's actual inability to pay rent and significantly (and needlessly) infringe on the constitutional rights of all lessors and landlords within the City.

2.     This Action challenges the implementation of the City's Eviction Moratorium (Ordinance No. 186585) and Rent Freeze Ordinance (Ordinance No. 186607) (collectively the "Ordinances") adopted by the City Council on March 27, 2020 and March 30, 2020, respectively.

3.     Plaintiff's members are sympathetic to tenants who have actually suffered hardship due to the Pandemic.  Plaintiff's members have every incentive to work with those tenants who do not have the financial means to pay all or some portion of their rent.  As set forth below, however, the Ordinances actively undermine any such attempts at cooperation and allow tenants who actually have the ability to pay all or some of their rent to ignore their contractual obligations for the foreseeable future.

4.     The Eviction Moratorium, among other things, contains provisions that ***indefinitely*** prohibit landlords and property owners from initiating or continuing residential eviction proceedings based upon non-payment of rent.  Although it ostensibly only applies if a tenant is unable to pay due to circumstances related to the

Pandemic, it does not require tenants to provide notice, let alone documentation, of their inability to pay.  While the Eviction Moratorium provides no relief for owners and landlords and requires them to continue meeting their contractual and statutory obligations as "lessors," it completely abrogates the material obligations of lessees and eliminates all of the contractual remedies lessors ordinarily have when tenants breach their lease provisions.  Lessors are forbidden not only from commencing eviction proceedings for failure to pay rent, but from charging any late fees or interest to which they are contractually entitled.  Under the Eviction Moratorium, tenants may continue to occupy their respective premises at no charge, utilizing the water, power, trash, sewage, and other fees that the landlords must continue to pay without reimbursement.  By stripping all remedies away from owners – without requiring tenants to demonstrate an inability to pay rent – the Eviction Moratorium discourages tenants who can pay all or some of what they owe from doing so.

5.     The Eviction Moratorium also gives tenants a full twelve months following expiration of the "Local Emergency Period"—which seems likely to last many more months, at a minimum—to repay back rent, irrespective of the tenant's ability to pay some or all rent, the term of the lease, any agreed plan or schedule for repayment, or any evidence demonstrating that the tenant will actually be capable of paying back rent at the expiration of the one-year grace period.  For many, if not most "qualifying" tenants, the "rent deferral" provision will operate as rent forgiveness, as it is unlikely that tenants who do not pay rent during the Local Emergency Period will be in a position to pay back rent, in addition to their normal rent, at the conclusion of the grace period (whenever that may be).  The Eviction Moratorium also fails to address how a landlord or property owner would actually be able to collect rent from those tenants who take advantage of the Eviction Moratorium, but move to a different location by the end of the one-year grace period.  Indeed, the City has banned owners from pursuing their primary remedy (eviction) needed to mitigate damages where the tenant fails to pay rent.  Every month a landlord is prevented from renting its unit to

a paying tenant is a month for which the landlord cannot mitigate any damages.  The Eviction Moratorium would force owners to allow tenants who have stopped paying – and may never pay again – to continue to occupy their units for many months and likely well into 2021.  While owners can theoretically eventually sue such tenants for back rent (but not for any interest or late fees), their likelihood of ever actually collecting on a judgment for many months of back rent is minimal, at best.  As for those tenants who move prior to the time owners may sue to recover back rent, there is no realistic chance to recover such rent and, even if there was, the owner would incur a tremendous (and likely unrecoverable) litigation expense just to recover that to which the owner is already entitled.

6.     The Eviction Moratorium further prohibits all evictions based on the presence of unauthorized occupants or pets, as well as for undefined "nuisance[s] related to COVID-19."  Incredibly, the Eviction Moratorium creates a private right of action in favor of *only* tenants whereby tenants are allowed to sue for alleged violations of the moratorium, subjecting landlords to civil penalties of up to *$15,000 per violation.*  Thus, while the Eviction Moratorium bars lessors and landlords, like Plaintiff's members, from utilizing their primary contractual remedy to secure payment of rent, it provides a new weapon for tenants to use against landlords and lessors who seek only that to which they are entitled under their existing leases.

7.     The Rent Freeze Ordinance prohibits property owners from raising rent on any property subject to the City's Rent Stabilization Ordinance for a period of one year following the end of the "Local Emergency" as declared by the Mayor, thus preventing property owners from implementing even the modest increases ordinarily allowed on properties pursuant to their respective lease agreements.  The Rent Freeze Ordinance was adopted without any mechanism to determine whether rent increases are necessary for landlords to obtain a fair return, as required under the United States Constitution.   The impact of the two Ordinances together is thus particularly devastating, as property owners are not only forced to forbear collecting rent and

effectively give interest-free loans to tenants who assert any Pandemic-related inability to pay, but are also prohibited from making normal rent adjustments with respect to tenants who do not claim any financial hardship. The Ordinances also require property owners to financially support their tenants during the Local Emergency by subsidizing tenants' rent, utilities and other charges without any support to the property owner or landlord.

8. The City attempts to justify the Ordinances as reasonable "eviction controls and rent control," which they are not. As set forth below, this action seeks to nullify the Ordinances as violative of the United States Constitution, on the grounds that they improperly interfere with Plaintiff's members' contracts and due process rights and constitute an uncompensated taking of the fundamental property rights of Plaintiff's members.

9. If allowed to stand, the Ordinances will not only continue to violate Plaintiff's members' rights under the United States Constitution, but will continue to inflict massive and widespread economic damage on property owners and landlords throughout the City, while unconstitutionally placing the entire economic burden of the Pandemic on the backs of property owners and landlords, including Plaintiff's members, who have already been financially crippled by the Pandemic. Many of Plaintiff's members have mortgages on their properties that they are unable to pay without a steady stream of rental income. Plaintiff's members similarly rely on rental income to maintain and secure their properties and pay employees, among other operating and personal expenses, including payment for food and housing for their own families. The vast majority of Plaintiff's members are "mom and pop" landlords holding fewer than 10 units, and nearly 50% of Plaintiff's members have 5 or fewer units. Plaintiff's members are required to pay the substantial property taxes, utility fees and other assessments on their respective properties. Most of Plaintiff's members cannot financially survive if a significant number of their tenants do not pay rent for a prolonged period of time. The effect of the Ordinances will thus be to put many of

Plaintiff's members out of the rental business, either through foreclosure and/or bankruptcy, ultimately reducing the badly needed supply of rental housing within the City and further driving up the cost of housing.  The City was fully aware of this when enacting the Eviction Moratorium, with some officials openly hoping to convert private distressed properties to public housing.  The stakes for immediate relief from this Court could not be higher.

10.    Accordingly, Plaintiff brings this action asserting a ***facial challenge*** to the constitutionality of the Ordinances, which have deprived Plaintiff's members of their fundamental rights and liberties embodied in the United States Constitution.  In doing so, Plaintiff seeks the following remedies:

    a.    Equitable and injunctive relief to enjoin the City's enforcement of the Ordinances;

    b.    Declaratory relief from this Court under 28 U.S.C. § 2201 that the Ordinances violate Plaintiff's members' civil rights under 42 U.S.C. § 1983 of the Federal Civil Rights Act ("Section 1983"), the Contract Clause of the United States Constitution and the Due Process Clause under the Fourteenth Amendment and Fifth Amendment for violation of Plaintiff's due process rights, and effect a taking of private property under the Takings Clause of the Fifth Amendment to the United States Constitution;

    c.    Attorney's fees and costs for the work performed by Plaintiff's counsel in this lawsuit in an amount according to proof; and

    d.    For such other and further relief as this Court deems just and appropriate.

## JURISDICTION AND VENUE

11.    This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiff's members' constitutional rights to due process under the Fifth

and Fourteenth Amendments to the United States Constitution, as well as their constitutional rights pursuant to Article I, Section 10 ("Contracts Clause") of the United States Constitution.  Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has authority to award the requested declaratory relief pursuant to 28 U.S.C. § 2201; the requested injunctive relief pursuant to 28 U.S.C. § 1343(a); and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

12.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because Defendant City of Los Angeles is located within this district and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

13.    Plaintiff Apartment Association of Los Angeles County, Inc., doing business as "Apartment Association of Greater Los Angeles" ("Plaintiff" or "AAGLA") at all relevant times, is and was a California mutual benefit Corporation organized and authorized to do business and doing business in the State of California. Founded in 1917, AAGLA is comprised of over 10,000 members that own or manage over 150,000 rental housing units throughout the counties of Los Angeles, Ventura, and San Bernardino.  For over 100 years, AAGLA has served as an advocate for rental housing providers at the local, county, state, and federal levels of government.

14.    Defendant City of Los Angeles ("City" or "Defendant") is a municipal corporation, organized under its Charter and the laws of the State of California.

15.    Defendant Eric Garcetti ("Garcetti" or "Mayor") is made a party to this Action in his official capacity as the Mayor of Los Angeles in the State of California. Garcetti is sued herein in his official capacity under the rule of *Ex Parte Young* to enjoin the enforcement of the City's Eviction Moratorium and Rent Freeze Ordinance. *Ex Parte Young*, 209 U.S. 123, 152-154 (1908).

16.    Defendant City Council of the City of Los Angeles ("City Council") is made a party to this Action in its official capacity as City Council of the City of Los

Angeles for the State of California.

17.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 25 and therefore sues Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously-named Defendants is in some manner responsible or liable for the events and happenings referred to herein, and that each such fictitiously named Defendant caused injury and damage to Plaintiff's members as alleged in this Complaint.  Plaintiff will seek leave of court to amend this Complaint to allege the true names and capacities of such fictitiously-named Defendants when the same are ascertained.

18.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times hereto, each of the Defendants was the agent of each of the remaining Defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency or employment.

## STANDING

19.     As stated above, Plaintiff's members own and manage rental properties throughout the greater Los Angeles area, including numerous properties within the City of Los Angeles.  Thousands of Plaintiff's members are "Owners," or "Property Owners" as those terms are used in the City's Eviction Moratorium and Rent Freeze Ordinance, whose contractual and ownership rights in their respective properties are directly impacted by the City's Ordinances, and who would thus have standing to challenge such Ordinances in their own right. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

20.     Plaintiff has standing to bring its claims asserting a facial challenge to the Ordinances since it is an association comprised of members who are the subject of enforcement of the City's overbroad and unconstitutional Ordinances, which have the effect of forcing Plaintiff's members to alone bear a public burden by eviscerating Plaintiff's members' ability to contractually collect rent and/or otherwise use their properties as they rightfully so choose.  Specifically, Plaintiff's members have

suffered injuries directly attributable to the following provisions contained in the Ordinances:

(a)     The provision prohibiting an "Owner" from endeavoring "to evict or evict[ing] a residential tenant for non-payment of rent during the Local Emergency Period if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic" codified in Section 49.99.2(A) of the City's Municipal Code;

(b)     The provision prohibiting an "Owner" from endeavoring "to evict or evict[ing] a tenant for a no-fault reason during the Local Emergency Period" codified in Section 49.99.2(B) of the Los Angeles Municipal Code;

(c)     The provision prohibiting an "Owner" from endeavoring "to evict or evict[ing] a residential tenant based on the presence of unauthorized occupants or pets, or for nuisance related to COVID-19 during the Local Emergency Period" codified at Section 49.99.2(C) of the Los Angeles Municipal Code;

(d)     The provision prohibiting an "Owner" from charging "interest or a late fee on rent not paid under the provisions of this article" codified at Section 49.99.2(D) of the Los Angeles Municipal Code;

(e)     The provision requiring an "Owner" to provide notices to tenants inviting them to seek the protections embodied in Section 49.99.2 of the Los Angeles Municipal Code, as further elaborated in Section 49.99.2(E) of said municipal code;

(f)     The provision prohibiting Owners from attempting to "influence" a tenant to use monies received from any government relief program for rent, as codified at Section 49.992(F) of the Los Angeles Municipal Code;

(g)     The provision establishing a private right of action against any

"Owner" who violates Section 49.99 of the Los Angeles Municipal Code, allowing for civil penalties up to $10,000 per violation of the code section, and an additional $5,000 per violation where the "tenant is older than 65 or disabled," as codified at Section 49.99.7 of the Los Angeles Municipal Code; and

(h)    The provision set forth in Section 151.32 of the Los Angeles Municipal Code placing a freeze on rent increases for properties subject to the City's Rent Stabilization Ordinance.

## FACTUAL ALLEGATIONS

### A.    The Outbreak of COVID-19

21.    The global COVID-19 pandemic ("Pandemic") has caused catastrophic and unprecedented economic damage across the globe, and with it, significant loss of life and fundamental changes to both world and national economies. The Coronavirus outbreak has turned the world upside-down, causing profound damage to the lives of all Americans and to the national economy. To be sure, State and U.S. officials have faced tremendous adversity in planning, coordinating, and at times, executing effective nationwide and statewide policies to protect the general public's health, safety and welfare during this time of crisis. However, the Ordinances, as well-intentioned as they may be, have had an unlawful and disparate impact on landlords and property owners to the point of jeopardizing Plaintiff's members' businesses and livelihoods.

22.    In response to the outbreak in the State of California, on March 4, 2020, Governor Newsom issued a "State of Emergency" Order to address the threat of the spread of the Pandemic throughout California's communities. Governor Newsom subsequently issued Executive Order No. N-33-20 on March 19, 2020, which, among other things, mandated that "all individuals living in the State of California" were to "stay home or at their place of residence except as needed to maintain the continuity of operations of the federal critical infrastructure sectors as outlined at

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19."

23.     On March 13, 2020, President Donald J. Trump proclaimed a National State of Emergency as a result of the threat of the Pandemic.

24.     On March 15, 2020, Mayor Garcetti issued a Public Order under the City of Los Angeles's Emergency Authority entitled "New City Measures to Address COVID-19."  Among other things, the Mayor's Order mandated that "no landlord shall evict a residential tenant in the City of Los Angeles during this local emergency period if the tenant is able to show an inability to pay rent due to circumstances related to the COVID-19 pandemic."  The Mayor's Order additionally provided that such circumstances include "loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a member of the tenant's household who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures."  Of note, there were no provisions mandating any sort of documentation be retained by tenants who claim an inability to pay rent due to COVID-19.  Nor were there any protections provided for landlords or property owners rightfully attempting to continue collecting rent.

## B.     The Governor's Eviction-Related Executive Orders

25.     On March 16, 2020, Governor Newsom issued Executive Order No. N-28-20.  In relevant part, the Order purported to suspended provisions of state law that would "preempt or otherwise restrict a local government's exercise of its police power to impose substantive limits on residential or commercial evictions," but only to the extent that "[t]he basis for the eviction is nonpayment of rent . . . arising out of a substantial decrease in household or business income" caused by the Pandemic or the government response thereto.  The order also required that the decrease in income be "documented."  While the Order provided that such protections would only be in effect through May 31, 2020, Executive Order No. N-66-20, issued on May 29, 2020, extended the protections for an additional 60 days from the date of

1  such order.

2      26.    On or about June 30, 2020, Governor Newsom issued Executive Order

3  N-71-20, once again extending N-28-20, this time through September 30, 2020.

4      **C.    The City's Eviction Moratorium**

5      27.    On March 27, 2020, the City Council for Defendant City of Los Angeles

6  enacted Ordinance No. 186585 ("Eviction Moratorium") mandating a "temporary"[1]

7  moratorium on evictions for non-payment of rent for tenants who are unable to pay

8  rent due to circumstances related to the COVID-19 pandemic.    The Eviction

9  Moratorium was signed by the Mayor on March 31, 2020, but retroactively applied to

10  "non-payment eviction notices, no-fault eviction notices, and unlawful detainer

11  actions based on such notices, served or filed on or after March 4, 2020."    The

12  Eviction Moratorium applies to both commercial real property and residential real

13  property, both of which are broadly defined in the ordinance.    The Eviction

14  Moratorium is not set to expire until "the end of the Local Emergency period."    The

15  Local Emergency period is defined as the period of time from March 4, 2020 to the

16  end of the local emergency as declared by the Mayor.    Over five months into the Local

17  Emergency, the Mayor and City Council have given no indication that the emergency

18  period will end in the foreseeable future.    To the contrary, it seems exceedingly likely

19  based on statements from Los Angeles officials that the declared emergency will

20  extend well into 2021.

21      28.    The City's Eviction Moratorium prohibits landlords from terminating

22  tenancies based on (1) non-payment of rent due to COVID-19 related inability to pay

23  (without requiring documentation of such inability); (2) any "no fault" reason for

24  termination;    (3) certain    lease    violations    related    to    unauthorized    occupants,

25  unauthorized pets, and nuisance; and (4) the Ellis Act[2].    The ordinance also allows for

26  ─────────────────

27  [1] The word "temporary" is somewhat misleading, as the Eviction Moratorium has no
specified end date, and extends certain protections an additional 12-months beyond
the "end of the Local Emergency."

28  [2] Landlords are prohibited from removing any occupied units from the rental market
as would otherwise be allowed by the Ellis Act until 60 days after the end of the Local

an extended repayment schedule–giving tenants up to 12-months after the end of the Local Emergency to repay the delayed rent, without any interest or late penalties having accrued.[3]  Further, while it provides that tenants "may" agree to a repayment plan, they are not required to do so.  Thus, a tenant who fails to pay rent during the emergency period can refuse to pay *any* of that back rent for another full year after the emergency order is lifted, before the landlord has any recourse.  Nevertheless, the Eviction Moratorium purports to compel landlords and property owners to continue paying for the tenants' utilities, and to continue maintaining secure and habitable living units pursuant to the terms of the leases.  The Eviction Moratorium thus compels landlords to serve the public's need for housing without payment for rent and with no option to withdraw their premises from the rental housing market.  The Eviction Moratorium fails to provide any protection for the property owners who are unable to pay their mortgages, utilities and operating expenses needed to continue providing habitable units to their tenants.

29.    While the Eviction Moratorium ostensibly protects tenants who are unable to pay rent due to circumstances related to the COVID-19 pandemic, it arbitrarily shifts the financial burden onto property owners, many of whom were already suffering financial hardship as a result of the Pandemic and have no equivalent remedy at law.

30.    Notably, the Eviction Moratorium *does not require* tenants to provide notice of COVID-19-related inability to pay to the landlord or to provide documentation to the landlord, in contrast to the requirements of Newsom's Executive Orders.  While the City provides an *optional* form tenants can use to notify their landlords of a COVID-19-related inability to pay, the form is not mandatory.  The Eviction Moratorium nonetheless prohibits owners from endeavoring to evict any

_____

Emergency period.

[3] The ordinance prohibits an owner from charging interest or a late fee on rent not paid under its provisions.

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

tenant with such an inability, in addition to providing that qualifying inability to pay serves as an affirmative defense to eviction for non-payment.

31. The Eviction Moratorium enables tenants to withhold all rent payments without providing notice to landlords, without providing landlords any documents demonstrating qualifications for protection and without allowing landlords any tribunal to contest a tenant's claim for protection. Indeed, the City Council did everything in its power to eliminate all judicial or non-judicial remedies available to property owners.

32. The City also created a private right of action in favor of tenants only, which allows tenants to sue their landlords for violating the Eviction Moratorium, after providing notice to the landlord and 15-day period to cure the violation. A tenant may bring an action for civil penalties of up to $10,000 per violation (plus up to an additional $5,000 if the tenant is senior citizen or disabled). The private right of action applies from May 12, 2020 forward. Thus, while landlords have been stripped of all remedies and any tribunal to adjudicate grievances, such as a commission or court to protect their rights, tenants are free to go to court to assert monetary claims against their landlords.

33. On May 6, 2020, the City enacted Ordinance No. 186606 as an update to the Eviction Moratorium. The update includes a prohibition on the influencing or attempting to influence, "through fraud, intimidation or coercion, a residential tenant to transfer or pay to the Owner any sum received by the tenant as part of any government relief program." The City did so notwithstanding the fact that, as discussed in more detail below, such government relief programs were specifically designed to allow individuals to continue meeting their monthly expense obligations such as rent.

**D.** **The City's Rent Freeze Ordinance**

34. On March 30, 2020, Mayor Garcetti enacted Ordinance No. 186607 ("Rent Freeze Ordinance"), prohibiting owners from increasing rents on occupied

1  rental units that are subject to the City's rent control provisions beginning on the date

2  of the order.  As a result, property owners, like Plaintiff's members, are prohibited

3  from increasing rents on occupied rental units subject to the Ordinance through

4  sixty (60) days after the expiration of the local emergency period.

5       35.    On May 6, 2020, the City Council extended the Rent Freeze Ordinance

6  to *one year* after the expiration of the Local Emergency period.

7       36.    The Rent Freeze Ordinance freezes all rents without any consideration

8  of the impact of such rent freezes on the legally required mandate that rent control

9  programs allow for a "fair return" to the property owner.

10      **E.    The Alleged Statutory Basis for the City's Eviction Moratorium**

11      37.    The City's Eviction Moratorium cites the Governor's Executive Order

12  No. N-28-20 as allegedly authorizing the City to establish additional measures to

13  promote housing security and stability to protect public health and mitigate the

14  economic impacts of COVID-19.  The Rent Freeze Ordinance is notably silent as to

15  any statutory basis for its enactment, but otherwise states the ordinance is "required

16  for the immediate protection of the public peace, health and safety for the following

17  reasons:  the City of Los Angeles will suffer irreparable damage, including loss of life

18  and property, should the devastating effects of COVID-19 not be quickly mitigated."

19      38.    Notably, the City's Ordinances do not impose the same obligations on

20  tenants as do Newsom's eviction-related Executive Orders, such as mandating tenants

21  "retain verifiable documentation" to support a "substantial decrease in household or

22  business  income  related  to  COVID-19."    *See*  Newsom's  Executive  Order

23  No. N-37-20.  Additionally, Newsom's Executive Order No. N-37-20 specifically

24  states, "Nothing in this Order shall prevent a tenant who is able to pay all or some of

25  the rent due from paying that rent in a timely manner or relieve a tenant of liability

26  for unpaid rent."

27

28

**F.      The CARES Act and Increased Availability of Unemployment Benefits**

39.      To combat the growing financial losses suffered by many Americans during the Pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, signed into law by President Trump on March 27, 2020. The CARES Act provides over $2 trillion in direct economic assistance for American workers, families, and small businesses, and preserves jobs for American industries.[4]

40.      Specifically, the CARES Act expands the scope of individuals who are eligible for unemployment benefits, including those who are "furloughed" or otherwise unemployed as a direct result of COVID-19, including self-employed individuals, independent contractors, gig workers/freelancers, and those who have exhausted state and federal unemployment benefits.  It provides for Economic Impact Payments to American households of up to $1,200 per adult for individuals whose income was less than $99,000 (or $198,000 for joint filers) and $500 per child under 17 years old – or up to $3,400 for a family of four.  The Act adds $600 per week from the federal government on top of whatever base amount a worker receives from the state.

41.      Under the CARES Act, employers of all sizes that face closures or suffer economic hardship due to COVID-19 are incentivized to keep employees on the payroll through a 50% credit on up to $10,000 of wages paid or incurred from March 13, 2020 through December 31, 2020.[5]

42.      To be eligible for unemployment benefits under the CARES Act, individuals must provide self-certification to the state that they are (1) partially or fully unemployed, or (2) unable and unavailable to work because:

a.      They have been diagnosed with COVID-19 or have symptoms of

---

[4]  https://home.treasury.gov/policy-issues/cares/assistance-for-american-workers-and-families
[5]  https://home.treasury.gov/policy-issues/cares/preserving-jobs-for-american-industry

1       it and seeking diagnosis;

2       b.      A member of their household has been diagnosed with COVID-
3               19;

4       c.      They are providing care for a family or household member
5               diagnosed with COVID-19;

6       d.      A child or other person in the household for whom they have
7               primary caregiving responsibility is unable to attend school or
8               another facility that is closed as a direct result of the COVID-19
9               health emergency, and such school or facility care is required for
10              the individual to work;

11      e.      They cannot reach the place of employment because of a
12              quarantine imposed as a direct result of the COVID-19 health
13              emergency;

14      f.      They were scheduled to start employment and do not have a job
15              or cannot reach their place of employment as a result of the
16              COVID-19 public health emergency;

17      g.      They have become the breadwinner or major support for a
18              household because the head of household has died as a direct result
19              of COVID-19;

20      h.      They had to quit their job as a direct result of the COVID-19 public
21              health emergency;

22      i.      Their place of employment is closed as a direct result of the
23              COVID-19 public health emergency; or

24      j.      They meet other criteria established by the Secretary of Labor.

25      43.     The CARES Act allows for substantial unemployment benefits for
26 virtually every American directly or indirectly impacted by the Pandemic.  Individuals
27 who meet the above criteria will receive the weekly benefit as determined by their
28 state for a maximum of 39 weeks, plus Pandemic Unemployment Compensation

("PUC") equal to $600 per week on top of the normal unemployment benefit. Individuals who were previously approved for unemployment benefits will continue to receive their weekly unemployment benefit for a maximum of 39 weeks.  Since most states provide 26 weeks of unemployment benefits, the CARES Act effectively expands coverage for an additional 13 weeks.

44.     One of the more notable "loopholes" of the CARES Act is the "windfall" received by many employees, where individuals actually receive *higher wages* through available unemployment benefits in comparison to their wages pre-Pandemic. For example, if an employer places an employee on a reduced schedule, depending on the employee's rate of pay, he or she may receive a "windfall" by receiving PUC. That is, the employee may receive more through unemployment benefits than he or she would have at work.  The CARES Act does not address whether a state has the authority to adjust PUC for employees who are considered "partially unemployed" under state law.

45.     While the stated goal of the CARES Act was to replace employee wages that had been impacted by COVID-19, the result is many individuals may now be eligible for more money while unemployed than they made while working.

46.     A new analysis by Peter Ganong, Pascal Noel and Joseph Vavra, economists at the University of Chicago, uses government data from 2019 to estimate that 68% of unemployed workers who can receive tax-free benefits are eligible for payments that are greater than their lost earnings.[6]  They also found that the estimated median replacement rate – the share of a worker's original weekly salary that is being replaced by unemployment benefits – is 134%, or more than 1/3 above their original wage.  A substantial minority of those workers, particularly in low-wage professions like food service and janitorial work, may end up receiving more than 150% of their previous weekly salary.

---

[6] https://fivethirtyeight.com/features/many-americans-are-getting-more-money-from-unemployment-than-they-were-from-their-jobs/

47.     In addition to the CARES Act and PUC, there are several additional financial resources available to individuals as a result of the Pandemic, such as the Families First Coronavirus Response Act ("FFCRA"), new paid leave laws under the Family and Medical Leave Act ("FMLA"), and relief from federal student loans, to name a few.  Thus, the premise behind the Ordinances—*i.e.*, that dramatic action by the City was necessary to prevent huge numbers of Los Angeles residents from being removed from their housing due to Pandemic-related financial hardship—is simply false.

48.     While the financial resources available to tenants impacted by COVID-19 abound, the remedies available to landlords and property owners are noticeably absent.  Landlords and property owners, like Plaintiff's members, are still responsible for paying mortgages, property taxes, utilities, security, managers, government-imposed fees, employee salaries, and a host of other expenses needed to maintain and operate their rental properties.

**G.      The City's Ordinances Violate the Constitutional Rights of Plaintiff's Members**

49.     As a result of the issuance and enforcement of the City's Ordinances, the City has violated Plaintiff's members' constitutional rights to the free use of their properties.  The Ordinances abrogate Plaintiff's members' contractual rights in that they permit tenants to unilaterally violate the terms of their leases, without the landlords' or lessors' consent.

50.     "To be sure, individual rights secured by the Constitution do not disappear during a public health crisis."  *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020).  Fundamental and unalienable rights are by their very nature "essential" – they are the essential rights which led to the founding of this country and this state.  For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public.  But the ultimate strength of our constitutional guarantee lies in the unhesitating application in times of

crisis and tranquility alike." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring).

51.    "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.  The Constitution was adopted in a period of grave emergency.  Its grants of power to the federal government and its limitations of the power of the States were determined in light of emergency, and they are not altered by emergency.  What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-426 (1934) ("*Blaisdell*").

52.    Plaintiff's members desire to protect their properties, while at the same time giving reasonable opportunity for their tenants to maintain their tenancies.  In order to do so, Plaintiff's members must have the ability to commence a residential non-payment proceeding before a Court of competent jurisdiction.   Any relief afforded to tenants that is justified by the public health emergency, in order not to contravene Plaintiff's members' constitutional rights, can only be of character appropriate to that emergency, and granted only upon reasonable conditions. *Blaisdell, supra,* 290 U.S. at 445.  In cases of leases, the Supreme Court has observed that relief may be appropriate where "the relief afforded was temporary and conditional; that it was sustained because of the emergency due to scarcity of housing; ***and that provision was made for*** <u>***reasonable compensation***</u> ***to the landlord during the period he was prevented from regaining possession***." *Id.* at 441-442 (emph. added).

53.    Here, however, the City's Ordinances are neither "appropriate," nor granted upon "reasonable conditions."  The relief afforded is neither temporary nor conditional.  Nor do the Ordinances provide for "reasonable compensation" to the landlords or lessors, during the indefinite period the Ordinances are to remain in

effect.   Indeed, the Eviction Moratorium expressly allows tenants to remain in possession without paying any rent during the emergency period.  The Ordinances are not addressed to a legitimate end and the measures taken by the City are not reasonable or appropriate to that end. *Blaisdell, supra,* 290 U.S. at 438.

54.   The City's Ordinances have caused widespread and catastrophic financial damage to landlords and lessors, like Plaintiff's members, who have no remedies available to them by which to recover the losses caused by their tenants' non-payment of rent.  There exist hundreds of thousands of rental properties subject to the Ordinances within the City.  Even a modest reduction in rent payments as a result of the Ordinances would equate to tens of millions of dollars in lost rent per month.  A year's worth of lost rent City-wide would easily equate to billions of dollars in losses borne exclusively by property owners with rental properties in the City.  Accordingly, Plaintiff seeks injunctive and declaratory relief against the City for violations of the United States Constitution, the Federal Civil Rights Act, 42 U.S.C. § 1983 ("FCRA"), and the Declaratory Judgment Act, 28 U.S.C. § 2201 ("DJA"), as follows:

a. Enjoin and declare the Ordinances invalid as violative of the Contracts Clause of Article I, Section 10 of the United States Constitution.

b. Declare the Ordinances effect a taking under the Takings Clause of the Fifth Amendment to the United States Constitution.

c. Enjoin and declare the Ordinances further violate the substantive and procedural due process under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

d. Declare the Ordinances subject the City to liability under 42 U.S.C. § 1983 as a deprivation of Plaintiff's members' rights, privileges, and immunities secured by the United States

1                  Constitution and/or laws of the United States to which Plaintiff's

2                  members are and were legitimately entitled.

3       55.    Moreover, the City's Ordinances are not "narrowly tailored" to further

4 any compelling governmental interest.  On the contrary, while the Ordinances were

5 ostensibly intended to protect tenants from being evicted due to their inability to pay

6 rent, this goal could have been achieved by far less intrusive means, including, but

7 not limited to:  (a) permitting the courts to hear each case on its own merits and

8 fashion relief appropriate to the specific positions of the affected landlords and

9 tenants, thereby protecting tenants from immediate eviction but also providing

10 protection to landlords from excessive periods of non-payment; (b) requiring tenants

11 to substantiate the criteria for qualifying for protection under the Ordinances through

12 documentation or other evidence; (c) providing landlords a tribunal or other forum to

13 challenge a tenant's claimed qualification for protection under the Ordinances;

14 (d) providing tenants with the means to pay rent in order to satisfy the City's tenant

15 protection goals, without requiring landlords to bear the burden and threat of

16 significant non-payment of rent to implement the City's tenant protection program;

17 and/or (e) ensuring owners their constitutional right to a "fair return" by compensating

18 landlords and property owners directly when a tenant fails to pay rent in order to

19 continue occupying the premises to slow the spread of the virus.

20       56.    Instead, the City's Ordinances give tenants a present sense that they are

21 not contractually bound to pay *any* portion of rent for an indefinite period of time,

22 e.g., up to twelve (12) months *after* the Local Emergency Period ends.  Nor do the

23 City's Ordinances provide a vehicle by which landlords or lessors, like Plaintiff's

24 members, can continue to collect rent from those with an ability to pay (including

25 even a portion of their rent) or a forum within which lessors and landlords could

26 challenge tenant claims.

27       57.    Without immediate relief, Plaintiff's members are subject to

28 administrative penalties and massive fines based on the enforcement of the City's

Ordinances.  Unless and until injunctive relief is granted, Plaintiff's members will continue to suffer irreparable harm for which they are left without an adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### Violation of the Contracts Clause/42 U.S.C. § 1983

### (U.S. Const. Art. 1, § 10)

### (*By Plaintiff against All Defendants*

58.    Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

59.    The Contracts Clause, Art. 1, § 10, of the United States Constitution, provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." The Contracts Clause applies to cities and prohibits cities from enacting ordinances that substantially impair Plaintiff's members' existing, lawful contracts.

60.    The Ninth Circuit has ruled that Contracts Clause violations are indeed actionable under 42 U.S.C. § 1983.  Specifically, the Ninth Circuit has stated, "The right of a party not to have a State, or a political subdivision thereof, impair its obligations of contract is a right secured by the first article of the United States Constitution.  A deprivation of that right may therefore give rise to a cause of action under section 1983."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003).

61.    In determining whether a contractual impairment is substantial, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Sveen v. Melin*, 138 S.Ct. 1815, 1822 (2018).  If a court determines that a law works a substantial impairment, it then considers "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Sveen, supra*, 138 S.Ct. at 1822 (quoting *Energy*

1   *Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411-12 (1983).

2        62.    Where, as here, a law substantially impairs a contract, the public entity

3   bears the burden of showing that the impairment is both reasonable and necessary.

4   "The government must use the least intrusive means to achieve its goals.  It is not free

5   to impose a drastic impairment when an evident and more moderate course would

6   serve its purposes equally well."  *Interstate Marina Dev. Co, supra,* 155 Cal.App.3d

7   435, at 445-46 (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 31 (1977).

8        63.    Under these standards, the Ordinances violate the Contracts Clause of

9   the United States Constitution.  The Eviction Moratorium and Rent Freeze Ordinance

10  fundamentally upend the contractual bargains struck between Plaintiff's members and

11  their tenants by effectively relieving the tenants of their obligation to pay rent and

12  comply with certain other provisions of their leases, and leaving owners, like

13  Plaintiff's members, without any recourse for an undetermined period of time.  Under

14  the Eviction Moratorium, Plaintiff's members, as well as other property owners

15  and/or landlords, are required to allow tenants to remain on the properties rent free

16  for an unspecified duration of time, thus depriving Plaintiff's members of the

17  opportunity to collect any portion of rent from their current tenants, or otherwise rent

18  their properties to tenants who can pay rent.  Such an ordinance is the quintessential

19  "substantial" impairment, as it "undermines the contractual bargain, interferes with a

20  party's reasonable expectations, and prevents the party from safeguarding or

21  reinstating his rights."  *Sveen, supra,* 138 S.Ct. at 1822.

22       64.    Rent control measures – like the City's Ordinances - are constitutionally

23  infirm on their face if they operate to deprive owners of a "just and reasonable" return

24  on their property by foreclosing all avenues to assure owners a "fair return" on their

25  properties, or precluding owners from petitioning the government to address

26  grievances or disputes arising under the government's interference and control over

27  the landlord-tenant relationship.  *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988);

28  *Sierra Lake Reserve v. City of Rocklin* 938 F.2d 951, 956-958 (9th Cir. 1991).

65.     The Eviction Moratorium further unilaterally rewrites all residential leases within the City to delete restrictions on pets and on who is authorized to occupy the leased property—without any attempt to tie such impairments to the Pandemic. Even if there were a legitimate purpose behind the City's Ordinances, the complete obliteration of Plaintiff's members' contracts and tenants' obligations to pay rent under such contracts is not a reasonable way of achieving that purpose.  Accordingly, the contractual impairments effectuated by the enactment and enforcement of the City's Ordinances violate the Contracts Clause and are unconstitutional.

66.     In applying the City's Ordinances to Plaintiff's members, the City has acted under color of statute, ordinance, regulation and policy of the municipality.  The City's conduct has deprived Plaintiff's members of the rights, privileges, and immunities secured by the United States Constitution and/or laws of the United States to which Plaintiff's members are and were legitimately entitled.

67.     Plaintiff's members have no adequate remedy at law to prevent or redress the irreparable injuries alleged herein.

68.     Unless the City is enjoined and restrained from enforcing or threatening to enforce the City's Ordinances, Plaintiff's members will be irreparably injured. Plaintiff's members will be deprived of rights guaranteed under the United States Constitution, and will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which will be extremely difficult or impossible to ascertain.  While Plaintiff's members are free to sue the City for damages stemming from the continuous and sustained loss of rent over the as yet undefined period of time, by the time the rent payment obligations are restored in the future, many will have lost their properties to foreclosure.  As the City's constitutional violations are ongoing, Plaintiff's members are also entitled to injunctive relief now.

69.     Finally, the City's conduct has required Plaintiff to incur attorneys' fees and costs of suit to bring this action, and Plaintiff is entitled to attorneys' fees and costs under, *inter alia*, 42 U.S.C. § 1983 *et seq.* and 42 U.S.C. § 1988(b).

## SECOND CLAIM FOR RELIEF

**Uncompensated Taking Implicating the Takings Clause of the Fifth Amendment to the United States Constitution/42 U.S.C. § 1983**

***(By Plaintiff against All Defendants)***

70.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

71.     The Takings Clause, present in the Fifth Amendment to the United States Constitution, provides that private property shall not "be taken for public use, without just compensation." U.S. Const., amend. V.

72.     The purpose of the Takings Clause is to "bar [] Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole." *Lingle v. Chevron Corp.*, 544 U.S. 528, 537 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Government action may implicate the Takings Clause where it is "the functional [] equivalent [of] the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id*. At 539.

73.     The United States Supreme Court has repeatedly acknowledged that takings liability under the Fifth Amendment to the United States Constitution may be redressed under 42 U.S.C. § 1983.

74.     The Ordinances in this case fall squarely within the "physical occupation" line of cases the United States Supreme Court has held constitute "per se" categorical takings for which the government is required to pay "just compensation." The Eviction Moratorium compels landlords to continue providing a public service of rental housing in the absence of any mechanism to ensure landlords receive a "fair return" and further deprives owners of any ability to mitigate rental losses. While the Ordinances purport to allow owners to recover rent from such individuals at some point in the future, they do nothing to protect property owners

from losses they will undoubtedly sustain when such tenants are unable to pay their rental obligations in the future or to compensate property owners for the rent they could have obtained from new paying tenants if the City did not indefinitely ban all evictions.   The City has thus eliminated the property owners' fundamental constitutional right to exclude nonpaying tenants from their respective properties. As Justice Thurgood Marshall proclaimed in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 436 (1982), "property law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property" and "[t]o require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury."   As the Supreme Court acknowledged, "our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal impact on the owner." *Id.* at 435.

75.   While the landlord-tenant relationship has historically been the subject of regulation, the owners' consent to tenant occupancies subject to regulation has always been premised upon the owners receiving a "fair return" on such occupied units and has never been subject to tenants occupying the units without paying a "reasonable rent" and without assurance from the regulating body that the owners will receive a "fair return."

76.   The Eviction Moratorium allows for tenants to continue occupying their respective units without payment of rent for an indefinite period of time without the assurance that any rent that remains unpaid may actually be collected by the owners. The Ordinances further eliminate the owners' ability to mitigate their damages by re-letting the premises to paying tenants.

77.   In addition, and independent from the indefinite eviction ban, the Ordinances force owners to accept pets and family members into units, even where leases prohibit such pets and additional family members and occupants.   Such provision constitutes a "per se" physical occupation taking under *Loretto, supra,* 458

1  U.S. at 436.

2      78.    The Eviction Moratorium constitutes the functional equivalent of the

3  City commandeering private rental units to aid in the City's desire to provide housing

4  to Los Angeles residents at no cost to the tenant or the City.  The Ordinances and the

5  enforcement thereof have caused both a complete and total regulatory and physical

6  taking of Plaintiff's members' properties without just compensation as required under

7  the Takings Clause of the Fifth Amendment to the U.S. Constitution.

8      79.    Further, while the Eviction Moratorium theoretically allows property

9  owners to eventually try to collect the rent deferred under the ordinance, it does not

10 allow any interest or late fees to be charged on such rent, thereby depriving property

11 owners of their constitutional right to the time value of their money.  In reality,

12 practical implications are much more severe, both because: (1) the odds of actually

13 recovering many months of back rent from tenants a year after the fact are extremely

14 low; and (2) many property owners will lose their properties as a result of their

15 inability to pay their mortgages and property taxes due to non-payment of rent.

16     80.    Additionally, where the effect of the City's Rent Freeze Ordinance

17 would necessarily be to lower rents more than could reasonably be considered to be

18 required for the Ordinance's stated purpose, such Ordinance is unconstitutionally

19 confiscatory.  *Birkenfeld, supra,* 17 Cal.3d at 165 (citing *Federal Power Comm'n v.*

20 *Natural Gas Pipeline Co.*, 315 U.S. 575, 585-586 (1942).  Here, the effect of the

21 City's Rent Freeze Ordinance is confiscatory as tenants may never be able to repay

22 back rent, nor are they obligated to repay interest or late fees that would have

23 otherwise accrued.

24     81.    Finally, the "character of governmental action" constitutes a clear

25 physical invasion of private property.  *Lingle, supra,* 544 U.S. at 537.  After all, the

26 Ordinances would effectively require Plaintiff's members to allow their tenants to

27 continue to occupy the properties free of charge *and* requires Plaintiff's members to

28 allow their tenants to remain there for the foreseeable future.

82.    Plaintiff's members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the City is enjoined from implementing and enforcing the Eviction Moratorium.

83.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Eviction Moratorium as an uncompensated taking.

84.    Alternatively, in the event the Court is not inclined to grant injunctive relief enjoining an uncompensated taking, under 28 U.S.C. § 2201, Plaintiff is entitled to declaratory relief determining that the City's Ordinances effect a taking of private property under the Takings Clause of the Fifth Amendment to the United States Constitution.

85.    Plaintiff found it necessary to engage the services of private counsel to vindicate the rights of its members under the law.  Plaintiff is therefore entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF

**Violation of the Due Process Clause of the Fourteenth Amendment**

**to the United States Constitution/42 U.S.C. § 1983**

**(*By Plaintiff against All Defendants*)**

86.    Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

87.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution stands as an additional constitutional hurdle to the City's enactment of the Ordinances.  The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," including the "specific freedoms protected by the Bill of Rights" and "those fundamental rights and liberties which are, objectively, 'deeply rooted in

this Nation's history and tradition,'" such as property rights. *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 502 (1977)). Thus, while the "police power" of the government may be broad, it "must be exercised within a limited ambit and is subordinate to constitutional limitations." *Panhandle E. Pipe Line Co. v. St. Highway Comm'n of Kansas*, 294 U.S. 613, 622 (1935).

88.     The City's police power therefore does not afford "unrestricted authority to accomplish whatever the public may presently desire." *Panhandle E. Pipe Line Co. v. St. Highway Comm'n of Kansas*, 294 U.S. 613, 622 (1935). Instead, "[i]t is the governmental power of self-protection and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury." *Id.*

89.     Therefore, "a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle, supra,* 544 U.S. at 542; *Rea v. Matteucci*, 121 F.3d 483, 485 (9th Cir. 1997) (under Due Process Clause a "federal interest remains in protecting the individual citizen from state action that is wholly arbitrary or irrational"). Furthermore, a law violates the Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).

90.     The Ordinances and enforcement thereof, violate Plaintiff's members' substantive and procedural due process rights secured by the Fourteenth Amendment to the United States Constitution. Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. *Duncan v. Louisiana*, 391 U.S. 145,

147-149 (1968).  In addition, these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs.  *See, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Grisworld v. Connecticut*, 381 U.S. 479, 484-486 (1965).

91.    In the context of price controls and rent controls, where the government requires private interests to continue serving the public under threat of civil or criminal penalty, the Due Process clause requires the government to afford a process by which Owners may contest application of the restriction to a given set of circumstances.  *Yakus v. United States (Rottenberg)* 321 U.S. 414, 437-438 [upholding price control regulation providing multiple layers of government review and noting that regulatory scheme did not "compel" continued service].

92.    The Eviction Moratorium fails to provide any tribunal for property owners to contest a tenant's claim for protection under the moratorium.  The City's regulatory scheme under this emergency does not even require tenants to notify their landlords of an intent to seek protection under the Ordinances, nor does it allow for any forum (administrative or otherwise) for landlords to contest a tenant's claim for protection.  The lack of any process by which a landlord may assert its grievances for any particular tenant constitutes a clear violation of procedural and substantive due process guaranteed by the Due Process Clauses embodied in the Fourteenth and Fifth Amendments.

93.    The Eviction Moratorium, which compels landlords to accept non-paying tenants for the foreseeable future, also fails to provide any mechanism for landlords to obtain a "fair return," as required in all price and rent control schemes.  By compelling landlords to provide a public service (the furnishing of housing during the pandemic without rent payments), the City has deprived owners of their constitutional right to a fair return for the foreseeable future with no assurance that tenants will actually be able to pay many months of back rent by the end of the one-year grace period.  In addition. the Eviction Moratorium eliminates a landlord's ability

1  to mitigate rent losses from those tenants who invoke the protections of the Eviction
2  Moratorium.

3         94.    To add insult to injury, the Eviction Moratorium provides tenants with
4  more process than they already had under the City's municipal code and state law.
5  The Eviction Moratorium provides a brand new private right of action in favor of
6  tenants, and allows them to seek excessive civil penalties from landlords alleged to
7  have violated the Eviction Moratorium.  The new private right of action provides for
8  statutory penalties in the amount of $10,000 per violation, or $15,000 per violation
9  where the tenant is disabled or over 65 years of age.  There is no question the
10 Ordinances compel landlords to continue providing service to the public by
11 continuing to furnish habitable units to their tenants without payment from tenants
12 who assert protection under the Eviction Moratorium.  Moreover, owners must
13 continue to pay utilities, property taxes, maintenance expenses, security expenses,
14 mortgage payments, and other operating expenses to continue providing housing to
15 the public without receiving rent income from tenants asserting protection under the
16 Eviction Moratorium.

17        95.    The Ordinances, which expressly deprive Plaintiff's members' of their
18 rights and liberties in the use of their properties, does not afford Plaintiff's members
19 with a constitutionally adequate hearing to present their case to disallow the Eviction
20 Moratorium and Rent Freeze Ordinance, and specifically the unreasonable prohibition
21 on the collection of rent and termination of rightful eviction processes.  As a result of
22 the Ordinances, Plaintiff's members are unjustifiably prevented from being able to
23 rightfully use their properties and mitigate damages where tenants fail to pay rent.  At
24 a minimum, Plaintiff avers that its members should be able to continue to collect rent
25 from those tenants who are able to pay even a reasonable portion of the total amount
26 of rent due and owing, and should be allowed a forum to contest a tenant's claim
27 concerning qualifications for protections under the Ordinances. *Home Bldg. & Loan*
28 *Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934); see also *Block v. Hirsh* 256 U.S. 135,

157 [upholding rent freeze and eviction moratorium in declared state of emergency where "[m]achinery [was] provided to secure to the landlord a reasonable rent]"].

96.     Here, where California's unlawful detainer statutes are designed to "provide landlords with a summary procedure for exercising their rights of repossession against tenants" and fully occupy the field with respect to that procedure, the Ordinances have deprived Plaintiff's members of their procedural and substantive due process rights by "raising procedural barriers between the landlord and the judicial proceeding." *Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 151 (1976); see also *Yakus, supra*, 321 U.S. at 437-438 [due process is denied where government compels private party to provide public benefit without the option to withdraw from industry].  By enacting a law inconsistent with the general laws of the state – which wholly preempt the local ordinances – the City's Eviction Moratorium is arbitrary and capricious. The Eviction Moratorium goes far beyond what was contemplated by Newsom's Executive Order N-28-20 and directly infringes on Plaintiff's members' procedural and substantive due process rights, in violation of the Fourteenth Amendment to the United States Constitution.

97.     Not only have Defendants eliminated the courts as a forum ***for a landlord*** to challenge rental disputes concerning the payment of rent, but they have eliminated any ability of a landlord to exercise her constitutional right to have an impartial decision-maker adjudicate her grievance or claim that a particular tenant does not qualify for protection.

98.     Moreover, where a rent control law, such as the City's Rent Freeze Ordinance, produces unreasonable delay or unnecessarily cumbersome procedural requirements for obtaining approval of a rent increase, such law violates the landlord's procedural due process rights. *Birkenfeld, supra,* 17 Cal.App.3d at 169-173 ["[R]ent adjustment mechanisms must operate without a substantially greater incidence and degree of delay than is practically necessary."]; see also *Galland v. City of Clovis*, 24 Cal.4th 1003, 1039 (2001).  The City's Rent Freeze Ordinance is not set to expire

until a **_full year_** after the end of the local emergency, a prime example of unreasonable and unconstitutional delay. The City's Rent Freeze Ordinance imposes a blanket rent freeze on all properties subject to the City's Rent Stabilization Ordinance, without any particularized determination concerning the individual landlords' financial impacts, capital improvements or other costs that landlords are entitled to capture by rent increases.

99.    The City failed to comply with the procedural and substantive requirements of the United States Constitution in connection with Plaintiff's members' rights and liberties as they relate to their respective properties, which would have given Plaintiff and its members a meaningful opportunity to respond to the proposed ordinances and explain how and why they were so deeply flawed and unconstitutional.

100.   Because the City's decision in issuing the Eviction Moratorium and Rent Freeze Ordinance was made in reliance on procedurally deficient and substantively unlawful processes, Plaintiff's members were directly and proximately deprived of the rightful use of their properties, and consequently, their ability to lawfully operate their properties without unconstitutional government overreach.

101.   Because the City's decisions were made without regard to the United States Constitution, or any "law" for that matter, Plaintiff's members were directly and proximately deprived of their property rights absent substantive and procedural due process of law, in violation of the Fifth Amendment and Fourteenth Amendment to the United States Constitution.

102.   Plaintiff and its members have no adequate remedy at law and will suffer continued serious and irreparable harm to their constitutional rights unless the City is enjoined from implementing and enforcing the Eviction Moratorium and Rent Freeze Ordinances.

103.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief

invalidating and restraining enforcement of the Ordinances.  Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a Declaratory Judgment declaring the Ordinances invalid as violative of the Due Process Clauses of the Fifth Amendment and Fourteenth Amendment to the United States Constitution.

104.   Plaintiff found it necessary to engage the services of private counsel to vindicate its rights under the law. Plaintiff is therefore entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988.

### FOURTH CLAIM FOR RELIEF

**Violation of the Tenth Amendment to the United States Constitution**

***(By Plaintiff against All Defendants)***

105.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

106.   The California Supreme Court has found that "While the police power is very broad in concept, it is ***not without restriction*** in relation to the taking of damaging of property.  When it passes ***beyond proper bounds in its invasion of property rights***, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation." *House v. Los Angeles County Flood Control Dist.*, 25 Cal.2d 384 (1944) (Emphasis added).

107.   In this case, the City mandated that property owners allow tenants to continue to occupy rental units without paying rent, and without providing any mechanism for owners to be made whole.  Such a mandate completely and unconstitutionally deprived Plaintiff's members of all economically beneficial use of their properties without just compensation.

108.  A government's "police power" is restricted by Constitutional considerations, including the Fifth Amendment's "Takings Clause," as well as the Due Process and Equal Protection Clauses.  The California Constitution requires that a municipality's exercise of its police power must bear a "reasonable relation to the

public welfare." *Associated Home Builders etc., Inc. v. City of Livermore*, 18 Cal.3d 582, 604–605 (1976).  The ordinance must have a real and substantial relation to the public welfare," and "[t]here must be a reasonable basis in fact, not in fancy, to support the legislative determination."  *Id*. at 609.

109.   The Ordinances go beyond a legitimate exercise of police power in numerous respects.  For example, the Eviction Moratorium bars evictions that are necessary to maintain the public welfare, including evictions for lease breaches that have nothing to do with the Pandemic—like unauthorized occupants and pets.  It likewise bans evictions for other unspecified "nuisance related to COVID."  Thus, landlords are prohibited from taking necessary actions to stop nuisances if such measures are "related to COVID."  These restrictions not only prevent owners from protecting their own property, but from protecting their other tenants from such nuisance, thus harming, rather than promoting, the public welfare.

110.   Additionally, the City's Rent Freeze Ordinance falls outside the bounds of a legitimate exercise of police power, since it is not reasonably calculated to relieve excessive rents while simultaneously providing landlords with just and reasonable return on their property.  *Birkenfeld, supra,* 17 Cal.3d at 165 (citing *Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585-586 (1942).  Here, Plaintiff's members are not provided any returns on their property for as long as the Ordinances remain in effect.  Where such provisions would necessarily lower rent more than could be reasonably considered to be required, they are unconstitutionally confiscatory. *Id.*

111.   Likewise, as described above, numerous other provisions of the Ordinances are not tailored to further a legitimate public purpose and will harm the public welfare.  As such, they are not proper exercises of the police power.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff requests that this Court:

1.    Issue a declaratory judgment that the City's Ordinances are null and

1  void, and of no effect, as:

2          a.   unconstitutional as violative of the Contracts Clause of Article I,
3               Section 10 of the United States Constitution;

4          b.   effecting an uncompensated taking under the Takings Clause of
5               the Fifth Amendment to the United States Constitution;

6          c.   unconstitutional and in violation of procedural and substantive due
7               process guaranteed by the Due Process Clauses of the Fifth
8               Amendment and Fourteenth Amendment to the United States
9               Constitution;

10         d.   in excess of statutory jurisdiction, authority, or limitations, or
11              short of statutory right in violation of the United States
12              Constitution;

13         e.   a violation of 42 U.S.C. § 1983 as a deprivation of Plaintiff's
14              members' rights, privileges, and immunities secured by the United
15              States Constitution and/or laws of the United States.

16  2.   Set aside and hold unlawful the City's Ordinances;

17  3.   Permanently enjoin the City and all persons and entities in active concert
18  or participation with the City from implementing and enforcing the City's
19  Ordinances;

20  4.   Issue a preliminary injunction preventing the City from enforcing or
21  implementing the Ordinances until this Court decides the merits of this lawsuit;

22  5.   Permanently enjoin the City and all persons and entities in active concert
23  or participation with the City from enforcing the Ordinances unless the ordinance is
24  issued in accordance with all procedural and substantive due process requirements of
25  the United States Constitution;

26  6.   Award Plaintiff at least nominal damages;

27  7.   Award Plaintiff its costs and reasonable attorney's fees incurred in this
28  action pursuant to 42 U.S.C. § 1988 and other applicable law; and

1      8.      Grant all other such relief to Plaintiff as the Court may deem proper and

2  just.

3

4  Dated:  August 7, 2020                    RUTAN & TUCKER, LLP
                                            DOUGLAS J. DENNINGTON
5                                           JOHN A. RAMIREZ
                                            PETER J. HOWELL
6                                           KELSEY E. QUIST

7                                           By:      s/ Douglas J. Dennington

8                                                Douglas J. Dennington
                                                Attorneys for Plaintiff
9                                                Apartment Association of Greater Los
                                                Angeles
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiffs hereby demand a jury trial as to all claims and causes for which a

3     jury trial is available.

4

5     Dated:  August 7, 2020                    RUTAN & TUCKER, LLP
                                                DOUGLAS J. DENNINGTON
6                                               JOHN A. RAMIREZ
                                                PETER J. HOWELL
7                                               KELSEY E. QUIST

8                                               By:        /s/ Douglas J. Dennington

9                                                  Douglas J. Dennington
                                                   Attorneys for Plaintiff
10                                                 APARTMENT ASSOCIATION OF
                                                   GREATER LOS ANGELES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28