OFFICE OF THE LOS ANGELES CITY ATTORNEY
MICHAEL N. FEUER, City Attorney (SBN 111529)
CRAIG TAKENAKA (SBN 128898)
DEBORAH BREITHAUPT (SBN 170206)
ELAINE ZHONG (SBN 286394)
City Hall, 200 North Spring Street, 21st Floor
Los Angeles, California  90012
Telephone: (213) 922-8382

DAVID MICHAELSON (SBN 138445)
MATTHEW SCHERB (SBN 237461)
200 North Main Street, City Hall East
Los Angeles, California 90012

Attorneys for Defendants CITY OF LOS ANGELES,
ERIC GARCETTI, CITY COUNCIL OF THE
CITY OF LOS ANGELES

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APARTMENT ASSOCIATION OF LOS ANGELES COUNTY, INC., dba "APARTMENT ASSOCIATION OF GREATER LOS ANGELES," <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF LOS ANGELES; ERIC GARCETTI, in his official capacity as Mayor of Los Angeles; and CITY COUNCIL OF THE CITY OF LOS ANGELES, in its official capacity; DOES 1 through 25, inclusive, <br><br> Defendants. | ) Case No. 2:20-cv-05193-DDP (JEM) <br> ) *Hon. Dean D. Pregerson* <br> ) <br> ) **DEFENDANT CITY OF LOS** <br> ) **ANGELES' OPPOSITION TO** <br> ) **PLAINTIFF'S MOTION FOR** <br> ) **PRELIMINARY INJUNCTION;** <br> ) **MEMORANDUM OF POINTS AND** <br> ) **AUTHORITIES** <br> ) <br> ) FILED CONCURRENTLY WITH <br> ) REQUEST FOR JUDICIAL NOTICE <br> ) AND PROPOSED ORDER <br> ) <br> ) Hearing Date: October 26, 2020 <br> ) Time: 10:00 am <br> ) Courtroom: 9C |

1

CITY OF LOS ANGELES' OPPOSITION TO MOT. FOR PRELIM. INJUNCTION

# **TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................1

II.  BACKGROUND ................................................................................................2

    A.  The COVID-19 Pandemic and State of Emergency .....................................2

    B.  Initial Statewide Protections Relating to Evictions......................................3

    C.  The City's COVID-19 Emergency Tenant Protection Ordinances................4

        1.  The City's COVID-19 Eviction Ordinance ..........................................4

        2.  The City's Rent Freeze on Rent Stabilized Properties .......................5

    D.  California's COVID-19 Tenant Relief Act ....................................................6

    E.  Economic Relief Programs............................................................................7

III.  LEGAL STANDARD ........................................................................................8

IV.  ARGUMENT.....................................................................................................9

    A.  AAGLA Lacks Standing ...............................................................................9

    B.  AAGLA Has Not Established Likelihood of Success on the Merits Nor Raised "Serious Questions" About the Merits ...........................................10

        1.  AAGLA's Contract Clause Claim Will Not Succeed.......................10

        2.  AAGLA's Due Process Claim Raises No Serious Questions ...........18

    C.  AAGLA Fails To Demonstrate Irreparable Harm Absent an Injunction.....21

        1.  There Is No Presumption of Irreparable Harm Here .........................21

        2.  AAGLA Has Not Established Irreparable Harm ...............................22

    D.  The Balance of Interests Does Not Tip "Sharply" In AAGLA's Favor ......24

V.  CONCLUSION..................................................................................................25

i

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

CASES

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)................................9

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978)..................................16, 18

*Altman v. Cty. of Santa Clara*, Case No. 20-cv-02180-JST,
  2020 U.S. Dist. LEXIS 97535 (N.D. Cal. June 2, 2020)........................................10, 25

*Auracle Homes, LLC v. Lamont*, No. 3:20-cv-0829 (VAB),
  2020 U.S. Dist. LEXIS 141500 (D. Conn. Aug. 7, 2020)........................................2, 25

*Ballinger v. City of Oakland*, 398 F. Supp. 3d 560 (N.D. Cal. 2019) ............................12

*Birkenfeld v. City of Berkeley*, 17 Cal.3d 129 (1976)...........................................12, 16, 19

*Block v. Hirsh*, 256 U.S. 135 (1921).............................................................12, 13, 15, 16

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006) ........................................15

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86 (3d Cir. 1992) ........................... 22-23

*Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ...................23

*Carson Mobilehome Park Owners' Ass'n v. City of Carson*, 35 Cal. 3d 184 (1983) ......20

*Church of Scientology v. United States*, 920 F.2d 1481 (9th Cir. 1990) .........................22

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019).............................................22

*Danekas v. S.F. Residential Rent Stabilization & Arb. Bd.*,
  95 Cal. App. 4th 638 (2001) .....................................................................................11

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
  356 F.3d 1256 (10th Cir. 2004) ...............................................................................21

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) .............................................22

*Elmsford Apt. Assocs., LLC et al. v. Cuomo*, No. 20-cv-04062-CM,
  2020 U.S. Dist. LEXIS 115354 (S.D.N.Y. June 29, 2020) .............................2, 11, 14

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.,* 459 U.S. 400 (1983)....11, 15, 16

*Foster v. Britton*, 242 Cal. App. 4th 920 (2015).............................................................12

*Gish v. Newsom*, No. EDCV 20-755 JGB (KKx),

TABLE OF AUTHORITIES

2020 U.S. Dist. LEXIS 74741 (C.D. Cal. Apr. 23, 2020) ............................................16

*Guggenheim v. City of Goleta*, 638 F.3d 1111 (9th Cir. 2010) ........................................12

*HAPCO v. City of Philadelphia*, No. 20-3300,

2020 U.S. Dist. LEXIS 156327 (E.D. Pa. Aug. 27, 2020) ....................................*passim*

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239 (9th Cir. 2013)...............22

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ........................11, 15, 17, 18

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977).....................................9

*Interstate Marina Dev. Co. v. Cty. of L.A.*, 155 Cal. App. 3d 435 (1984) ......................12

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ..................................................10, 16, 25

*Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal. 4th 761 (1997) .......................12, 20

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987)........................13

*L.A. Mem'l Coliseum Comm'n. v. Nat'l Football League*,

634 F.2d 1197 (9th Cir. 1980) ..............................................................................23

*Lake Forest Elem. v. Orleans Par. Sch. Bd.*, No. 16-2323,

2016 U.S. Dist. LEXIS 131914 (E.D. La. Sep. 27, 2016)........................................22

*Lebbos v. Judges of Superior Court, Santa Clara Cty.*, 883 F.2d 810 (9th Cir. 1989)....19

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011).........................................................8

*Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528 (2005) ........................................................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................................9

*Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) ..........................21

*Matorin v. Massachusetts*, Civil Action No. 2084CV01334

(Mass. Dist. Ct. Aug. 26, 2020) .............................................................................2

*Morrison v. Peterson*, 809 F.3d 1059 (9th Cir. 2015) ......................................................10

*N. New Mexicans Prot. Land & Water Rights v. United States*,

161 F. Supp. 3d 1020 (D.N.M. 2016). ...................................................................10

*Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*,

896 F.2d 1283 (11th Cir. 1990) ..............................................................................22

iii

TABLE OF AUTHORITIES

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374 (9th Cir. 1985) .............21

*Palos Verdes Shores Mobile Estates v. City of Los Angeles*,

    142 Cal. App. 3d 362 (1983). ......................................................................21

*Pennell v. San Jose*, 485 U.S. 1 (1988)..........................................................12, 20

*Pension Benefit Guar. Corp. v. R. A. Gray & Co.*, 467 U.S. 717 (1984).........................19

*Richardson v. City & Cty. of Honolulu*, 124 F.3d 1150 (9th Cir. 1997) .........................19

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) ...................16, 25

*Santa Monica Beach v. Superior Ct.*, 19 Cal. 4th 952 (1999) ..........................................12

*Schnuck v. Santa Monica*, 935 F.2d 171 (9th Cir. 1991)............................................12, 19

*Baptiste v. Kennealy*, No. 20-cv-11335-MLW, 2020 U.S. Dist. LEXIS 176264

    (D. Mass. Sept. 25, 2020) ..........................................................................2

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000)............................................21

*State Bonded Audit Bureau, Inc. v. Pomona Mut. Bldg. & Loan Ass'n*,

    37 Cal. App. 2d Supp. 765 (1940) .......................................14, 15, 17

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (2008)...............................23, 24, 25

*Sveen v. Melin*, 138 S.Ct. 1815 (2018) ......................................................11, 14

*Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189 (9th Cir. 2013) ...................19

*TJM 64, Inc. v. Harris*, No. 2:20-cv-02498-JPM-tmp,

    2020 U.S. Dist. LEXIS 134037 (W.D. Tenn. July 29, 2020).........................25

*Troy, Ltd. v. Renna*, 727 F. 2d 287 (3d Cir. 1983) .........................................12, 15, 16

*U.S. Trust Co. v. New Jersey*, 431 U.S. 1 (1976) ......................................11, 14

*United States v. Salerno*, 481 U.S. 739 (1987)..............................................10

*Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32 (1940)..................................11, 15

*W.B. Worthen Co. v. Thomas,* 292 U.S. 426 (1934)...............................................11

*Warth v. Seldin*, 422 U.S. 490 (1975)...............................................................10

*Wash. Legal Found. v. Legal Found. of Wash.*, 271 F. 3d 835 (9th Cir. 2001) ...............9

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ......................................23

iv

TABLE OF AUTHORITIES

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ................................................8, 21, 22

*Wis. Cent. v. PSC*, 95 F.3d 1359 (7th Cir. 1996)...........................................22

*World Gym, Inc. v. Baker*, No. 20-cv-11162-DJC,

    2020 U.S. Dist. LEXIS 131236 (D. Mass. July 24, 2020) .........................19

*Yee v. City of Escondido*, 503 U.S. 519 (1992) ............................................12

## STATUTES

15 U.S.C. § 9056.............................................................................................8

15 U.S.C. § 9057.............................................................................................8

42 U.S.C. § 1437f..........................................................................................23

Cal. Civ. Code § 1671...................................................................................12

Cal. Civ. Code § 1940.2................................................................................13

Cal. Civ. Code § 1942.4................................................................................12

Cal. Civ. Code § 1947.12..............................................................................12

Cal. Civ. Code § 1951.2................................................................................14

Cal. Civ. Code § 1954.52................................................................................5

Cal. Pen. Code § 396................................................................................2, 13

Cal. Code of Civ. P. § 116.223........................................................................6

Cal. Code of Civ. P. §§ 1159 *et seq.* ....................................................*passim*

Gov't Code § 7060.4.....................................................................................13

Gov't Code § 8550 *et seq.*..............................................................................2

Los Angeles Admin. Code §§ 8.21 *et seq.*.....................................................2

Los Angeles Municipal Code § 151.00 *et seq.* ........................................5, 12

San Francisco Admin. Code § 37.10B...........................................................13

Santa Monica Mun. Code § 4.56.020 ...........................................................13

Santa Monica Charter, art. XVIII, § 1805 ....................................................15

TABLE OF AUTHORITIES

**REGULATIONS**

24 C.F.R. § 982.310 ........................................................................................12

85 Fed. Reg. 55292 ...........................................................................................3

TABLE OF AUTHORITIES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The novel coronavirus pandemic is the public health crisis of our time.  The virus is highly contagious and its disease, COVID-19, is deadly.  When cases first soared, the City of Los Angeles passed the two laws at issue here to keep its residents housed and safe.  These measures continue to be justified seven months later.  Without a vaccine, all levels of government confirm social distancing and staying "safer at home" remain the most effective tools for slowing transmission.  For example, California courts stopped processing unlawful detainers and judicial foreclosures, the California Legislature then adopted statewide tenant protections, which significantly limit evictions across this state through at least February 2021, and the Centers for Disease Control and Prevention ("CDC") has imposed a nationwide moratorium on evictions for failure to pay rent through December 2020.  Public health experts fear infections and deaths will increase this fall, making an extension of these protections required, not obviated.[1]

At this crucial moment, despite *not* challenging the state and federal moratoria, and despite delaying *six months* after the City's laws were enacted, Plaintiff Apartment Association of Greater Los Angeles ("AAGLA") *now* seeks a preliminary injunction. This extraordinary relief would have been inappropriate six months ago; it is surely inappropriate now.  AAGLA's motion rests on two faulty notions:  (1) the City's laws excuse tenants from paying rent and (2) AAGLA's members are constitutionally entitled, under Due Process and the Contract Clause, to rent "on time" or an eviction remedy without delay.  But the City's laws (1) do not forgive rent, and (2) are constitutional exercises of the City's police powers—as numerous other courts across the nation have

---

[1] Joel Achenbach and Rachel Weiner, *Experts Project Autumn Surge in Coronavirus Cases, with a peak after Election Day,* WASHINGTON POST, https://www.washingtonpost.com/health/coronavirus-fall-projections-second-wave/2020/09/04/6edb3392-ed61-11ea-99a1-71343d03bc29_story.html

MEMORANDUM OF POINTS AND AUTHORITIES

concluded.  Also, none of AAGLA's members have suffered irreparable harm.  When compared with the likely harms from evictions—*i.e.*, homelessness, further transmission of the virus, or death—this case is not close.  Finally, an injunction now would offer AAGLA's members no relief:  their desired evictions will not happen with the state and federal orders in place.  AAGLA's motion must be denied.

## II.    BACKGROUND

### A.    <u>The COVID-19 Pandemic and State of Emergency</u>

The grave public health and economic impacts of the COVID-19 pandemic are extensively documented.  *See, e.g.*, Request for Judicial Notice ("RJN") Exs. A-FF.[2] After the coronavirus appeared in the United States, Governor Gavin Newsom, on March 4, 2020, declared a State of Emergency in California.  RJN Ex. A.  That same day, Los Angeles County and the City of Los Angeles declared emergencies within their jurisdictions.  RJN Exs. B-D.  These declarations mobilized emergency relief and authority.  *E.g.*, Gov't Code §§ 8550 *et seq.*; L.A. Admin. Code §§ 8.21 *et seq.*, Cal. Pen. Code § 396.  Beginning on March 12, 2020, Mayor Eric Garcetti started issuing orders designed to slow the spread of the coronavirus, including several aimed at assisting residents to stay housed, none of which are challenged here.  RJN Exs. G-I.[3]

The City Council has repeatedly voted to continue the local emergency.  Council File No. 20-0291[4]; RJN Ex. J; Gov't Code § 8630; L.A. Admin. Code § 8.27.  And for

---

[2] *See also Baptiste v. Kennealy*, No. 1:20-cv-11335-MLW, 2020 U.S. Dist. LEXIS 176264 (D. Mass. Sept. 25, 2020); *HAPCO v. City of Philadelphia*, No. 20-3300, 2020 U.S. Dist. LEXIS 156327 (E.D. Pa. Aug. 27, 2020); *Auracle Homes, LLC v. Lamont*, No. 3:20-cv-0829 (VAB), 2020 U.S. Dist. LEXIS 141500 (D. Conn. Aug. 7, 2020); *Elmsford Apt. Assocs., LLC et al. v. Cuomo*, No. 20-cv-04062-CM, 2020 U.S. Dist. LEXIS 115354 (S.D.N.Y. June 29, 2020); *Matorin v. Massachusetts*, Civil Action No. 2084CV01334 (Mass. Dist. Ct. Aug. 26, 2020), RJN Ex. ZZ.
[3] *Available at Emergency Orders, Memorandum, and Files Related to COVID-19*, The Los Angeles Mayor, https://www.lamayor.org/COVID19Orders
[4] *Available at* Clerk of the City of Los Angeles, CityClerk Connect Council File

MEMORANDUM OF POINTS AND AUTHORITIES

good reason:  to date, the county has suffered over a quarter million cases and 6,200 deaths.[5]  Given reported infection rates, the City's economy still cannot fully re-open under state and county public health directives.[6]  Meanwhile, the region's unemployment rate remains about 20 percent.[7]

Seven months into this pandemic, there is still no known treatment, vaccine, or cure.  According to public health authorities, quarantine and social distancing are presently the most effective measures to prevent spread of the virus.  *See, e.g.*, 85 Fed. Reg. 55292 (Sept. 4, 2020).  The CDC, for example, has confirmed that "[e]viction moratoria facilitate self-isolation," and "allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID–19."  *Id.*  Further, evictions increase the likelihood of individuals moving into congregate settings or becoming homeless, which put them at higher risk of contracting COVID-19.  *Id.*  For these reasons, the CDC has recently ordered a moratorium on residential evictions for nonpayment of rent until December 31, 2020.  *Id.*

## B.  <u>Initial Statewide Protections Relating to Evictions</u>

At the start of the pandemic, nearly every level of government imposed restrictions on evictions to keep residents housed.  On March 16, 2020, Governor Newsom issued Executive Order N-28-20, after finding that the "economic impacts of COVID-19 have been significant, and could threaten to undermine Californian's housing security and the stability of California businesses."  RJN Exs. K, L.  The Governor also found that COVID-19 was causing residents "substantial losses in income" because of business

---

Management System, https://cityclerk.lacity.org/lacityclerkconnect/.

[5] *LA County COVID-19 Surveillance Dashboard*, L.A. COUNTY DEPARTMENT OF PUBLIC HEALTH, http://dashboard.publichealth.lacounty.gov/covid19_surveillance_dashboard/
[6] *Blueprint for a Safer Economy*, STATE OF CALIFORNIA, https://covid19.ca.gov/safer-economy/
[7] *Economy at a Glance*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/eag/eag.ca_losangeles_md.htm

3

MEMORANDUM OF POINTS AND AUTHORITIES

closures and layoffs, hindering their ability to keep up with rent.  RJN Ex. K.  Noting "homelessness can exacerbate vulnerability to COVID-19," the Governor suspended state laws that "restrict a local government's exercise of its police power to impose substantive limitations" on residential evictions for unpaid rent due to the pandemic.  *Id.*

Separately, on April 6, 2020, the California Judicial Council adopted Emergency Rules 1 and 2, which effectively halted evictions and judicial foreclosures statewide. RJN Ex. M.  No court could issue a summons for an unlawful detainer complaint unless "necessary to protect public health and safety," nor enter a default or a default judgment for restitution in such actions.  *Id.*  These rules expired September 1, 2020.  *Id*.

### C.  <u>The City's COVID-19 Emergency Tenant Protection Ordinances</u>

Against this backdrop, beginning on or about March 17, 2020, the Los Angeles City Council passed over 48 motions addressing the COVID-19 pandemic, including several regarding residential tenancies.  *E.g.*, Council File Nos. 20-0147-S19; 20-0401.

#### 1.  *The City's COVID-19 Eviction Ordinance*

On March 31, 2020, the City adopted Ordinance No. 186585 (hereinafter, "Eviction Ordinance").  RJN Ex. N.  Incorporating the findings of the Governor and public health authorities, the Eviction Ordinance aims to prevent further transmission of COVID-19; to avoid unnecessary housing displacement caused by the virus, which would exacerbate the City's homeless crisis; and to mitigate the lasting economic impacts of the pandemic on tenants.  *Id.*  It prohibits evictions for non-payment of rent *during the local emergency* when a tenant is "unable to pay rent due to circumstances related to the COVID-19 pandemic."  *Id.*  It further protects tenants from eviction for unpaid rent accumulated *during the local emergency* if tenants pay within twelve months following its expiration.  *Id.*  So, once the emergency ends, tenants face eviction for rent then due, but not for rent accumulated during the emergency for twelve months.  The Eviction Ordinance also prohibits late fees and interest on rent that is unpaid under its terms.  *Id.* During the local emergency, the law also prohibits no-fault evictions, and evictions based on the presence of unauthorized occupants, pets, or nuisance related to COVID-19.  *Id.*

4

Tenants may invoke the law as an affirmative defense in an unlawful detainer action.  *Id.*  The Ordinance expressly states, ***"Nothing in this article eliminates any obligation to pay lawfully charged rent."***  *Id.* (emphasis added).

The City later amended the Eviction Ordinance with Ordinance No. 186606, on May 12, 2020, after learning some landlords were engaging in behavior designed to skirt the City's protections.  RJN Exs. O, P.  For example, reports surfaced that some landlords, after they were informed their tenants are likely protected under the Ordinance, knowingly served invalid eviction notices to coerce their tenants to leave.  RJN Ex. P.  As amended, the Ordinance provides a cause of action to tenants whose landlords engage in harassing and bad faith behaviors, which accrues *only after the tenant provides written notice of the alleged violation and the landlord has failed to cure*.  RJN Ex. O.

## 2.   *The City's Rent Freeze on Rent Stabilized Properties*

Though not analyzed in AAGLA's papers, the City also adopted Ordinance No. 186607 (hereinafter, "RSO Rent Freeze") on May 12, 2020, to temporarily freeze rents of occupied, residential rental units subject to the City's Rent Stabilization Ordinance ("RSO"), Los Angeles Municipal Code ("LAMC") section 151.00 *et seq.*  The RSO generally regulates multi-family rental properties constructed before 1978 and, ordinarily, allows rent increases, without City permission, of between 3 and 8 percent once every 12 months on occupied units, a so-called general adjustment.[8]  LAMC § 151.06.[9]  The RSO Rent Freeze prohibits raising rents for one year following the expiration of the local emergency, unless necessary to obtain a "just and reasonable" return.  RJN Ex. Q.  If a

---

[8] The City has vacancy de-control.  Upon lawful vacancy of a rental unit, the landlord may set the initial rent.  LAMC § 151.06.C; Cal. Civ. Code §§ 1954.52, 1954.53.

[9] In 2020, the general adjustment would have been four percent, which is based on the change in the consumer price index ("CPI").  RJN Ex. S.  Other rent-controlled cities allow smaller rent increases each year in the absence of an emergency.  For example, the City of Santa Monica allows increases equal to 75 percent of the change in the CPI or may impose a dollar-amount ceiling.  Santa Monica Charter, art. XVIII, § 1805.

MEMORANDUM OF POINTS AND AUTHORITIES

landlord is not making such a return, they may, as before the pandemic, apply for a rent adjustment under LAMC section 151.07.  *Id*.  The City found the freeze necessary because many Los Angeles households had already been spending more than 30 percent of their income on rent, and many individuals had been laid off due to the pandemic and likely could not afford additional rent increases.  RJN Ex. R.

### D.    California's COVID-19 Tenant Relief Act

On August 31, 2020, after finding a need to "stabilize the housing situation for tenants and landlords" and to help "address the pandemic, protect public health, and set the stage for recovery," the California Legislature passed the COVID-19 Tenant Relief Act, Assembly Bill 3088—just as the state's Judicial Council rules were set to expire. Among other things, the Bill modifies the state's unlawful detainer statute, Code of Civil Procedure ("CCP") section 1159 *et seq*. as follows:  (a) state courts may not issue summonses for eviction actions for nonpayment of rent until October 5, 2020 (CCP § 1179.01.5); (b) unpaid rent accrued between March 1, and August 31, 2020, can *never* be the basis for an eviction, provided that the tenant suffered a COVID-19-related hardship (*id*. § 1179.03.g); (c) unpaid rent accruing between September 1, 2020 and January 31, 2021, cannot be the basis for an eviction until February 1, 2021 (*id*. § 1179.03.g.2.A); and (d) if a tenant, before that date, pays at least 25 percent of rent due between September 1, 2020 and January 31, 2021, the tenant cannot be evicted for the balance (*id*. § 1179.03.g.2.B).  Unpaid rent owed, although not grounds for an eviction, may be collected in a civil action, for example, filed in a small claims court.  CCP § 116.223. The Bill also prevents evictions without cause until February 2021.  CCP § 1179.03.5. Finally, the Bill provides penalties if landlords retaliate against tenants with unpaid rent because of COVID-19.  Cal. Civ. Code § 1942.5(d).

Landlords serving eviction notices for unpaid rent must inform their tenants of their rights under the Bill and include a form declaration with which tenants may attest to their inability to pay rent because of COVID-19-related hardships.  CCP §§ 1179.02; 1179.03.a.1.  A tenant who does not return this declaration within 15 days of service of

6

the eviction notice risks losing the Bill's protections.  CCP § 1179.03.5.  Contrary to AAGLA's characterizations (Mot. at 14, 32), the Bill does not condition its protections upon a landlord's service of an eviction notice; for example, a tenant would be protected by the Bill by serving a completed declaration prior to receiving an eviction notice.

The Bill explicitly states it does not preempt any prior local eviction ordinance adopted in response to the pandemic and, therefore, exists as an additional, separate protection.  CCP § 1179.05.  However, the Bill alters local ordinances by precluding any grace periods for repayment from extending beyond March 2022.  CCP § 1179.05.a.2.C. Therefore, any rent unpaid under the City's Eviction Ordinance must be paid no later than March 2022.  Failure to pay rent by March 2022 could be the basis for an eviction.

In sum, the Bill exceeds or overlaps with the City's law in the following ways that would prevent certain evictions from going forward:

- No landlord may terminate a tenancy without cause;

- A tenant can *never* be evicted for rent that was unpaid between March 1, and August 31, 2020 if the tenant suffered a COVID-19 hardship and completes a declaration (the City's Ordinance only defers those evictions);

- No eviction action for unpaid rent for September 1, 2020 and January 31, 2021, may be filed until February 1, 2021, if the tenant suffered a COVID-19 hardship; and,

- If a tenant suffered a COVID-19 hardship and pays 25 percent of the rent due between September 1, 2020 and January 31, 2021, the tenant can *never* be evicted for the balance owed (the City's Ordinance only defers these evictions).

### E.   **Economic Relief Programs**

Government agencies at all levels have rolled out economic relief to address COVID-19's impacts, many of which aim to help landlords and tenants make ends meet. For example, beginning on March 12, 2020, the City's Department of Water and Power—along with numerous other public utilities in the County—stated it would defer disconnections for non-payment of water and power charges, and began offering payment

7

plans.  RJN Exs. T, TT.  The Los Angeles County Tax Assessor also agreed to waive late payment penalties for yearly property taxes if a property owner's inability to pay is due to COVID-19.  RJN Ex. U.  The IRS postponed tax filing and payments to July 15, 2020.  RJN Ex. V.  The California Franchise Tax Board also extended tax filing deadlines.  RJN Ex. W.  Additionally, Californians are eligible for mortgage forbearance from large banks and 200 state charted banks, credit unions, and servicers.  RJN Ex. X.

On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, providing over $2 trillion in economic assistance to workers, families, and businesses.  Some of its features include:  (1) "Economic Impact Payments" of up to $1,200 per qualified adult; (2) Loans and grants to businesses to support payroll and rent; and (3) Forbearance on federally-backed mortgages, with no late fees or interest until payments resume, in return for the suspension of evictions and foreclosures (15 U.S.C. §§ 9056, 9057); *see also HAPCO*, 2020 U.S. Dist. LEXIS 156327, at **35-37 (providing summary of CARES Act).

To alleviate the pandemic's economic impacts on both renters and landlords, the City established a $100 million relief program, providing up to $2,000 in rent relief payments to low-income households, payable directly to landlords.  Los Angeles, Cal., Ord. Nos. 186605; 186702.  As initially funded, the program is expected to assist at least 50,000 households, and is believed to be the largest emergency rental assistance program for COVID-19 in the country.  RJN Ex. Y at 162.

## III.   LEGAL STANDARD

Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008).  To obtain such relief, AAGLA must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Id*.  A court must find that "a certain threshold showing [has been] made on each factor."  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam).  Assuming that

this threshold has been met, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, *so long as the plaintiff also shows that there is a likelihood of irreparable injury and that [relief] is in the public interest*."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quotation marks omitted) (emphasis added).

## IV.   ARGUMENT

AAGLA's motion fails because: (1) it has not demonstrated associational standing (Third Amend. Compl. ¶¶ 19-20); (2) it will not succeed on, nor has it raised serious questions about, the merits; (3) its members will not suffer irreparable harm absent an injunction; and (4) the balance of interests favor continuing the City's laws.

### A.   <u>AAGLA Lacks Standing</u>

AAGLA has no standing to sue as a representative of its members.  Associational standing requires its members to show: (1) "injury in fact" (2) caused by the City's ordinances (3) that "likely" will be redressed by a favorable decision.  *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977); *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F. 3d 835, 847 (9th Cir. 2001).  AAGLA's claimed injuries will not be redressed by a favorable outcome in this lawsuit.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  California has separately enacted law that prevents evictions for non-payment of rent until at least February 2021 and prohibits other evictions until February 2021, unless for a specified cause.  Further, tenants who attest that they have been financially impacted by the pandemic can *never* be evicted for rent owed between March and August 2020, and if they pay 25 percent of their rent owed from September 2020 through January 2021, cannot be evicted for the balance of the unpaid rent.  The CDC has imposed its own moratorium until December 2020.  Therefore, a favorable decision in this case would not necessarily allow AAGLA's members to proceed with evictions, or provide immediate rent relief to landlords.  AAGLA's members likely must separately file a civil action to recover unpaid rent, or challenge these other laws.  Even AAGLA admits that the state law "[f]rankly limits the relief that landlords can achieve in

9

MEMORANDUM OF POINTS AND AUTHORITIES

this action."  (Mot. at 31.)

Finally, because of the web of COVID-19 laws and given that each landlord is not similarly situated, as demonstrated in AAGLA's own motion, the City's laws may impact its members in distinctly different ways, requiring the participation of its members in this lawsuit.  This makes associational standing inappropriate.  *See Warth v. Seldin*, 422 U.S. 490, 515-16 (1975) (no standing where "damages claims are not common to the entire membership" and "both the fact and extent of injury would require individualized proof"); *see also N. New Mexicans Prot. Land & Water Rights v. United States*, 161 F. Supp. 3d 1020, 1041-42, 1044 (D.N.M. 2016).

## B.  **AAGLA Has Not Established Likelihood of Success on the Merits Nor Raised "Serious Questions" About the Merits**

Under *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 31 (1905), special leeway is granted to policymakers during a pandemic, such as COVID-19.  *See Altman v. Cty. of Santa Clara*, Case No. 20-cv-02180-JST, 2020 U.S. Dist. LEXIS 97535, *24 (N.D. Cal. June 2, 2020).  Challenged actions should not be found invalid under the Constitution unless they have "no real or substantial relation" to addressing the pandemic or are "beyond all question, a plain, palpable invasion" of the asserted rights.  197 U.S. at 31. The ordinances at issue here are temporary measures directed at stemming the spread of the pandemic and its fallout, and they do not, beyond all question, constitute an invasion of constitutional rights.  As far as the City is aware, every challenge to local eviction laws passed in response to the pandemic, to date, has failed on the same theories asserted by AAGLA.  *See supra* n.2.  And as explained below, the ordinances do not violate constitutional rights at all.  Where, as here, AAGLA mounts a facial attack on legislative acts, it cannot establish "that no set of circumstances exists under which [the City's ordinances] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Morrison v. Peterson*, 809 F.3d 1059, 1064 (9th Cir. 2015).

### 1.    *AAGLA's Contract Clause Claim Will Not Succeed*

A three-part inquiry governs Contract Clause claims: (1) is the contractual

MEMORANDUM OF POINTS AND AUTHORITIES

impairment substantial and, if so; (2) does the law serve a legitimate public purpose, such as remedying a general social or economic problem and, if such purpose is demonstrated; (3) are the means chosen to accomplish this purpose reasonable and necessary?  *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.,* 459 U.S. 400, 411-13 (1983).  Unless the public entity is a party to the contract, courts defer to the legislature's determination on whether a particular law is reasonable and necessary.  *See id.* at 412-13; *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22-23 (1976).  In this analysis, courts must cabin the Contract Clause with the inherent police power of the state "to safeguard the vital interests of its people."  *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934); *W.B. Worthen Co. v. Thomas,* 292 U.S. 426, 433 (1934) ("[L]iteralism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection.").  AAGLA cannot prevail under this test.

### a.    There Is No Substantial Impairment of Contracts

Whether a law has "operated as a substantial impairment of a contractual relationship" depends on "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating rights."  *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).  "The extent to which [an] impairment qualifies as substantial is affected by whether the relevant party operates in a heavily regulated industry."  *Cuomo*, 2020 U.S. Dist. LEXIS 115354, at *38; *see also Energy Reserves*, 459 U.S. at 411-13; *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940) ("When [a party] purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic."); *Danekas v. S.F. Residential Rent Stabilization & Arb. Bd.*, 95 Cal. App. 4th 638, 651 (2001) (in "highly regulated industry" "further regulation can be reasonably anticipated," upholding ordinance prohibiting certain lease restrictions on subletting).  The City's laws do not substantially impair contracts.

*First*, the City's ordinances do not "undermine the contractual bargain" or interfere with the "reasonable expectations" of the parties.  As AAGLA concedes (Mot. at 20, n.6),

11

MEMORANDUM OF POINTS AND AUTHORITIES

landlord-tenant relationships are heavily regulated. *Ballinger v. City of Oakland*, 398 F. Supp. 3d 560, 577 (N.D. Cal. 2019); *HAPCO*, 2020 U.S. Dist. LEXIS 156327, at *17 (describing federal laws governing landlord-tenant relationships); *see also Troy, Ltd. v. Renna*, 727 F. 2d 287, 297 (3d Cir. 1983) (no "substantial impairment" where extensive eviction and rent regulations already exist in New Jersey). For example, multiple laws already limit rent increases and evictions for rental property. LAMC § 151.06 (limits on rent increases); § 151.09 (requiring an eviction to be based on an enumerated "just cause"); Cal. Civ. Code § 1947.12 (limits on rent increases statewide), § 1946.2 (requiring "just cause" evictions); 24 C.F.R. § 982.310 (requiring cause for evictions of Section 8 voucher holders).[10] A variety of state laws condition a landlord's ability to collect rent on compliance with basic habitability standards. *See, e.g.*, Cal. Civ. Code § 1942.4. As to the City's ban on interest and fees on late rent, state law regulates those, too. *See* Cal. Civ. Code § 1671 (liquidated damages provisions in residential leases are generally void). Far from being an outlier, as AAGLA suggests (Mot. at 12), the Eviction Ordinance's civil remedy for tenants is similar to those that already exist under

---

[10] As AAGLA concedes (Mot. at 20 n.6), rent and eviction controls are pervasive in this country, dating back to World War I. *See, e.g.*, *Block v. Hirsh*, 256 U.S. 135, 153 (1921); *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 161 (1976). Indeed, a vast body of federal and state law sets forth the legal framework for rent and eviction controls, which in California have been upheld against a variety of challenges spanning forty years. *See, e.g.*, *Foster v. Britton*, 242 Cal. App. 4th 920, 928-32 (2015) (upholding eviction control against preemption challenge). Rent and eviction controls are generally constitutionally permissible uses of police power. *See, e.g.*, *Pennell v. San Jose*, 485 U.S. 1, 12 n.6 (1988) (statutes regulating the economic relations of landlords and tenants are not *per se* takings); *Yee v. City of Escondido*, 503 U.S. 519, 523-25 (1992) (same); *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1123 (9th Cir. 2010) (rent control does not violate due process); *Schnuck v. Santa Monica*, 935 F.2d 171, 173 (9th Cir. 1991) (citing cases); *Interstate Marina Dev. Co. v. Cty. of L.A.*, 155 Cal. App. 3d 435, 447 (1984); *Santa Monica Beach v. Superior Ct.*, 19 Cal. 4th 952, 964 (1999); *Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal. 4th 761, 768-69, 771 (1997). Notably, AAGLA fails to analyze this body of law.

MEMORANDUM OF POINTS AND AUTHORITIES

state and local anti-retaliation and anti-harassment laws. *See, e.g.*, Cal. Civ. Code §§ 1940.2, 1942.5, 1954; San Francisco Admin. Code § 37.10B; Santa Monica Mun. Code § 4.56.020.[11]   Finally, during a state of emergency, these landlord-tenant relations are further regulated by California's anti-price gouging statute, which, without regard for whether property is subject to rent control laws, prohibits landlords from raising rents greater than 10 percent, prohibits landlords from evicting a tenant in order to raise rents, and allows localities to take further, similar actions. Cal. Pen. Code § 396(e), (f).[12]

"Long ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,'" *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92 (1987), and a "public exigency" will justify restricting property rights, including those of landlords, *Block*, 256 U.S. at 156. Far from "dramatically alter[ing] existing contracts inconsistent with historic regulation," as AAGLA asserts (Mot. at 21), the City's Ordinances predictably extend pre-existing protections against unwarranted evictions—which would otherwise cause displacement during an unprecedented pandemic—and afford tenants respite from rent increases for a temporary period of time.

---

[11] Contrary to AAGLA's interpretation, the Eviction Ordinance would not prevent a landlord from serving an eviction notice or initiating eviction proceedings when the landlord has a good faith belief that their tenant is not protected, such as in the example described by one of its members. Adomian Decl. ¶¶ 5-6 (alleging tenant with six-figure income has not paid two months of rent).

[12] Even prior to COVID-19, evictions took time. Depending on why a landlord seeks possession of their property, they may be required to wait several months before instituting an unlawful detainer action. *See, e.g.*, Cal. Civ. Code §§ 1946.1, 1954.535, Gov't Code § 7060.4. If a tenant is at-fault, the landlord must first serve a notice giving the tenant an opportunity to cure. CCP §§ 1161, 1162. Sometimes, an eviction notice must also state a legal cause for the eviction; otherwise it is ineffective. *E.g.*, Cal. Civ. Code § 1946.2; LAMC § 151.09. An eviction hearing is typically scheduled within 20 days of the landlord's request and the tenant may raise various defenses to an eviction. CCP §§ 1161, 1167, 1167.3, 1170.5. If a judgment and writ is entered against a tenant, they may request a stay of execution. CCP § 1176.

13

MEMORANDUM OF POINTS AND AUTHORITIES

**Second**, the City's laws do not prevent landlords from "safeguarding" or "reinstating" their rights, *Sveen*, 138 S. Ct. at 1822, nor do they "obliterate[] the primary enforcement mechanisms embodied in leases," as AAGLA asserts (Mot. at 22). "A reasonable modification of statutes governing *contract remedies* is much less likely to upset expectations than a law adjusting the express terms of an agreement." *United States Tr. Co.*, 431 U.S. at 19 n.17 (emphasis added). The ordinances require tenants to comply with their contractual obligations, including the requirement to pay rent. They do not eliminate a landlords' ability to collect rent.[13] At the end of the day, the landlord still has the full "suite of contractual remedies" to collect any rent that is owed. *Cuomo*, 2020 U.S. Dist. LEXIS 115354, at *45; *see also* Cal. Civ. Code § 1951.2. Otherwise, once the state of emergency ends, landlords may resume most evictions according to applicable law. The ordinances only alter the timing when such evictions may occur. And to avoid later eviction, tenants must prove a COVID-19 hardship as part of their affirmative defense in an unlawful detainer court.

Finally, as to the City's temporary ban on late fees and interest on rent that is unpaid during the emergency, which AAGLA specifically calls out (Mot. at 22-23), the City has paused, not eliminated, that obligation. Once the emergency is over, AAGLA's members may continue to charge late fees and interest on unpaid rent, *just not on the unpaid rent accumulated during the emergency*.[14] Similar temporary alterations to contracts have been upheld under the Contract Clause. *State Bonded Audit Bureau, Inc. v. Pomona Mut. Bldg. & Loan Ass'n*, 37 Cal. App. 2d Supp. 765, 767 (1940). In *State*

---

[13] AAGLA argues that the Ordinances do not "provide any protections for landlords whose tenants depart after exhausting the full rent forbearance" (Mot. at 22), and therefore, any back rent owed would be difficult to collect. However, AAGLA fails to demonstrate how these challenges are any different than those they face when a tenant is delinquent in normal circumstances. While a landlord awaits possession pending an unlawful detainer action, presumably their tenants still accumulate unpaid rent.

[14] According to AAGLA, it provides a sample lease agreement to its members; even that form does not provide for interest on late rent. Yukelson Decl. Ex. A.

*Bonded*, for example, California temporarily lowered the interest paid on certificates of deposit for two years during the Great Depression.  The reduction was not "unreasonable" because it "was for the period of the emergency only."  *Id.* at 768 (citing *Blaisdell*).  Because an extraordinary emergency existed and the regulation was "reasonably calculated to protect the public welfare," the regulation was not "unconstitutional merely because it alters that which was a definite obligation of the contract in the absence of such extraordinary facts."  *Id.*; *see also HAPCO*, 2020 U.S. Dist. LEXIS 156327, at *25 (upholding temporary ban on late fees and interest).

### b.   The Ordinances Serve a Legitimate Government Purpose

Even if the City's laws allegedly "substantially impair" contractual obligations, they nevertheless do not violate the Contract Clause because they serve a significant and legitimate government purpose.  *Energy Reserves*, 459 U.S. at 411-12.  Purposes held to be legitimate include:  (a) temporarily protecting tenants from rent increases and eviction arising from a housing shortage in government centers during World War I, *Blaisdell*, 290 U.S. 398, 440-42 (citing *Block*, 256 U.S. at 135 and others); (b) protecting mortgage holders from foreclosure during the Great Depression, *Blaisdell*, 290 U.S. at 398 (sustaining law extending the period of redemption by two years in Minnesota); (c) protecting the economic welfare and credit system of the state during the Great Depression, *Veix*, 310 U.S. at 38-39 (sustaining permanent legislation limiting withdrawals from savings and loans associations); (d) protecting senior citizens and disabled persons from the mental and physical harm of evictions, *Troy*, 727 F.2d at 297 (sustaining law extending leasehold of elderly and disabled tenants for forty years); (e) addressing a city's fiscal crisis, *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (sustaining law freezing wages for public employees); and (f) protecting consumers "from the escalation of natural gas prices caused by deregulation," *Energy Reserves*, 459 U.S. at 417 (sustaining statute imposing price ceilings on gas).

The City's laws undoubtedly serve a legitimate governmental purpose during an unprecedented pandemic that evolves daily.  They prevent transmission of COVID-19 by

15

unnecessary housing displacement, and address the lasting economic impacts of the pandemic on tenants.  The laws impose a "generally applicable [rule] designed to advance a broad societal interest." *Troy*, 727 F.2d at 299.  AAGLA agrees.  (Mot. at 24.)

### c.    <u>The City's Ordinances Are Necessary and Reasonable</u>

Because the City is not itself a contracting party, courts "defer to [its] legislative judgment as to the necessity and reasonableness" of the laws.  *Troy*, 727 F. 2d at 298. Scrutiny here is also relaxed, because the alleged interference is only temporary and in response to a public health emergency.  *Gish v. Newsom*, No. EDCV 20-755 JGB (KKx), 2020 U.S. Dist. LEXIS 74741, at *14 (C.D. Cal. Apr. 23, 2020) (citing *Jacobson*, 197 U.S. at 29, 31) (health emergencies call for reduced scrutiny); *Energy Reserves*, 459 U.S. at 411 (lesser impairment, lesser scrutiny).  "Our Constitution principally entrusts 'the safety and the health of the people' to the politically accountable officials of the States[.]" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (citing *Jacobson*, 197 U.S. at 38).  "When those officials undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."  *Id.*

Under these criteria, the "reasonableness and necessity" of the City's laws is plain. The City determined these laws were necessary to avoid displacing residents amidst a pandemic involving a highly-communicable disease and guidelines from all levels of government calling on them to stay at home.  The City also determined it was necessary to protect rent-stabilized tenants from rent increases given the historic unemployment and economic hardship caused by the pandemic.  And the City reasonably determined interest and late fees could further compound COVID-19 affected tenants' dilemmas, causing them to self-evict or be evicted.  RJN Ex. Z.  The laws are reasonable because the City is regulating, amidst an unprecedented health crisis, in a field it has already regulated, *see supra* Section IV.B.1.a.  *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249 (1978).  Courts have already found that both rent and eviction controls are "reasonable" legislative responses to a housing emergency.  *See, e.g.*, *Block*, 256 U.S. at 135; *Birkenfeld*, 17 Cal.3d at 161.

MEMORANDUM OF POINTS AND AUTHORITIES

Finally, because the City's laws are temporary and tailored to the COVID-19 pandemic, additional deference is due. *Blaisdell*, 290 U.S. at 415, 423, 438 (two-year redemption period deemed "reasonable"); *State Bonded*, 37 Cal. App. 2d Supp. at 767 (reducing interest paid on certificates of deposit for two years found "reasonable"). The Eviction Ordinance prohibits evictions for non-payment of rent only when the inability to pay is "due to circumstances related to the COVID-19 pandemic." The Eviction Ordinance also prevents evictions during the emergency *only* when the tenant is not at-fault or in the narrow circumstance when a tenant can demonstrate they have unauthorized occupants or pets, or created a nuisance because of the pandemic or its government-ordered responses. Even during the pandemic, the law still affords a landlord the right to evict a tenant: (1) when they have not paid rent for reasons unrelated to COVID-19 (*see* n.11); (2) when they have caused damage to the property; or (3) when they have engaged in criminal activity at the property. Further, rents at RSO properties are frozen for only a year past the COVID-19 emergency. However, if a landlord is not making a just and reasonable return, they may apply for a rent adjustment, as before.

### d.   *Blaisdell* Does Not Support AAGLA

AAGLA stretches *Blaisdell* for its novel proposition that, to avoid a Contract Clause violation, the City must require tenants to pay "a reasonable amount of rent contemporaneous with occupancy as a condition to avoiding eviction." (Mot. at 24.) *Blaisdell* **upheld** a Minnesota law delaying foreclosure sales and extending the period of redemption for mortgagers who defaulted on their loans. 290 U.S. at 415. Among other features, the law maintained the mortgage indebtedness, interest owed on the loan, and "the validity of the sale and the right of a mortgagee-purchaser to title or to obtain a deficiency judgment." *Id.* at 445. Additionally, while the mortgagor maintained possession during the extended redemption period, they had to compensate the mortgagee-purchaser, or lose the right to redemption. *Id.* The Court then upheld the law for five reasons: (1) an emergency existed requiring the protection of homeowners; (2) the state law was enacted to protect "a basic interest in society;" (3) relief was "of a

17

MEMORANDUM OF POINTS AND AUTHORITIES

character appropriate to the emergency, and could be granted only upon reasonable conditions;" (4) the imposed conditions were reasonable; and (5) the legislation was temporary. *Id.* at 444-47; *Spannaus*, 438 U.S. at 242-43. Therefore, the Minnesota statute was sustained based on the same factors that courts now use to decide modern Contract Clause challenges; *Blaisdell* did not uphold the statute "only because" (Mot. at 25-26) it required the mortgagor to pay rent during possession—that was not the controlling legal principle. *Blaisdell* made clear that contracts are subject to and may be constrained by the state's inherent police powers: "'into all contracts. . . there enter conditions which arise, not out of the literal terms of the contract itself. They are superinduced by the pre-existing and higher authority of the laws of nature, of nations, or of the community to which the parties belong. . . . Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur.'" *Blaisdell*, 290 U.S. at 435-36. "[T]he protective power of the state . . . is read into all contracts." *Id.* at 444.

In any event, each of the factors considered in *Blaisdell* is satisfied here, for the reasons discussed above. And though the Minnesota statute required the mortgagor to pay rent, so do the City's laws. They merely temporarily delay *one* of the landlord's remedies under a residential lease. Likewise, in *Blaisdell*, the Court upheld the Minnesota law because "[w]ithout impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct." *Id.* at 430. "[I]f state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be nonexistent when the urgent public need demanding such relief is produced by other and economic causes." *Id.* at 240-41. Multiple courts have upheld eviction moratoria under the Contract Clause, citing *Blaisdell* approvingly. *Supra* n.2.

### 2.   *AAGLA's Due Process Claim Raises No Serious Questions*

AAGLA claims that the ordinances violate its members' alleged substantive due process rights to "monthly rental payments," "oust defaulting tenants," and "late fees and

18

interest owed on deferred rent" (Mot. at 27), by failing to provide regulatory "machinery" to protect landlords and guarantee "fair rent" (*id.* at 30).  This novel due process theory fails as a matter of law.

AAGLA has identified no fundamental rights at stake and agrees that economic legislation is subject to mere rational basis review.  (Mot. at 27.)  Because AAGLA's Contract Clause claim fails, its due process claim, which challenges economic legislation, also fails because it is subject to even "less searching standards."  *Pension Benefit Guar. Corp. v. R. A. Gray & Co.*, 467 U.S. 717, 733 (1984); *see also World Gym, Inc. v. Baker*, No. 20-cv-11162-DJC, 2020 U.S. Dist. LEXIS 131236, at *8 (D. Mass. July 24, 2020) ("When economic legislation does not . . . impinge on fundamental rights, courts generally view constitutional challenges with . . . skepticism due to respect for legislative choices[.]").  AAGLA cannot meet the "extremely high" burden, *Richardson v. City & Cty. of Honolulu*, 124 F.3d 1150, 1162 (9th Cir. 1997), of showing that the ordinances are "arbitrary and irrational."  *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 542 (2005).  Governmental action is rationally related to a legitimate goal unless the action is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."  *Lebbos v. Judges of Superior Court, Santa Clara Cty.*, 883 F.2d 810, 818 (9th Cir. 1989).  To violate substantive due process, "the alleged deprivation must 'shock the conscience and offend the community's sense of fair play and decency.'"  *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013) (citation omitted) ("We apply rational basis review because landlords are not a protected class.").  Likewise, rent controls violate due process only if "arbitrary, discriminatory, or demonstrably irrelevant" to a legitimate governmental purpose.  *Schnuck*, 935 F.2d at 173.  As discussed in Section IV.B.1, *supra*, the City has a legitimate interest in protecting tenants from evictions and unreasonable rent increases during this emergency, *Pennell*, 485 U.S. at 11, and the City's laws are intended to "substantially alleviate hardships" to Los Angeles tenants.  *Schnuck*, 935 F.2d at 173; *see also Birkenfeld*, 17 Cal.3d at 153 (eviction control is a proper exercise of police power).

19

MEMORANDUM OF POINTS AND AUTHORITIES

As to the allegation that the Eviction Ordinance provides no forum to hear AAGLA's members' challenges to their tenants' claims, that is inaccurate.  (Mot. at 12.) Nothing in the City's laws prevent AAGLA's members from accessing the courts, which is where they may exercise their contractual remedies and which is where their tenants' affirmative defenses will be ultimately heard and tried.  Even if the City allegedly does not "provide landlords with the means of challenging whether tenants have truly experienced a COVID-19 financial hardship"—and such forums exist—the laws are still not arbitrary or irrational.  *HAPCO*, 2020 U.S. Dist. LEXIS 156327, at *24.

Presumably unable to establish a due process violation under the test actually applicable to the City's Eviction Ordinance, AAGLA invents one out of whole cloth. AAGLA suggests that, presumably despite this unprecedented health crisis, "when government . . . regulates the landlord-tenant relationship . . . the Due Process Clause requires the government to establish a regulatory process" that provides for a "fair and reasonable return" and a mechanism for "relief from the regulation."  (Mot. at 29.)  The City's RSO Rent Freeze already explicitly provides for just and reasonable rents and an adjustment process.[15]  And this freeze does *not* apply to vacant or non-RSO property.

---

[15] AAGLA does not appear to base its due process claim on the City's RSO Rent Freeze. Nor could it.  Rent control ordinances pass constitutional muster so long as they provide a property owner a "fair return."  *See, e.g.*, *Pennell*, 485 U.S. at 11-14.  The "essential inquiry in due process cases involving price controls is whether the regulatory scheme's *result* is just and reasonable."  *Kavanau*, 16 Cal. 4th at 778 (citing cases).  Although courts generally recommend allowing rent adjustments based on generally applicable factors, rent control ordinances are not required to allow rent increases every year, so long as they have a reasonably efficient mechanism for adjusting rents.  *Carson Mobilehome Park Owners' Ass'n v. City of Carson*, 35 Cal. 3d 184, 195 (1983).  Under the City's RSO Rent Freeze, rents on vacated units may be increased to any amount (provided the state anti-price gouging law is not violated).  LAMC § 151.06.C; Cal. Civ. Code §§ 1954.52, 1954.53.  When landlords believe they are not receiving a fair return on their property, they may petition for rent adjustments and are entitled to noticed, evidentiary hearings.  LAMC § 151.07.B.  The City's RSO was upheld as providing

MEMORANDUM OF POINTS AND AUTHORITIES

Landlords may still set and increase rents according to what the market will bear on unregulated properties.  And despite the eviction moratoria, that rent is still due and obtainable in court.  AAGLA has identified nothing requiring the City to ensure landlords obtain a "fair return" on property for which the City's price controls do not apply at all.

## C.   AAGLA Fails To Demonstrate Irreparable Harm Absent an Injunction

As a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing" of entitlement, irreparable harm must be shown.  *Winter*, 555 U.S. at 22.  AAGLA's failure to demonstrate irreparable harm is, by itself, is grounds for the Court to deny its motion.  *See, e.g., Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) ("irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction"); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("A showing of irreparable injury is the sine qua non of injunctive relief… . [E]ven if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.") (citations omitted).

AAGLA filed this lawsuit on June 11, 2020, months after the ordinances were enacted.  It did not seek a preliminary injunction until another three months later.  This significant delay itself should bar the relief it seeks.  *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered. . . .").

### 1.   There Is No Presumption of Irreparable Harm Here

AAGLA's motion relies almost entirely on the argument that constitutional injuries raise a presumption of irreparable harm.  (Mot. at 18-19.)  Irreparable harm cannot be

---

landlords a "fair return" over thirty years ago.  *Palos Verdes Shores Mobile Estates v. City of Los Angeles*, 142 Cal. App. 3d 362, 368-69 (1983).

MEMORANDUM OF POINTS AND AUTHORITIES

presumed, and categorical rules that would relieve a party of having to show that harm in certain cases are improper. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1249 (9th Cir. 2013). Although the Supreme Court has stated that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), this statement, in light of *eBay* and *Winter*, cannot relieve a party seeking injunctive relief from actually showing specific harm, *even in the First Amendment context*, *Cuviello v. City of Vallejo*, 944 F.3d 816, 831-32 (9th Cir. 2019). Meanwhile, the Supreme Court has *not* embraced a presumption related to any other constitutional provision. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285-86 (11th Cir. 1990) (noting a possible equal protection violation resulting in chiefly economic injury would not create irreparable harm). Thus, neither a Due Process nor a Contract Clause violation creates a presumption of irreparable harm. *Church of Scientology v. United States*, 920 F.2d 1481, 1489 (9th Cir. 1990) (due process); *Wis. Cent. v. PSC*, 95 F.3d 1359, 1372 (7th Cir. 1996) (due process and contract clause); *HAPCO*, 2020 U.S. Dist. LEXIS 156327, at *32 n.130 (contract clause and substantive due process); *Lake Forest Elem. v. Orleans Par. Sch. Bd.*, No. 16-2323, 2016 U.S. Dist. LEXIS 131914, at *11-12 (E.D. La. Sep. 27, 2016) (contract clause). AAGLA cites inapposite cases involving the separation of families, wrongful detention, and other classically irreparable injuries. (Mot. at 19.) Even assuming that a Contract Clause or Due Process violation creates a presumption of irreparable harm, AAGLA fails to establish that harm, as discussed above.

## 2. *AAGLA Has Not Established Irreparable Harm*

AAGLA's one-paragraph discussion of its members' "irreparable harm" is completely inadequate. "[T]o demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir.

22

1992) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.  A plaintiff must do more than merely allege imminent harm to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original; internal citations omitted).  Economic harms are not irreparable.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (2008) ("it has long been held that traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable").

AAGLA's evidence of "irreparable harm" boils down to a handful of members whose tenants are late on rent by a few months, and their assertions that they rely on a steady stream of rental income to keep up with their mortgages and other expenses.  *E.g.*, Adomian Decl. ¶ 5 (one tenant "almost two full months behind in rent"); Rosenberg Decl. ¶ 5; Smith Decl. ¶¶ 2, 3 (one out of six units in one property and two out of five units in another owe rent).  In other words, they have allegedly suffered economic harm.  Even still, these members admit they currently have tenants who have been paying their rent in full, each month, notwithstanding the City's laws.  *Id.*  Some of those tenants pay rent guaranteed by the Federal government, and their landlords are paid fair market rent[16] under 42 U.S.C. section 1437f.  *E.g.*, Garcia Decl. ¶ 6 (stating that four out of seven tenants are Section 8 tenants).[17]  And some members admit they have tenants who are

---

[16] *About Section 8*, HACLA, http://home.hacla.org/abouts8

[17] The Garcia Declaration is internally inconsistent and unreliable.  Garcia states that "three units have stopped paying rent," yet states that those three units are now vacant.  Garcia Decl. ¶¶ 4, 5 (stating "three units have stopped paying rent" but that "two" or "three" units are vacant).  Further, Garcia references some unpaid rent by tenants who have since left the property, but does not explain any efforts to collect on that unpaid rent, such as through an action under California Civil Code section 1951.2.

MEMORANDUM OF POINTS AND AUTHORITIES

abusing the laws by withholding rent despite not qualifying for relief.  Adomian Decl. ¶¶ 5-6.  Those tenants are not allowed to withhold rent and may be evicted, as soon as state and federal moratoria are lifted.  Yet, AAGLA does not challenge those moratoria, which also defer evictions; of course, those moratoria mean the City's Eviction Ordinance is causing no harm at all.  Meanwhile, AAGLA cites nothing to support the notion that missed rent payments constitutes irreparable harm.  Nor does AAGLA attempt to explain how these alleged injuries are any different from the kinds of business risks and losses its members would have incurred even without the City's laws.[18]  It also speculates that a tenant who is evicted will be easily replaced during, and despite of, the pandemic to replace any lost rent.[19]

AAGLA further has failed to show (1) that all of its 10,000 members (Yukelson Decl. ¶ 3) are suffering the same kind of harm, *HAPCO*, 2020 U.S. Dist. LEXIS 156327, at *33; or (2) that these harms cannot otherwise be mitigated by the myriad programs protecting landlords, *id.* at *35, such as the City's $100 million renter's relief program or the CARES Act, among others, *supra* Section II.E.  AAGLA's declarations do not address whether AAGLA's members have made use of these programs at all.  Finally, as with AAGLA's standing problem, even if the Court granted the injunction, these harms will not be alleviated because California and the CDC have stopped evictions, too.

### D.   The Balance of Interests Does Not Tip "Sharply" In AAGLA's Favor

The public's interest in controlling the spread of a dangerous pandemic requires denial of preliminary injunctive relief.  *See Stormans*, 586 F.3d at 1138 ("In assessing

---

[18] The City is acutely aware of the economic impacts the pandemic has had on property owners.  Nonetheless, it is worth noting that AAGLA's members alleged hardships do not seem to be caused by the City's laws; rather, they have taken business risks compounded by COVID-19.  For example, one owner's investment property operated at a negative cash flow prior to the pandemic.  Adomian Decl. ¶ 3.

[19] News reports suggest otherwise.  *E.g.*, *L.A. Rent Is Falling, with Some Big Drops in Luxury Buildings*, Los Angeles Times, https://www.latimes.com/homeless-housing/story/2020-08-10/la-rent-is-falling-high-end

MEMORANDUM OF POINTS AND AUTHORITIES

whether the plaintiffs have met [their burden to show that the balance of equities tips in their favor], the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'")  Here, AAGLA's likelihood of success is low, it raises no "serious questions" about the merits, and its members have not met their burden of showing "irreparable harm."  Any alleged economic harm AAGLA's members have shown does not outweigh the public's interest in controlling the spread of COVID-19 and preventing death.  *See, e.g.*, *Auracle*, 2020 U.S. Dist. LEXIS 141500, at *54; *Altman*, 2020 U.S. Dist. LEXIS 97535, at *24; *TJM 64, Inc. v. Harris*, No. 2:20-cv-02498-JPM-tmp, 2020 U.S. Dist. LEXIS 134037, at *25 (W.D. Tenn. July 29, 2020) (enjoining a COVID-19 closure order inappropriate given "the potential public health consequences" of continued businesses operation).  AAGLA concedes the need for some regulation by not challenging actions by the state or CDC; its motion does not justify the extraordinary relief sought, but rather invites this Court to legislate.  "Given the ongoing nature and continued uncertainty of when public life will resume to normal, there is nothing in this record to suggest that [the City's] efforts thus far should be second-guessed, much less stayed."  *Auracle*, 2020 U.S. Dist. LEXIS 141500, at *54 (citing *Jacobson*, 197 U.S. at 38; *Pentecostal Church*, 140 S. Ct. at 1613).

## V.   CONCLUSION

The City understands COVID-19 has disrupted lives and the economy, including AAGLA's members' businesses.  However, AAGLA has failed to satisfy the standards for a preliminary injunction, so its motion must be denied.

Respectfully submitted,

Dated: October 5, 2020          MICHAEL N. FEUER, City Attorney
                               DEBORAH BREITHAUPT, Deputy City Attorney
                               ELAINE ZHONG, Deputy City Attorney

                               By:  */s/ Deborah Breithaupt*
                                    DEBORAH BREITHAUPT, Deputy City Attorney
                               Attorneys for Defendants City of Los Angeles, et al.

25