KATHRYN A. EIDMANN (268053)
keidmann@publiccounsel.org
FAIZAH MALIK (320479)
fmalik@publiccounsel.org
GIGI LAM (284233)
glam@publiccounsel.org
ALISA RANDELL (293490)
arandell@publiccounsel.org
LAUREN ZACK (321497)
lzack@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:   (213) 385-2977
Facsimile:    (213) 385-9089

NISHA N. VYAS (228922)
nvyas@wclp.org
MATTHEW WARREN (305422)
mwarren@wclp.org
RICHARD ROTHSCHILD (67356)
rrothschild@wclp.org
WESTERN CENTER ON LAW AND
POVERTY
3701 Wilshire Blvd. #208
Los Angeles, California 90010
Telephone:  (213) 487-7211
Facsimile:   (213) 487-0242

MICHAEL RAWSON (95868)
mrawson@pilpca.org
CRAIG CASTELLANET (176054)
ccastellanet@pilpca.org
PUBLIC INTEREST LAW PROJECT
449 15th Street #301
Oakland, California 94612
Telephone:   (510) 891-9794
Facsimile:    (510) 891-9727

MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
KRYSTA KAUBLE PACHMAN
(280951)
kpachman@susmangodfrey.com
ROHIT D. NATH (316062)
rnath@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150

Attorneys for Intervenor-Defendants, ALLIANCE OF CALIFORNIANS FOR COMMUNITY EMPOWERMENT ACTION and STRATEGIC ACTIONS FOR A JUST ECONOMY

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APARTMENT ASSOCIATION OF LOS ANGELES COUNTY, INC., dba "APARTMENT ASSOCIATION OF GREATER LOS ANGELES," <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF LOS ANGELES; ERIC GARCETTI, in his official capacity as Mayor of Los Angeles; and CITY COUNCIL OF THE CITY OF LOS ANGELES, in its official capacity; DOES 1 through 25, inclusive, Defendants. | Case No. 2:20-cv-05193-DDP-JEM <br><br> **INTERVENORS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: October 26, 2020 <br> Time: 10:00 a.m. <br> Courtroom: 9C, 9th Floor <br> Judge: Hon. Dean D. Pregerson |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................... 1

II.   BACKGROUND ..................................................................................... 3

    A.    The COVID-19 Pandemic's Impact on Public Health and Housing Insecurity in the City of Los Angeles ................................. 4

    B.    Government Efforts to Curb the Housing Crisis in the Wake of the Pandemic ................................................................................. 5

        1.    The City of Los Angeles Ordinances ......................................... 6

        2.    Judicial Council Emergency Rules, AB 3088, and Emergency Protections for Landlords ..................................... 7

III.  LEGAL STANDARD ............................................................................. 9

IV.   ARGUMENT ......................................................................................... 9

    A.    Plaintiff Cannot Show a Likelihood of Prevailing On the Merits ........ 9

        1.    Plaintiff's Contracts Clause Challenge Is Meritless. .................. 9

            a.    The Eviction Ordinance Does Not Impose a Substantial, Unforeseeable Impairment on Rental Agreements. ................................................................ 10

            b.    The Rent-Freeze Ordinance Is Not a Restriction on Contractual Relationships. ............................................ 15

            c.    The Ordinances Are Constitutionally Reasonable and Necessary to Address the Worst Pandemic in Over a Century. ............................................................ 15

        2.    Plaintiff's Substantive Due Process Claim Is Frivolous. ......... 19

    B.    Plaintiff Has Not Shown a Likelihood of Irreparable Harm Absent Emergency Injunctive Relief ................................................ 22

    C.    The Balance of Equities Weighs Sharply Against Enjoining the Ordinances ......................................................................................... 24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.J. California Mini Bus, Inc. v. Airport Commn of the City &*
*Cty. of San Francisco*, 148 F. Supp. 3d 904 (N.D. Cal. 2015) ......................... 20

*Amwest Sur. Ins. Co. v. Reno*,
52 F.3d 332 (9th Cir. 1995) ............................................................... 22

*Auracle Homes, LLC v. Lamont*,
No. 20-CV-00829 (VAB), 2020 WL 4558682 (D. Conn. Aug. 7,
2020) ......................................................................... 1, 14, 17

*Ballinger v. City of Oakland*,
398 F. Supp. 3d 560 (N.D. Cal. 2019) .................................................. 9, 15, 17

*Baptiste v. Kennealy*,
No. 1:20-CV-11335-MLW, 2020 WL 5751572 (D. Mass. Sept. 25,
2020) ................................................................................. 2

*Bridge Aina Le'a, LLC v. State of Hawaii Land Use Comm'n*,
125 F. Supp. 3d 1051 (D. Haw. 2015), *aff'd sub nom.*
950 F.3d 610 (9th Cir. 2020) ............................................................. 20

*Campanelli v. Allstate Life Ins. Co.*,
322 F.3d 1086 (9th Cir. 2003) .......................................................... 15

*City of Los Angeles, Calif. v. Patel*,
576 U.S. 409 (2015) .................................................................... 13

*Colony Cove Properties, LLC v. City of Carson*,
640 F.3d 948 (9th Cir. 2011) ........................................................... 20

*Edgar A. Levy Leasing Co. v. Siegel*,
258 U.S. 242 (1922) ................................................................. 16, 17

*Elmsford Apartment Assocs., LLC v. Cuomo*,
No. 20-CV-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29,
2020) ............................................................................*passim*

*HAPCO v. City of Philadephia*,
  No. CV 20-3300, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020)................*passim*

*Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ............................................................... 9

*Hohe v. Casey*,
  868 F.2d 69 (3d Cir. 1989) ................................................................... 22

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934) ................................................................. 17, 18, 19

*Hotop v. City of San Jose*,
  No. 18-CV-02024-LHK, 2018 WL 4850405 (N.D. Cal. Oct. 4,
  2018) .................................................................................................... 21

*Johnson v. City of San Francisco*,
  No. 09-CV-05503-JSW, 2010 WL 3078635 (N.D. Cal. Aug. 5,
  2010) .................................................................................................... 22

*Keyoni Enterprises, LLC v. City of Maui*,
  No. 15-CV-00086-DKW, 2015 WL 1470847 (D. Haw. Mar. 30,
  2015) ............................................................................................... 22, 23

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987) ............................................................................... 9

*Marcus Brown Holding Co. v. Feldman*,
  256 U.S. 170 (1921) ............................................................................. 17

*Melandres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) (Mot. )................................................... 23

*Mussetter Distrib., Inc. v. DBI Beverage Inc.*,
  685 F. Supp. 2d 1028 (N.D. Cal. 2010).......................................... 2, 11

*San Francisco Apartment Association, et al. v. City and County of San
  Francisco*,
  No. CPF-20-517136 (Super. Ct. Aug. 3, 2020)..................................... 2

*Siegel v. Bradstreet*,
  No. 08-2480-CAS-SSX, 2008 WL 4195949 (C.D. Cal. Sept. 8,
  2008), *aff'd*, 360 F. App'x 832 (9th Cir. 2009).................................. 15

INTERVENORS' OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

*Sveen v. Melin*,
  138 S. Ct. 1815, 1822 (2018) ........................................................................ 9, 10

*Sylvia Landfield Tr. v. City of Los Angeles*,
  729 F.3d 1189 (9th Cir. 2013) ....................................................................... 3, 20

*Vanguard Med. Mgmt. Billing, Inc. v. Baker*,
  No. 17-965-GW-DTBX, 2018 WL 6137198 (C.D. Cal. Apr. 26,
  2018) ............................................................................................................... 9, 13

*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*,
  310 U.S. 32 (1940) .......................................................................................... 2, 11

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ........................................................................................ 20

*Watson v. USP Lompoc*,
  No. 11-CV-1791-DDP-RZ, 2011 WL 941365 (C.D. Cal. Mar. 17,
  2011) (Pregerson, J.) ...................................................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................ 9

**Statutes**

Cal. Civ. Code § 1671 ............................................................................................ 13

Cal. Civ. Code § 1946.2 ......................................................................................... 11

Cal. Civ. Code § 1947.12 ....................................................................................... 11

Cal. Civil Code § 1942.4 ........................................................................................ 21

Cal. Gov. Code § 12955(a)-(p) .............................................................................. 10

California's Tenant Protection Act of 2019 ......................................................... 11

Coronavirus Aid, Relief, and Economic Security Act,
  Pub. L. No. 116-136 (CARES Act) §§ 4022 & 4023 ......................................... 8

INTERVENORS' OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

## Ordinances

City of Los Angeles Municipal Code
    § 151.00 (Rent Stabilization Ordinance).....................................*passim*
    § 151.09 ...................................................................................... 10
    § 151.09(A)(2)(b) ....................................................................... 13
    § 151.09(D)................................................................................. 13
    § 151.10 ...................................................................................... 21
    § 151.10(A)................................................................................. 13
    § 151.23(B) ................................................................................. 10
    § 151.32 .............................................................................7, 15, 21
    § 499.99.2(A).............................................................................. 12

City of Los Angeles Ordinance
    No. 186340 ................................................................................. 11
    No. 186606 (Eviction Ordinance) ..........................................*passim*
    No. 186606 § 49.99.2(A)............................................................... 6
    No. 186606 § 49.99.2(B)............................................................... 6
    No. 186606 § 49.99.2(C).............................................................. 6
    No. 186606 § 49.99.6 ................................................................... 7
    No. 186606 § 49.99.7 ................................................................... 7
    No. 186607 (Rent-Freeze Ordinance) ....................................*passim*

## Rules

Fed. R. Civ. P. 24.............................................................................. 1

Judicial Council of California
    Temporary Emergency Rule 1....................................................... 7
    Temporary Emergency Rule 2....................................................... 7

## Other Authorities

California Assembly Bill 3088 ..................................................6, 7, 8

Liam Dillon, L.A. City Council Passes $100-million Coronavirus Rent
    Relief Program, *LA Times* (June 23, 2020), online at
    latimes.com/homeless-housing/story/2020-06-23/l-a-passes-100-
    million-coronavirus-rent-relief (accessed Oct. 3, 2020) ..................... 8

U.S. Const. amend. I........................................................................ 22

U.S. Const. art. I, § 10 ...............................................................*passim*

# TABLE OF DEFINED TERMS

| AAGLA or Plaintiff | Plaintiff Apartment Association of Los Angeles County, Inc., d/b/a "Apartment Association of Greater Los Angeles" |
|---|---|
| AB 3308 | California Assembly Bill 3088 |
| Benfer Decl. | Expert Declaration of Prof. Emily Benfer in Opposition to Motion for Preliminary Injunction |
| CARES Act | Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136 |
| City | City of Los Angeles |
| Cookson Decl. | Declaration of Tenant Drew Cookson in Opposition to Motion for Preliminary Injunction |
| Danny C. Decl. | Declaration of Tenant Danny C. in Opposition to Motion for Preliminary Injunction |
| David D. Decl. | Declaration of David D. in Support of Motion to Intervene (Dkt. 13-4) |
| Dueñas Decl. | Declaration of Landlord Francisco Dueñas in Opposition to Motion for Preliminary Injunction |
| Eugenia T. Decl. | Declaration of Tenant Eugenia T. in Opposition to Motion for Preliminary Injunction |
| Eviction Ordinance | City of Los Angeles Ordinance No. 186606 (Dkt. 47-3) |
| Gabriel B. Decl. | Declaration of Tenant Gabriel B. in Opposition to Motion for Preliminary Injunction |
| Garcia Decl. | Declaration of Evelyn Garcia in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 46-3) |
| Intervenors | Intervenors Alliance of California for Community Empowerment Action (ACCE Action) and Strategic Actions for a Just Economy (SAJE) |
| LAMC or Municipal Code | Los Angeles Municipal Code |
| Mishori Decl. | Expert Declaration of Dr. Ranit Mishori in Support of Motion to Intervene (Dkt. 13-3) |
| Motion or Mot. | Plaintiff's Motion for Preliminary Injunction (Dkt. 46) |
| Paola R. Decl. | Declaration of Tenant Paola R. in Opposition to Motion for Preliminary Injunction |
| Pedro M. Decl. | Declaration of Tenant Pedro M. in Opposition to Motion for Preliminary Injunction |
| Rent-Freeze Ordinance | City of Los Angeles Ordinance No. 186607 (Dkt. 47-4) |

INTERVENORS' OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

| RJN | Intervenors' Request for Judicial Notice in Opposition to Plaintiff's Motion for Preliminary Injunction |
|---|---|
| Rosenberg Decl. | Declaration of Adam Rosenberg in Support of Plaintiff's Motion for Preliminary Injunction (Dkt. 46-6) |
| RSO | City of Los Angeles Rent Stabilization Ordinance, Los Angeles Municipal Code § 151.00 *et seq.* |
| Sonia R. Decl. | Declaration of Tenant Sonia R. in Opposition to Motion for Preliminary Injunction |
| Strathmann Decl. | Supplemental Declaration of Cynthia Strathmann of SAJE in Opposition to Motion for Preliminary Injunction |
| Supp. Mishori Decl. | Supplemental Expert Declaration of Dr. Ranit Mishori in Opposition to Motion for Preliminary Injunction |
| Susana S. Decl. | Declaration of Tenant Susana S. in Opposition to Motion for Preliminary Injunction |
| Tsemberis Decl. | Expert Declaration of Dr. Sam Tsemberis in Opposition to Motion for Preliminary Injunction |

INTERVENORS' OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

# I.  **INTRODUCTION**

In response to the global coronavirus pandemic that has killed over 200,000 Americans, the City of Los Angeles enacted two ordinances to keep vulnerable tenants in their homes. The first, Ordinance No. 186606 ("Eviction Ordinance"),[1] temporarily prohibits evictions for no-fault reasons, for the inability to pay rent due to COVID-19, for unauthorized pets or occupants, and for COVID-19-related nuisance during the City's declared state of emergency. Dkt. 47-3. The second, Ordinance No. 186607 ("Rent-Freeze Ordinance"), temporarily freezes rents on units subject to the City's Rent Stabilization Ordinance ("RSO").  Dkt. 47-4. As the pandemic and its economic aftershocks ravage the City, these Ordinances remain lifelines for tenants. Without them, tens of thousands of vulnerable Angelenos, including children, may be forced into homelessness, where they are at a higher risk of contracting, spreading, and dying from the novel coronavirus. *Infra* 24-25. The Ordinances are saving lives. Plaintiff seeks to enjoin them to save money.

Plaintiff's motion for preliminary injunction should be denied because Plaintiff has no hope of prevailing on the merits, Plaintiff's members will not suffer irreparable harm as a result of the Ordinances, and the balance of equities tips sharply against enjoining these emergency measures. This is not a matter of first impression. Plaintiff's challenge is a carbon copy of the constitutional challenges to other COVID-19 emergency eviction measures enacted across the country. Not one of these challenges has succeeded. To date, four federal district courts have rejected claims raising the same theories Plaintiff raises here, and these decisions provide a roadmap for why Plaintiff's motion should be denied.[2]

---

[1] Citations to Eviction Ordinance are to the Ordinance, as amended on May 7, 2020, attached as Exhibit 3 to Plaintiff's request for judicial notice.

[2] *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *11 (S.D.N.Y. June 29, 2020) (holding that New York State's eviction moratorium and security deposit ordinances enacted in wake of COVID-19; *Auracle Homes, LLC v. Lamont*, No. 20-CV-00829 (VAB), 2020 WL 4558682, at

1

On the merits, Plaintiff raises two facial constitutional claims: a Contracts Clause challenge and a substantive due process challenge. Plaintiff argues that the Ordinances violate the Contracts Clause because they delay landlords' ability to pursue evictions for certain grounds during the COVID-19 emergency period, costing them rent in the process. But under the Contracts Clause, a government has the "authority . . . to safeguard the vital interests of its people" and "all contracts are made subject to this paramount authority . . . [including] contractual arrangements between landlords and tenants." *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38–39 (1940). A Contracts Clause violation exists only where there is an *unforeseen* and substantial impairment to contracts, and the bar for Contracts Clause violations with respect to regulatory changes in highly regulated industries— like housing—are especially high because "[f]urther regulation in [such] field[s] would not be unexpected." *Mussetter Distrib., Inc. v. DBI Beverage Inc.*, 685 F. Supp. 2d 1028, 1033 (N.D. Cal. 2010).

Against this backdrop, Plaintiff's Contracts Clause claim is meritless. Evictions have been heavily regulated for decades—federal, state, and local law dictate when and for what reasons a landlord may evict a tenant. Like many laws before it, the Eviction Ordinance suspends, only temporarily, one subset of the many other permissible grounds for evicting tenants. The obligations of lease agreements remain largely intact; landlords may collect rent and evict tenants for a litany of reasons unaffected by the Ordinances. As for the Rent-Freeze Ordinance, it has zero effect on existing contractual relations, and is at most a temporary change to the

_____

*1 (D. Conn. Aug. 7, 2020) (denying motion to enjoin State of Connecticut COVID-19 emergency housing measures); *HAPCO v. City of Philadelphia*, No. CV 20-3300, 2020 WL 5095496, at *7 (E.D. Pa. Aug. 28, 2020) (same with respect to City of Philadelphia); *Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL 5751572, at *1 (D. Mass. Sept. 25, 2020) (same with respect to Commonwealth of Massachusetts measures). *See also San Francisco Apartment Association, et al. v. City and County of San Francisco,* No. CPF-20-517136 (Super. Ct. Aug. 3, 2020).

INTERVENORS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

City's existing RSO regulating rent increases. The Ordinances are therefore the types of foreseeable regulatory changes that courts have time and again upheld against Contracts Clause challenges. *Infra* 9-19.

Plaintiff's due process challenge is frivolous and duplicative of the Contracts Clause theory. Plaintiff argues that landlords' substantive due process rights are violated because they, temporarily, cannot force impoverished tenants impacted by the global pandemic out of housing. But to succeed on a facial substantive due process challenge, Plaintiff must show that the Ordinances, as applied to every landlord and tenant in the City, "shock the conscience." *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013). If anything, it is the absence of *further* protections for the City's most vulnerable in this crisis that shocks the conscience.

Merits aside, Plaintiff cannot show that landlords will suffer irreparable harm, and the equities weigh decisively against an injunction. The primary harm Plaintiff asserts is the temporary loss of rent, but Plaintiff's own declarations belie any claim this alleged loss is irreparable. Its members own multi-unit buildings, in which the majority (save the most vulnerable) are making timely rent payments—payments likely sufficient to keep landlords fed and housed during this crisis. The same is not true for the tens of thousands of tenants on the brink of homelessness. Without the Ordinances, the City will face a humanitarian crisis, thousands will be left homeless, and lives will be lost. Even if Plaintiff's claims about the Ordinances are accurate (they are not), its members can be made whole. But if forced to face the prospect of eviction without the Ordinances' protections, the City's vulnerable tenants cannot.

## II.   BACKGROUND

In March 2020, the COVID-19 pandemic brought the country to a halt. On March 19, 2020, Governor Newsom and Mayor Garcetti issued stay-at-home orders, requiring all Los Angeles (and California) residents except essential workers to shelter in place. *See* RJN Ex. 1. The resulting business and school closures exacted a

severe toll on financially vulnerable Angelenos, many of whom were already teetering on the edge. In response, the City, County, and State took action.

**A.** **The COVID-19 Pandemic's Impact on Public Health and Housing Insecurity in the City of Los Angeles**

Housing instability was already an emergency in Los Angeles before COVID-19: as of January 2020, *41,290* people were experiencing homelessness on any given night in the City—an increase of 16.1% from the previous year. Tsembris Decl. ¶ 17. The pandemic threatens to exponentially spike these alarming figures. In cities where officials have allowed emergency housing measures to expire, eviction filings surged to historic highs; without the Ordinances, the City will follow this trend. Benfer Decl. ¶¶ 17-18. Under even conservative estimates, the Los Angeles area will witness over 100,000 evictions if eviction protections are lifted absent meaningful government intervention, and tens of thousands of those households will become homeless. Tsembris Decl. ¶ 6 & Ex. B; Benfer Decl. ¶ 16.

The unemployment rate in Los Angeles County is now over 20%, with nearly 1 million Angelenos out of work, disproportionately impacting the lowest income workers. Tsembris Decl. ¶ 18. Before the pandemic, many were barely making ends meet as house cleaners, street vendors, mechanics, freelancers, repairmen, and babysitters—jobs for which demand has plummeted. Strathmann Decl. ¶ 10; Susana S. Decl. ("I have not been able to work since the pandemic began"); Eugenia T. Decl. ("street vending has been extremely difficult due to coronavirus, and I have barely been able to work"); Pedro M. Decl. ¶ 7; Danny C. Decl. ¶ 5; Gabriel B. Decl. ¶ 6; Sonia R. Decl. ¶¶ 7-11. These tenants are either jobless or scrambling for opportunities as COVID-19 continues to spread. Tsembris Decl. ¶ 28.

Low-income households often have no safety net to tide them over during the pandemic, and many impacted households do not qualify for federal or local assistance. *See* Benfer Decl. ¶ 8; Dkt. 13-4, David D. Decl. ¶ 7; Gabriel B. Decl. ¶ 6. Tenants who were stably housed pre-pandemic are now suddenly facing the

4

1   prospect of eviction with nowhere else to go.  *See* Eugenia T. Decl. ¶¶ 4, 20; Pedro

2   M. Decl. ¶¶ 4, 15; Gabriel B. Decl. ¶ 15; Danny C. Decl. ¶ 15.

3       Those who manage to scrape together enough to pay rent often do so at the

4   expense of feeding themselves and their children. Tsembris Decl. ¶ 9; Benfer Decl.

5   ¶ 13. Approximately 12% of adults in California experience food insecurity—Black

6   and Latinx populations at a rate twice that of white populations—and the pandemic

7   has made this worse.  Benfer Decl. ¶ 8; David D. Decl. ¶ 16 ("I had to cut my food

8   budget and limit myself to only one meal a day."); Eugenia T. Decl. ¶ 13 ("In May,

9   June, and July we were able to pay rent, but . . . . [t]here were days when we went

10  without food."). Many tenants behind on rent intend to pay all owed rent as soon as

11  it is possible but do not have the funds to do so now. Susana S. Decl. ¶ 10.

12      Widespread housing insecurity raises serious public health concerns. Housing

13  instability and homelessness are linked to a range of health conditions, including high

14  blood pressure, diabetes, hepatitis C, HIV, chronic heart and lung disease, and more.

15  Dkt. 13-3, Mishori Decl. ¶¶ 23–24.  The pandemic exacerbates existing health risks

16  of housing instability and creates new risks for the community at large. *Id.* ¶¶ 35-40.

17  Displaced households cannot follow CDC recommendations regarding social

18  distancing, hygiene, and quarantining, putting them at higher risk of contracting,

19  spreading, and dying from COVID-19, particularly because these households are

20  disproportionately likely to suffer from pre-existing conditions that make them more

21  vulnerable to the virus. Dkt. 13-3, Mishori Decl. ¶¶ 16-26; Benfer Decl. ¶ 21-24.

22  "Safer at home" is meaningless without a home in the first place.

23      **B.**   **Government Efforts to Curb the Housing Crisis in the Wake of the**

24          **Pandemic**

25      In response to COVID-19, state and local officials took steps to avoid

26  exacerbating the housing crisis. The City enacted the Eviction Ordinance challenged

27  here in March 2020, which was followed by emergency action by the Judicial

28  Council, and, most recently, the State Legislature in enacting AB 3088.

### 1.     The City of Los Angeles Ordinances

The Eviction Ordinance was originally signed into law on March 31, 2020, and amended on May 6, 2020. Dkt. 47-3. The Eviction Ordinance implements a temporary prohibition on certain types of evictions during the "Local Emergency Period" declared by Mayor Garcetti. The Eviction Ordinance prohibits:

- Residential evictions of a "tenant for non-payment of rent . . . if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic,"[3] Ordinance No. 186606 § 49.99.2(A);

- Residential evictions "for a no-fault reason," *id.* § 49.99.2(B); and

- Residential evictions "based on the presence of unauthorized occupants" and pets "or for nuisance related to COVID-19," *id.* § 49.99.2(C).

The Eviction Ordinance further provides that tenants shall "have up to 12 months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period." As a result of AB 3088, described below, this grace period will begin to run on March 1, 2021 and expire on March 1, 2022, at the latest.[4] *See* AB 3088 § 1179.05(a)(2)(A).

The Eviction Ordinance protections are limited. Under the Eviction Ordinance, a landlord may still evict tenants on a variety of grounds, including, *inter alia*, for: (1) nonpayment of rent for tenants with ability to pay; (2) nonpayment of rent if the inability to pay is unrelated to COVID-19; (3) nuisances unrelated to COVID-19; and (4) illegal activity. The Eviction Ordinance preserves a landlord's ability to bring an

---

[3] The Ordinance defines "circumstances related to the COVID-19 pandemic" to include "loss of income due to a COVID-19 workplace closure, child care expenditures due to school closures, health-care expenses related to being ill with COVID-19 or caring for a member of the tenant's household or family who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures." *Id.*

[4] If the City declares the end of the local emergency period prior to March 1, 2021, the 12-month clock will begin at the conclusion of the local emergency period.

unlawful detainer action to adjudicate eviction claims, and a tenant may invoke the protections of the Eviction Ordinance as an affirmative defense in such an action. The Ordinance also allows tenants to seek injunctive relief and civil penalties for violations of the Ordinance. *Id.* §§ 49.99.6, 49.99.7.

The City adopted the Rent-Freeze Ordinance on May 12, 2020. Dkt. 47-4. The Rent-Freeze Ordinance provides that "[t]he maximum adjusted rent of any occupied rental unit may not be increased, unless necessary to obtain a just and reasonable return, until one year following the termination of the local emergency." Ordinance No. 186607 § 151.32. The Rent-Freeze Ordinance does not apply to all rental units in the City, only those subject to the City's RSO. The Rent-Freeze Ordinance permits rent increases "necessary to obtain a just and reasonable return." Ordinance No. 186607 § 151.32.

Both Ordinances are set to expire in connection with the end of the local emergency period. Mayor Garcetti issued the Declaration of Local Emergency on March 4, 2020 and the emergency declaration persists as of the date of this filing.

### 2. Judicial Council Emergency Rules, AB 3088, and Emergency Protections for Landlords

On April 6, 2020, the Judicial Council of California approved temporary Emergency Rules 1 and 2 in response to the pandemic. Rule 1 prohibited the issuance of "a summons on a complaint for unlawful detainer" and Emergency Rule 2 stayed foreclosure actions throughout the state. RJN Ex. 2.

Because the Emergency Rules sunset on September 1, 2020, the California Legislature passed Assembly Bill 3088, which provided emergency protection for tenants and small landlords. AB 3308 § 2(c). For tenants who certify their inability to pay rent due to COVID-19, AB 3088 bars evictions for nonpayment of any rent that was due between March 1, 2020 and August 31, 2020. Evictions of certifying tenants are also barred for rent due between September 1, 2020 and January 31, 2021,

provided that the tenant pays at least 25 percent of the aggregate rent due during that five-month period by January 31, 2021. AB 3308 § 1179.03.

AB 3088 does not eliminate the protections provided for in the City's Ordinances, but establishes a floor for eviction protections. With or without the Ordinances, landlords in the City cannot evict certifying tenants for back-rent that accrued from March through the end of August, nor for any later accrued rent until January 31, 2021. The projected "lost rent" that Plaintiff complains of will likely not occur *as a result of* the City's Ordinances—as opposed to AB 3088—until after the January 31, 2021 deadline for tenants to pay a portion of rent under AB 3088.

AB 3088 also gave landlords with 1-4 units protection under California's Homeowners Bill of Rights' anti-foreclosure protections, established notice requirements for lenders who deny requests for mortgage forbearance due to COVID-19, and created a private right of action for landlords against any lender who violates the terms of the Act. AB 3088 § 3273.10; RJN Ex. 3 (AB 3088 factsheet).

These landlord protections followed several other measures. The CARES Act allows borrowers—including landlords—with federally-backed mortgages to request forbearance, during which time the lender cannot charge additional fees, penalties, or interest. *See* CARES Act §§ 4022; 4023. For a building with fewer than five units, this forbearance can last up to 360 days. *Id.* § 4022(b)(2). The City of Los Angeles established the more than $100 million COVID-19 Emergency Renters Assistance Subsidy Program, which allowed renters impacted by the COVID-19 pandemic to apply for temporary rent subsidies up to $1,000 paid directly to the landlord.[5] *See, e.g.*, RJN Ex. 4.

---

[5] *See, e.g.*, Liam Dillon, L.A. City Council Passes $100-million Coronavirus Rent Relief Program*, LA Times* (June 23, 2020), online at latimes.com/homeless-housing/story/2020-06-23/l-a-passes-100-million-coronavirus-rent-relief (accessed Oct. 3, 2020).

INTERVENORS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## IV.   ARGUMENT

### A.   Plaintiff Cannot Show a Likelihood of Prevailing On the Merits

#### 1.   Plaintiff's Contracts Clause Challenge Is Meritless.

Article I, Section 10 of the U.S. Constitution prohibits states from passing laws "impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1. The Contracts Clause is "not to be read literally," *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502–03, (1987), but "is 'narrowly construe[d]' in order 'to ensure that local governments can effectively exercise their police powers.'" *Ballinger v. City of Oakland*, 398 F. Supp. 3d 560, 576 (N.D. Cal. 2019).

Courts apply a two-step inquiry under the Contracts Clause. First, "courts determine whether the state law has operated as a substantial impairment of a contractual relationship." *Ballinger*, 398 F. Supp. 3d at 576–77 (quotation marks omitted). Second, if and only if there is substantial impairment, courts evaluate the "means and ends of the legislation," including whether there is a "significant and legitimate public purpose behind the regulation." *Sveen*, 138 S. Ct. at 1821.  As is true of facial challenges more generally, Plaintiff must establish a likelihood that *all* applications of the challenged law run afoul of the Contracts Clause. *Vanguard Med. Mgmt. Billing, Inc. v. Baker*, No. 17-965-GW-DTBX, 2018 WL 6137198, at *18 (C.D. Cal. Apr. 26, 2018) (dismissing Contracts Clause claim).

9

Plaintiff's facial challenge to the Ordinances flunks both steps of the Contracts Clause analysis. First, the Ordinances do not substantially impair any rental agreements—let alone *all* such agreements, as Plaintiff must show on a facial challenge—because both are fully foreseeable adjustments to a complex regulatory scheme. Second, the Ordinances are reasonable and necessary because nearly a century of Supreme Court precedent has upheld far more invasive restrictions.

a.    The Eviction Ordinance Does Not Impose a Substantial, Unforeseeable Impairment on Rental Agreements.

Substantial impairment is evaluated with a view to "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). Past regulation of an industry is central to the substantial-impairment analysis. "Because past regulation puts industry participants on notice that they may face further government intervention in the future," later regulations are "less likely to violate the contracts clause where [they] cover[] the same topic as the prior regulation and share[] the same overt legislative intent to the protect the parties protected by the prior regulation." *Elmsford*, 2020 WL 3498456, at *8 (citations and quotation marks omitted).

Viewed against the backdrop of decades of regulations dictating the timing and permissible grounds for evictions, the Eviction Ordinance has, at most, a minimal, temporary effect on landlords. California law and the Municipal Code establish that—regardless of the terms of any rental agreement—a landlord may only evict tenants based on particular grounds enumerated by statute. *See, e.g.*, Los Angeles Municipal Code ("LAMC") § 151.09 (listing permissible reasons for evicting tenants for units subject to RSO); Cal. Gov. Code § 12955(a)-(p) (barring landlords from, *inter alia*, evicting tenants on the basis of race, gender, sexual orientation, and several other factors). The timing of evictions is also heavily regulated. *See, e.g.*, LAMC

§ 151.23(B) (requiring a minimum of 120-days' notice to tenant if landlord intends to remove unit from market; one-year notice for tenants at least 62 years of age who lived in the unit one year or more). These requirements are constantly changing. The Municipal Code governing evictions has been amended several times in the last decade alone, and the City previously implemented a temporary eviction moratorium to combat an epidemic of evictions in late 2019 as landlords responded to the California's Tenant Protection Act of 2019.[6] RJN Ex. 5 (Ordinance No. 186340, temporarily "prohibit[ing] no-fault evictions through December 31, 2019"). The 2019 Tenant Protection Act itself imposed enormous changes on landlords' ability to increase rents (Cal. Civ. Code § 1947.12) and to terminate tenancies (and thus evict tenants) without just cause, as defined under the statute (*id.* § 1946.2). In short, the timing and basis for evictions are subject to a complex patchwork of federal, state and, local regulations—regulations that themselves are perpetually in flux. Because all rental agreements as of 2020 were made subject to this fluctuating patchwork of eviction regulations, the Eviction Ordinance did not "substantially impair" them. *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic."); *Mussetter Distrib., Inc. v. DBI Beverage Inc*., 685 F. Supp. 2d 1028, 1034 (N.D. Cal. 2010) (upholding statute governing "the beer manufacturer/distributor relationship" because "existing statutes govern various aspects of" that relationship  and therefore

---

[6] Plaintiff argues that the Eviction Ordinance was not foreseeable because it affects both buildings subject to the City's RSO and buildings exempt from it. But the boundaries of what buildings are subject to particular restrictions fluctuate—and those changing directives put landlords "on notice that they may face further government intervention in the future." *Elmsford*, 2020 WL 3498456, at *8. For example, the 2019 Tenant Protection Act imposed a significant number of restrictions on rent and evictions on properties previously not subject to such restrictions. *See, e.g.*, Cal. Civ. Code § 1946.2.

INTERVENORS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

"[f]urther regulation in this field would not be unexpected.").[7]

Compared to the many eviction regulations affecting landlords before the pandemic—some of which permanently bar evictions for certain reasons—the Eviction Ordinance is a drop in the bucket. The Ordinance preserves nearly all of a landlord's rights and remedies. Landlords are free to pursue evictions on most grounds, including nonpayment of rent for tenants able to pay, nonpayment of rent for tenants whose inability to pay is unrelated to COVID-19, property damage, or illegal activity. *See* Ordinance No. 186606 § 49.99.2(A). In the limited circumstances where the Ordinance temporarily prohibits evictions—*e.g.*, COVID-19-related inability to pay—tenants are not relieved of the obligation to pay rent, unless further legislation is enacted. *Id.* For many rental agreements, the Ordinance therefore has no impact on a landowner's remedies, and for others, the Ordinance merely delays eviction proceedings. This is confirmed in the factual record, which shows that the overwhelming majority of tenants are paying rent on time, and those who are behind are typically only partially delinquent and have every intention of paying. *See, e.g.*, Dueñas Decl. ¶¶ 2, 5-6 (owner of three rental properties reporting all tenants paying rent on time); Dkt. 46-6, Rosenberg Decl. ¶¶ 4-5 (AAGLA member: only 29 percent of tenants across four multi-unit buildings behind on rent, implying 71 percent of tenants are up-to-date); Dkt. 46-3, Garcia Decl. ¶¶ 2, 4 (AAGLA member: only three tenants in 7-unit building behind on rent). That Plaintiff's own witnesses admit that many tenants are still paying rent on time under the Eviction Ordinance is fatal to its facial challenge, because Plaintiff must show a likelihood that *all applications* of the

---

[7] *See also HAPCO*, 2020 WL 5095496, at *7 (upholding Philadelphia eviction moratorium because "residential leases have been heavily regulated for many years."); *Elmsford*, 2020 WL 3498456, at *13 ("[P]ast regulation puts industry participants on notice that they may face further government intervention in the future . . . . Again, there is no question that residential leases are subject to a number of regulations that do not implicate the Contracts Clause.").

Eviction Ordinance unconstitutionally impair existing contractual rights.[8] *Vanguard*, 2018 WL 6137198, at *19.

Other aspects of the Eviction Ordinance about which Plaintiff complains have also been the subject of direct, prior regulation, meaning that the changes under the Eviction Ordinance were foreseeable and did not upset expectations. The Eviction Ordinance temporarily prohibits evictions for unauthorized "occupants or pets," Mot. at 23, but the City has, for years, restricted landlords' ability to evict tenants for "exceeding the limits on occupancy set forth in [] rental agreement[s]" and even for pets. *See* LAMC § 151.09(A)(2)(b) (barring evictions for exceeding occupancy limits where additional occupants are dependent children or, for other occupants, where the landlord "unreasonably withh[o]lds" approval of additional occupant); *id.* § 151.09(D) ("A landlord shall not change the terms of a tenancy to prohibit pets and then evict the tenant for keeping a pet which was kept and allowed prior to the change" absent nuisance). Plaintiff also complains of the inability to charge "late fees," Mot. at 22-23, but, under California law, late fees agreed to in "a provision in a contract liquidating damages" are presumed "void."[9] *See, e.g.*, Cal. Civil Code § 1671 (governing liquidated damages in "a lease of real property for use as a

---

[8] For a facial challenge, Plaintiff must show the Eviction Ordinance substantially impairs all rental agreements in the City, whether the tenant is currently up to date on rent or currently invoking the Ordinance's protections. All rental agreements are subject to the Ordinance, and the tenants may need to invoke the protections of the Ordinance at a later date (*e.g.*, if they later contract COVID-19). *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418–19 (2015).

[9] Plaintiff also suggests the creation of a private right of action against persons who violate the Ordinance's provisions is unfair. But private enforcement of housing code is nothing new. *See, e.g.*, LAMC § 151.10(A) (providing for treble damages against "[a]ny person who demands, accepts or retains any payment of rent in excess of the maximum rent or maximum adjusted rent" provided for under the City's RSO). This enforcement mechanism critical to combat many landlords' blatant disregard for tenants' legal rights. *See, e.g.*, Eugenia T. Decl. ¶¶ 10-11, 20; Pedro M. Decl. ¶ 14; Cookson Decl. ¶ 14; Paola R. Decl. ¶ 12.

INTERVENORS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

dwelling"); *HAPCO*, 2020 WL 5095496, at *8 ("it is doubtful that the loss of late fees constitutes a substantial impairment."). Because the changes effected by the Ordinance were entirely foreseeable and should have been priced into Plaintiff's members' contracts, Plaintiff's claim fails on the substantial impairment prong.

Several other federal courts addressing Contracts Clause challenges to COVID-19 eviction measures have reached the same conclusion. In the *Elmsford* case challenging New York State's temporary moratorium on evictions against tenants "facing financial hardship due to the COVID-19 pandemic," Judge McMahon concluded that "[t]he tenants are still bound to their contracts, and the landlord may obtain a judgment for unpaid rent if the tenants fail to honor their obligations." 2020 WL 3498456, at *15. Bids to enjoin Connecticut and Philadelphia eviction moratoria similarly failed because landlords "operate[d] in a heavily regulated industry," and thus "the expected costs of foreseeable future regulation are already presumed to be priced into the contracts formed under the prior regulation." *Auracle Homes*, 2020 WL 4558682, at *17 (quotation marks omitted); *HAPCO*, 2020 WL 5095496, at *6.

The same is true here under the Eviction Ordinance—and in fact any supposed "impairment" has been blunted by AB 3088, which is not at issue here. Whether or not the City's Ordinances are enjoined, landlords cannot evict tenants for nonpayment of rent if they declare COVID-19-related need through at least January 31, 2021. The ability to collect rent on the day it is due—the so-called "heart of any rental lease," Mot. at 21—will be affected whether the Ordinance is enjoined or not. The Ordinance nevertheless provides a lifeline for a subset of tenants who cannot afford even 25 percent their rent due to loss of income. *See* Benfer Decl. ¶ 11; Susana S. Decl. ¶ 8; Eugenia T. Decl. ¶ 7; Pedro M. Decl. ¶ 8; Gabriel B. Decl. ¶ 7, 14; Strathmann Decl. ¶¶ 10-15. Because the Eviction Ordinance does no more than temporarily adjust the existing patchwork of laws regulating evictions and rent, and because its impact on landlords has been dampened by AB 3088, Plaintiff cannot establish a likelihood that any contract—let alone, for its facial challenge, *all* rental

14

1   agreements in the City—is substantially impaired by the Eviction Ordinance.

2          b.       The Rent-Freeze Ordinance Is Not a Restriction on
3                   Contractual Relationships.

4          Plaintiff does not even argue that Rent-Freeze Ordinance imposes a

5   "substantial impairment" on existing contracts, and it cannot do so for the first time

6   on reply. This Ordinance has no impact on current contractual obligations, only

7   affecting a landlord's ability to increase *future* rent. Like the Eviction Ordinance, the

8   Rent-Freeze Ordinance was passed against the backdrop of a preexisting rent control

9   scheme. *See* Mot at 20 n.6 (admitting "rent control ordinances have survived

10  constitutional scrutiny"). The Rent-Freeze Ordinance only affects owners of

11  properties already subject to the RSO, *i.e.*, those owners for whom rent-increase

12  regulation is the most foreseeable. *Ballinger*, 398 F. Supp. at 577. The Rent-Freeze

13  Ordinance also does not categorically prohibit rent increases, as it permits increases

14  "necessary to obtain a just and reasonable return." Ordinance No. 186607 § 151.32.

15         c.       The Ordinances Are Constitutionally Reasonable and
16                  Necessary to Address the Worst Pandemic in Over a
17                  Century.

18         The Court need not reach the second prong of the Contracts Clause analysis.

19  But if it does, Plaintiff's claim fails here too. Under this prong, if a measure is found

20  to substantially impair a contract, "it is still constitutional if [1] the state has a

21  significant and legitimate public purpose behind the regulation" and [2] "the

22  adjustment of the rights and responsibilities of contracting parties is based upon

23  reasonable conditions and is of a character appropriate to the public purpose

24  justifying the legislation's adoption." *Siegel v. Bradstreet*, No. 08-2480-CAS-SSX,

25  2008 WL 4195949, at *4 (C.D. Cal. Sept. 8, 2008) (cleaned up), *aff'd*, 360 F. App'x

26  832 (9th Cir. 2009). Where, as here, the state is not a party to the contracts at issue,

27  "courts defer to legislative judgment as to the necessity and reasonableness of a

28  particular measure." *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1098 (9th

Cir. 2003) (cleaned up). Plaintiff does not dispute that there is a significant and legitimate purpose behind these COVID-19 emergency measures. Mot. at 24. Instead, relying on conclusory statements and a Depression-era case *upholding* a foreclosure moratorium against a Contracts Clause challenge, Plaintiff asserts that the City's pandemic measures are not reasonable.

The Ordinances are leaps and bounds above the threshold for reasonableness under the Contracts Clause. The Ordinances address the gravest public health crisis in over a century and the associated economic fallout that has triggered soaring unemployment.[10] The Ordinances seek to avert a mass increase in evictions that would trigger a homelessness crisis, which would not only be a humanitarian disaster but also exacerbate the spread of a novel coronavirus that public health officials are still scrambling to understand.[11] The Ordinances narrowly targeted those impacted by the pandemic and the City's most vulnerable while keeping the essential terms of existing rental agreements intact. Without the Ordinances, tens of thousands of Angeleno tenants—including thousands of children—may face homelessness, where their chance of dying and spreading the virus increases substantially. *Supra* 4-5. With the Ordinances, these tenants stay in their homes—and, perhaps, some landlords suffer temporary financial losses. *Contra* Dueñas Decl. ¶¶ 5-6. That does not raise constitutional concerns; regulation in the interest of public and economic health "requiring large expenditures by landlords" is still "a valid exercise of the police power." *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 247 (1922). The Ordinances' relatively minimal "adjustment of the rights and responsibilities of contracting parties" is therefore constitutionally reasonable, particularly because the Court "must defer to legislative judgment as to the necessity and reasonableness of a

---

[10] Benfer Decl. ¶¶ 10-11; Tsemberis Decl. ¶ 18.

[11] Benfer Decl. ¶¶ 15-26; Mishori Supp. Decl. ¶¶ 5-7; Dkt. 13-3, Mishori Decl. ¶¶ 35-40.

INTERVENORS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

particular measure." *Ballinger*, 398 F. Supp. at 576–77 (quotation marks omitted); *Auracle Homes*, 2020 WL 4558682, at *18 ("When those officials undertake to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad. [T]hey should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (cleaned up)).

Plaintiff argues that "[p]rior to the pandemic, no court—federal or state—had ever held that a government entity . . . may excuse tenants from paying a reasonable amount of rent contemporaneous with occupancy as a condition to avoiding eviction." Mot. at 24 (emphasis omitted). Plaintiff neglects to mention, however, that during the pandemic, *every* court—both federal *and* state—has rejected nearly identical Contracts Clause challenges to eviction moratoria across the country, all of which did not have any contemporaneous-payment conditions. *Supra* 1 n. 1. Virtually the only cases Plaintiff cites in support of its Contracts Clause claim are a series of Supreme Court decisions from the 1920s and 1930s that *upheld* emergency restrictions and legislatures' broad discretion to address emergencies, even when resulting regulations cause damage to property holders. *See, e.g.*, *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 199 (1921) ("[C]ontracts are made subject to this exercise of the power of the State when otherwise justified."); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 430 (1934) ("In all such cases the question becomes, therefore, one of reasonableness, and of that the legislature is primarily the judge.").[12] And none of those cases addressed circumstances as exigent as these, where the City faces not only a severe economic crisis, but record unemployment

---

[12] Many of these cases, which Plaintiff refers to as the "lease cases," upheld restrictions far more invasive than the Eviction or Rent-Freeze Ordinances. For example, *Edgar A. Levy Leasing Co.* effectively sanctioned partial rent forgiveness by allowing a tenant to challenge the rent required under his current lease and seek an adjustment to a "fair and reasonable" rent. 258 U.S. 242 at 292. The Eviction Ordinance leaves rent-payment obligations intact.

*and* a once-in-a-generation pandemic to boot. Benfer Decl. ¶¶ 10-11; *See, e.g.*, *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398 (1934) (addressing Depression-era mortgage moratorium).

Plaintiff primarily relies on *Blaisdell*, but that case actually demonstrates why the Ordinances are fully constitutional. *See HAPCO*, 2020 WL 5095496, at *6 (upholding Philadelphia moratorium, noting that "[t]he leading case in the modern era of Contract Clause interpretation, *Home Building & Loan Assn. v. Blaisdell*, is strikingly similar to the instant case"). In *Blaisdell*, the Supreme Court upheld a Depression-era Minnesota emergency foreclosure measure intended to combat a housing crisis. The occupants had obtained a court order under that law extending the period of repossession on the property by two years (until May 1935), provided rent payments of $40 per month, even though, without the court's judgment, Home Building & Loan Association would have had the contractual right to repossess on May 2, 1933. *Id.* at 420. In rejecting a Contracts Clause challenge, the Supreme Court found five factors significant: (1) "the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed"; (2) "the state law was enacted to protect a basic society interest, not a favored group"; (3) "the relief was appropriately tailored to the emergency it was designed to meet"; (4) "the imposed conditions were reasonable"; and (5) "the legislation was limited to the duration of the emergency." *Id.* at 434. Under these factors, the Ordinances are clearly constitutional—they were enacted to address a global pandemic, limited to the duration of the emergency, enacted to protect the broader interests of public health and housing security, and tailored to protect vulnerable tenants. *Supra* 4-7.

Nevertheless, Plaintiff argues that the *Blaisdell* Court "implied" that an emergency housing ordinance must provide for contemporaneous payments of "reasonable rent" to property owners. Mot at 24-26. For this argument, Plaintiff plucks a quote from the opinion referring to the $40 per month rent required under the Minnesota state court order as one, of many reasons, why the Minnesota measure

was "reasonable." Mot. at 25-26. The Court did *not* hold that the contemporaneous-rent aspect of the Minnesota order was essential to its reasonableness. The opinion includes a laundry list of *other* factors that rendered the Minnesota order reasonable, including that, like here, many essential contractual obligations remained intact, *e.g.*, "the integrity of the mortgage indebtedness [was] not impaired" and "the validity of the sale and right of mortgagee-purchaser to obtain title . . . [were] maintained." *Id.* at 445-46. *Blaidsdell* also rejected the entire premise of Plaintiff's argument—that is, that limits on what may have been constitutionally permissible legislation to address the circumstances of 1934 set unyielding rules for governments addressing the far more complex circumstances of 2020. *Blaidsdell* made clear that socioeconomic changes—like the "constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests"—correspondingly change the boundaries of the state's police power.[13] This is why federal courts addressing challenges to COVID-19 eviction moratoria nationwide have concluded that they are "a reasonable way to advance a significant and legitimate public purpose." *HAPCO*, 2020 WL 5095496, at *8.

### 2.    Plaintiff's Substantive Due Process Claim Is Frivolous.

Plaintiff's substantive due process arguments recycle the same theories Plaintiff raises with respect to the Contracts Clause. The standard for substantive due process review is low: "[I]f a statute is not arbitrary, but implements a rational means of achieving a legitimate governmental end, it satisfies due process. Courts do not require that the governmental body's legislative acts actually advance its stated purposes, but instead look to whether the governmental body could have had no

---

[13] *Id.* at 442 ("Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the state itself were touched only remotely, it has later been found that the fundamental interests of the state are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends.").

legitimate reason for its decision." *A.J. California Mini Bus, Inc. v. Airport Commn of the City & Cty. of San Francisco*, 148 F. Supp. 3d 904, 915 (N.D. Cal. 2015) (quotation marks omitted). To meet this standard, "the alleged deprivation must "shock the conscience and offend the community's sense of fair play and decency." *Sylvia Landfield Tr.*, 729 F.3d at 1195.

Plaintiff's argument falls far short. Plaintiff's admission that "maintaining people in their homes to slow the spread of the coronavirus constituted a legitimate public interest" alone precludes a finding that the Ordinances "shock the conscience." Mot. 24. And placing temporary limits on evictions and rent increases no doubt is *rationally* related to the legitimate end of keeping tenants in their homes. *HAPCO*, 2020 WL 5095496, at *12 ("it is not irrational for the City to assume that the fear of accumulating interest and late fees would cause many tenants who are experiencing a COVID-19 financial hardship to self-evict"). Plaintiff asserts certain so-called "liberty interests" at stake—a landlord's "right to monthly rental payments," "a landlord's right to oust defaulting tenants," and "late fees and interest owed on deferred rent"—but none of these economic interests are "fundamental rights and liberty interests" that warrant heighted protection. Mot. at 27; *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("heightened protection" applies only to "fundamental rights and liberty interests," *e.g.*, "rights to marry," "to have children").

Plaintiff argues that both the Rent-Freeze and Eviction Ordinances are "price controls" that must guarantee a "fair and reasonable return." Mot. at 28. But claims for "fair and reasonable" returns are "subsumed by the Takings Clause" and not properly evaluated under substantive due process.[14] *See, e.g.*, *Colony Cove*

---

[14] While Plaintiff did plead a Takings Claim in its complaint, Dkt. 35 ¶¶ 70-85, it has not raised it in its preliminary injunction motion, likely because equitable relief is unavailable for takings. *See, e.g.*, *Bridge Aina Le'a, LLC v. State of Hawaii Land Use Comm'n*, 125 F. Supp. 3d 1051, 1066 (D. Haw. 2015), *aff'd sub nom.* 950 F.3d 610 (9th Cir. 2020).

1    *Properties, LLC v. City of Carson,* 640 F.3d 948, 960 (9th Cir. 2011). Further, the

2    Rent Freeze Ordinance includes a safety valve, allowing landlords to increase rent if

3    "necessary to obtain a just and reasonable return." Ordinance No. 186607 § 151.32.

4    *See, e.g.,* *Hotop v. City of San Jose*, No. 18-CV-02024-LHK, 2018 WL 4850405, at

5    *8 (N.D. Cal. Oct. 4, 2018) (dismissing regulatory takings claim against rent-control

6    ordinance where it permitted landlords to petition for rent increase to receive a fair

7    return).

8         Plaintiff also raises a variety of claims sounding in procedural due process.

9    Specifically, Plaintiff argues that (1) the Eviction Ordinance deprives landlords of an

10   ability to challenge a tenant's claim for protection under the Ordinance; and (2) the

11   private right of action in the Eviction Ordinance violates landlords' due process

12   rights. But under the Eviction Ordinance, landlords have the exact same procedural

13   forums and rights they had before the pandemic. Landlords can still pursue unlawful

14   detainer actions, where tenants may raise the Ordinance's protections as an

15   affirmative defense. The same is true with respect to the private right of action, which

16   is necessary to deter landlords' rampant, documented violations of the Eviction

17   Ordinance's protections. *See, e.g.*, Eugenia T. Decl. ¶¶ 10-11, 20; Pedro M. Decl. ¶

18   14; Paola R. Decl. ¶ 12. Landlords can defend themselves in court in an action

19   brought by a tenant just like any other litigant. Laws creating penalties for parties that

20   bring harassing unlawful detainer actions, or other litigation, are commonplace and

21   do not come close to "shocking the conscience." *See, e.g.*,  LAMC § 151.10 ("treble

22   damages" penalty for "[a]ny person who demands, accepts or retains any payment of

23   rent in excess  of the maximum rent"); Cal. Civil Code § 1942.4 (prohibiting the

24   collection of rent on dwellings with outstanding code violations; providing for

25   attorneys' fees to prevailing party). Because landlords have access to the exact same

26   procedural protections—*i.e.*, access to the courts to defend themselves or bring

27   unlawful detainer actions—that they did before the pandemic, Plaintiff's *sub silentio*

28   procedural due process claim is meritless.

**B.**     **Plaintiff Has Not Shown a Likelihood of Irreparable Harm Absent Emergency Injunctive Relief**

Plaintiff bears the burden to "show a likelihood of irreparable harm absent a preliminary injunction." *Watson v. USP Lompoc*, No. 11-CV-1791-DDP-RZ, 2011 WL 941365, at *1 (C.D. Cal. Mar. 17, 2011) (denying preliminary injunction) (Pregerson, J.). Plaintiff relies exclusively on the incorrect premise that constitutional violations establish a *per se* irreparable harm showing. Mot. at 18-19. But courts in this circuit and across the country routinely deny preliminary injunctions where, as here, a plaintiff's asserted constitutional injuries are purely economic in nature and thus compensable after the fact.[15] *See, e.g.*, *Keyoni Enterprises, LLC v. City of Maui*, No. 15-CV-00086-DKW, 2015 WL 1470847, at *9 (D. Haw. Mar. 30, 2015) ("[T]he Enterprises are arguing that because they are alleging a violation of their commercial speech rights, they will suffer . . . a 75% loss in sales, fines totaling as much as $1,000 per day from the date the NOVs were issued, and ultimately, the potential shuttering of operations. Without minimizing the import of these effects, real or not, none of them are irreparable." (cleaned up)). Plaintiff's allegations of the *economic* effects of the ordinances on its members, namely, allegedly lost rent during the COVID-19 emergency period, are harms that can be redressed at a later date in individual actions.

---

[15] *Amwest Sur. Ins. Co. v. Reno*, 52 F.3d 332 (9th Cir. 1995) ("We reject Amwest's argument that economic harm constitutes irreparable injury when a property right protected by the Constitution has been impaired. . . . Economic harm frequently constitutes a deprivation of property, but it is nevertheless fully compensable by recovery of damages.") (memorandum disposition); *Johnson v. City of San Francisco*, No. 09-CV-05503-JSW, 2010 WL 3078635, at *3 (N.D. Cal. Aug. 5, 2010) ("[A]lthough Plaintiff makes a constitutional claim, his claim is essentially one for lost wages . . . Lost wages alone do not constitute a claim for irreparable harm as money damages would be sufficient to remedy the wrong should one ultimately be found to have been committed"); *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989) ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits.").

*Id.* Plaintiff's individual members may sue for back-rent or damages for injuries under the Contracts Clause. While many of those claims will likely be meritless, even if they were viable, there is no reason why Plaintiff's members could not be made whole *without* emergency equitable relief.[16]

Plaintiff's exaggerations do not rise to the level of "economic harm" sufficient to be irreparable. Plaintiff's own declarations show that its members own multi-unit buildings where the majority of tenants, even several months after the Ordinances took effect, are up to date on rent. *Supra* 12-13; *see also* Dueñas ¶¶ Decl. 5-6 (landlord reporting all tenants paying rent on time). Property owners are also eligible for local and federal relief programs that provide direct cash assistance and options to stave off foreclosure. *Supra* 8; Dkt. 46-3, Garcia Decl. ¶ 8 (landlord noting that she secured extensions for mortgage payments). Many injuries that Plaintiff complains of have nothing to do with the Ordinances at all, injuries an injunction will not relieve. For example, several of Plaintiff's witnesses claim that tenants have been *unable* to pay rent as a result of COVID-19, and are unlikely to ever be in a position to pay owed back-rent. Enjoining the Ordinances will not change tenants' *ability to pay* rent—a consequence of the economic aftershock of the global pandemic—and thus will not alleviate landlords' alleged financial woes, particularly because Plaintiff admits that, even if its members could evict tenants for nonpayment, they are unlikely to *re-let* the apartments to other tenants. *See, e.g.*, Dkt. 46-6, Rosenberg Decl. ¶¶ 6-7 (asserting that tenants have been unable to pay and that, during the pandemic, he has been more particular about selecting tenants); Dkt. 15 (Pltf's Opp. Mot. Interv.) at 10 (arguing that many landlords will not evict tenants even in the absence of the ordinance). Plaintiff has failed to show a likelihood of irreparable harm, which is a

---

[16] Plaintiff's cited cases for the proposition that constitutional violations are sufficient to establish irreparable harm are distinguishable because nearly all involve unlawful detention, not economic harm. *See, e.g.*, *Melandres v. Arpaio*, 695 F.3d 990, 1102 (9th Cir. 2012) (Mot. at 18).

reason alone to deny this motion.

C.     **The Balance of Equities Weighs Sharply Against Enjoining the
Ordinances**

The balance of hardships is not even remotely close. Enjoining the Ordinances will create a humanitarian crisis by upending the lives of tenants across the City. The declarations submitted by Intervenors establish that many tenants are barely hanging on to shelter. Many have lost all or nearly all their income, and many others who *do* have income find themselves in the position of supporting family members and loved ones who have been suddenly unemployed. Strathmann Decl. ¶¶ 10, 13-14 ("[A] majority of community members we serve lost their jobs or are underemployed during COVID-19"); Benfer Decl. ¶¶ 6-14. Few of these vulnerable tenants have the luxury of a back-up plan, as many are undocumented and ineligible for unemployment assistance. Strathmann Decl. ¶10 (many tenants "did not receive unemployment benefits because many are undocumented and were therefore ineligible"); Eugenia T. Decl. ¶ 7 ("We do not qualify for any of the unemployment assistance that the government has offered."); Susana S. Decl. ¶ 8 ("During the pandemic, I have not had any source of financial support. I have not been able to access any of the government support programs").

The Ordinances are essential to keep these vulnerable tenants in their homes and to allow them to spend what little they have on other essentials, like food and hygiene products necessary during a pandemic. Benfer Decl. ¶ 8; David D. Decl. ¶ 16; Strathmann Decl. ¶ 12 ("Tenants are literally ***eating once a day*** because they have no leftover money"). Without the Ordinances, Intervenors' experts predict that more than 100,000 Angelenos—including thousands of children—will face evictions. Benfer Decl. ¶ 15-19; Tsemberis Decl. ¶ 6-7; Susana S. Decl. ¶ 13 ("If I am evicted, ***I do not know what I will do or what will happen to my grandson***."); Sonia R. Decl. ¶ 17 ("If I am evicted, ***I will be left on the streets with all my children***."); Gabriel B. Decl. ¶ 17 (eviction "would cause my family," including a

24

13-year-old son, "a lot of suffering"); Eugenia T. Decl. ¶ 17. This is not hypothetical—other jurisdictions have witnessed record spikes in eviction filings upon lifting COVID-19 tenant protections. Benfer Decl. ¶¶ 16-19.

If that happens, thousands of disproportionately Black and Latinx Angelenos be forced into homelessness or housing insecurity, where—pandemic aside—they face significant trauma, exacerbation of physical health conditions (*e.g.*, high blood pressure, diabetes, and heart disease), and higher risks of being victims of sexual assault and other violent crimes. Tsemberis Decl. ¶¶ 10-12, 15-17. They are also stripped of the best currently-known defense against COVID-19—the ability to socially distance—and face a significantly higher risk of contracting, spreading and dying of the virus. Dkt. 13-3, Mishori Decl. ¶¶ 15-26. These effects will likely be irreparable because, "once a person becomes homeless, it is extremely difficult to get them back into housing." Dkt. 13-3, Mishori Decl. ¶ 20.

On the other side of the scale, Plaintiff's members are concerned about their ability to fully financially exploit their property in the middle of a global pandemic that has claimed over 200,000 American lives. But even under the Ordinances, Plaintiff's members are collecting income each *month* that dwarfs the income that many vulnerable tenants will see all year. *Compare, e.g.,* Dkt. 46-6, Rosenberg Decl. ¶¶ 6 (collecting 75% of rent on 180 units), with Susana S. Decl. ¶ 8 (no source of income during pandemic); Pedro M. Decl. ¶ 8 ("[T]here are days when I cannot make any money. Sometimes I will make $150 in a week").

There is simply no comparison. Because lives and public health are at stake on only one side of the scale, the balance of hardships weighs sharply against enjoining the ordinances. Plaintiff's motion should be denied.

Dated: July 20, 2020                  PUBLIC COUNSEL

                                      By: */s/ Kathryn Eidmann*
                                              Kathryn Eidmann
                                              Faizah Malik
                                              Gigi Lam
                                              Alisa Randell
                                              Lauren Zack
                                              610 S. Ardmore Avenue
                                              Los Angeles, California 90005
                                              Telephone: (213) 385-2977
                                              Facsimile:  (213) 385-9089
                                              Email: keidmann@publiccounsel.org
                                                        fmalik@publiccounsel.org
                                                        glam@publiccounsel.org
                                                        arandell@publiccounsel.org
                                                        lzack@publiccounsel.org

                                      WESTERN CENTER ON LAW AND
                                      POVERTY

                                      By: */s/ Nisha Vyas*
                                              Nisha Vyas
                                              Matthew Warren
                                              Richard Rothschild
                                              3701 Wilshire Blvd. #208
                                              Los Angeles, CA 90010
                                              Telephone:  (213) 487-7211
                                              Facsimile:   (213) 487-0242
                                              Email: nvyas@wclp.org
                                                        mwarren@wclp.org
                                                        rrothschild@wclp.org

                                      PUBLIC INTEREST LAW PROJECT

                                      By: */s/ Michael Rawson*
                                              Michael Rawson
                                              Craig Castellanet
                                              449 15th Street #301
                                              Oakland, California 94612

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone:     (510) 891-9794
Facsimile:     (510) 891-9727
Email: mrawson@pilpca.org
              ccastellanet@pilpca.org

SUSMAN GODFREY L.L.P.

By: */s/ Rohit D. Nath*
      Marc M. Seltzer
      Krysta Kauble Pachman
      Rohit D. Nath
      1900 Avenue of the Stars, Suite 1400
      Los Angeles, CA  90067
      Telephone:     (310) 789-3100
      Facsimile:     (310) 789-3150
      Email: mseltzer@susmangodfrey.com
              kpachman@susmangodfrey.com
              rnath@susmangodfrey.com

Attorneys for Intervenor-Defendants,
ALLIANCE OF CALIFORNIANS FOR
COMMUNITY EMPOWERMENT ACTION
and STRATEGIC ACTIONS FOR A JUST
ECONOMY

INTERVENORS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

## **ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I attest that the other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Rohit D. Nath*
Rohit D. Nath