1  Douglas J. Dennington (State Bar No. 173447)
   ddennington@rutan.com
2  John A. Ramirez (State Bar No. 184151)
   jramirez@rutan.com
3  Peter J. Howell (State Bar No. 227636)
   phowell@rutan.com
4  Kelsey Quist (State Bar No. 309876)
   kquist@rutan.com
5  RUTAN & TUCKER, LLP
   611 Anton Boulevard, Suite 1400
6  Costa Mesa, California 92626-1931
   Telephone:   714-641-5100
7  Facsimile:   714-546-9035

8  Attorneys for Plaintiff
   APARTMENT ASSOCIATION OF LOS
9  ANGELES COUNTY, INC., dba "APARTMENT
   ASSOCIATION OF GREATER LOS ANGELES,"

10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13  APARTMENT ASSOCIATION OF          Case No. 2:20-cv-05193-DDP-JEM
    LOS ANGELES COUNTY, INC., dba
14  "APARTMENT ASSOCIATION OF         *Judge: Hon. Dean D. Pregerson*
    GREATER LOS ANGELES,",            Dept:  9C
15
                 Plaintiff,           **PLAINTIFF'S CONSOLIDATED
16                                    REPLY IN SUPPORT OF MOTION
         vs.                          FOR PRELIMINARY INJUNCTION
17                                    [RESPONSE TO OPPOSITIONS
    CITY OF LOS ANGELES; ERIC         FILED BY BOTH CITY
18  GARCETTI, in his official capacity as  DEFENDANTS AND INTERVENOR-
    Mayor of Los Angeles; and CITY    DEFENDANTS]**
19  COUNCIL OF THE CITY OF LOS
    ANGELES, in its official capacity;
20  DOES 1 through 25, inclusive, ,    Date:   October 26, 2020
                                      Time:   10:00 a.m.
21               Defendant;           Ctrm:  9C

22  ALLIANCE OF CALIFORNIANS FOR      Date Action Filed:  June 11, 2020
    COMMUNITY EMPOWERMENT             Trial Date:        Not Set
23  ACTION and STRATEGIC ACTIONS
    FOR A JUST ECONOMY,
24
                 Intervenor-Defendants.
25

26

27

28

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20                -1-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................... 6

II.  THE ASSERTION AAGLA LACKS STANDING IS
     BASELESS ................................................................................................ 7

     A.   AAGLA's Claims Are Redressable ............................................... 7

     B.   AAGLA's Claims For Prospective Relief Do Not
          Necessitate The Individual Participation Of AAGLA's
          Members ......................................................................................... 9

III. AAGLA HAS ESTABLISHED A LIKELIHOOD OF SUCCESS
     ON THE MERITS ................................................................................... 10

     A.   AAGLA Is Likely To Succeed On Its Contract Clause
          Claim ............................................................................................ 10

          1.   The Ordinances do not merely substantially impair
               leases, but entirely deprive landlords of the benefit
               of the bargain ...................................................................... 10

          2.   The Ordinances Are Not Necessary and Reasonable ........... 14

     B.   AAGLA Has Established A Likelihood Of Success On Its
          Substantive Due Process Claim .................................................. 17

          1.   Requiring the "machinery" for a fair and reasonable
               return is constitutionally required for regulated
               industries under substantive due process ............................ 17

          2.   AAGLA's substantive due process claim is not
               subsumed into the Takings Clause ...................................... 21

IV.  AAGLA AMPLY DEMONSTRATES IRREPARABLE HARM
     SHOULD THE ORDINANCE NOT BE ENJOINED ............................. 23

     A.   AAGLA Has Demonstrated That Continued Operation Of
          The Ordinances Results In Specific And Immediate
          Irreparable Harm To Its Members ............................................... 24

     B.   Contrary To The City's Argument, Irreparable Harm May
          Be Presumed For Constitutional Claims Like Those
          Raised Here ................................................................................. 26

V.   CONCLUSION ...................................................................................... 28

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-2-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aliya v. Medcare Fin., L.L.C. v. Nickell,*
    2014 WL 12526383, (C.D. Cal. Nov. 26, 2014)...........................................25

*Allied Structural Steel Co. v. Spannaus,*
    438 U.S. 234 (1978) .......................................................................................15

*Atl. Mut. Ins. Co. v. Comm'r,*
    523 U.S. 382 (1998) ................................................................................12, 21

*Auracle Homes, L.L.C. v. Lamont,*
    No. 20-cv-00829 (VAB), 2020 WL 4558682, (D. Conn. Aug. 7,
    2020) ...............................................................................................................11

*Baptiste v. Kennealy,*
    No. 20-cv-11335-MLW, 2020 WL 5751572 (D. Mass. Sept. 25,
    2020)........................................................................................................passim

*Block v. Hirsh,*
    256 U.S. 135 (1921) ...............................................................18, 19, 20, 22

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988).........................................................................24

*Chastleton Corp. v. Sinclair,*
    264 U.S. 543 (1924) .......................................................................................15

*Church of Scientology v. United States,*
    920 F.2d 1481 (9th Cir. 1990)........................................................................27

*Colony Cove Props., L.L.C. v. City of Carson,*
    640 F.3d 948 (9th Cir. 2011)..........................................................................21

*Crown Point Dev., Inc. v. City of Sun Valley,*
    506 F.3d 851 (9th Cir. 2007)..........................................................................22

*Cuviello v. City of Vallejo,*
    944 F.3d 816 (9th Cir. 2019)..........................................................................27

*de Jesus Ortega Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012).....................................................................27, 28

*DirecTV, L.L.C. v. E&E Enterprises Global, Inc.,*
    2017 WL 4325585 (C.D. Cal., Sept. 25, 2017)............................................25

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) .................................................................................26, 27

*Elmsford Apt. Assocs., L.L.C. v. Cuomo,*
    No. 20-cv-4062 (CM), 2020 WL 3498456,  (S.D.N.Y. June 29,
    2020)................................................................................................................11

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-3-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

**Page(s)**

*Fed. Power Com. v. Hope Nat'l Gas Co.*,
  320 U.S. 591 (1944) ................................................................. 18

*Guar. Nat'l Ins. Co. v. Gates*
  ,916 F.2d 508 (9th Cir. 1990) ................................................. 19

*HAPCO v. City of Phila.*,
  No. CV 20-3300, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020) ................... 11

*Herb Reed Enters., L.L.C. v. Fla. Ent. Mgmt.*,
  736 F.3d 1239 (9th Cir. 2013) ........................................... 26, 27

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .................................................. 27

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934) ................................................. 15, 16, 19

*Kavanau v. Santa Monica Rent Control Bd.*,
  16 Cal. 4th 761 (1997) ....................................................... 18

*Legacy Church, Inc. v. Kunkel*,
  No. CIV 20-0327, 2020 WL 1905586 (D.N.M. Apr. 17, 2020) ................ 15

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005) .......................................................... 22

*Loretto v. Teleprompter Manhattan Catv Corp.*,
  458 U.S. 419 (1982) .......................................................... 22

*Lucas v. South Carolina Coastal Council*,
  505 U.S. 1003 (1992) ......................................................... 22

*Meese v. Keene*,
  481 U.S. 465 (1987) ........................................................... 8

*MGM Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ....................................... 25

*North New Mexicans Protecting Land & Water Rights v. United States*,
  161 F. Supp. 3d 1020 (D.N.M. 2016) ........................................... 9

*Penn Cent. Transp. Co. v. N.Y. City*,
  438 U.S. 104 (1978) .......................................................... 22

*Pennell v. San Jose*,
  485 U.S. 1 (1988) ............................................................ 23

*Planned Parenthood Ariz., Inc. v. Humble*,
  753 F.3d 905 (9th Cir. 2014) ................................................. 27

*Sierra Lake Rsrv. v. City of Rocklin*,
  938 F.2d 951 (9th Cir. 1991) ................................................. 17

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-4-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

**Page(s)**

*Strauss v. Milwaukee Cheese Wis.,*
112 F.3d 845 (7th Cir. 1997)......................................................................... 12

*Sveen v. Melin,*
138 S. Ct. 1815 (2018) ................................................................................. 10

*U.S. Tr. Co. of New York v. New Jersey,*
431 U.S. 1 (1977) ......................................................................................... 16

*United States v. Carolene Products Co.,*
304 U.S. 144 (1938) ..................................................................................... 15

*United States v. Carolene Products Co.,*
304 U.S. 144, 153 (1938) ............................................................................... 6

*Univ. of Haw. Prof'l Assembly v. Cayetano,*
183 F.3d 1096, 1104 (9th Cir. 1999)........................................................... 12

*Warth v. Seldin,*
422 U.S. 490 (1975) ....................................................................................... 9

*WildEarth Guardians v. USDA,*
795 F.3d 1148 (9th Cir. 2015) ....................................................................... 7

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008) ......................................................................................... 27

*Yakus v. United States,*
321 U.S. 414 (1944) ..................................................................................... 22

*Yee v. City of Escondido,*
503 U.S. 519 (1993) ..................................................................................... 17

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-5-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

In attempting to justify the Ordinances, the City and Intervenors (collectively, "Defendants") resort to wildly inconsistent claims, arguing on the one hand that "[e]njoining the Ordinances will create a humanitarian crisis by upending the lives of tenants across the City" (Intervenors' Opposition ("Int. Opp."), ECF No. 55, at 24:4-5), while conceding on the other that "evictions will not happen with the state and federal orders in place." City's Opposition ("City Opp."), ECF No. 53, at 2:4-5.

Given the Supreme Court's repeated guidance that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist" (*United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938),) the question currently before the Court is not whether the Ordinances were valid when adopted (though AAGLA contends they were not), but whether they are valid now, at a point the City argues an injunction "would offer AAGLA's members no relief . . . with the state and federal orders in place." City Opp., at 2:4-5.

While it is true that the Ordinances are partially redundant of AB 3088, they impose an additional unreasonable layer of regulation that significantly harms landlords by preventing them from taking advantage of the modest safeguards included within AB 3088 to prevent abuse. The Ordinances go much further than necessary to prevent tenants suffering a financial hardship from being evicted and unreasonably harm landlords by preventing them from collecting any interest or late fees on rent that may be up to two years late and by forcing them to accept unauthorized occupants, pets, and "nuisance related to COVID-19." Plaintiff's Request for Judicial Notice in Support of Motion for Preliminary Injunction ("RJN"), ECF No. 47, Ex. 3. Unlike the state and federal moratoria, the Ordinances also affirmatively allow "up to 12 months following the expiration of the Local Emergency Period to repay any rent deferred" (Sec. 49.99.2—RJN, ECF No. 47, Ex. 3), thus

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-6-

Case No. 2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  apparently preventing landlords from seeking to recover unpaid rent through a civil

2  action (including via the small claims process authorized by AB 3088) until at least

3  March 2022.

4        Whether or not a statewide eviction moratorium (like that imposed by AB

5  3088) is a reasonable and necessary response to the Pandemic, the City's Ordinances

6  go far beyond what is required to prevent mass evictions and related harms and are

7  clearly unnecessary and unreasonable, particularly in light of the state and federal

8  moratoria that are now in place.  Accordingly, AAGLA respectfully urges the Court

9  to enjoin enforcement of the Ordinances to mitigate the irreparable harm AAGLA's

10  members and other landlords in the City are currently experiencing.

11  **II.**    **THE ASSERTION AAGLA LACKS STANDING IS BASELESS**

12        The City asserts AAGLA lacks standing on the grounds that the injuries to

13  AAGLA's members "will not be redressed by a favorable outcome in the lawsuit"

14  and, even if they could be redressed, the "damages claims" asserted by AAGLA's

15  members require "individualized proof" that is inappropriate for associational

16  standing. City Opp., at pp. 9-10.  The City is wrong on both counts.

17      **A.**    **AAGLA's Claims Are Redressable.**

18        The "redressability" component of associational standing does not require

19  complete relief from a favorable judgment.  As the Ninth Circuit has made clear,

20  where multiple actors contribute to the injury for which relief is sought, it is not

21  necessary that all actors responsible for the injury be named in the lawsuit. *WildEarth*

22  *Guardians v. USDA,* 795 F.3d 1148, 1156-1157 (9th Cir. 2015).  Indeed, ***"[s]o long***

23  ***as a defendant is at least partially causing the alleged injury, a plaintiff may sue***

24  ***that defendant, even if the defendant is just one of multiple causes of the plaintiff's***

25  ***injury." Id.*** at 1157 (emphasis added).  As the Ninth Circuit reasoned, redressability

26  does not require "complete" relief and "the mere existence of multiple causes of an

27  injury does not defeat redressability." *Id*.  "Partial relief" most assuredly qualifies as

28

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-7-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

"redress for standing purposes." *Id.* at 1157 n. 5 (citing *Meese v. Keene,* 481 U.S. 465, 476-77 (1987)).

In its moving papers, AAGLA details the interplay between the new, statewide eviction moratorium embodied in AB 3088 and the City's Eviction Moratorium.[1]  The City has made clear that its Eviction Moratorium is more protective of tenants than AB 3088, which requires: (1) tenants seeking protection to sign a declaration—under penalty of perjury—attesting that they have been financially impacted by the Pandemic, and (2) payment of at least 25% of their contractual rental obligations between September 1, 2020 and January 31, 2021 (to be paid on or before January 31, 2021).  Plaintiff's RJN, ECF No. 47-7 (City Attorney explaining that "the City's ordinance *offers overall greater protection* for tenants than the State's new law or the Centers for Disease Control and Prevention's (CDC) new order").  While tenants who comply with the procedure mandated under AB 3088 may not be evicted for failure to pay back rent, AB 3088 at least requires tenants to verify (under penalty of perjury) their entitlement to protection and pay at least a fraction of rent from September 1, 2020 through January 31, 2021.  In addition, AB 3088 does not force landlords to accept unauthorized tenants or pets in violation of their leases, nor does it include any requirement that landlords waive late fees and the time value of money (interest) on back rent.  There is no question that a favorable judgment invalidating the Eviction Moratorium would provide significant relief to landlords.

Finally, the City's refusal to require tenants to comply with the modest requirements of AB 3088 itself shows that invalidation of the City's Ordinances would provide some relief to landlords the City's Ordinances do not provide.  AAGLA's claims are redressable according to controlling Ninth Circuit precedent.

---

[1]  AAGLA also explains how the new federal CDC order has no application in the State of California, given the fact that it requires payment of all back rent owed by tenants on or before the expiration of the order on December 31, 2020.  The failure to pay all such back rent subjects tenants to eviction proceedings beginning January 1, 2021 (the day after the CDC order is to expire on December 31st).

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-8-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

**B.**   **AAGLA's Claims For Prospective Relief Do Not Necessitate The Individual Participation Of AAGLA's Members.**

The City cites *Warth v. Seldin,* 422 U.S. 490, 515-16 (1975) and *North New Mexicans Protecting Land & Water Rights v. United States,* 161 F. Supp. 3d 1020, 1041-42, 1044 (D.N.M. 2016), for the unremarkable proposition that associations generally lack standing to assert monetary claims on behalf of their members, due to the fact that such claims would necessarily require the participation of individual members in the litigation.  AAGLA does not dispute this general proposition.

AAGLA, however, has not asserted any monetary claims in this action, either on its own behalf or in a representational capacity for its members.  AAGLA only seeks declaratory and injunctive relief, *i.e.,* AAGLA seeks a declaration that the Ordinances are unconstitutional and to enjoin their continued implementation.  The fact that the Ordinances and other "COVID-19 laws" may not impact all of AAGLA's members to the same extent is irrelevant to the inquiry.  For standing purposes, AAGLA need only demonstrate that one or more of its members has been impacted by the City's Ordinances. *Warth, supra,* 422 U.S. at 515 (for representational standing, "to justify any relief ***the association must show that <u>one or more</u> of its members are injured***") (emphasis added).[2]

---

[2]   Intervenors assert the bizarre argument that AAGLA cannot bring a facial challenge to the Ordinances unless every one of AAGLA's members has suffered a loss attributable to the Ordinances. Int. Opp., at 12:20-13:2.  That most certainly is not the test and, if it were, associational standing would cease to exist.  As pointed out above, for standing purposes, AAGLA need only demonstrate that "one or more" of its members suffered harm.

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-9-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

III.   **AAGLA HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS**

A.   **AAGLA Is Likely To Succeed On Its Contract Clause Claim.**

1.   **The Ordinances do not merely substantially impair leases, but entirely deprive landlords of the benefit of the bargain.**

As stated by the City, whether a law has "operated as a substantial impairment of a contractual relationship" depends on "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating rights." City Opp., at 11:14-17 (quoting *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018)); *see also* Int. Opp., at 10:9-12. Defendants argue that standard is not met in light of the fact that landlord-tenant relationships were already highly-regulated (City Opp., at 11:27-13:7), going so far as to take the astonishing position that a law requiring landlords to provide housing without payment for an indefinite period that has already exceeded 7 months "was entirely foreseeable and should have been priced into Plaintiff's members' contracts." Int. Opp., at 14:3-4; *see also* City Opp., at 13:13-14.[3]   The assertion that landlords should have expected such a law is specious, at best.   As the District Court recently found in *Baptiste v. Kennealy,* No. 20-cv-11335-MLW, 2020 WL 5751572 (D. Mass. Sept. 25, 2020), a case cited by both sets of Defendants:

> [A] reasonable landlord would not have anticipated a virtually unprecedented event such as the COVID-19 pandemic that would generate a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do pay rent....   Nor would a reasonable landlord have

---

[3]   The suggestion that such a regulation should have been "priced into" existing leases is particularly jarring coming from groups with a particular interest in housing affordability. and underscores the unintended consequences that are sure to result from the Ordinances and similar measures.  While the Ordinances were obviously not "priced into" prior leases, they will undoubtedly have a detrimental effect on future housing affordability, if allowed to stand.

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-10-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1    anticipated more than a brief, temporary prohibition on

2    evictions if an unforeseen emergency developed.

3  *Baptiste,* 2020 WL 5751572, at *16.[4]

4       The fundamental difference between the Ordinances at issue and each of

5  Defendants' examples of landlord-tenant regulations that have been upheld in past

6  years is that the Ordinances effectively deprive landlords of the entire benefit of the

7  bargain.  The only affirmative obligation a residential tenant generally has is to pay

8  rent.  That rent is the consideration for every obligation a landlord is required to

9  undertake in order to provide housing, including not only providing shelter in the first

10 instance, but maintaining the property and providing amenities.  The Ordinance thus

11 requires landlords to continue to uphold their end of the lease, even when a tenant has

12 defaulted on their sole obligation, *i.e.,* where there is a complete failure of

13 consideration.  There simply is no legitimate question that the Ordinances undermine

14 the contractual bargain and interfere with landlords' reasonable expectations.

15      The City argues that the Ordinances "do not prevent landlords from

16 'safeguarding' or 'reinstating' their rights, asserting "[a]t the end of the day, the

17 landlord still has the full 'suite of contractual remedies' to collect any rent that is

18 ─────────────────

19 [4]   While the *Baptiste* court ultimately found the eviction moratorium at issue there did not violate the Contracts Clause because it was reasonable when enacted, the court

20 stressed that a further extension of the ordinance (past October 17, 2020) might nonetheless cause the moratorium to violate the Contracts Clause.  *Id.* at *14. Notably, Massachusetts has not further extended the moratorium.  *See*

21 https://www.mass.gov/info-details/covid-19-eviction-diversion-frequently-asked-questions#6.-when-the-state-moratorium-expires-on-october-17,-do-evictions-begin-

22 again?  The three other extra-circuit district court cases opining on COVID-19-related eviction moratoria are also distinguishable and involved measures less drastic than

23 the Ordinances.  For example, the court in *Elmsford Apt. Assocs., L.L.C. v. Cuomo*, No. 20-cv-4062 (CM), 2020 WL 3498456, at *3–4 (S.D.N.Y. June 29, 2020), ruled

24 on a moratorium that only prohibits evictions for nonpayment of rent, as opposed to evictions for breach of other material lease terms like unauthorized persons or pets,

25 and provides that security deposits held by landlords—typically the exclusive property of tenants—may be applied toward rents owed.  *See also Auracle Homes,*

26 *L.L.C. v. Lamont*, No. 20-cv-00829 (VAB), 2020 WL 4558682, at *3–4 (D. Conn. Aug. 7, 2020) (same).  The law at issue in *HAPCO v. City of Phila.*, No. CV 20-3300,

27 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020) requires renters to provide a signed certification of hardship detailing their financial circumstances, *and* allows for later

28 eviction of tenants who fail to repay rents owed during a nine-month repayment period *Id.* at *3.

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20                        -11-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

owed." City Opp., at 14:1-9. Even assuming that were true—and as a practical matter is it not—the Ordinances would still substantially impair existing leases. By "at the end of the day," the City actually means landlords may be allowed to begin attempting to collect back rent in March 2022—up to two years after it became due. The opportunity to potentially collect back rent a year or two from now is not an adequate safeguard for landlords' contractual right to receive monthly rent. Housing providers—like virtually all businesses—require a steady stream of monthly income to continue operating. Landlords have monthly expenses that cannot wait until 12 months after the Pandemic is over.[5] *See, e.g.*, Smith Decl., ¶¶ (property owners currently depleting retirement savings to pay monthly expenses and at risk of losing properties if inability to collect rent continues); Garcia Decl., ¶¶ 8, 10 (landlord currently unable to pay mortgage on his rental property due to loss of rental income).

Further, apart from the cash flow issue, and even assuming that landlords could collect all back rent when owed under the Ordinances, the effect of the Ordinances is to partially forgive rent, because of the prohibition on interest and late fees. Given the time value of money, the right to receive a dollar a year from now is worth less than a dollar today. *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 384 (1998) (defining "the time value of money" as "the fact that '[a] dollar today is worth more than a dollar tomorrow'"); *see also Strauss v. Milwaukee Cheese Wis.* ("*In re Milwaukee Cheese Wis.*") 112 F.3d 845, 849 (7th Cir. 1997) ("Compensation deferred is compensation reduced by the time value of money"). Thus, in extending the time by which tenants are required to pay rent by up to 2 years and prohibiting any interest from being charged during that time, the Ordinances have effectively reduced the rent owed, and changed the financial terms of every impacted lease. *Univ. of Haw. Prof'l Assembly v. Cayetano,* 183 F.3d 1096, 1104 (9th Cir. 1999) (alteration of financial term of

---

[5] Intervenors seem not to understand the difference between gross income and profit. Intervenors at 25:17-18 ("Plaintiff's members are collecting income each *month* that dwarfs the income that many vulnerable tenants will see all year.") A landlord who has expenses that exceed the income from those tenants who are still paying obviously has ***negative*** net income, and will not be in business very long.

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-12-

Case No. 2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1    contract constitutes "substantial impairment" of contract).

2          Moreover, the Court is not required to close its eyes to the obvious practical

3    impact of the Ordinances.  As observed by the District Court in the *Baptiste* case:

4              The Act states that it does not relieve a tenant from the obligation

5              to pay rent. *Id.* § 3(f). Nor does it restrict a landlord's right to sue

6              for rent that is owed. *Id.* However, ***this right is largely illusory***,

7              as tenants who have not paid their rent for many months because

8              of economic distress -- or, indeed, for any other reason -- are

9              unlikely to pay a money judgment against them.

10   *Baptiste*, 2020 WL 5751572, at *9 (emphasis added).   Indeed, Defendants have

11   submitted multiple declarations from tenants expressing an inability to repay the rent

12   they already owe.  *See, e.g.,* Pedro M. Decl. (English) ¶ 13 ("If everything with the

13   pandemic got better quickly, it would still take a lot of time — even years to pay back

14   what I owe. But I know that life will not go back to normal in a matter of weeks after

15   all this."); *see also* Gabriel B. Decl. ¶ 9; Susana S. Decl. ¶ 10; Danny C. Decl. ¶ 11.

16   The SAJE Executive Director likewise casts doubt on the ability of tenants to repay

17   back rent, even with 12 months to do so, explaining "[t]his is why we have been

18   organizing and calling for the cancellation of rent debt."  Strathmann Decl. ¶ 15.

19         While the City repeatedly insists the Ordinances do not forgive rent, it does not

20   actually dispute AAGLA's contention that back rent will be nearly impossible to

21   collect, instead claiming "AAGLA fails to demonstrate how these challenges are any

22   different than those they face when a tenant is delinquent in normal circumstances"

23   and that tenants presumably "still accumulate unpaid rent" while landlords await

24   possession "pending an unlawful detainer action." City Opp., at 14, n.13.  That is

25   precisely the point.  The entire purpose of the unlawful detainer statutes is to allow

26   landlords to cut their losses, because—even under normal circumstances—a monetary

27   judgment against a tenant who cannot afford their rent is virtually worthless.  *See,*

28   *e.g.,* Rosenberg Decl., ¶¶ 7-8 (manager of approximately 180 units has "never once

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-13-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

been able to collect" on a judgment for back rent in his 15 years of experience).   In taking away landlords' ability to even begin the unlawful detainer process by serving a notice to pay rent or quit, the Ordinances prevent landlords from mitigating their losses and force them to continue providing services for which they will never receive payment.

While not as dramatic as the requirement that landlords provide housing without payment, other provisions of the Ordinances nonetheless similarly fundamentally change the nature of the bargain.  For example, the provisions requiring landlords accept unauthorized occupants, pets, and even "nuisance" prevent landlords from enforcing express contractual provisions that are necessary not only to protect landlords' property, but to protect other tenants.  Intervenors argue that such restrictions are similar to previous restrictions imposed by the City (Int. Opp. at p.13), but there is obviously a stark difference between placing limited restrictions on the enforcement of occupancy limits (*e.g.*, providing a tenant may not be evicted if a dependent child joins the tenancy) and prohibiting ***all*** enforcement of such limitations, no matter the circumstances or degree of the violation.[6]

### 2.    The Ordinances Are Not Necessary and Reasonable.

Defendants urge the Court adopt a position of extreme deference to the City, arguing "scrutiny here is also relaxed, because the alleged interference is only temporary and in response to a public health emergency." City Opp., at 16:7-11. While it is true some courts have applied lessened scrutiny to measures adopted in response to a public health emergency, that approach has been rightly criticized as insufficiently protective of constitutional rights and cannot appropriately be used to shield supposed "temporary"[7] measures from scrutiny more than 7 months after they

---

[6]  By this, AAGLA does not intend to suggest the City's previous restrictions did not also run afoul of the Constitution.  A City's prior unconstitutional acts may never justify future unconstitutional acts.

[7]  Notwithstanding the City's repeated description of the Ordinance as "temporary," the City Attorney acknowledges on its website that "it is not known when the City will lift the declaration of emergency," (Plaintiff's RJN, ECF No. 47, Ex. 7) thereafter

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20                                    -14-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

have been put into place.[8]  *See, e.g., Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327, 2020 WL 1905586 (D.N.M. Apr. 17, 2020) (applying ordinary levels of scrutiny in considering motion to enjoin COVID-related restrictions on gatherings).

Indeed, as repeatedly recognized by the Supreme Court, an emergency regulation that is reasonable at the time it was enacted may become unreasonable if the facts justifying the emergency action change.  *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 442 (1934) ("a law 'depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed'"); *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) (same); *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938) ("the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist").

As discussed in AAGLA's moving papers, prior to the current Pandemic, no court had ever held that a government entity may excuse tenants from paying a reasonable amount of rent contemporaneous with occupancy as a condition to avoiding eviction.  *Blaisdell*, which Defendants appear to agree is the most relevant Supreme Court authority on the issue, would not have upheld a law allowing defaulting mortgagees to temporarily remain in their homes during an emergency *but for* a provision requiring them to pay a reasonable rent during such occupancy. *See Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 242 (1978) (*Blaisdell* "clearly

---

triggering the reinstatement of rental payments (albeit, providing tenants an additional *twelve months* to pay back overdue rent).

[8]   Lindsay F. Wiley & Steve Vladeck, *COVID-19 Reinforces the Argument for "Regular" Judicial Review--Not Suspension of Civil Liberties--In Times of Crisis*, Harv. L. Rev. Blog (Apr. 9, 2020), https://blog.harvardlawreview.org/covid-19-reinforces-the-argument-for-regular-judicial-review-not-suspension-of-civil-liberties-in-times-of-crisis/ [https://perma.cc/E8FD-VXHL] ("the most critical failure of the suspension model is that it does not account for the importance of an independent judiciary in a crisis—"as perhaps the only institution that is in any structural position to push back against potential overreaching by the local, state, or federal political branches.")

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20                                           -15-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  implied" that the moratorium at issue would be invalidated but for the conditions

2  imposed (including the payment of reasonable rent)); *U.S. Tr. Co. of New York v. New*

3  *Jersey,* 431 U.S. 1, 15-16 (1977) (same). Defendants accuse AAGLA of "stretch[ing]

4  *Blaisdell,*" arguing that the rent requirement was not the "controlling legal principle."

5  City Opp., at 18:6-7.  This is no stretch.  *Blaisdell* repeatedly emphasized the critical

6  condition to the Minnesota moratorium requiring payment of "reasonable rent" and

7  that "the mortgagee-purchaser ***during the time that he cannot obtain possession is***

8  ***not left without compensation for the withholding of possession.***" *Blaisdell, supra,*

9  290 U.S.  at 445 (Emphasis added).  Defendants fail to point to any pre-Pandemic

10  authority upholding an eviction moratorium that did not have such a condition in

11  place.  Requiring landlords to allow tenants who are not paying rent to continue to

12  occupy their properties indefinitely is patently unreasonable.

13      Moreover, while AAGLA contends the Ordinances were unreasonable and

14  invalid when adopted, there is no question that they are unreasonable given the state

15  of facts that exist today.  Even assuming arguendo that it was reasonable for the City

16  to adopt a temporary eviction moratorium at the beginning of the Pandemic in March,

17  when the public policy goal was to "flatten the curve" and other tenant protections

18  were not in place, there is no need for the Ordinances now 7 months later, with

19  COVID cases decreasing and state and federal eviction moratoria in place.  Both the

20  City and Intervenors focus almost solely on the City's interest in averting a mass

21  increase in evictions during the Pandemic in arguing the Ordinances are reasonable

22  and necessary.  But it is undisputed that such "evictions will not happen with the state

23  and federal orders in place."  City Opp., at 2:4-5.  Indeed, the City goes so far as to

24  assert—wrongly—that an injunction would provide "no relief."  *Id.*

25      Given the existence of the statewide moratorium, the Ordinances are simply

26  not necessary to prevent the parade of horribles that Defendants assert would occur if

27  an eviction moratorium were not in place.  Defendants do not even attempt to argue

28  that the City has any legitimate interest in protecting tenants who claim financial

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20                                    -16-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

hardship, yet refuse to sign a declaration under penalty of perjury attesting to such hardship, from eviction.  Nor do Defendants make any attempt to explain why forcing landlords to accept unauthorized occupants, tenants, and nuisance is a reasonable response to the Pandemic.  *See* City Opp., at 16:16-28.  In fact, the Declaration of Professor Emily Benfer, submitted by Defendants indicates that "couch surfing" and "residential crowding and increased contact with others drive the spread of respiratory illnesses, such as COVID-19." Benfer Decl., at ¶ 21. The City's only explanation for prohibiting late fees and interest—that such fees could cause tenants to "self-evict or be evicted"—makes little sense.  City Opp., at 16:21-23.  Tenants are protected from eviction by AB 3088 regardless of whether a landlord may charge interest and there is no reason to believe a tenant who is unable to pay rent will "self-evict" merely because they could be required to pay interest on their back rent.[9]

**B.**     **AAGLA Has Established A Likelihood Of Success On Its Substantive Due Process Claim.**

**1.**     **Requiring the "machinery" for a fair and reasonable return is constitutionally required for regulated industries under substantive due process.**

To be clear—and contrary to the City's subtle suggestion (*see* City Opp., at 19)—AAGLA does not agree that the Ordinance here is subject to mere rational basis review.  Rather, in the context of price and rent controls, substantive due process requires the government to provide the "machinery" needed to guarantee a fair and reasonable return for the industry regulated.  *See Sierra Lake Rsrv. v. City of Rocklin*, 938 F.2d 951, 958 (9th Cir. 1991)*, abrogated in part on other grounds by Yee v. City of Escondido*, 503 U.S. 519 (1993); *see also Block v. Hirsh*, 256 U.S. 135, 156-57

---

[9]     It should be noted that a policy that encourages tenants who can no longer afford their rent to seek more affordable housing is not necessarily a bad thing.  Defendants' own evidence indicates that many tenants are accruing significant debt that they will never be able to repay, with or without interest.  To the extent the City's Ordinances encourage tenants who may have other options to continue occupying apartments they cannot afford, it ultimately benefits neither those tenants nor their landlords.

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-17-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

(1921) (upholding Washington, D.C. eviction moratorium in emergency where the emergency measure required tenants to pay a "reasonable rent" as a condition to protection from eviction).

The City does not address its failure to provide a mechanism to assure landlords the constitutionally-mandated "fair return," and simply concludes that it somehow does not apply to this particular regulation. As noted above, however, whenever the government intervenes in such a Draconian manner to eliminate the primary legal remedy in an industry, it must establish the machinery necessary to provide a fair return to the regulated industry. As set forth in *Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal. 4th 761, 771 (1997), a case repeatedly cited by the City, ***due process prohibits government actions*** in the nature of rent control which fail to assure a reasonable return:

> The latter guaranty—sometimes described as substantive due process—prevents government from enacting legislation that is "arbitrary" or "discriminatory" or lacks "a reasonable relation to a proper legislative purpose. . . In the context of price control, which includes rent control, courts generally find that a regulation bears "a reasonable relation to a proper legislative purpose" ***so long as the law does not deprive investors a "fair return" and thereby become "confiscatory."***

(Emphasis added) (quoting *Fed. Power Com. v. Hope Nat'l Gas Co.,* 320 U.S. 591, 602-03 (1944)).

This requirement is not, as the City states, a "new test" invented out of whole cloth. It is a requirement dating back to the very first rent control measure upheld by the Supreme Court in *Block, supra,* 256 U.S. at 156-57. A government measure which allows tenants to remain in possession without paying rent, and without any mechanism to assure payment years after the payment was due, fails to satisfy this due process requirement.

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-18-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1       It is telling that the City largely avoids AAGLA's argument, choosing instead

2   to attack its own rational basis straw man.  Ensuring a fair and reasonable return on

3   investment is a historic component of substantive due process and is required here.

4       The parties agree that housing, including leasing of housing, is a regulated

5   industry.  City Opp., at 11–12.  That concession matters.  In heavily regulated

6   industries where private business may expire by the stroke of a regulator's pen,

7   something more than rational basis is needed to check governmental overreach.  The

8   Ninth Circuit has embraced that notion.  In *Sierra Lake*, for instance, the court opined

9   that the plaintiff had a colorable substantive due process claim resulting from a rent

10   control ordinance prohibiting rent increases commensurate with the cost of actual

11   capital improvements.  *See Sierra Lake*, 938 F.2d at 958.  This was so, the court held,

12   because such capital improvements are investments "for which a 'fair and reasonable

13   return must be allowed.'"  *Id.* (quoting *Guar. Nat'l Ins. Co. v. Gates*, 916 F.2d 508,

14   512–14 & n.4 (9th Cir. 1990).  "Breaking even is not enough; the law must provide

15   for a profit on one's investment."  *Id.*

16       Indeed, this concern animated the holding in *Block, supra*.  In upholding an

17   eviction moratorium, the Supreme Court explicitly acknowledged that "[m]achinery

18   is provided to secure to the landlord a reasonable rent," thus mitigating due process

19   concerns.  *Id.* at 157.  The "machinery" in *Block* was that law's requirement that

20   tenants continue abiding by the terms in their leases — *i.e.*, paying either the agreed-

21   upon rent, or an amount fixed by a commission.  *Id.* at 154.  *Blaisdell* is in accord.

22   *See Blaisdell*, 290 U.S. at 424 (noting that a law postponing foreclosure sales during

23   the Great Depression nevertheless required payment of a "reasonable rent" to the

24   mortgagee concurrent with occupancy).  The *Blaisdell* Court concluded that, "[w]hile

25   the mortgagee-purchaser is debarred from actual possession, he has, so far as rental

26   value is concerned, the equivalent of possession during the extended period."  *Id.*

27       Nothing in the City's Ordinance here approximates the "machinery" present in

28   *Block* or *Blaisdell* that would ensure a fair return on investment.  Instead, tenants can

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-19-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

unilaterally cease abiding by critical terms of their lease, even in bad faith, and Los Angeles landlords are left with no recourse.  For many landlords, the return is neither fair nor reasonable—it may be nonexistent.

Defendants suggest that because the City's Eviction Moratorium provides that tenants will remain on the hook for all unpaid back rent at some point in the future, AAGLA's members will be made whole in the long run.  Such a claim ignores common sense and the City's own Eviction Moratorium.  First, the very purpose of the City's Ordinances is to protect those tenants who are most "at risk" and have suffered severely from the Pandemic.  There is no evidence to suggest that an "at risk" tenant will be able (and willing) to pay all the back rent by March 1, 2022 (the last date on which the 12-month grace period set forth in the Eviction Moratorium may run according to AB 3088).  The tenant declarations provided by Intervenors invariably suggests the opposite.  Had landlords been allowed to replace nonpaying tenants with paying tenants (a risk that actually *is* contemplated by landlords when executing leases), the many months of back rent accumulated by non-paying tenants would be significantly reduced.  Moreover, the City's Eviction Moratorium fails to even address the fact that many of these tenants will never be able to pay the back rent owed.

The City's Eviction Moratorium removes the primary remedy landlords have to mitigate damages—a right that unquestionably has been destroyed by the City's Eviction Moratorium—without any legal process for landlords to petition a tribunal for relief.  Unlike the landlord in *Block, supra,* Los Angeles landlords have no recourse to a tribunal to assure the constitutionally-required "fair return."

Finally, landlords will never be made whole even in the unlikely and rare event tenants do make good on their rental obligations.  Without being tethered to any Pandemic-related government interest, the Eviction Moratorium outright prohibits landlords from obtaining interest or contractual late fees on back rent (which under the City's Eviction Moratorium and AB 3088 will not have to be repaid for a period

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-20-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1    of up to two years following the original enactment of the Eviction Moratorium).  The

2    Eviction Moratorium forces landlords to become lenders to their tenants without any

3    compensation in the form of late fees or interest to reflect the very high risk of never

4    being paid, the administrative costs to collect back rent, and the time value of money.

5    As discussed above, "[a] dollar today is worth more than a dollar tomorrow."  *Atl.*

6    *Mut. Ins. Co., supra*, 523 U.S. at 384.

7         The City also suggests that landlords are not without a remedy, and may file

8    litigation to obtain monetary judgments against their tenants.   The Ordinances,

9    however, affirmatively allow "up to 12 months following the expiration of the Local

10   Emergency Period to repay any rent deferred."  *See* Sec. 49.99.2—RJN, ECF No. 47,

11   Ex. 3.   Thus, contrary to the City's suggestion, the Ordinances effectively bar

12   landlords from bringing ***any*** legal action (including a small claims action via the

13   process authorized by AB 3088) until the 12 month repayment period is over in March

14   2022.[10]

15              **2.      AAGLA's substantive due process claim is not subsumed into**

16                      **the Takings Clause.**

17        Intervenor-Defendants also refuse to address AAGLA's fair return argument,

18   though for a different reason. Intervenor-Defendants suggest that "claims for 'fair and

19   reasonable' returns are 'subsumed by the Takings Clause,'" and thus not cognizable

20   under substantive due process.  Int. Opp., at 20 (quoting *Colony Cove Props., L.L.C.*

21   *v. City of Carson*, 640 F.3d 948, 960 (9th Cir. 2011)).  Not true.  *Colony Cove* does

22   not stand for a *per se* rule that claims like those here are subsumed into the Takings

23   Clause.  That case involved an ***as-applied*** challenge to a rent control ordinance after

24   the plaintiff applied for a rental rate increase and was denied. *Id.* at 960.  In fact,

25   *Colony Cove* itself cites to another Ninth Circuit opinion, *Crown Point Dev., Inc. v.*

26

27   ───────────────
     [10]   While the Ordinances allow the deferral period to go on indefinitely, as long as the
28   local emergency is in effect, AB 3088 provides that where the commencement of a
     repayment period is so conditioned, it "is deemed to begin on March 1, 2021."  C.C.P.
     § 1179.05.

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-21-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

*City of Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007), which provides that "the Fifth Amendment w[ill] preclude a due process challenge *only if* the alleged conduct *is actually covered* by the Takings Clause." (Emphasis added).

The "fair return" requirement finds its origin in the Due Process Clauses, not the Takings Clause. *See, e.g., Yakus v. United States,* 321 U.S. 414, 431-33 (1944) (upholding government-mandated price fixing scheme against *due process challenge* where regulatory scheme allowed for wholesale meat suppliers to challenge the regulation and a "reasonable opportunity to be heard and present evidence" on fair return); and *Block, supra,* 256 U.S. at 460 (upholding temporary eviction moratorium against *due process challenge* where eviction protection was conditioned on payment of "reasonable rent" as determined by a court).

The Supreme Court has never applied the "fair return" test to determine whether a particular government act runs afoul of the Takings Clause.   As the Supreme Court explained in *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538-39 (2005), takings jurisprudence has staked out "two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes," *see Loretto v. Teleprompter Manhattan Catv Corp.,* 458 U.S. 419 (1982) (physical occupation) and *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992) (deprivation of all economically viable use of private property), as well as the "ad hoc" takings test based on an evaluation of factors set forth in *Penn Cent. Transp. Co. v. N.Y. City,* 438 U.S. 104 (1978) (deprivation of distinct, investment-backed expectations and magnitude of law's impact on private property).

In some cases, facts giving rise to an as-applied "fair return" claim may also give rise to an as-applied takings claim under *Penn Central*.   For example, a government measure which fails to allow a landlord a "reasonable return" may be so onerous as to constitute a deprivation of distinct, investment-backed expectations to also constitute a taking under *Penn Central*.   In that case, *Colony Cove* suggests the "more specific" constitutional proscription may subsume the less specific

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-22-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

prohibition.[11]  That is not the case here, however, where AAGLA's due process claim does not rest on the end result of an administrative rent-control process designed to assure the landlord a "fair return" in a particular set of circumstances.  AAGLA's due process claim, rather, embodies a *facial challenge* to the City's enactment of an Eviction Moratorium that provides for no such "machinery."  Quite simply, this is not a subject that falls within any of the takings tests espoused in takings jurisprudence.

By requiring landlords to accept without question any claim for protection, the City has ignored the right of landlords to at least the "functional equivalent" of possession (reasonable rent) during the time period the Eviction Moratorium remains in place.  AAGLA's substantive due process claim does not fall within any of the tests espoused for physical and regulatory takings and is solely dependent upon the City's failure to provide *any process* to landlords suffering hardships as a result of the Pandemic (and the failure of their tenants to pay even a "reasonable rent").  This does not come close to the minimum process requirements due landlords insofar as the City's Eviction Moratorium would never assure a "fair return" to landlords. *See Pennell v. San Jose,* 485 U.S. 1, 13-14 (1988) (upholding local rent control measure after determining measure "so carefully consider[ed] *both the individual circumstances of the landlord and the tenant* before determining whether to allow an *additional* increase in rent over and above certain amounts that [were] deemed reasonable") (emphasis added).

## IV.    AAGLA AMPLY DEMONSTRATES IRREPARABLE HARM SHOULD THE ORDINANCE NOT BE ENJOINED

The City claims that AAGLA cannot demonstrate irreparable harm to its

---

[11]  It should be noted that the Supreme Court has not approved of the suggestion in *Colony Cove* that an as-applied due process challenge based on the failure to provide a "fair return" is subsumed into the Takings Clause. After *Lingle*—which made clear that the "substantially advances a legitimate state purpose" test has no place in takings jurisprudence and should strictly be confined to substantive due process claims—it remains an open question whether the Supreme Court would concur with a Circuit-specific rule that requires substantive due process claims to be subsumed into the Takings Clause in the "fair return" context that has always been specific to substantive due process.

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-23-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1   members absent an injunction.  City Opp., ECF No. 53, at 21:5–24:18.  The City is

2   wrong.  Constitutional violations enjoy a presumption of irreparable harm.  The Court

3   need not rely on that presumption, however, because AAGLA has clearly shown that

4   its members will suffer immediate and irreparable harm should the Ordinance not be

5   enjoined.

6       **A.**    **AAGLA Has Demonstrated That Continued Operation Of The**

7             **Ordinances Results In Specific And Immediate Irreparable Harm**

8             **To Its Members.**

9       The City argues that AAGLA must present something more than speculation

10  to satisfy its burden.  City Opp., at 23:1–6 (quoting *Caribbean Marine Servs. Co. v.*

11  *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).   In other words, AAGLA must

12  "*demonstrate* immediate threatened injury" to obtain relief.  *Caribbean Marine*, 844

13  F.2d at 674.   AAGLA agrees, but the irreparable harm from the Ordinances to

14  AAGLA's members is clear.

15      Defendants argue that AAGLA's members have not suffered irreparable harm

16  because the Ordinances allow landlords to eventually seek back rent owed after the

17  12-month repayment period runs.  But the possibility of obtaining judgments for back

18  rent a year and a half from now is cold comfort to landlords that have monthly

19  expenses they cannot afford to meet without receiving rent now.   *See, e.g.*, Smith

20  Decl., ¶¶ 6, 8 (property owners currently depleting retirement savings to pay monthly

21  expenses and at risk of losing properties if inability to collect rent continues); Garcia

22  Decl., ¶¶ 8, 10 (landlord currently unable to pay mortgage on his rental property due

23  to loss of rental income).  Landlords who stand to lose their businesses—and unique

24  and irreplaceable rental properties—cannot be made whole through future actions for

25  damages.

26      Moreover, while Defendants argue that "[e]conomic harms are not irreparable,"

27  because they can be remedied by compensatory awards (City Opp., at 7-10), this

28  Court and others have recognized that such economic harm may be irreparable where

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-24-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

the party being harmed has no realistic chance of recovering sufficient damages to be made whole. *See, e.g., DirecTV, L.L.C. v. E&E Enterprises Global, Inc.,* 2017 WL 4325585 (C.D. Cal., Sept. 25, 2017), *at* \*5-6 (finding "a significant threat of irreparable injury absent injunctive relief" based upon "the risk of non-payment of damages" and granting preliminary injunction)*; Aliya v. Medcare Fin., L.L.C. v. Nickell,* 2014 WL 12526383, at \*5 (C.D. Cal. Nov. 26, 2014) ("[D]amages are no remedy at all if they cannot be collected.")*; MGM Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197 (C.D. Cal. 2007) (finding plaintiffs in a copyright case would "continue to suffer irreparable" harm without an injunction, because it was "extremely unlikely" that the defendant could afford to compensate them for alleged infringements and discussing similar cases).[12] That is certainly the case here.

As discussed above, the right to seek a monetary judgment from tenants who have not paid their rent for many months because of economic distress is "largely illusory." *Baptiste*, 2020 WL 5751572, at \*9. Neither the City nor Intervenor actually argues that landlords are likely to receive back rent owed at the end of the 12-month repayment period. Quite the opposite, Intervenors have submitted numerous declarations confirming that tenants will be in no position to pay debt that is expected to total as much as $909 million by January 2021 and go so far as to explain that they are ***"calling for the cancellation of rent debt,"*** precisely because repayment of such debt is unrealistic. *See* Prof. Benfer Decl. ¶ 16; Strathmann Decl. ¶ 15 (emphasis added). Thus, while the Ordinances may not explicitly excuse rent debt, that will be the practical outcome. As long as the Ordinances are in place, landlords are required to continue providing a service with no realistic chance of being paid for doing so.

The City further argues that the irreparable harms here will not be alleviated by

---

[12]  It is for this reason that the City's citation to *L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980) is inapposite. While that case noted that economic harms are generally not irreparable, that contention depends on the existence of meaningful recourse in the courts. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, *ultimately to be recovered*, does not usually constitute irreparable injury." (emphasis added)).

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-25-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

enjoining the Ordinance because state law and federal regulations also preclude evictions. City Opp., at 24:16–18.  As discussed earlier, the City's Ordinance is far more Draconian than its state or federal counterparts.  By prohibiting landlords from even serving a notice to pay or quit—which is often sufficient to trigger payment from tenants who are able to pay—and eliminating the state requirement that a tenant sign a declaration under penalty of perjury to qualify for relief, the Ordinances deprive landlords of meaningful tools and resources to mitigate otherwise irreparable harms.

Further, unlike the state law, the Ordinances not only prevent landlords from evicting tenants for failure to pay rent, but specify that "[t]enants shall have up to 12 months following the expiration of the Local Emergency Period to repay any rent deferred during the Local Emergency Period."  *See* Sec. 49.99.2—RJN, ECF No. 47, Ex. 3.  Landlords are thus prohibited from seeking to collect unpaid rent (including through a small claims court action, as allowed by AB 3088) until March 2022, even as to tenants who have moved out prior to that date.

Thus, the Ordinances irreparably harm landlords above and beyond the harm caused by the federal and state moratoria.  On the other hand, the state moratorium will ensure that none of the hardships Defendants argue are necessary to prevent will come to pass, because tenants who are truly suffering COVID-19-related financial distress will still be protected from eviction.

**B.** **Contrary To The City's Argument, Irreparable Harm May Be Presumed For Constitutional Claims Like Those Raised Here.**

The City relies on *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and *Herb Reed Enters., L.L.C. v. Fla. Ent. Mgmt.*, 736 F.3d 1239 (9th Cir. 2013) for the general proposition that irreparable harm cannot be presumed. City Opp., at 21:25–22:20.  But *eBay* and *Herb Reed*—neither of which involved an alleged deprivation of any constitutional right—only address preliminary injunction standards in the context of patents and trademarks. *See eBay*, 547 U.S. at 393 ("We hold only that the decision whether to grant or deny injunctive relief . . . must be exercised consistent

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20

-26-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

with traditional principles of equity, in patent disputes no less than in other cases[.]"); *Herb Reed*, 736 F.3d at 1248–49 (noting that two Supreme Court decisions, including *eBay*, "cast doubt on the validity of this court's previous rule that the likelihood of irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim" (quotation marks, citation, and emphasis omitted)).

Constitutional claims are different. Contrary to the City's argument that only the loss of First Amendment freedoms can support a presumption of irreparable harm (City Opp., at 22:4-10), the Ninth Circuit has applied a presumption of irreparable harm post-*Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008), to a kaleidoscope of alleged constitutional violations. *See, e.g.*, *Cuviello v. City of Vallejo*, 944 F.3d 816, 832 (9th Cir. 2019) (prior restraints under First Amendment); *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (detention under Due Process Clause of Fifth Amendment); *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (race-based traffic stops under Fourth and Fourteenth Amendments); *see also Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 917–18 (9th Cir. 2014) (in a challenge to abortion regulations as void for vagueness, violative of a woman's right to bodily integrity, and equal protection, cites *Melendres* favorably to assert that constitutional deprivations may generally constitute irreparable injury, which reaching the question).

The City attempts to extrude a lack of precisely on-point authority into the broad proposition that "neither a Due Process nor a Contract Clause violation creates a presumption of irreparable harm." City Opp., at 22:13–14. But the paucity of authority on regulations enacted to deal with a once-in-a-lifetime global pandemic is not surprising. *See Baptiste*, 2020 WL 5751572, at *1 ("This case presents issues of federal constitutional law that are not often litigated."). *Church of Scientology v. United* States, 920 F.2d 1481 (9th Cir. 1990), cited by the City cites to support its argument, is easily distinguishable. There, a plaintiff church sued the Internal

Rutan & Tucker, LLP
*attorneys at law*

560/036254-0001
15605751.5 a10/12/20

-27-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  Revenue Service under a host of claims, including the First Amendment's
2  Establishment Clause and Fifth Amendment's Due Process Clause.  *See Id.* at 1483.
3  At base, that case was motivated by the church's attempt to restrain *tax assessments*.
4  *See Id.* at 1488.  Thus, traditional remedies like suing for a refund against the United
5  States government—with guaranteed payment of any judgments obtained—would
6  likely assuage any potential harms suffered.  *See Id.* at 1489.  Not so here.  As
7  explained above, unlike *Church of Scientology*, any potential legal remedies that
8  could be asserted by AAGLA members are illusory, and would come too late to be of
9  use to many of AAGLA's members even if they were not.

10     Given the importance of protecting constitutional rights, "[i]t is well
11  established that the deprivation of constitutional rights 'unquestionably constitutes
12  irreparable injury.'" *de Jesus Ortega Melendres v. Arpaio, supra,* 695 F.3d at 1002.
13  Thus, to the extent the Court somehow finds AAGLA has not demonstrated sufficient
14  harm to support the requested injunction, the Court should presume such harm.

15  **V.    CONCLUSION**

16     For the reasons set forth above and in the AAGLA's moving papers, Plaintiff
17  respectfully requests that the Court issue a preliminary injunction enjoining
18  enforcement of the Ordinances.

19

20  Dated:  October 12, 2020                    RUTAN & TUCKER, LLP
                                                DOUGLAS J. DENNINGTON
21                                              JOHN A. RAMIREZ
                                                PETER J. HOWELL
22                                              KELSEY QUIST

23
                                                By: /s/ Douglas J. Dennington
24                                              _____
                                                Douglas J. Dennington
25                                              Attorneys for Plaintiff
                                                APARTMENT ASSOCIATION OF
26                                              LOS ANGELES COUNTY, INC., dba
                                                "APARTMENT ASSOCIATION OF
27                                              GREATER LOS ANGELES"

28

Rutan & Tucker, LLP
attorneys at law

560/036254-0001
15605751.5 a10/12/20                     -28-

Case No.  2:20-cv-05193-DDP-JEM
PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION