NATIONAL HOUSING LAW PROJECT
Deborah Thrope (Cal. Bar No. 256769)
1663 Mission Street, Suite 460
San Francisco, CA 94103
(415) 546-7000
dthrope@nhlp.org
Attorney for Amicus Curiae NHLP

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APARTMENT ASSOCIATION OF LOS ANGELES COUNTY, INC., d/b/a/ "APARTMENT ASSOCIATION OF GREATER LOS ANGELES," <br><br> v. <br><br> CITY OF LOS ANGELES, et al <br><br> Defendants | Case No. 2:20-cv-05193-DDP-JEM <br> Hon. Dean D. Pregerson |

**BRIEF OF AMICUS CURIAE NATIONAL HOUSING LAW PROJECT**

**National Housing Law Project**
1663 Mission Street, Suite 460
San Francisco, CA 94103
Phone: (415) 546-7000

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Corporate Disclosure Statement and Certifications . . . . . . . . . . . . . . . . . . . . . . . .iii

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Identity and Interest of Amicus National Housing Law Project . . . . . . . . . . 2

III. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A. Los Angeles has a compelling interest in preventing mass evictions   . . . ... 3

     B.  The ordinance is an appropriate response to the mass eviction threat . . . . . 7

     C. Procedural due process further supports an eviction moratorium . . . . . . . .. 9

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

# TABLE OF AUTHORITIES

Cases

*Baptiste v. Kennedy,* __ F.Supp.3d __,
      2020 WL 5751572 (D. Mass. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Boddie v. Connecticut,*
      401 U.S. 371 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 8

*Elmsford Apartment Assocs., LLC v. Cuomo,*
      __ F.Supp.3d __, 2020 WL 3498456, (S.D.N.Y. 2020) . . . . . . . . . . . . . . . .8

*Green v. Superior Court,*
      517 P.2d 1168 (Cal. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Goldberg v. Kelly*,
      397 U.S. 254 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

BRIEF OF AMICUS CURIAE NHLP

*Lindsey v. Normet,*
    405 U.S. 56, (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 12

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Mullane v. Central Hanover Bank & Tr. Co.,*
    339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*U.S. v. Kras,*
    409 U.S. 434 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

<u>Statutes</u>

Cal. Civ. Proc. Code Sec. 1170.5, 1170.7, 1174.2: . . . . . . . . . . . . . . . . . . . . . 9

Cal. Civ. Code, Sec. 1942.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

California Statutes of 2020, Ch. 37 (Aug. 31, 2020) . . . . . . . . . . . . . . . . . . . . 12

Los Angeles Ordinance No. 186585, Sec. 49.99.2 . . . . . . . . . . . . . . . . . . .. 3, 8-10

15 U.S.C. Sec. 9057, 9058 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Other Authorities</u>

85 Fed.Reg. at 55292 (Sept. 4, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 12

L.A. Court Connect, User Guide, 28 (Oc. 1, 2020) . . . . . . . . . . . . . . . . . . . . . 11, 12

**CORPORATE DISCLOSURE STATEMENT AND CERTIFICATIONS**

Amicus NHLP certifies, based on Rule of Appellate Procedure 29(a)(4)E), that:

1. NHLP is a nonprofit organization; NHLP has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2. No party or party's counsel authored this brief in whole or in part.

3. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief.

No person or entity other than Amicus NHLP, its staff, and its counsel contributed money that was intended to fund the preparation or submission.

## I. Introduction

The Covid-19 pandemic has taken over 213,000 lives,[1] the related economic

disruption has left millions of U.S. tenants behind in rent and fearing eviction.  In

California, an estimated 16.3 million households (more than half of California's

29.9 million households) have lost employment income since March 13.[2]  Almost

1.4 million are behind in rent,[3] over 600,000 of whom expected (on Sept. 23) to

face eviction within two months.[4]  In all, 2.2 million California renter households

had "slight" to "no confidence" in being able to pay October's rent.[5]

Mass evictions at any time would mean devastating consequences for those

tenants themselves, as well as their employers, schools, and communities.  Mass

evictions during a pandemic, when social distancing and vigilant hygiene are

imperative, would be terrifying.  And for courts, overwhelming case numbers,

coupled with limitations on court access and shifts to on-line hearings, raise new

obstacles to fairness and due process in eviction proceedings.

The City of Los Angeles' Ordinance No. 186585 mitigates these problems

by temporarily restricting certain residential evictions during the local emergency

---

[1] Centers for Disease Control & Prevention, Coronavirus Disease 2019, on-line at:
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, last visited Oct. 11,
2020
[2] U.S. Census Bureau, Week 14 Household Pulse Survey, Employment Table 1 (Sep. 23, 2020),
on-line at: https://www.census.gov/data/tables/2020/demo/hhp/hhp14.html
[3] U.S. Census Bureau, Week 14 Household Pulse Survey, Housing Table 1b (Sep. 23, 2020).
[4] U.S. Census Bureau, Week 14 Household Pulse Survey, Housing Table 3b (Sep. 23, 2020).
[5] U.S. Census Bureau, Week 14 Household Pulse Survey, Housing Table 2b (Sep. 23, 2020).

BRIEF OF AMICUS CURIAE NHLP

period.  This Court should ultimately uphold the ordinance as a practical and rational response to the mass evictions emergency.  At this stage, the Court should deny preliminary injunctive relief as contrary to the overwhelming public interest.

## II.    Identity & Interest of Amicus Curiae NHLP

The National Housing Law Project (NHLP) is a nonprofit organization that works to advance tenants' rights, increase housing opportunities for underserved communities, and preserve and expand the nation's supply of safe and affordable homes.  NHLP coordinates the Housing Justice Network, a nationwide group of more than 1,600 legal services attorneys and advocates that has collaborated on significant housing law issues for over 40 years. Since 1981 NHLP has published *HUD Housing Programs: Tenants' Rights;* commonly known as the "Greenbook," it is seminal authority on the rights of HUD program participants.  NHLP plays a key role in California as an IOLTA-funded support center, providing technical assistance to attorneys at legal services organizations throughout the state. Since the arrival of Covid-19, NHLP has been a leader in the fight against pandemic-related evictions, including by seeking imposition of state and federal eviction restrictions and funding for rental assistance, creating resources to help enforce tenant protections, and providing training to a broad constellation of stakeholders.

This brief is submitted pursuant to leave requested by accompanying motion.

**III**. **Argument**

Los Angeles Ordinance No. 186585 is a practical and rational measure to assure tenants will not be evicted for financial causes, minor lease violations, or without fault during a public health emergency, particularly when full and fair access to the judicial system cannot be consistently assured.

## A.  Los Angeles has a compelling interest in preventing mass evictions.

Of the many economic threats from the Covid-19 pandemic, perhaps none would be more devastating than widespread evictions.  A single eviction can inflict serious and long-term consequences on a family—losing not only their home but also disrupting employment and child care arrangements, impacting children's education, threatening or resulting in family separation, causing toxic stress and other health effects, and often resulting in prolonged housing insecurity.[6]  These consequences then radiate further harms into the surrounding communities.[7]

In a typical year, approximately 900,000 of the roughly 43 million U.S. renter-occupied households experience judicial eviction.[8]  But the pandemic could

---

[6] See Dyvonne Body et al., "A Glimpse into the Eviction Crisis: Why Housing Stability Deserves Greater Attention," Aspen Institute (July 24, 2019), on-line at: https://www.aspeninstitute.org/blog-posts/a-glimpse-into-the-eviction-crisis-why-housing-stability-deserves-greater-attention/

[7] See Rilwan Babajide  et al., Effects of Eviction on Individuals and Communities in Middlesex County" (May 12, 2016), on-line at: https://www.pschousing.org/sites/default/files/2016_EvictionStudyFinalDraft.pdf

[8] See Eviction Lab, "National Estimates: Eviction in America" (May 11, 2018), on-line at: https://evictionlab.org/national-estimates/

BRIEF OF AMICUS CURIAE NHLP

produce evictions on an incomprehensible scale.  The U.S. Census Bureau reported on July 1 that almost 9 million tenants had no confidence in being able to make their next rent payment, with another 32.7 million reporting only "slight" or "moderate confidence."[9] An Aspen Institute study this summer predicted the U.S. could ultimately see between 19-23 million evictions this year.[10]

In September, over 885,000 California renter households had no confidence in being able to pay their October rent, with over 1.3 million others reporting "slight" and nearly 3 million just "moderate" confidence.[11]  The global consulting firm Stout Risus Ross estimates from 1.5 million to over 1.7 million California renter households are at risk of eviction for nonpayment of rent—and that over 1 million eviction filings would occur by Jan. 1, 2021, absent moratoria.[12]  These alarming numbers mean California, like the rest of the U.S., would be experiencing an eviction crisis almost beyond description if not for the various moratoria now in place.  According to Eviction Lab, about 77,400 evictions take place in California

---

[9] See U.S. Census Bureau, Week 10 Household Pulse Survey, Housing Table 2b (Jul. 15, 2020), on-line at: https://www.census.gov/data/tables/2020/demo/hhp/hhp10.html

[10]  See Katherine Lucas Mckay, Zach Neumann & Sam Gilman, "20 Million Renters Are at Risk of Eviction; Policymakers Must Act Now to Mitigate Widespread Hardship," The Aspen Institute (Jun. 19, 2020) (predicting 19-23 million U.S. evictions by Sept. 30, 2020), on-line at: https://www.aspeninstitute.org/blog-posts/20-million-renters-are-at-risk-of-eviction/

[11] U.S. Census Bureau, Week 14 Household Pulse Survey, Housing Table 2b.

[12]Stout Risius Ross, LLC, Esitmation of Households Experiencing Rental Shortfall and Potentially Facing Eviction, California Figures, on-line at: https://app.powerbi.com/view?r=eyJrIjoiNzRhYjg2NzAtMGE1MC00NmNjLTllOTMtYjM2NjFmOTA4ZjMyIiwidCI6Ijc5MGJmNjk2LTE3NDYtNGE4OS1hZjI0LTc4ZGE5Y2RhZGE2MSIsImMiOjN9, last visited Oct. 6, 2020

BRIEF OF AMICUS CURIAE NHLP

in an entire typical year;[13] left unchecked, California could see a wave of evictions sweep more than ten times as many families out of their homes just this fall.[14]

Evictions on such a grand scale could destabilize entire neighborhoods and communities: from high absenteeism and declining test scores that threaten school accreditation[15] to reduced employee performance and turnover in workplaces[16] to a marked increase emergency room use.[17]  An Urban Institute study of housing loss during the Great Recession showed high concentrations of displacements inflicted community harms including "declining property values and physical deterioration; crime, social disorder, and population turnover; and local government fiscal stress and deterioration of services."[18] A Department of Justice study in five major cities similarly observed that concentrated housing loss (based on foreclosure) "increases

---

[13] See Eviction Lab, California spreadsheet, on-line at: https://evictionlab.org/map/#/2016?geography=states&bounds=-138.158,25.541,-98.707,45.225&type=efr&locations=06,-117.899,35.497

[14] See Katherine Lucas Mckay, Zach Neumann & Sam Gilman, "20 Million Renters Are at Risk of Eviction; Policymakers Must Act Now to Mitigate Widespread Hardship," The Aspen Institute (Jun. 19, 2020) (predicting 19-23 million U.S. evictions by Sept. 30, 2020), on-line at: https://www.aspeninstitute.org/blog-posts/20-million-renters-are-at-risk-of-eviction/

[15] See Kathryn Howell, "Eviction and Educational Instability in Richmond, Virginia," p. 4 on-line at:  https://cura.vcu.edu/media/cura/pdfs/cura-documents/EvictionandEducationalInstabilityinRichmond.pdf;

[16] Matthew Desmond and Carl Gershenson, "Housing and Employment Insecurity among the Working Poor," Social Problems at 14 (Jan. 11, 2016), on-line at: https://scholar.harvard.edu/files/mdesmond/files/desmondgershenson.sp2016.pdf?m=1452638824;

[17] Robert Collinson and Davin Reed, "The Effects of Evictions on Low-Income Households," at 25-26 (Dec. 2018).

[18] G. Thomas Kingsley, Robin Smith, and David Price, "The Impacts of Foreclosures on Families and Communities," Urban Institute, p. 13 (May 2009), on-line at: https://www.urban.org/sites/default/files/publication/30426/411909-The-Impacts-of-Foreclosures-on-Families-and-Communities.PDF

BRIEF OF AMICUS CURIAE NHLP

crime (especially violent and public order crime) in the micro-neighborhoods immediately surrounding the property[.]"[19]

There is little reason to expect better results from Covid-related evictions; indeed, the size and speed of the present crisis portends even worse neighborhood effects. While the Great Recession saw nearly 7.8 million U.S. homeowners lose their homes to foreclosure between 2007-2016,[20] mass evictions could displace up to three times as many households within a matter of weeks.  Schools, businesses, and other community organizations could not realistically weather such enormous, sudden displacement of their students, workers, customers, or members.

One million or more sudden evictions would also result in a significant increase in local homelessness.  A UCLA study in May predicted mass evictions would leave about 120,000 families--including 184,000 children-- homeless in L.A. County.[21]  Even an increase a fraction of that size would instantly multiply the area homeless population, which was counted at about 66,436 persons (in

---

[19] Ingrid Gould Ellen, Ph.D., and Johanna Lacoe, "The Impact of Foreclosures on Neighborhood Crime," p. 6 (Feb. 2015), on-line at: https://www.ncjrs.gov/pdffiles1/nij/grants/248653.pdf
[20] See Corelogic, "United States Residential Foreclosure Crisis: Ten Years Later," p. 3 (Mar. 2017), on-line at: https://www.corelogic.com/research/foreclosure-report/national-foreclosure-report-10-year.pdf
[21] See Gary Blasi, "UD Day: Impending Evictions and Homelessness in Los Angeles," Luskin Center on Inequality and Democracy, pp. 18-20 (May 28, 2020), on-line at: https://escholarship.org/uc/item/2gz6c8cv

BRIEF OF AMICUS CURIAE NHLP

greater Los Angeles) in January.[22]  With even pre-pandemic homeless numbers

already outstripping available shelter and housing resources,[23] California has seen

alarming numbers of informal homeless encampments established.[24]  Many such

encampments have over 100 residents and have been in place at least one year,

with over one-fourth existing longer than six years.[25] As the CDC recently warned,

such encampment settings present "inadequate access to hygiene, sanitation

facilities, health care, and therapeutics. The latter factors contribute to the further

spread of COVID-19."  85 Fed.Reg. at 55292, 55295 (Sept. 4, 2020).

**B. The ordinance is an appropriate response to the mass eviction threat.**

In the civil context, restrictions on court access generally require only a

rational basis.  *See U.S. v. Kras,* 409 U.S. 434, 445 (1973) (rational basis for fee

justified burden on indigent debtor's ability to file bankruptcy). L.A.'s ordinance

easily survives this standard. At minimum, delaying mass evictions gives tenants

and communities more time to plan and prepare—and keeps alive the hope of

avoiding mass evictions altogether (e.g., if federal relief funds come available).[26]

---

[22] See Los Angeles Homeless Services Authority, 2020 Greater Los Angeles Homeless Count
Results (June 2020), on-line at: https://www.lahsa.org/news?article=726-2020-greater-los-
angeles-homeless-count-results&ref=hc

[23] See Los Angeles Homeless Services Authority, 2020 Housing Inventory Count, on-line at:
https://www.lahsa.org/documents?id=4659-2020-housing-inventory-count.xlsx&ref=hc

[24] National Law Center on Homelessness & Poverty, "Tent City USA," 19-21, 24 (Oct. 2018),
on-line at: https://nlchp.org/wp-content/uploads/2018/10/Tent_City_USA_2017.pdf

[25] *Id*. at 21.

[26] For example, H.R. 6800, Health and Economic Recovery Omnibus Emergency Solutions Act,
would (among other things) fund $100 billion in rental assistance.

1

2
The City need not tailor its ordinance as to minimize its adverse effects on

3
landlords; heightened scrutiny applies only to judicial proceedings that afford the

4
exclusive means of protecting fundamental rights.  *See Boddie v. Connecticut,* 401

5
U.S. 371, 382 (1971) (conditioning indigent person's access to divorce proceeding

6
upon payment of court fees violated due process clause).  An eviction lawsuit

7
neither implicates any fundamental right nor represents the sole means of

8
adjudicating alleged lease violations.  *See Elmsford Apartment Assocs., LLC v.*

9
*Cuomo,* __ F.Supp.3d __, 2020 WL 3498456, at *16 (S.D.N.Y. 2020) (state

10
eviction moratorium did not violate right to petition clause because restriction was

11
temporary and other remedies were available); *see also Baptiste v. Kennedy,* __

12
F.Supp.3d __, 2020 WL 5751572 at *25 (D. Mass. 2020) (eviction moratorium did

13
not unconstitutionally infringe on landlord's access to court).

14

15
Nonetheless, the ordinance careful minimizes burdens on landlords.  The

16
measure is temporary, expiring when L.A.'s Covid-19 emergency period ends.  *See*

17
Ord. § 49.99.2(A). The ordinance prohibits only evictions brought without cause,

18
for nonpayment of rent where the tenant's default arose from a Covid-19 hardship,

19
certain violations of guest or pet polices or a tenant's Covid infection or need to

20
quarantine—but still allows evictions of tenants whose conduct poses genuine

21
hazards to others or to the physical premises, or even for non-payment if a tenant

22

23

24

BRIEF OF AMICUS CURIAE NHLP

was not impacted by Covid-19.  *See Id.*  Nothing in the ordinance eliminates a

landlord's right to collect rent or a tenant's obligation to pay it.  *See* Ord. §

49.99.2(A), (D).  Indeed, the ordinance requires tenants who avoid eviction for

non-payment to cure the delinquency within 12 months after the local emergency

period expires.  *See* Ord. § 49.99.2(A).  These provisions ensure that a tenant able

to pay rent has no incentive to withhold it or fail to pay on time.

### C. Procedural due process furthers support eviction moratorium.

The use of summary proceedings to adjudicate residential eviction cases,

which dates back to the *actio spollii* of Roman law,[27] has been held to fulfill basic

federal procedural due process requirements.  *See Lindsey v. Normet,* 405 U.S. 56,

65(1972).  California's summary eviction procedure, which provides for some

formal discovery, allows tenants at least five days to appear with trial up to 20 days

later, and permits defenses such as retaliation or uninhabitable conditions, affords

more than the minimal safeguards held sufficient in *Lindsey*.  *See* Cal. Civ. Proc.

Code §§ 1170.5(a), 1170.7, 1174.2; Cal. Civ. Code § 1942.5; *Green v. Superior*

*Court,* 517 P.2d 1168, 1182 (Cal. 1974); *compare with Lindsey* at 65-66 (trial

within four days of suit, no discovery, and certain defenses excluded).  Pandemic

conditions, however, alter the procedural due process calculus dramatically.

---

[27] See Dr. Eric Descheemaeker, "The Consequences of Possession," Univ. of Edinburgh School of Law, 22-23 (2013), on-line at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2302273

BRIEF OF AMICUS CURIAE NHLP

During Covid-19, the need for a safe home in which to quarantine from others and practice good hygiene and social distancing heightens the importance of housing, pandemic conditions amplifying the risk of erroneous eviction by raising impediments to preparing and presenting defenses in a hearing, and overriding public health considerations militate against the ordinary governmental interest in quickly and efficiently adjudicating the present right of possession. *See generally Mathews v. Eldridge,* 424 U.S. 319, 335 (1976) (process due depends on importance of the interest at stake, risk of erroneous deprivation, probable value of additional safeguards, governmental interest, and burdens of additional process).

In particular, the risk of infection may chill tenants or witnesses from appearing in court.  Closures of businesses and offices may interfere with investigating claims or gathering evidence --a particular problem where formal discovery is limited.  These deterrents would be further exacerbated by a large case volume; social distancing may not be possible in a court with a large docket, crowded with parties, witnesses, and attorneys.  The ordinance mitigates this problem by restricting lower-priority evictions, leaving courts free to hear only the highest-priority eviction cases with fewer people present.  *See* Ord., § 49.99.2

Conversely, rules adopted to protect public health may impede tenants from defending.  For example, currently any persons "displaying symptoms consistent with COVID-19 are prohibited from entering any court facility." Los Angeles

Superior Court Covid-19 Social Distancing Protocol (June 15, 2020).  Protocols

such as these may lessen fears of appearing in court, but could result in tenants,

witnesses, or attorneys being denied admission for hearings—especially if tenants

or other court-users do not have receive sufficient notice of these policies and

practices.  *See Mullane v. Central Hanover Bank & Tr. Co.,* 339 U.S. 306, 314

(1950) (notice must be "reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections").

Remote hearings overcome some of these difficulties, but raise others.  One

concern is the ability of tenants to confront and cross-examine adverse witnesses,

particularly in telephonic or audio-only appearances.  *See Goldberg v. Kelly*, 397

U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on

questions of fact, due process requires an opportunity to confront and cross-

examine adverse witnesses."); *see also* L.A. Court Connect, User Guide, 28 (Oc. 1,

2020) ("User Guide") (allowing audio-only appearances).  Even video hearings

may not adequately enable a court to assess the credibility of witnesses.  *See*

National Center for State Courts, *Call to Action: Achieving Civil Justice for All,*

Appx G, p. 3 (Jul. 15, 2020)[28] ("Examples of inappropriate situations [for video

hearings] include where there are poor connections, a hearing requires reference to

---

[28] On-line at: https://www.ncsc.org/__data/assets/pdf_file/0022/25726/ncsc-cji-appendices-g.pdf

BRIEF OF AMICUS CURIAE NHLP

multiple documents, the subject matter is complex, or issues of witness credibility are involved."). Remote hearings pose particular challenges for tenants who may lack proper devices, reliable internet access, or struggle with technology. *See* User Guide, 85-89 (technical specifications for remote access).[29] L.A. Superior Court also charges litigants a fee ($15 for audio and $23 for video) to appear remotely, which must be paid by debit or credit card. *See* User Guide at 10. The court uses a "share screen" function for presenting exhibits, which requires video and may be problematic for items not easily converted to digital files. See User Guide at 73.

The *Lindsey* court relied heavily on the simplicity of most eviction cases in holding that summary proceedings afford due process. *See Lindsey* at 65 ("Tenants would appear to have as much access to relevant facts as their landlord, and they can be expected to know the terms of their lease, whether they have paid their rent, whether they are in possession of the premises, and whether they have received a proper notice to quit…."). Yet eviction cases are far more complicated during Covid-19. For example, California's new Tenant, Homeowner, and Small Landlord Relief and Stabilization Act (AB 3088)[30] created temporary eviction protections for nonpayment of rent related to Covid-19. The federal CARES Act prohibited evictions filed for nonpayment of rent or other charges between March

---

[29] On-line at: https://www.lacourt.org/lacc/guides/laccug
[30] Ch. 37, Statutes of 2020 (Aug. 31, 2020).

BRIEF OF AMICUS CURIAE NHLP

27 and July 24; the Act still requires 30 days' written notice to evict and blocks

some evictions in properties receiving forbearances on federally-backed loans. *See*

15 U.S.C. §§ 9057-58.  The recent CDC eviction order adds further complexities.

See 85 Fed.Reg. at 55292.  Few tenants will be able to effectively raise defenses

based on these or other Covid-era provisions without representation. A moratorium

offers a practical alternative to the difficulty and expense of appointing counsel,

without which tenants would face an exceedingly high risk of erroneous eviction.

**IV. Conclusion**

For the above reasons, the Court should deny the preliminary injunction.


Respectfully submitted this 13 day of October, 2020, by:


    */s/ Deborah Thrope*
Deborah Thrope  (Cal. Bar No. 256769)
**National Housing Law Project**
1663 Mission Street, Suite 460
San Francisco, CA 94103
(415) 546-7000
dthrope@nhlp.org