# EXHIBIT A

Jonathan B. Miller
LiJia Gong (SBN# 294268)
Sophia TonNu (SBN #330189)
sophia@publicrightsproject.org
PUBLIC RIGHTS PROJECT
4096 Piedmont Avenue #149
Oakland, CA 94611
Tel.: 301-335-3828

*Attorneys for Amici Cities and County*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APARTMENT ASSOCIATION OF LOS ANGELES COUNTY, INC., <br><br> Plaintiff, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | No. 2:20-cv-05193-DDP-JEM <br><br> **[PROPOSED] BRIEF OF *AMICI CURIAE* CITIES AND COUNTY** <br><br><br><br><br><br> **Before the Honorable Dean D. Pregerson** <br> **Hearing Date:** October 26, 2020 <br> **Hearing Time**: 10:00AM |

1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

SUMMARY OF ARGUMENT .................................................................... 1

ARGUMENT ............................................................................................... 2

I. The Eviction Moratorium Promotes the Public Health and Economic Welfare of Los Angeles Residents ....................................................................... 2

  A.  The Eviction Moratorium Promotes Public Health and Safety by Ensuring Residents Have Stable Housing in Which to Social Distance and Shelter-in-Place ....................................................................... 5

    1.  Stay-at-Home and Social Distancing Guidance ......................... 6

    2.  Homelessness ............................................................................. 7

    3.  Overcrowding ............................................................................. 9

  B.  The Eviction Moratorium Promotes Public Health and Safety by Maintaining Economic Welfare ...................................................... 12

II.  The Eviction Moratorium Does Not Violate the Contracts Clause ................. 18

  A.  The Eviction Moratorium Does Not Substantially Impair Private Contractual Rights. ....................................................................... 19

  B.  The Eviction Moratorium Fulfills a Significant and Legitimate Public Purpose ....................................................................... 21

  C.  The Eviction Moratorium is Reasonably Tailored to Protect the Public Health and Economic Welfare of Tenants During the COVID-19 Pandemic ........... 22

CONCLUSION ....................................................................... 24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

ii

1

# TABLE OF AUTHORITIES

2

## CASES

3

4
*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978) …………………………………………………………..19

5
*Auracle Homes, LLC v. Lamont*, No. 3:20-cv-0829 (VAB),
    2020 U.S. Dist. LEXIS 141500 (D. Conn. Aug. 7, 2020) ………………………..5

6

7
*Baptiste v. Kennealy*, No. 1:20-cv-11335-MLW,
    2020 U.S. Dist. LEXIS 176264 (D. Mass. Sept. 25, 2020) …………………….5

8
*Birkenfeld v. City of Berkeley*,
    550 P.2d 1001 (Cal. 1976) …………………………………………….…12

9

10
*Block v. Hirsh*,
    256 U.S. 135 (1921) ……………………………………………………..21

11
*Chicago Bd. of Realtors, Inc. v. Chicago*,
    819 F.2d 732 (7th Cir. 1987) ……………………………………………19

12

13
*Elmsford Apt. Assocs., LLC et al. v. Cuomo*,
    No. 20-cv-04062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ……...5, 19, 20

14
*Energy Reserves Group v. Kansas Power & Light Company*,
    459 U.S. 400 (1983) ………………………………….…………….…18, 21, 22

15

16
*Exxon Corp. v. Governor of Md.*,
    437 U.S. 117 (1978) ……………………………………………………..12

17
*Friends of Danny Devito v. Wolf*,
    227 A.3d 872 (Pa. 2020) …………………………………………………..5

18

19
*HAPCO v. City of Philadelphia*, No. 20-3300,
    2020 U.S. Dist. LEXIS 156327 (E.D. Pa. Aug. 27, 2020) …………….....…5, 20

20
*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) …………………………………………………...18, 22-23

21

iii

*Interstate Marina Dev. Co. v. Cty. of Los Angeles,*
    202 Cal. Rptr. 377 (Ct. App. 1984)……………………………………..……4

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ………………………………………………..……3

*Kelley v. Johnson,*
    425 U.S. 238 (1976) ………………………………………………...……5

*Laurel Hill Cemetery v. City & County of San Francisco,*
    93 P. 70 (Cal. 1907) ………………………………………………….…..5

*Massachusetts Bd. of Ret. v. Murgia,*
    427 U.S. 307 (1976) ………………………………………………………4

*Matorin v. Massachusetts,*
    No. 20-CV-01334 (Mass. Sup. Ct. Aug. 26, 2020) ……………………………5

*New York State Rest. Ass'n v. New York City Bd. of Health,*
    556 F.3d 114 (2d Cir. 2009) …………………………………………….....3

*Pennell v. San Jose,*
    485 U.S. 1 (1988) …………………………………………………….....4

*Renton v. Playtime Theatres,*
    475 U.S. 41 (1986) ……………………………………………………....18

*San Francisco Apartment Ass'n v. City & Cty. of San Francisco,*
    881 F.3d 1169, 1179 (9th Cir. 2018)…………………………………………4

*S. Bay United Pentecostal Church v. Newsom,*
    590 U.S. ___, 140 S. Ct. 1613 (2020)…………………………………………5

*Schnuck v. City of Santa Monica,*
    935 F.2d 171 (9th Cir. 1991) ……………………………………………...4

*Sullivan v. Nassau Cty. Interim Fin. Auth.,*
    959 F.3d 54 (2d Cir. 2020) ……………………………………………19

*Sveen v. Melin,*
    138 S.Ct. 1815 (2018) ……………………………………….........18, 20

iv

*Sylvia Landfield Trust v. City of Los Angeles,*………………………………………....4
    729 F.3d 1189 (9th Cir. 2013)

*Troy, Ltd. v. Renna,*
    727 F.2d 287 (3d Cir. 1984) …………………………………………………19-20

*U.S. Trust Co. of New York v. New Jersey,*
    431 U.S. 1 (1977) …………………………………………………………..19, 21, 22

*Veix* v. *Sixth Ward Bldg. & Loan Ass'n.,*
    310 U.S. 32 (1940) …………………………………………………………19, 21, 22

## STATUTES, RULES AND OTHER AUTHORITIES

Cal. Civil Pro. Code § 1179.05(a)(2)(C) ……………………………………………….23

L.A., Cal., Ordinance 186585, § 49.99.2 (Mar. 31, 2020) ……………………..*passim*

L.A., Cal., Ordinance 186585, § 49.99.5 (Mar. 31, 2020) ……………………..*passim*

L.A., Cal., Ordinance 186606 (May 12, 2020) …………………………………*passim*

L.A., Cal., Admin. Code, ch. 3, art. 3, § 8.31 (2020) ……………………………… 23

v

1

## SUMMARY OF ARGUMENT

2

At a moment of unprecedented crisis, state and local governments have been

3

indispensable to the public health and economic responses to the COVID-19

4

pandemic. Standing at a crucial cornerstone of health and welfare, and integral to that

5

overall response, is housing security. Across America, state and local governments—

6

through a variety of means, including legislative actions, executive orders, and judicial

7

rules—have restricted or barred eviction proceedings during some or all of the current

8

pandemic. Because of the critical role that eviction restrictions and other housing

9

security measures will continue to play in our collective and long-term response to

10

COVID-19, the City of Chicago, along with the Cities of Albuquerque, Austin,

11

Baltimore, Boston, Cambridge, Chelsea, Cincinnati, Columbus, Dayton, Gary, Santa

12

Cruz, Santa Monica, Seattle, St. Paul, Oakland, Portland, Tucson, Somerville and

13

West Hollywood as well as Santa Clara County (collectively, "*Amici* Cities and

14

County"), submit this brief as *amicus curiae* in opposition to the motion for

15

preliminary injunction and in support of Defendants the City of Los Angeles, Eric

16

Garcetti, and the City Council of the City of Los Angeles.

17

*Amici* Cities and County address arguments in this case that have broad ranging

18

implications for state and local governments across the country. In short summation,

19

all of Plaintiff's arguments challenging L.A., Cal., Ordinance 186585 (Mar. 31, 2020)

20

and L.A., Cal., Ordinance 186606 (May 12, 2020) (hereinafter, the "eviction

21

1

moratorium") should be rejected by this Court. First, the eviction moratorium falls squarely within the City's police power to promote public health, safety, and welfare during a pandemic and implicates no fundamental rights. The moratorium has done so by enabling residents to shelter in place and socially distance. Additionally, by maintaining the economic welfare of tenants, the moratorium protects individuals and neighborhoods against the dangers and risks associated with evictions, including health and safety harms. These housing stability safeguards are crucial as a matter of both public health and economic response to the current crises.

Second, the moratorium does not substantially impair a landlord's contractual rights with tenants. The eviction moratorium follows established precedent which has upheld similar responses to recessions and significant economic downturns, even without the additional challenges imposed by a global pandemic in the current moment. If adopted, Plaintiff's expansive and incorrect reading of the Contracts Clause of the U.S. Constitution could unduly limit state and local governmental authority to enact regulatory measures to safeguard the welfare of their residents during a crisis.

## ARGUMENT

### I.   THE EVICTION MORATORIUM PROMOTES THE PUBLIC HEALTH AND ECONOMIC WELFARE OF LOS ANGELES RESIDENTS

The City of Los Angeles's eviction moratorium falls well within the expansive police power authority granted to California cities to uphold public health and safety.

2

Plaintiff offers a conclusory assertion that the eviction moratorium implicates a fundamental right and completely fails to address the evidence that the moratorium rationally protects the health of Los Angeles residents. Pl.'s Mot. for Prelim. Inj. 27-28, ECF No. 46 (Sept. 21, 2020). Even balancing the harms, the public health evidence overwhelmingly demonstrates that access to stable housing is a crucial component of containing the novel coronavirus. Eviction moratoriums have a substantial relation to public health when they ensure that tenants maintain this access.

In the seminal case of *Jacobson v. Massachusetts*, the U.S. Supreme Court upheld Massachusetts's authority to enforce its compulsory vaccination law. 197 U.S. 11 (1905). The Court concluded that public health measures are constitutional so long as they demonstrate a "real or substantial relation" to the protection of public health. *Id.* at 30-31; *accord New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 134 (2d Cir. 2009) (recognizing tradition of local health & safety regulation and upholding local public health ordinance as reasonable). Here, the eviction moratorium undoubtedly maintains a real and substantial relation to protecting the public health in the face of the COVID-19 pandemic by increasing housing stability and allowing Los Angeles to implement social distancing and quarantining measures.

3

1     The eviction moratorium, moreover, does not discriminate against members of

2  a protected class nor implicate a fundamental right.[1] Because a limitation on the use of

3  property does not implicate a fundamental right, it need only be rational. *See, e.g.*,

4  *Schnuck v. City of Santa Monica*, 935 F.2d 171, 174 (9th Cir. 1991) ("Rent controls

5  violate due process only if 'arbitrary, discriminatory, or demonstrably irrelevant' to a

6  legitimate governmental purpose") (quoting *Pennell v. San Jose*, 485 U.S. 1, 11

7  (1988)). Contrary to Plaintiff's assertions that they have a fundamental right to evict

8  tenants, the court in *Schnuck* specifically upheld restrictions on rent increases and

9  evictions as reasonable. *Id.* at 172, 175. As described in more detail below, Los

10 Angeles's eviction moratorium is rationally related to the City's intertwined interested

11 in protecting the health of its residents and promoting their economic security.

12

13

14 _____

15 [1] Unless public health legislation impermissibly interferes with the "exercise of a
   fundamental right" or disadvantages a "suspect class," courts under the Equal
16 Protection and Due Process Clauses use rational basis review. *See, e.g.*, *Massachusetts
   Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Both federal and California courts
17 have found that landlords are not a protected class. *Sylvia Landfield Trust v. City of
   Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013) ("We apply rational basis review
18 because landlords are not a protected class…"); *San Francisco Apartment Ass'n v.
   City & Cnty. of San Francisco*, 881 F.3d 1169, 1179 (9th Cir. 2018) (same); *accord
19 Interstate Marina Dev. Co. v. Cnty. of Los Angeles*, 202 Cal. Rptr. 377 (Ct. App.
   1984).

20

21

**A. The Eviction Moratorium Promotes Public Health and Safety by Ensuring Residents Have Stable Housing in Which to Social Distance and Shelter-in-Place**

Federal and California law require public health regulations to have a rational connection with the promotion of public health and safety. *See Kelley v. Johnson*, 425 U.S. 238, 247 (1976); *Laurel Hill Cemetery v. City & County of San Francisco*, 93 P. 70, 72 (Cal. 1907) ("[S]upervisors have power to pass ordinances placing such restrictions upon the use of any property or the conduct of any business as may be necessary for the public health. Such ordinances must, of course, bear a rational relation to the object sought to be attained.") (internal citations omitted).[2] The eviction moratorium meets this standard by promoting public health in three distinct and critical ways: (1) ensuring efficacy of stay-at-home and social distancing guidance; (2) preventing homelessness; and (3) limiting housing overcrowding.

_____

[2] Federal and state courts have upheld public health measures on this basis in the context of COVID-19, including eviction moratoriums. *S. Bay United Pentecostal Church v. Newsom*, 590 U.S. ___, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring); *Friends of Danny Devito v. Wolf*, 227 A.3d 872 (Pa. 2020) (holding that the Pennsylvania Governor could close all "non-life-sustaining" businesses by executive order); *Baptiste v. Kennealy*, No. 1:20-cv-11335-MLW, 2020 U.S. Dist. LEXIS 176264 (D. Mass. Sept. 25, 2020) (upholding eviction moratorium); *HAPCO v. City of Philadelphia*, No. 20-3300, 2020 U.S. Dist. LEXIS 156327 (E.D. Pa. Aug. 27, 2020) (same); *Matorin v. Massachusetts*, Civil Action No. 20-CV-01334 (Mass. Sup. Ct. Aug. 26, 2020) (same); *Auracle Homes, LLC v. Lamont*, No. 3:20-cv-0829 (VAB), 2020 U.S. Dist. LEXIS 141500 (D. Conn. Aug. 7, 2020) (same); *Elmsford Apt. Assocs., LLC et al. v. Cuomo*, No. 20-cv-04062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) (same).

5

### 1.  Stay-at-Home and Social Distancing Guidance

Eviction moratoriums promote public health and safety by ensuring that stay-at-home orders can reduce the spread of COVID-19. Stay-at-home orders work to stop the spread of COVID-19 by limiting contagious contact outside of homes and thus lowering the number of new people infected by each case.[3] States that implemented stay-at-home orders saw a 48.6% reduction in new cases after three weeks and a 59.8% reduction in weekly fatalities.[4] States that imposed stay-at-home orders also saw a reduction in the average number of new people infected by a person sick with COVID-19 to less than one, a vital benchmark for successful suppression of the virus.[5] The reduction in spread happened because residents were able to stay at home, away from public transit and other public spaces.[6]

Eviction moratoriums play a crucial role in ensuring that stay-at-home orders are effective by preventing tenants from becoming homeless or relocating to overcrowded homes.[7] The economic downturn associated with the COVID-19

---

[3] James H. Fowler et al., *The Effect of Stay-at-Home Orders on COVID-19 Cases and Fatalities in the United States*, medRxiv, 1, 10-11 (May 12, 2020), https://www.medrxiv.org/content/10.1101/2020.04.13.20063628v3.full.pdf.

[4] *Id*. at 8.

[5] Juliette T. Unwin et al., *Report 23: State-level Tracking of COVID-19 in the United States*, Imperial College London, 9 (May 28, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/mrc-gida/2020-05-28-COVID19-Report-23-version2.pdf.

[6] *Id*. at 4.

[7] *See* Declaration of Emily A. Benfer ¶ 21, ECF No. 55-4 (October 4, 2020) (Visiting

pandemic has increased the number of households at risk of eviction.[8] Even under normal circumstances, evictions cause substantial increases in both homelessness and overcrowding, as people lose their homes and either have no place to go or find shelter wherever they can.[9] With public and nonprofit housing assistance and other social services strained due to tight budgets and rising need, experts predict that if the moratorium is lifted, increases in homelessness and overcrowding will be more severe than normal.[10] Homelessness and overcrowding will in turn increase the risk of both individual infection and uncontrolled outbreaks because individuals cannot effectively socially distance.

### 2. Homelessness

Homelessness increases the risk of infection and death caused by COVID-19. The Centers for Disease Control and Prevention ("CDC") noted that observing their recommended precautions to avoid contracting COVID-19, such as avoiding public

---

Professor of Law at Wake Forest University School of Law stating that "Eviction forces families into transiency and crowded residential environments that increase new contact with others and make compliance with pandemic health guidelines difficult or impossible.")

[8] *Id*. ¶¶ 10-13 (describing the impact the economic downturn has had on tenants' ability to pay rent).

[9] Kimberly Skobba & Edward G. Goetz, *Mobility Decisions of Very Low-Income Households*, 15.2 Cityscape: J. Pol'y Dev. & Res. 155, 158 (2013).

[10] Jen Kirby, *America's Looming Housing Catastrophe, Explained*, Vox (July 8, 2020), https://www.vox.com/21301823/rent-coronavirus-covid-19-housing-eviction-crisis.

7

1   spaces and frequent handwashing, may be impossible for people experiencing

2   homelessness.[11] Homelessness can create additional health problems and accelerate

3   aging for those who experience it chronically, which places this generally older

4   population at particularly high risk for severe illness and death from COVID-19.[12] In

5   other states, as individuals experiencing homelessness crowd into shelters without

6   resources to fully implement safe practices, these shelters have become hotspots for

7   community spread, threatening the broader public health.[13] While shelters in

8   California have implemented a range of COVID-19 safety protocols to reduce spread,

9   infection control remains very difficult and several Los Angeles homeless shelters

10  have experienced COVID-19 outbreaks.[14]

11  _____

12  [11] *People Experiencing Homelessness*, Ctrs. for Disease Control & Prevention (June 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/homelessness.html.

13  [12] Dennis P. Culhane et al., *Estimated Emergency and Observational/Quarantine Capacity Need for the US Homeless Population Related to COVID-19 Exposure by County; Projected Hospitalizations, Intensive Care Units and Mortality*, Nat'l All. to End Homelessness, 2-5 (Mar. 27, 2020), https://endhomelessness.org/wp-content/uploads/2020/03/COVID-paper_clean-636pm.pdf.

14  [13] *See, e.g.*, Vianna Davila, *Coronavirus Hot Spots in Texas Homeless Shelters Highlight Challenges Unsheltered Residents Face Social Distancing, Staying Clean*, Tex. Trib. (May 24, 2020), https://www.texastribune.org/2020/05/24/texas-homeless-shelters-coronavirus-houston-austin-dallas/.

19  [14] Joel Grover & Josh Underwood-Davis, *Coronavirus Spreads to Most Skid Row Homeless Shelters, Despite Efforts to Stop It*, NBC L.A. (May 11, 2020), https://www.nbclosangeles.com/investigations/coronavirus-spreads-to-most-skid-row-homeless-shelters-despite-efforts-to-stop-it/2360838/; *see also* Emily Mosites et al., *Assessment of SARS-CoV-2 Infection Prevalence in Homeless Shelters — Four U.S. Cities, March 27–April 15, 2020*, 69 Mortality & Morbidity Wkly. Rep. 521 (May 1,

8

### 3.  Overcrowding

Overcrowding or "doubling up" of households in non-shelter housing presents similar risks. Multiple studies have found that neighborhoods with a higher proportion of overcrowded homes had higher rates of infection, with greater risks especially for the elderly living in close quarters with younger people.[15] These studies reinforce the data and other evidence submitted by the Intervenor Defendants, which demonstrates that communities with higher percentages of overcrowding generally have had higher case infection rates.[16] Household members cannot effectively socially distance when they share common areas such as restrooms and may even share sleeping quarters. Essential workers in sectors with exposure to the general public, like food service and healthcare, also face disproportionate overcrowding, heightening the risk of

---

2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6917e1.htm (documenting outbreak that infected 66% of residents at a shelter in San Francisco).

[15] *COVID-19 Cases in New York City, a Neighborhood-Level Analysis*, NYU Furman Ctr. (Apr. 10, 2020), https://furmancenter.org/thestoop/entry/covid-19-cases-in-new-york-city-a-neighborhood-level-analysis; *see also* Benfer Dec., ¶ 21 ("Residential crowding and increased contact with others drive the spread of respiratory illnesses, such as COVID-19."); Jackie Botts & Lo Bénichou, *The Neighborhoods Where COVID Collides with Overcrowded Homes*, CalMatters (June 12, 2020), https://calmatters.org/projects/california-coronavirus-overcrowded-neighborhoods-homes/.

[16] *See* Benfer Dec. ¶ 21.

1  overcrowding-related COVID-19 exposure to themselves, their households, and the

2  community.[17]

3         As cases continue to rise nationally, experts also anticipate a "second wave" of

4  community spread, even in states and localities that have significantly reduced the

5  number of active COVID-19 cases.[18] Since the beginning of October, case rates in Los

6  Angeles County have begun to spike again, and the county remains at high risk for

7  spread of COVID-19 in the community.[19] Low existing immunity in the general

8  population and the contagiousness of the virus both make a resurgence more likely.[20]

9  Even after rigorous shelter-in-place orders, New York City and the State of Wisconsin

10 have re-imposed public health orders in response to community spread.[21] Local

11 _____

12 [17] Marisol Cuellar Mejia & Paulette Cha, *Overcrowded Housing and COVID-19 Risk
   among Essential Workers*, Pub. Pol'y Inst. of Cal. (May 12, 2020),
13 https://www.ppic.org/blog/overcrowded-housing-and-covid-19-risk-among-essential-
   workers/.

14 [18] Cory Stieg, *What a 'Second Wave' of Covid-19 Could Look Like and How to
   Prevent It*, CNBC (June 28, 2020), https://www.cnbc.com/2020/06/28/what-second-
15 wave-of-covid-19-means-and-how-to-prevent-it.html.

16 19 Evan Webeck, Coronavirus: Where Cases Are Rising and Where They Are Falling
   in California, Mercury News (Oct. 9, 2020),
17 https://www.mercurynews.com/2020/10/09/coronavirus-where-cases-are-rising-and-
   where-they-are-falling-in-california/.

18 [20] Tyler S. Brown & Rochelle P. Walensky, *Serosurveillance and the COVID-19
   Epidemic in the US: Undetected, Uncertain, and Out of Control*, JAMA Network
19 (July 21, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768835.

20 [21] Gregory Barber, *New York Is Trying Targeted Lockdowns. Will It Stop a Second
   Wave?*, WIRED (Oct. 12, 2020), https://www.wired.com/story/new-york-is-trying-
21 targeted-lockdowns-will-it-stop-a-second-wave/; Alison Durkee, *Wisconsin Judge
   Upholds Mask Mandate As Coronavirus Cases Surge*, Forbes (Oct. 12, 2020)

16

1  governments as service providers also have shifted resources to treat and prevent

2  COVID-19 and influenza cases in the fall and winter.[22]  The City itself is coordinating

3  with the County of Los Angeles and the University of Southern California School of

4  Pharmacy to increase the provision of free flu vaccines in anticipation of dual spread

5  during the fall and winter.[23] Absent the maintenance of the eviction moratorium, a

6  worsening public health crisis could accelerate as households are evicted just as

7  COVID-19 cases begin rising again.[24] At increased risk of contracting and spreading

8  COVID-19 due to homelessness or overcrowded housing, those evicted from their

9  residences could spark new outbreaks and undermine California's relative success

10  thus far in addressing the pandemic.[25]

11  _____

12  https://www.forbes.com/sites/alisondurkee/2020/10/12/wisconsin-judge-upholds-mask-mandate-as-coronavirus-cases-surge/ - 251433fb3821.

13  [22] *See, e.g.*, *With COVID-19 Increasing Risk, Santa Clara County Offers Free Flu Shots*, CBS SF Bay Area (Sept. 17, 2020) (expanding vaccination efforts),

14  https://sanfrancisco.cbslocal.com/2020/09/17/santa-clara-county-offering-free-flu-shots-as-covid-19-increases-risk/; Cyrus Moulton, *Worcester Health Officials Work to*

15  *Ward Off COVID, Flu Season 'Twindemic'*, Telegram (Oct. 10, 2020)

16  https://www.telegram.com/news/20201010/worcester-health-officials-work-to-ward-off-covid-flu-season-twindemic.

17  [23] Cari Spencer, *USC School of Pharmacy Partners With City of Los Angeles for Free Flu Shot Vaccines*, Daily Trojan (Oct. 9, 2020),

18  https://dailytrojan.com/2020/10/09/usc-school-of-pharmacy-partners-with-city-of-los-angeles-for-free-flu-shot-vaccines/.

19  [24] *See* Benfer Dec., ¶¶ 25-26 (lifting state eviction moratoriums associated with 2.1 times higher mortality and 1.5 times higher incidence of COVID-19).

20  [25] *See* Benfer Dec., ¶¶ 21, 23 (homeless shelters and transient living creates a particularly high risk for virus spread and infection).

21

11

### B. The Eviction Moratorium Promotes Public Health and Safety by Maintaining Economic Welfare

The eviction moratorium is also essential to maintaining the economic security of Los Angeles residents. The severe harms caused by the nearly unparalleled national economic crisis instigated by the pandemic imperil the public welfare of our communities. Even if the eviction moratorium is considered solely through the lens of economic regulation (rather than as a public health measure, which it is as well), state and local governments are still granted broad deference in review. *See, e.g.*, *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125-26 (1978); *accord Birkenfeld v. City of Berkeley*, 550 P.2d 1001, 1020 (Cal. 1976) ("[A] state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority…when it is declared by the legislature, to override it."). Under the California Constitution, cities' police power to promote public welfare "is as broad as the police power exercisable by the Legislature itself." *Id.* at 1009. Given the scale of the economic crisis faced by the City of Los Angeles and the rest of the country, and the devastating consequences of eviction on economic stability and public health and safety, a temporary eviction moratorium against nonpayment cases is an appropriate exercise of the City's authority.

Our residents are struggling economically. Between February and April of this year, the national unemployment rate increased from a low of 3.5% to a peak of

12

14.7%.[26] Accounting for misclassified workers and workers who have left the

workforce, the effective unemployment rate is likely still 11% in September, despite

extraordinary measures taken by the federal, state, and local governments.[27] The

California unemployment rate in April was the highest it has ever been at 16.4%.[28]

Although the state unemployment rate has decreased down to 11.4% in August, Los

Angeles County's unemployment rate remains high at 16.6%.[29]

Other indicators, such as rising food insecurity, further illustrate the economic

peril that so many families across the country are facing right now. Nationally,

enrollment in the Supplemental Nutrition Assistance Program ("SNAP" or "food

stamps") has increased by more than six million Americans since the beginning of the

---

[26] *Civilian Unemployment Rate*, U.S. Bureau of Lab. Stat.
https://www.bls.gov/charts/employment-situation/civilian-unemployment-rate.htm
(last visited Oct. 13, 2020).

[27] Scott Horsley, *Fed's Jerome Powell Calls for More Economic Aid, Warning 'Weakness Feeds on Weakness'*, NPR (Oct. 6, 2020),
https://www.npr.org/2020/10/06/920770414/feds-jerome-powell-calls-for-more-economic-aid-warning-weakness-feeds-on-weaknes; Rakesh Kochhar, *Unemployment Rose Higher in Three Months of COVID-19 Than It Did in Two Years of the Great Recession*, Pew Res. Ctr. (June 11, 2020) (documenting peak of unemployment during Great Recession at 10.6%), https://www.pewresearch.org/fact-tank/2020/06/11/unemployment-rose-higher-in-three-months-of-covid-19-than-it-did-in-two-years-of-the-great-recession/.

[28] *California Unemployment Rate Lowers Slightly to 16.3 Percent in May,* Emp. Development Dep't (June 9, 2020), https://edd.ca.gov/newsroom/unemployment-june-2020.htm.

[29] *Economy at a Glance*, U.S. Bureau of Lab. Stat. (Oct. 13, 2020),
https://www.bls.gov/eag/eag.ca_losangeles_md.htm.

13

crisis,[30] while California has witnessed a 350% increase in online applications for the

state's CalFresh program in the month of March.[31] Residents in our communities have

lost their health care coverage, which places them at greater risk of further economic

devastation should they fall ill.[32] Uninsured people may also face barriers in seeking

medical care, hampering the broader public health response to the COVID-19

pandemic.[33]

   Finally, due to surging unemployment and other economic factors, 1 in 6

renters nationally reported that they were unable to pay their full September rent on

time.[34] In Los Angeles County, 16% of renters reported failing to pay rent on time

---

[30] Dottie Rosenbaum, *Boost SNAP to Capitalize on Program's Effectiveness and Ability to Respond to Need*, Ctr. on Budget & Pol'y Priorities (July 18, 2020), https://cbpp.org/research/food-assistance/boost-snap-to-capitalize-on-programs-effectiveness-and-ability-to-respond.

[31] Patrick McGreevy, Demand for Food Stamps Surges in California as Virus Takes Economic Toll, L.A. Times (March 31, 2020), https://www.latimes.com/california/story/2020-03-31/california-demand-food-stamps-calfresh-coronavirus.

[32] Stan Dorn, *The COVID-19 Pandemic and Resulting Economic Crash Have Caused the Greatest Health Insurance Losses in American History*, Families USA (July 17, 2020), https://www.familiesusa.org/resources/the-covid-19-pandemic-and-resulting-economic-crash-have-caused-the-greatest-health-insurance-losses-in-american-history/.

[33] Jennifer Tolbert, *What Issues Will Uninsured People Face with Testing and Treatment for COVID-19?*, Kaiser Fam. Fdn. (Mar. 16, 2020), https://www.kff.org/coronavirus-covid-19/fact-sheet/what-issues-will-uninsured-people-face-with-testing-and-treatment-for-covid-19/.

[34] Annie Nova, Millions of Americans May Not be Able to Pay Their Rent in October, CNBC (October 2, 2020), https://www.cnbc.com/2020/10/02/millions-of-americans-may-not-be-able-to-pay-rent-in-october.html.

between May and July, with 40,000 households at least three months behind on rent as
of late August.[35] One study estimates that up to 40 million renters nationwide could be
at risk of eviction in the coming months[36]—up from estimates of around 20 million at
risk in June.[37] These issues compound in a vicious cycle: for instance, while
unemployment can cause difficulty in paying rent, housing insecurity also leads to job
loss among low-income workers.[38] If left unaddressed, these intersecting crises will
only accelerate the economic downturn.

*Amici* have particularly strong economic interests in keeping people housed
during this crisis. Stable housing is associated with maintaining stable employment,
which is especially important during a time when so many people are already at risk

---

[35] Michael Manville et al., COVID-19 and Renter Distress: Evidence in Los Angeles
County, UCLA Lewis Ctr. for Reg'l Pol'y Studies (2020) (documenting 22% of
renters missing full rent payments), https://www.lewis.ucla.edu/research/covid19-and-
renter-distress/.

[36] Emily Benfer et al., *The Covid-19 Eviction Crisis: An Estimated 30-40 Million
People in America Are at Risk*, Nat'l Low Income Hous. Coal. (Aug. 7, 2020),
https://nlihc.org/sites/default/files/The_Eviction_Crisis_080720.pdf.

[37] Katherine Lucas McKay et. al., *20 Million Renters Are at Risk of Eviction;
Policymakers Must Act Now to Mitigate Widespread Hardship*, Aspen Inst. (June 19,
2020), https://www.aspeninstitute.org/blog-posts/20-million-renters-are-at-risk-of-
eviction/.

[38] Matthew Desmond & Carl Gershenson, *Housing and Employment Insecurity
Among the Working Poor*, 63 Soc. Problems 54, 59 (2016) (finding that forced moves,
including evictions, increase the likelihood of job loss among low-income workers by
15 to 22 percentage points.)

[PROPOSED] BRIEF OF *AMICI CURIAE* CITIES AND COUNTY
CASE NO. 2:20-cv-05193-DDP-JEM

1  of losing their jobs.[39] Job loss and evictions compromise family savings, which in turn

2  "put[s] pressure on city budgets" by increasing the likelihood that people turn to

3  public benefits.[40] Cities will simultaneously lose revenue from unpaid utility bills and

4  other revenue streams.[41] Temporary eviction moratoriums ensure local governments

5  can direct limited resources toward the most vulnerable populations.

6      Confronted with this potential economic devastation, the City Council's

7  decision to impose an eviction moratorium is a reasonable—and even necessary—

8  regulation to ensure the economic stability and health and safety of the public.

9  Numerous studies have found that evictions cause severe and negative health and

10  safety impacts on affected households and their communities, with particularly

11  pernicious effects on low-income communities and communities of color.[42] Evictions

---

13  [39] *See* Benfer Dec., ¶ 10 ("[E]xtreme job and wage loss has resulted in unprecedent levels of rent hardship").

14  [40] *See, e.g.*, Signe-Mary McKernan, et al, *Thriving Residents, Thriving Cities: Family Financial Security Matters for Cities*, Urban Inst. (Apr. 21, 2016),

15  https://www.urban.org/research/publication/thriving-residents-thriving-cities-family-financial-security-matters-cities; *see also* Benfer Dec. ¶ 12 (stating that requests for

16  rental assistance have increased 92% since the pandemic began).

17  [41] Signe-Mary McKernan, *supra* note 40; For example, in 2019, the City of Chicago lost between $68 million and $157 million on evictions, unpaid property taxes, and

18  unpaid utility bills. Diana Elliot and Kassandra Martincheck, *Chicago: The Cost of Eviction and Unpaid Bills of Financially Insecure Families for City Budgets*, Urban

19  Inst. (Nov. 2019), https://www.urban.org/sites/default/files/publication/101301/cost-eviction-chicago.pdf.

20  [42] *See* Declaration of Sam Tsemberis, ¶¶ 5-9, 17-19, ECF No. 55-2 (Oct. 5, 2020) (Clinical Associate Professor in the UCLA Department of Psychiatry and

21  Biobehavioral Sciences discussing impact of evictions on racial disparities in Los

16

increase the likelihood of contact with the criminal justice system,[43] employment

instability,[44] maternal hardship and depression,[45] relocation to higher-poverty and

higher-crime neighborhoods,[46] drug use,[47] and poor health, particularly for children

exposed to toxins, stress, and other dangerous conditions resulting from homelessness

or substandard, overcrowded housing.[48]

\*        \*        \*        \*

Given the extensive public health and economic welfare impacts of a potential

wave of mass evictions, and given the centrality of housing stability to the City's

public health response to COVID-19, the City of Los Angeles's decision to

_____

Angeles).

[43] Aaron Gottlieb & Jessica W. Moose, *The Effect of Eviction on Maternal Criminal Justice Involvemen*t, 4 Socius: Socio. Res. Dynamic World 6-10 (2018).

[44] Matthew Desmond & Carl Gershenson, *supra* note 38, at 54–61.

[45] Matthew Desmond & Rachel T. Kimbro, *Eviction's Fallout: Housing, Hardship, and Health*, 94 Soc. Forces 310-19 (2015).

[46] Matthew Desmond & Tracey Shollenberger, *Forced Displacement from Rental Housing: Prevalence and Neighborhood Consequences*, 52 Demography 1760–69 (2015).

[47] *See, e.g.*, William Damon et. al., *Residential Eviction Predicts Initiation of or Relapse into Crystal Methamphetamine Use Among People Who Inject Drugs*, 41 J. Pub. Health 38-43 (2018); *see also* Ashley C. Bradford & W. David Bradford, *The Effect of Evictions on Accidental Drug and Alcohol Mortality*, 55 Health Serv. Res. 15-16 (2020).

[48] Allyson E. Gold, *No Home for Justice: How Eviction Perpetuates Health Inequity among Low-Income and Minority Tenants*, 24 Geo. J. Poverty L. & Pol'y 70-73 (2016).

17

temporarily halt nonpayment evictions was not only reasonable, but it was also the

correct choice.[49]

## II.   THE EVICTION MORATORIUM DOES NOT VIOLATE THE
##       CONTRACTS CLAUSE

Contracts Clause jurisprudence allows states to use police powers to impair

private contractual obligations if the three-part test set forth in *Energy Reserves Group*

*v. Kansas Power & Light Company* is met. 459 U.S. 400, 411-12 (1983); *see also*

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934) (holding that states

could use their police powers to protect citizens from economic harms by modifying

private contracts). Under *Energy Reserves*, a court must (1) determine if a law

substantially impairs private contractual rights. If it does, such a restriction can be

upheld if (2) the state has a "significant and legitimate public purpose behind the

regulation;" and (3) the adjustments of contractual rights and responsibilities were

based on reasonable conditions and tailored to the public purpose supporting the

legislation. 459 U.S. at 411-13; *see also Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018)

(collapsing parts two and three above into an inquiry about "the means and ends of the

---

[49] In doing so, the Los Angeles City Council lawfully relied on the findings of the
Governor and the Mayor in their executive orders. Executive Order, Proclamation of a
State of Emergency (Mar. 4, 2020); Executive Order, Declaration of Local Emergency
(Mar. 4, 2020); *see also Renton v. Playtime Theatres*, 475 U.S. 41, 51-52 (1986)
(finding that when addressing an issue already addressed by other jurisdictions or
authorities, states and local governments are granted the deference to rely on evidence
generated by other jurisdictions or authorities, so long as it is reasonably relevant to
the instant problem).

legislation"). "The law affords States a wide berth to infringe upon private contractual

rights when they do so in the public interest." *Elmsford Apartment Assocs.*, 2020 WL

3498456, at *12 (citing *U.S. Tr. Co. of New York. v. New Jersey*, 431 U.S. 1, 16

(1977)). The eviction moratorium does not meet the threshold requirements of a

substantial impairment, but even if it did, the regulation has several significant

purposes and is tailored to the purposes for the legislation.

### A. The Eviction Moratorium Does Not Substantially Impair Private Contractual Rights.

The eviction moratorium does not substantially impair landlords' contractual

rights. Among other things, past regulation of the industry is relevant as to whether

the regulation in question constitutes a substantial impairment. *Allied Structural Steel

Co. v. Spannaus*, 438 U.S. 234, 242 n.13 (1978) (citing *Veix* v. *Sixth Ward Bldg. &

Loan Ass'n.*, 310 U.S. 32, 38 (1940)); *see also Elmsford Apartment Ass'ns.*, 2020 WL

3498456 at *12 ("[T]he extent to which such impairment qualifies as substantial, 'is

affected by whether the relevant party operates in a heavily regulated industry.'")

(quoting *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020)).

Additionally, "the landlord-tenant relationship is, if nothing else, heavily regulated."

*Chicago Bd. of Realtors, Inc. v. Chicago*, 819 F.2d 732, 736-37 (7th Cir. 1987)

(explaining that tenant-protective measures, such as limits on late fees and

maintenance requirements, were subject to lesser scrutiny under the substantial

impairment standard); *see also Troy, Ltd. v. Renna*, 727 F.2d 287, 297 (3d Cir. 1984)

19

1  (concluding that prolonging the length of time a landlord was barred from evicting a

2  tenant was not a substantial impairment because the tenancy was already regulated by

3  the state); *Elmsford Apartment Ass'ns.,* 2020 WL 3498456, at *12-13; *HAPCO v. City*

4  *of Philadelphia*, No. 20-3300, 2020 U.S. Dist. LEXIS 156327, at *18 -*19 (E.D. Pa.

5  Aug. 27, 2020) (similarly reasoning that an eviction moratorium, rent repayment grace

6  period, and ban on late fees was not a substantial impairment because it "merely

7  postpone[] the date on which landlords may commence" eviction proceedings and

8  collect full rent from their tenant).

9          In determining substantial impairment, Supreme Court precedent has

10  "considered the extent to which the law undermines the contractual bargain, interferes

11  with a party's reasonable expectations, and prevents the party from safeguarding or

12  reinstating his rights." *Sveen*, 138 S. Ct. at 1822 (internal citations omitted). Even

13  laws that make a "significant change" do not necessarily constitute a "substantial

14  impairment." *Id.* (concluding that Minnesota revocation-on-divorce statute did not

15  substantially impair pre-existing contractual arrangements). The City's eviction

16  moratorium and the rent repayment grace period impose a temporary restraint on a

17  landlord's ability to take action for nonpayment. They do not extinguish the right to

18  collect future rent from tenants or extinguish payments that are due. Accordingly,

19  neither policy is a substantial impairment and the analysis could stop here.

20

21

**B. The Eviction Moratorium Fulfills a Significant and Legitimate Public Purpose**

Even if the eviction moratorium substantially impairs the private contractual rights of landlords, it is permitted to do so because it serves a significant public purpose. The "remedying of a broad and general social or economic problem" constitutes a significant and legitimate public purpose that justifies impairing private contracts. *Energy Reserves*, 459 U.S. at 411-12. This "authority retained by the state over contracts to safeguard the vital interests of its people . . . extends to economic needs . . . ." *Veix*, 310 U.S. at 38-39 (upholding state restriction on withdrawal of funds).

In prior crises, the Supreme Court has held that protecting the stability of the nation's economy constituted a significant and legitimate public purpose that justified the impairment of contractual rights. *See id.*; *see also U.S. Tr. Co. of New York*, 431 U.S. at 22 n.19 (citations omitted) (explaining that the existence of an emergency and limited duration of a policy are factors to be assessed but are not dispositive when determining the existence of a legitimate public purpose). In *Veix*, "the weakness in the financial system" after the Great Depression justified substantial impairment of building and loan associations' contracts because it protected the public from widespread harm resulting from further depression of real estate values. 310 U.S. at 38-39. In *Block v. Hirsh*, the Supreme Court upheld a temporary rent control law in the District of Columbia that was implemented because of a national housing shortage

21

1  after World War I. 256 U.S. 135 (1921). Here, the City of Los Angeles has acted to

2  protect tenants from the similarly massive social and economic problems, on top of a

3  public health crisis.[50] As discussed above, the eviction moratorium serves to limit the

4  spread of COVID-19 and protect the public health of the state. Because losing access

5  to stable housing is associated with an increased likelihood of job loss,[51] keeping

6  people housed is also critical during the current economic crisis where so many have

7  lost their jobs.

### C. The Eviction Moratorium is Reasonably Tailored to Protect the Public Health and Economic Welfare of Tenants During the COVID-19 Pandemic

10         Under the third prong of the Contracts Clause analysis, any substantial

11  impairment to contractual relationships must be reasonable and tailored to the public

12  purpose supporting the legislation. *Energy Reserves*, 459 U.S. at 412-13. Relevant

13  factors include whether the state has declared an emergency, if the law is temporary in

14  nature, and if the law is limited in its purpose, although no single factor is an

15  "absolute requirement[]." *U.S. Tr. Co.*, 431 U.S. at 22 n.19; *see also Veix*, 310 U.S. at

16  39-40 (finding no Contracts Clause violation when an emergency had passed but its

17  effects remained even though the relief was not temporary); *Blaisdell*, 290 U.S. at

18  _____

19  [50] *See* L.A., Cal., Ordinance 186585 (Mar. 31, 2020) ("[A]s a result of the public
    health emergency. . . many residents and businesses in the City of Los Angeles have
20  experienced or expect soon to experience sudden and unexpected income loss").

21  [51] *See* Matthew Desmond & Carl Gershenson, *supra* note 38, at 54–61; Tsemberis
    Dec., ¶ 22 (discussing challenges of re-entering job market, when homeless).

1   447-48 (finding no Contracts Clause violation for a two-year moratorium on

2   foreclosures). Here, the eviction moratorium meets this test handily.

3        The impact of the moratorium on rental contracts is reasonable and

4   appropriately tailored in light of the state of emergency declared in response to the

5   COVID-19 pandemic. The Mayor of Los Angeles declared a state of emergency on

6   March 4, 2020 in response to COVID-19's "imminent threat to the public health."[52]

7   The eviction moratorium is a temporary extension of the emergency declaration and

8   only lasts during the local emergency period. While tenants have an additional twelve

9   months after the local emergency ends to repay unpaid rent without the risk of

10  eviction, state law explicitly provides that period cannot extend past March 2022. Cal.

11  Civil Pro. Code § 1179.05(a)(2)(C). Furthermore, while the City Council can extend

12  the emergency declaration, the Council must terminate the declaration "at the earliest

13  possible date that conditions warrant." L.A., Cal., Admin. Code, ch. 3, art. 3, § 8.31

14  (2020). After the eviction moratorium is lifted, landlords remain free to file eviction

15  suits in court or pursue back rent in small claims court. Indeed, the moratorium

16  explicitly preserves tenants' obligations to pay rent to landlords. L.A., Cal., Ordinance

17  186585, § 49.99.5 (Mar. 31, 2020).

18       Finally, the purpose of the regulation is to protect renters during an

19  unprecedented public health and economic crisis. An eviction moratorium is an

20  _____

21  [52] Executive Order, Declaration of Local Emergency (Mar. 4, 2020).

23

1    effective means to promote public health and economic welfare during the ongoing

2    global pandemic both because keeping people inside and housed curbs the spread of

3    the virus, and because ensuring housing stability contributes to job retention and

4    strengthens local economies. Given the substantial public interest state and local

5    governments have in maintaining both local public health and economic stability,

6    temporary and limited regulations are a justified measure to take to support the public

7    good. Accordingly, the eviction moratorium is reasonably tailored in duration and

8    reach to support this crucial public purpose.

9                                    **<u>CONCLUSION</u>**

10           For all the foregoing reasons and for the reasons provided in opposition by

11   Defendants the City of Los Angeles, Eric Garcetti, and the City Council of the City of

12   Los Angeles, *Amici* Cities and County respectfully request that the motion for

13   preliminary injunction be denied.

14

15

16

17

18

19

20

21

[PROPOSED] BRIEF OF *AMICI CURIAE* CITIES AND COUNTY
CASE NO. 2:20-cv-05193-DDP-JEM

1

2                              Respectfully submitted,

3                              */s/ Sophia T. TonNu*

Jonathan B. Miller

4                              LiJia Gong (SBN #294268)

Sophia TonNu (SBN #330189)

5                              PUBLIC RIGHTS PROJECT

4096 Piedmont Avenue #149

6                              Oakland, CA 94611

lijia@publicrightsproject.org

7                              Tel: 301-335-3828

8                              *Counsel for Amici Cities and County*

9                              Stephen J. Kane

Rebecca Hirsch

10                           Affirmative Litigation Division

CITY OF CHICAGO DEPARTMENT OF

11                           LAW

121 North LaSalle Street, Room 600

12                           Chicago, Illinois 60602

13                           *Counsel for the City of Chicago*

14  Dated:       October 13, 2020

15

16

17

18

19

20

21

25

## LIST OF ADDITIONAL COUNSEL

ESTEBAN A. AGUILAR, JR.
City Attorney
One Civic Plaza N.W.
4th Floor, Room 4072
Albuquerque, NM 87102
*Attorney for the City of Albuquerque, New Mexico*

CHERYL WATSON FISHER
City Solicitor
500 Broadway
Room 307
Chelsea, MA 02150
*Attorney for the City of Chelsea, Massachusetts*

ANNE L. MORGAN
City Attorney
P.O. Box 1546
Austin, TX 78701-1546
*Attorney for the City of Austin, Texas*

ANDREW W. GARTH
Interim City Solicitor
801 Plum Street, Room 214
Cincinnati, Ohio 45202
*Attorney for the City of Cincinnati, Ohio*

DANA P. MOORE
Acting City Solicitor
100 N. Holliday Street, Suite 101
Baltimore, MD 21202
*Attorney for the City of Baltimore, Maryland*

ZACH KLEIN
City Attorney
77 North Front Street, 4th Floor
Columbus, OH 43215
*Attorney for the City of Columbus, Ohio*

EUGENE L. O'FLAHERTY
Corporation Counsel
City Hall, Room 615
Boston MA, 02201
*Attorney for the City of Boston, Massachusetts*

BARBARA J. DOSECK
City Attorney
101 W. Third Street
P.O. Box 22
Dayton, OH 45401
*Attorney for the City of Dayton, Ohio*

NANCY E. GLOWA
City Solicitor
City of Cambridge
795 Massachusetts Avenue
Cambridge, MA 02139
*Attorney for the City of Cambridge, Massachusetts*

RODNEY POL, JR.
City Attorney
401 Broadway, Suite 101
Gary, IN 46402
*Attorney for the City of Gary, Indiana*

1   BARBARA J. PARKER
    City Attorney
2   One Frank Ogawa Plaza
    Sixth Floor
3   Oakland, CA 94612
    *Attorney for the City of*
4   *Oakland, California*

5   TRACY REEVE
    City Attorney
6   1221 SW Fourth Avenue
    Room 430
7   Portland, OR 97204
    *Attorney for the City of*
8   *Portland, Oregon*

9   LYNDSEY M. OLSON
    City Attorney
10  400 City Hall and Courthouse
    15 West Kellogg Boulevard
11  Saint Paul, MN 55102
    *Attorney for the City of Saint Paul,*
12  *Minnesota*

13  JAMES R. WILLIAMS
    County Counsel
14  70 W. Hedding Street,
    East Wing, 9th Floor
15  San Jose, CA 95110
    *Attorney for the County of*
16  *Santa Clara, California*

17  ANTHONY P. CONDOTTI
    City Attorney
18  Atchinson, Barisone &
    Condotti
19  P.O. Box 481
    Santa Cruz, CA 95061
20  *Attorney for the City of Santa Cruz,*
    *California*

21

GEORGE S. CARDONA
Interim City Attorney
1685 Main Street, Third Floor
Santa Monica, CA 90401
*Counsel for the City of*
*Santa Monica, California*

PETER S. HOLMES
City Attorney
701 Fifth Avenue,
Suite 2050
Seattle, WA 98104
*Attorney for the City of*
*Seattle, Washington*

FRANCIS X. WRIGHT, JR.
City Solicitor
93 Highland Avenue
Somerville, MA 02143
*Attorney for the City of Somerville,*
*Massachusetts*

MICHAEL RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726
*Attorney for the City of*
*Tucson, Arizona*

MICHAEL JENKINS
City Attorney
Best Best & Krieger, LLP
1230 Rosecrans Avenue, Ste 110
Manhattan Beach, CA 90266
*Attorney for the City of*
*West Hollywood, Californi*