O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

APARTMENT ASSOCIATION OF LOS   )   Case No. CV 20-05193 DDP (JEMx)
ANGELES COUNTY, INC.,          )
                               )
                Plaintiff,     )   **ORDER DENYING PLAINTIFF'S MOTION**
                               )   **FOR PRELIMINARY INJUNCTION**
      v.                       )
                               )
CITY OF LOS ANGELES, ET AL.,   )   [Dkt. 46]
                               )
                Defendants.    )

      Presently before the court is Plaintiff Apartment Association
of Los Angeles County, doing business as the Apartment Association
of Greater Los Angeles ("AAGLA")'s Motion for Preliminary
Injunction.  Having considered the submissions of the parties and
heard oral argument, the court denies the motion and adopts the
following Order.[1]

**I.   Background**

---

[1] The court has also considered submissions from amici curiae
(1) National Housing Law Project ("NHLP"); (2) Professors Ananya
Roy and Paul Ong, of the University of California, Los Angeles
("UCLA Scholars"); and (3) the Cities of Chicago, Albuquerque,
Austin, Baltimore, Boston, Cambridge, Chelsea, Cincinnati,
Columbus, Dayton, Gary, Santa Cruz, Santa Monica, Seattle, St.
Paul, Oakland, Portland, Tucson, Somerville, and West Hollywood,
and Santa Clara County ("Amici Governments").

1    The COVID-19 global pandemic is the gravest public health

2 crisis in over a century.  At present, the novel coronavirus has

3 killed at least 230,000 Americans and infected over 9 million

4 more.[2]  The true toll may never be known, but is likely

5 significantly higher.  The Centers for Disease Control and

6 Prevention ("CDC"), for example, estimates that the number of

7 "excess deaths" in the United States is closer to 300,000.[3]

8 Neither the State of California nor the City of Los Angeles have

9 been spared from the ravages of COVID-19.  Nearly a million

10 Californians have been infected, and nearly 18,000 have died.[4]

11 Approximately 300,000 of those cases and 7,000 of those fatalities

12 have occurred in the Los Angeles area.[5]

13    Eight months into the pandemic, the City of Los Angeles

14 remains in a state of emergency.  In accordance with

15 recommendations from national, state, and local public health

16 authorities, state and local officials have taken hitherto

17 unthinkable steps to slow the spread of the virus.  For a time, all

18 state and city residents were ordered to stay confined to their

19 places of residence, with limited exceptions.[6]  Although

20

21    [2] See

22 https://covid.cdc.gov/covid-data-tracker/?CDC AA refVal=https%3A%2F
%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-updates%2Fcases-in

23 -us.html#cases casesper100k

24    [3] See https://www.cdc.gov/mmwr/volumes/69/wr/mm6942e2.htm

25    [4] See https://www.cdph.ca.gov/Programs/OPA/Pages/NR20-293.aspx

26    [5] See
http://dashboard.publichealth.lacounty.gov/covid19 surveillance das

27 hboard/

28    [6] See
https://covid19.ca.gov/stay-home-except-for-essential-needs/;

restrictions have eased somewhat at present, many types of
businesses and gathering places remain closed in Los Angeles,
including movie theaters, bars, athletic fields, theme parks, gyms
and fitness centers, museums, live performance venues, indoor
restaurants, and "non-critical" offices.[7]  These measures, in
conjunction with other coronavirus-related concerns, have had
devastating economic consequences.  By one estimate, over 16
million California households have lost employment income as a
result of the coronavirus.[8]  Over the last six months, the
unemployment rate in the Los Angeles area has ranged from 15 to 20
percent.[9]

Crises of national scope require national responses.
Initially, the federal government rose to meet the economic
challenge presented by the COVID crisis and passed the Coronavirus
Aid, Relief and Economic Security Act ("CARES Act"), Pub. L. No.
116-136.  Among the CARES Act's provisions were (1) a one-time
stimulus payment to taxpayers and (2) an additional $600 weekly
payment to Americans collecting unemployment benefits.[10] [11]  Those

---

[6](...continued)
https://www.lamayor.org/sites/g/files/wph446/f/page/file/20200527%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20(REV%202020.05.27).pdf

[7] See
https://corona-virus.la/sites/default/files/inline-files/MO COVID-19 What%27sOpen Updated%2020201007.pdf

[8] See
https://www.census.gov/data/tables/2020/demo/hhp/hhp14.html

[9] See https://www.bls.gov/eag/eag.ca losangeles md.htm

[10] See
https://home.treasury.gov/policy-issues/cares/assistance-for-american-workers-and-families;

(continued...)

additional unemployment payments expired, however, at the end of July, and Congress has not provided for further stimulus payments or other assistance to the American people.  But the crisis has not abated.  As the pandemic has worsened, its economic consequences have persisted.

These economic impacts have, unsurprisingly, affected the ability of many residential tenants to make rent payments. Somewhere between one million and 1.4 million California households are behind on their rent.[12]  Approximately 14% of renter households in Los Angeles County are behind on rent, largely due to the effects of the pandemic on employment.[13]  These households include over 450,000 people in the City of Los Angeles.[14]

As the CDC has explained, the novel coronavirus "spreads very easily and sustainably between people who are in close contact with one another . . . ."[15]  "[H]ousing stability helps protect public

---

[10](...continued)
https://www.edd.ca.gov/about edd/coronavirus-2019/cares-act.htm

[11] Undocumented immigrants, including those who pay federal taxes with an Individual Taxpayer Identification Number, are not eligible for one-time stimulus payments, nor are United States citizens who are married to and file taxes jointly with undocumented spouses.  See, e.g., Amador v. Mnuchin, No. CV ELH-20-1102, 2020 WL 4547950, at *4 (D. Md. Aug. 5, 2020).  Many vulnerable renters in Los Angeles are concentrated in immigrant neighborhoods.  (UCLA Scholars brief at 7.)

[12] See https://www.census.gov/data/tables/2020/demo/hhp/hhp14.html

[13] See UCLA Scholars brief at 4:10-11.

[14] Id. at 5:12.

[15] See Dep't of Health and Human Serv.'s, Centers for Disease Control and Prevention, *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/202
(continued...)

health because homelessness increases the likelihood of individuals moving into congregate settings . . ." [16]   Thus, "[i]n the context of a pandemic, eviction moratoria – like quarantine, isolation, and social distancing – can be an effective public help measure utilized to prevent the spread of communicable disease," and "facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19."[17]

Recognizing that "[t]he COVID-19 pandemic threatens to undermine housing security and generate unnecessary displacement of City residents," the City of Los Angeles adopted, among other measures, Ordinance 186606 ("the Eviction Moratorium," "City Moratorium," or "Moratorium").  The Moratorium "temporarily prohibits evictions of residential and commercial tenants for failure to pay rent due to COVID-19, and prohibits evictions of residential tenants during the emergency for no-fault reasons, for unauthorized occupants or pets, and for nuisances related to COVID-19."  (Plaintiff's Request for Judicial Notice, Ex. 3 at 2.) Landlords may continue to seek to evict tenants for other reasons, and do not run afoul of the Moratorium at all if they seek to evict a tenant on the basis of a good faith belief that the tenant does not qualify for the Moratorium's protections.[18]   (Id. at 3, 4).

---

[15](...continued)
0-19654.pdf

[16] Id.

[17] Id.

[18] The Moratorium also creates a private right of action for residential tenants against landlords for certain violations, but only after written notice to the landlord and a fifteen day window to cure the alleged violation.  (Moratorium at 4-5.)

Case 2:20-cv-05193-DDP-JEM   Document 80   Filed 11/13/20   Page 6 of 28   Page ID #:1308

The Moratorium's prohibition of evictions for COVID-related unpaid rent extends for twelve months after the expiration of the local emergency.[19]  (Id. at 3.)  In other words, tenants have one year after the end of the emergency to make any rent payments that were missed as a result of COVID, including as a result of workplace closures, health care expenses, child care expenses due to school closures, "or other reasonable expenditures stemming from government-ordered emergency measures."[20]  (Id.)  The Moratorium explicitly states, however, that it does not "eliminate[] any obligation to pay lawfully charged rent."  (Id. at 4.)  If, at the end of the one year grace period, a tenant still owes rent that came due during the emergency period, a landlord may seek to evict for that unpaid rent.  Landlords may not, however, charge late fees or interest for missed rent during the emergency or twelve month grace period.  (Id. at 3.)

Plaintiff AAGLA is comprised of thousands of owners and managers of rental housing units, including over 55,000 properties within the City of Los Angeles.  Plaintiff's Third Amended Complaint ("TAC") alleges that the City Eviction Moratorium and Rent Freeze Ordinance violate landlords' rights under the Contract Clause of the Constitution, as well as the Due Process Clause,

---

[19] The City also adopted Ordinance No. 186607 (the "Rent Freeze Ordinance"), which prohibits rent increases on units subject to existing rent control provisions for a similar twelve-month period following the end of the COVID emergency.  (Plaintiff's RJN, Ex. 4 at 21.)

[20] As discussed in further detail below, this grace period will, by operation of state law, expire no later than March 1, 2022.  See California Assembly Bill 3088 § 1179.05(a)(2)(A).

Takings Clause, and Tenth Amendment.  Plaintiff now moves for a preliminary injunction on the basis of the TAC's first two claims.

## II.  Legal Standard

A private party seeking a preliminary injunction must show that: (i) it is likely to succeed on the merits; (ii) it will suffer irreparable harm in the absence of preliminary relief; (iii) the balancing of the equities between the parties that would result from the issuance or denial of the injunction tips in its favor; and (iv) an injunction will be in the public interest.  <u>Winter v. Natural Resources Def. Council</u>, 555 U.S. 7, 20 (2008).  Preliminary relief may be warranted where a party: (i) shows a combination of probable success on the merits and the possibility of irreparable harm; or (ii) raises serious questions on such matters and shows that the balance of hardships tips in favor of an injunction.  <u>See Arcamuzi v. Continental Air Lines, Inc.</u>, 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." <u>Id.</u>; <u>see also</u> <u>hiQ Labs, Inc. v. LinkedIn Corp.</u>, 938 F.3d 985, 992 (9th Cir. 2019).  Under both formulations, the party must demonstrate a "fair chance of success on the merits" and a "significant threat of irreparable injury" absent the requested injunctive relief.[21] <u>Arcamuzi</u>, 819 F.2d at 937.

## III. Discussion

---

[21]  Even under the "serious interests" sliding scale test, a plaintiff must satisfy the four <u>Winter</u> factors and demonstrate "that there is a likelihood of irreparable injury and that the injunction is in the public interest." <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011).

A.  Likelihood of Success on the Merits

AAGLA contends that the Eviction Moratorium and the Rent Freeze Ordinance run afoul of the Contract Clause's prescription that states shall not pass "any Law impairing the Obligation of Contracts."  U.S. Const., Art. I, § 10.  Although this language "is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people."  Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410 (1983) (internal quotation marks omitted). "The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions."  Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 426 (1934).  Thus, to determine whether the Eviction Moratorium runs afoul of the Contract Clause, this Court must examine (1) whether the law "operate[s] as a substantial impairment of a contractual relationship," (2) whether the City "has a significant and legitimate public purpose" in enacting the moratorium, and (3) whether the "adjustment" of the rights of the contracting parties is "based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption."  Energy Reserves, 459 U.S. at 411-12 (alterations omitted); see also Sveen v. Melin, 138 S. Ct. 1815, 1821 (2018) (combining public purpose and reasonableness inquiries).  Here, although AAGLA concedes that the Eviction Moratorium is motivated by a legitimate public purpose, it

1    nevertheless contends that the moratorium substantially and

2    unreasonably impairs landlords' contract rights.[22]

3            1.  Substantial Impairment

4        Whether a law substantially impairs a contractual relationship

5    depends upon "the extent to which the law undermines the

6    contractual bargain, interferes with a party's reasonable

7    expectations, and prevents the party from safeguarding or

8    reinstating his rights."[23]  Sveen, 138 S. Ct. at 1822.  AAGLA

9    asserts that the Eviction Moratorium deprives landlords of the

10   "primary enforcement mechanism embodied in residential leases," and

11   that such mechanisms are "the heart of what the Supreme Court has

12   held must be protected under the Contract Clause."  (Memorandum in

13   support of motion at 22:4-7.)  This argument is premised upon

14   several mischaracterizations.  First, notwithstanding AAGLA's

15   description of eviction as the "primary" enforcement mechanism of a

16   rental contract, the Eviction Moratorium does not deprive landlords

17   of their contract remedies.  The Moratorium does not excuse tenants

18   from their contractual obligations to pay rent, and landlords

19   remain free to sue in contract for back rent owed.

20       Second, the Blaisdell court, contrary to AAGLA's

21   representation, did not state that contract enforcement measures

22   are sacrosanct.  Although the Court did recount its prior

23   _____

24       [22] Because the Rent Freeze Ordinance is less burdensome than
     the Eviction Moratorium, the discussion of the former is subsumed
     within that of the latter, herein.

25       [23] AAGLA asserts that an impairment is substantial "if it
26   deprives a private party of an important right, thwarts performance
     of an essential term, defeats the expectations of the parties, or
27   alters a financial term."  S. California Gas Co. v. City of Santa
     Ana, 336 F.3d 885, 890 (9th Cir. 2003) (internal citations
28   omitted).  That slightly looser standard applies, however, to
     public contracts.  Id.

                                    9

observation in <u>Von Hoffman v. City of Quincy</u>, 71 U.S. 535, 551 (1866), that "[n]othing can be more material to the obligation [of a contract] than the means of enforcement," the Court explained, in the very same paragraph, that the <u>Von Hoffman</u> court itself limited its "general statement" with the observation that "it is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. . . . Every case must be determined upon its own circumstances." <u>Blaisdell</u>, 290 U.S. at 430 (internal quotation marks omitted).[24]  Indeed, the Court went on to reject the very argument raised by AAGLA here.

> [I]t does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake. *** And, if state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be nonexistent when the urgent public need demanding such relief is produced by other and economic causes.

<u>Blaisdell</u>, 290 U.S. at 439.

That said, it would be difficult to conclude that the Moratorium does not, at a minimum, significantly interfere with landlords' reasonable expectations.  The reasonableness of a party's expectations will depend, to a significant extent, on the

---

[24] The <u>Blaisdell</u> court further explained that none of the cases it cited, including <u>Von Hoffman</u>, were "directly applicable," and that "broad expressions contained in some of these opinions went beyond the requirements of the decision, and are not controlling." <u>Blaisdell</u>, 290 U.S. at 434.

degree of regulation in the relevant industry.  See Energy
Reserves, 459 U.S. at 413; Allied Structural Steel Co. v. Spannaus,
438 U.S. 234, 242 n.13 (1978); Snake River Valley Elec. Ass'n v.
PacifiCorp, 357 F.3d 1042, 1051 n.9 (9th Cir. 2004).  AAGLA
concedes, as it must, that the landlord-tenant relationship has
long been subject to extensive regulation.  See, e.g., 42 U.S.C. §
3604; Cal. Civ. Code § 1942.4.  Several courts, examining Contract
Clause challenges to eviction moratoria in other locales, have
relied upon this history of regulation to conclude that eviction
moratoria are relatively minor alterations to existing regulatory
frameworks, and therefore do not interfere with landlords'
reasonable expectations.  See, e.g., HAPCO v. City of Philadelphia,
C.A. No. 20-3300, 2020 WL 5095496, *7-8 (E.D. Pa. Aug. 28, 2020);
Auracle Homes, LLC v. Lamont, No. 3:20-cv-00829 (VAB), 2020 WL
4558682, *17 (D. Conn. Aug. 7, 2020); Elmsford Apt. Assocs., LLC v.
Cuomo, No. 20-cv-4062 (CM), 2020 WL 3498456, *1 (S.D.N.Y. June 29,
2020).

     This Court respectfully concludes that the scope and nature of
the COVID-19 pandemic, and of the public health measures necessary
to combat it, have no precedent in the modern era, and that no
amount of prior regulation could have led landlords to expect
anything like the blanket Moratorium.  See Baptiste v. Kennealy,
No. 1:20-CV-11335-MLW, 2020 WL 5751572, at *16 (D. Mass. Sept. 25,
2020) ("[T]he court finds that a reasonable landlord would not have
anticipated a virtually unprecedented event such as the COVID-19
pandemic that would generate a ban on even initiating eviction
actions against tenants who do not pay rent and on replacing them
with tenants who do pay rent.").  This Court cannot ignore the

possibility that some landlords may face, at the very least, the
prospects of reduced cash flow and time value of missed rent
payments and increased wear and tear on rental properties, and that
these effects were, at least in terms of degree, unforeseeable.  At
this stage, therefore, the court concludes that AAGLA is likely to
succeed in showing a substantial impairment of its contractual
rights.[25]

2.   Reasonableness

No party disputes that the Moratorium was enacted in pursuit
of a legitimate public purpose.  The next question, therefore, "is
whether the adjustment of the rights and responsibilities of
contracting parties is based upon reasonable conditions and is of a
character appropriate to the public purpose justifying the
legislation's adoption."  Energy Reserves, 459 U.S. at 412 (quoting
United States Trust Co. of New York v. New Jersy, 431 U.S. 1, 22
(1977) (internal quotation marks and alterations omitted)).
"Unless the State itself is a contracting party, ... courts
properly defer to legislative judgment as to the necessity and
reasonableness of a particular measure."  Id. at 412-13 (internal
quotation marks omitted).

---

[25] This is not to say, of course, that further factual
development could not affect the court's conclusion.  In Baptiste,
for example, the court found it "not possible to determine
conclusively the extent of the impairment of plaintiffs'
contractual right to evict" because of factual uncertainties
regarding the temporal extent of Massachusetts' eviction
moratorium.  Baptiste, 2020 WL 5751572, at *17.  That particular
concern is less salient here, as the Moratorium's limitation on
evictions will persist for at least one year from today, and likely
until March 2022.  Further factual development, however, such as on
the question whether landlords are able, in practice, to secure
their contractual rights without recourse to eviction, could yet
affect the substantial impairment question.

1    Notwithstanding the Supreme Court's prescription, AAGLA urges
2    this Court to set aside the City's determination that the
3    Moratorium is necessary to protect public health, life, and
4    property, and to conclude that the law is not a reasonable means of
5    achieving its stated end.[26]  AAGLA's argument rests largely upon
6    unsupported factual assertions and a misreading of Supreme Court
7    precedent.  First, AAGLA asserts, without citation to any source,
8    that "there is no need for the Ordinances now . . ., with COVID
9    cases decreasing . . . ."  (Reply at 16:18-19.)  It is unclear to
10   the court whether that representation has been true at any point
11   since the onset of the pandemic.[27]  But even assuming that COVID
12   cases were decreasing at the time of writing, that is most
13   definitely not the case now, as fall wanes and winter approaches.[28]
14   Necessity aside, AAGLA primarily argues that, under <u>Blaisdell</u>,
15   no "government entity, even in an acute and sustained economic
16   emergency, may excuse tenants from paying a reasonable amount of
17   rent contemporaneous with occupancy as a condition to avoiding
18   eviction."[29]  (Mem. in support at 24:18-19 (emphasis omitted).)
19   AAGLA misreads <u>Blaisdell</u>, and subsequent cases interpreting it.
20
21

---

22   [26] <u>See</u> Moratorium at 2.
23   [27] <u>See</u>
     https://covid.cdc.gov/covid-data-tracker/#trends totalandratecases
24   [28] <u>See</u>
     https://covid.cdc.gov/covid-data-tracker/#trends dailytrendscases
25   [29] As discussed in further detail below, in the context of the
     irreparable harm analysis, this position is somewhat surprising in
26   light of AAGLA's argument that a separate, statewide eviction
     moratorium is more reasonable than the City Ordinance, and that "we
27   can certainly assume that the state law is constitutional."  As
     discussed below, that state law, like the Moratorium, prohibits
28   evictions for COVID-related nonpayment of rent, even where a tenant
     has paid no rent for a period of as much as eleven months.

1    In 1933, in the midst of a state of economic emergency brought
2    on by the Great Depression, Minnesota passed the "Mortgage
3    Moratorium Law." Blaisdell, 290 U.S. at 416.  The Mortgage
4    Moratorium Law automatically extended the period of redemption from
5    foreclosure sales for thirty days, and empowered county courts to
6    grant "just and equitable" further extensions, during which
7    mortgagee-purchasers would be unable to take possession or obtain
8    title.  Id.  In Blaisdell, defaulting mortgagors obtained a two
9    year extension of the redemption period, subject to the condition
10   that they make payments equal to the reasonable rental value of the
11   property.  Id. at 420.  The mortgagee, a building and loan
12   association, contended that the Mortgage Moratorium Law violated
13   the Contract Clause, Due Process Clause, and Equal Protection
14   Clause of the Fourteenth Amendment.  Id. at 416.

15   The Supreme Court, focusing on the Contract Clause,
16   disagreed.[30]  Id. at 447-48.  In so concluding, the Court observed
17   that (1) a state of emergency existed, (2) the moratorium was
18   addressed to "the protection of a basic interest of society" rather
19   than to the benefit of particular individuals, (3) the moratorium's
20   relief could only be "of a character appropriate to the emergency,
21   and could only be granted upon reasonable conditions," (4) the
22   moratorium, on balance, met that reasonableness requirement, and
23   (5) the legislation was temporary.  Id. at 447; see also Allied
24   Structural Steel, 438 U.S. at 242.  In finding the conditions
25   imposed by the Minnesota Moratorium Law reasonable on balance, the
26   Blaisdell court looked to several of the moratorium's provisions.

27

28       [30]  "No State shall . . . pass any . . . Law impairing the
Obligation of Contracts." U.S.Const., Art. I, § 10.

14

1  <u>Blaisdell</u>, 290 U.S. at 445-46; <u>Allied Structural Steel</u>, 438 U.S. at

2  243.  The relevant conditions included (1) a continuation of the

3  mortgage indebtedness, (2) the continued validity of the

4  mortgagee's right to title or a deficiency judgment, (3) the

5  mortgagor's obligation to pay the reasonable rental value, and (4)

6  the fact that most mortgagees were corporations and banks "not

7  seeking homes or the opportunity to engage in farming."  <u>Id.</u>

8      According to AAGLA, the <u>Blaisdell</u> court's inclusion of

9  reasonable rental value as a factor relevant to the reasonableness

10 of the Mortgage Moratorium Law was tantamount to a <u>requirement</u> that

11 any "adjustment" of rights relating to tenancy or occupancy include

12 rent payments.  For support, AAGLA points to the Supreme Court's

13 subsequent pronouncement in <u>Allied Structural Steel</u> that "[t]he

14 <u>Blaisdell</u> opinion [] clearly implied that if the Minnesota

15 moratorium legislation had not possessed the characteristics

16 attributed to it by the Court, it would have been invalid under the

17 Contract Clause of the Constitution."  <u>Allied Structural Steel</u>, 438

18 U.S. at 242.  The characteristics to which the <u>Allied Structural</u>

19 <u>Steel</u> court referred, however, were <u>not</u> the provisions bearing on

20 the reasonableness of the Mortgage Moratorium Law, but rather the

21 five broader considerations, of which reasonableness was but one.

22 <u>Id.</u>  As the Court explained,

23     In upholding the state mortgage moratorium law, the
       [<u>Blaisdell</u>] Court found five factors significant. First,
24     the state legislature had declared in the Act itself that
       an emergency need for the protection of homeowners existed.
25     Second, the state law was enacted to protect a basic
       societal interest, not a favored group. Third, the relief
26     was appropriately tailored to the emergency that it was
       designed to meet. <u>Fourth, the imposed conditions were</u>
27     <u>reasonable</u>. And, finally, the legislation was limited to
       the duration of the emergency.

28

15

1   Id. (internal citations omitted) (emphasis added).  Thus, although

2   the Blaisdell court might conceivably have reached a different

3   conclusion in the absence of a reasonable rent requirement, it did

4   not go so far as AAGLA would suggest.  Furthermore, the Supreme

5   Court has explained that, to the extent any of its post-Blaisdell

6   decisions did impose any specific limitations on legislatures'

7   powers vis-à-vis contracts, "[l]ater decisions abandoned these

8   limitations as absolute requirements."  U.S. Trust, 431 U.S. at 22

9   n.19.  Instead, specific requirements, including such a seemingly

10  fundamental consideration as the existence of an emergency, are

11  "subsumed in the overall determination of reasonableness."  Id.

12  "Undoubtedly the existence of an emergency and the limited duration

13  of a relief measure are factors to be assessed in determining the

14  reasonableness of an impairment, but [even] they cannot be regarded

15  as essential in every case."  Id.

16      In the absence of any specific prerequisite for

17  reasonableness, let alone a requirement that the Moratorium provide

18  for rent payments to landlords, this Court will defer to the City

19  Council's weighing of the interests at stake.  In so doing, the

20  court joins at least four other courts that have found eviction

21  moratoria reasonable in light of the COVID-19 pandemic at the

22  preliminary injunction stage, notwithstanding the lack of any

23  provision for partial rent payments.  See Baptiste, 2020 WL

24  5751572, at *19;  HAPCO, 2020 WL 5095496, at *10; Auracle, 2020 WL

25  4558682, at *18-19; Elmsford, 2020 WL 3498456, at *15.[31] [32]

26

27      [31] To be sure, although all four of these cases involve
    eviction moratoria with no partial rent requirement, the moratoria
28  at issue differ in their particulars from each other and from the
                                                  (continued...)

Notably, here, as in <u>Blaisdell</u>, the Moratorium is addressed to protect a basic societal need, is temporary in nature, does not disturb landlords' ability to obtain a judgment for contract damages, does not absolve tenants of any obligation to pay any amount of rent, does not appear to impact landlords' ability to obtain housing, and was implemented in the context of a state of emergency. Indeed, the current emergency is arguably more serious than that brought on by the Great Depression, coupling, as it does, the consequences of economic catastrophe with a serious, and worsening, threat to public health.

AAGLA makes much of the fact that the Moratorium does not require tenants affected by COVID-19 to make an affirmative declaration to that effect. Although such a requirement would certainly make it more difficult for ill-intentioned, financially secure tenants to game the Moratorium, landlords remain free to seek to evict such nonpaying tenants, so long as there exists a good faith basis to believe that the tenant falls outside the Moratorium's protections. (Moratorium at 2.) There does not appear to this Court to be anything inherently unreasonable about the City Council's decision to spare legitimately-impacted tenants the burden of attestation.

---

[31] (...continued)
Moratorium here. Of the four moratoria at issue in the cited cases, the City's Moratorium is most akin to the City of Philadelphia's, discussed in <u>HAPCO</u>, 2020 WL 5095496, at *2-4.
    [32] The <u>Elmsford</u> court converted a motion for a preliminary injunction into a motion for summary judgment, and, strictly speaking, did not reach the reasonableness question because it concluded, as a matter of law, that New York's eviction moratorium did not substantially impair landlords' contractual rights. <u>Elmsford</u>, 2020 WL 3498456, at *15.

1    Lastly, although the Moratorium does not mandate that tenants
2    pay a reasonable, or any, amount of rent, neither has the City
3    Council simply thrown landlords to the wolves.  Along with the
4    Moratorium and other coranavirus-related measures, the City
5    implemented an Emergency Rental Assistance Program ("ERAS"), which
6    will provide over $100 million in rental assistance payments to
7    approximately 50,000 low-income households by the end of this year.
8    (City Request for Judicial Notice, Ex. Y.)  This rent subsidy "will
9    be a grant paid directly to the tenant's landlord . . . ."  (Id. at
10   5-6 (emphasis added).)  The ERAS program does not impose any
11   requirements on landlords beyond those already implemented by the
12   Moratorium and the Rent Freeze Ordinance.  (Id.)  Although it is
13   unlikely that the ERAS program will be sufficient to make up the
14   entire shortfall of rent owed to AAGLA's members, the amount is not
15   insignificant, and is at the very least indicative of the City
16   Council's reasoned balancing of competing interests, including
17   those of tenants, landlords, and the public health.[33]

18

19   [33] AAGLA's Due Process claim fails for these same reasons.
     "Substantive due process provides no basis for overturning validly
20   enacted state statutes unless they are clearly arbitrary and
     unreasonable, having no substantial relation to the public health,
     safety, morals, or general welfare."  Spoklie v. Montana, 411 F.3d
21   1051, 1059 (9th Cir. 2005) (internal quotation marks omitted).  The
     Moratorium clearly meets this relatively low bar.  Despite AAGLA's
22   urging, this Court does not read Block v. Hirsh, 256 U.S. 135, 155
     (1921) to create some different standard for cases involving
23   regulation of rents.  Indeed, AAGLA's argument appears to be no
     more than a due process recasting of its "reasonable rental value"
24   theory.  The court in Block, as in Blaisdell, conducted a
     reasonableness analysis to determine whether the District of
25   Columbia Rents Act "goes too far."  Block, 256 U.S. at 156.
     Although the fact that "[m]achinery is provided to secure the
26   landlord a reasonable rent" was a relevant factor in that due
     process analysis, the existence of such "machinery" is not a
27   prerequisite to constitutional validity, any more than is
     "reasonable rent" in the Contract Clause context.  Id. at 157.
28                                              (continued...)

1    Thus, even though the court is persuaded that AAGLA will be

2   able to show that the Moratorium substantially impairs landlords'

3   contract rights, AAGLA is not likely to succeed on its Contract

4   Clause claim because any such impairment appears, at this stage, to

5   be eminently reasonable under the extraordinary circumstances.[34]

6        B.   Irreparable harm

7        A plaintiff seeking a preliminary injunction must demonstrate

8   not just a possibility, but a likelihood of irreparable harm.

9   Winter, 555 U.S. at 22; Alliance for the Wild, 632 F.3d at 1135.

10  Although AAGLA asserts that irreparable harm can be presumed in the

11  context of constitutional violations, the Ninth Circuit has

12  cautioned that the irreparable harm requirement does not "collapse

13

14       [33](...continued)
     Indeed, the Blaisdell court, having concluded that there was no
15   Contract Clause violation, summarily disposed of a corresponding
     due process claim.  Blaisdell, 290 U.S. at 448-49. ("We are of the
16   opinion that the Minnesota statute . . . does not violate the
     contract clause . . . . Whether the legislation is wise or unwise
17   as a matter of policy is a question with which we are not
     concerned.  What has been said on that point is also applicable to
18   the contention presented under the due process clause.") (citing
     Block) (emphasis added).
19       [34] As suggested above, nothing in this Order shall be read to
     suggest that further litigation of this matter could not affect the
20   Court's conclusions.  See note 25, above.  Although the Court finds
     the Moratorium reasonable on balance at this stage of proceedings,
21   the rationales for each of the Moratorium's various provisions are
     not all equally apparent.  For example, it stands to reason that
22   economic difficulties will lead to some consolidation of households
     and an increase in the number of inhabitants in some units, and
23   that to evict that entire expanded household would have serious
     public health consequences.  And it may well be that, absent a
24   prohibition on interest and late fees, tenants might "self-evict"
     rather than incur additional debt.  (Intervenors' brief at 20
25   (citing HAPCO, 2020 WL 5095496, at * 12)).  This Court will not
     second-guess the City's apparent conclusion that the risk of such
26   outcomes warrants a temporary suspension of interest charges, or
     that impacted renters should not be penalized in the form of late
27   fees for missed payments that are, by definition, attributable to
     the current emergency.  It remains to be seen, however, whether a
28   blanket prohibition on pet-related evictions in fact promotes, or
     can reasonably be assumed to protect, public safety.

into the merits question," even where a plaintiff demonstrates a likelihood of success on the merits of a constitutional claim. Cuviello v. City of Vallejo, 944 F.3d 816, 831 (9th Cir. 2019).  At the same time, however, the court has stated that certain constitutional violations, including First Amendment violations and unlawful detentions without due process, "unquestionably" constitute irreparable harm.  See, e.g., Klein v. City of San Clemente, 584 F.3d 1196, 1207 (9th Cir. 2009) (First Amendment); Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017) (Due Process).  Even assuming that economic injuries could also rise to the level of irreparable harm, this Court need not resolve this apparent tension because, for the reasons stated above, AAGLA has not demonstrated a likelihood of success on the merits of its constitutional claims.

AAGLA argues further that it is likely to suffer irreparable harm because, in the absence of injunctive relief, "tenants may simply live rent-free for the foreseeable future, without providing any documentation to their landlords."  (Mem. in support at 19:18-19.)  Although at first glance, it is somewhat unclear how landlords could possibly be irreparably harmed by the possibility of a temporary delay in rent payments "for the foreseeable future," AAGLA's reply makes clear that its theory of irreparable harm is that landlords have "no realistic chance of being paid . . . ."  (Reply at 25:24.)  It has long been established, however, "that economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) (citing

1   <u>Los Angeles Memorial Coliseum Comm'n v. National Football League</u>,

2   634 F.2d 1197, 1202 (9th Cir.1980); <u>see also</u> <u>Goldie's Bookstore,</u>

3   <u>Inc. v. Superior Court of State of Cal.</u>, 739 F.2d 466, 471 (9th

4   Cir. 1984) ("Mere financial injury, however, will not constitute

5   irreparable harm if adequate compensatory relief will be available

6   in the course of litigation.").  Indeed, the Ninth Circuit has

7   relied upon that principle in denying a preliminary injunction,

8   even when the economic injury at issue stemmed from an alleged

9   constitutional violation.  <u>Amwest Sur. Ins. Co. v. Reno</u>, 52 F.3d

10   332 (9th Cir. 1995) (unpublished disposition).

11       AAGLA contends that, notwithstanding the Ninth Circuit's

12   pronouncements, economic harm may be irreparable where there is a

13   significant risk that damages will never be collected.  (Reply at

14   25.)  Some courts, including this one, have occasionally found

15   irreparable harm where a plaintiff seeks monetary damages from a

16   defendant that is, or is likely to become, insolvent or may

17   dissipate assets to avoid judgment.  <u>See</u>, <u>e.g.</u>, <u>DirecTV, LLC v. E&E</u>

18   <u>Enterprises Glob., Inc.</u>, No. 17-06110-DDP-PLA, 2017 WL 4325585, at

19   *5 (C.D. Cal. Sept. 25, 2017); <u>Aliya Medcare Fin., LLC v. Nickell</u>,

20   No. CV1407806MMMSHX, 2014 WL 12526382, at *5 (C.D. Cal. Nov. 26,

21   2014); <u>Laguna Commercial Capital, LLC v. Se. Texas EMS, LLC</u>, No. CV

22   11-09930 MMM PLAX, 2011 WL 6409222, at *6 (C.D. Cal. Dec. 21,

23   2011).  Those cases, however, bear little resemblance to the

24   instant suit.  Here, AAGLA seeks only declaratory and injunctive

25   relief, not monetary damages.  AAGLA does not cite, nor is this

26   Court aware of, any authority for the proposition that an imminent

27   irreparable harm exists simply because a plaintiff may be unable to

28   collect a monetary judgment against some unascertained third party

1   at the conclusion of some unrelated, separate suit that has yet to,

2   and may never, be filed in the first instance.  AAGLA's reliance on

3   <u>Baptiste</u> is also misplaced.  Although the <u>Baptiste</u> court did opine

4   that landlords' contract remedies "will often be illusory" because

5   tenants may be judgment-proof, it did so in the course of the

6   substantial impairment analysis, and <u>not</u> as part of an irreparable

7   harm inquiry.  <u>Baptiste</u>, 2020 WL 5751572, at *16.

8       Although monetary losses alone cannot, in this context,

9   constitute irreparable harm, foreclosure theoretically could, as

10  landlords' properties are unique.  <u>See Sundance Land Corp. v. Cmty.</u>

11  <u>First Fed. Sav. & Loan Ass'n</u>, 840 F.2d 653, 661 (9th Cir. 1988).

12  Here, however, AAGLA has failed to demonstrate a likelihood, as

13  opposed to a mere possibility, that landlords are in imminent

14  danger of losing their properties to foreclosure.  AAGLA has

15  admittedly submitted declarations from only "a few" of its member

16  landlords, only two of whom make any reference to mortgage

17  difficulties.[35]  (Mem. in support at 16-17.)  One declarant states

18  that four of twelve units he and his wife manage are not paying

19  rent, but the declarant does not indicate that he is unable to make

20  mortgage payments.[36]  (Declaration of Fred Smith ¶¶ 4,6.)  Although

21

22      [35] Of the other two declarants, only one mentions a mortgage
    at all, and, despite a pre-Covid negative cash flow of $11,000 to
23  $26,000 per year, does not appear to have any difficulty making
    mortgage payments.  (Declaration of Natalie Adomian ¶ 3).
24  Adomian's declaration also undercuts AAGLA's contention that
    landlords will not be able to recover monetary damages, as she
25  states that her delinquent tenant earns at least $225,000 per year,
    and likely significantly more.  (<u>Id.</u> at ¶ 5.)
26      [36] The court in no way intends to minimize the hardship the
    declarant faces, and acknowledges that the declarant is paying a
27  portion of the mortgages out of his savings.  The monetary harm the
    declarant describes, however, do not rise to the level of
28  irreparable harm.

the second declarant does state that her father is unable to make mortgage payments, and that one out of seven of his tenants is currently not paying rent, she further states that the mortgagor bank has agreed to one lengthy extension, and the declaration does not indicate that the bank has expressed any intention to foreclose in the foreseeable future.  (Declaration of Evelyn Garcia, ¶¶ 4, 8.)  The court is not aware of any evidence that mortgagors are, in fact, generally eager or likely to foreclose on residential rental units in the current environment.  See Aliya Medcare, 2014 WL 12526382, at *4 ("It is not enough that the claimed harm be irreparable; it must be imminent as well." (citing Caribbean Marine Servs. Co., Inc. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988)).  Indeed, under the present circumstances, including the very Moratorium that AAGLA seeks to invalidate, mortgagors may have little incentive to foreclose and significant motivations to come to accommodations with property owners.  Furthermore, it is not clear that Mr. Garcia's difficulties are attributable to the Moratorium, as his mortgage was already delinquent by April 2, 2020.[37]  (Garcia Decl., Ex. A.)

Even putting all these considerations aside, AAGLA has failed to show that the preliminary injunction it seeks will prevent the harms it alleges.  The Moratorium represents but one layer of protection Los Angeles renters currently enjoy.  California state authorities have not remained idle in the face of the COVID crisis.  In late August, the state legislature passed Assembly Bill 3088,

---

[37] Again, this Court has no intention of minimizing the difficulties faced by Mr. Garcia or any other landlord.  Those difficulties do not, however, constitute irreparable harm for purposes of a preliminary injunction enjoining the Moratorium.

the COVID-19 Tenant Rights Act (the "State Law").  The State Law is similar in some ways to the City's Moratorium, insofar as it also prohibits no-fault evictions and evictions for COVID-related rent delinquencies, without limiting landlords' ability to seek unpaid rent through other means.  Cal. Code Civ. P. §§ CCP § 116.223, 1179.03, 1179.03.5.  The State Law generally does not affect pre-existing local measures, such as the Moratorium, except to (1) trigger the commencement of any existing local rent repayment grace periods, including those conditioned upon the end of a declared state of emergency, on March 1, 2021, and (2) terminate any such repayment periods on March 31, 2022.  Cal. Code Civ. P. § 1179.05.

In some aspects, however, the State Law goes beyond the Moratorium in ways that are more burdensome on landlords.  The Moratorium, for example, allows evictions for back rent that remains unpaid at the conclusion of the Moratorium's twelve-month grace period.  Under the State Law, in contrast, tenants can <u>never</u> be evicted for <u>any</u> COVID-related missed rent incurred between March 1, 2020 and August 31, 2020.  Cal. Code Civ. P. § 1179.04(a).  Similarly, tenants can <u>never</u> be evicted for failure to pay rent that comes due between September 1, 2020 and January 31, 2021, so long as the tenant pays, no later than January 31, twenty-five percent of the rent due during that period.[38]  Cal. Civ. Code § 1179.03(g)(2)(B).  Thus, although the State Law provides for a shorter grace period than does the City Moratorium, it also essentially forgives, for eviction purposes (and eviction purposes

---

[38] These protections only apply to tenants who provide landlords with a declaration that the tenant has missed rent due to decreased income or increased expenses attributable to COVID-19. The City Moratorium has no equivalent attestation requirement.

1   only), 100% of six months' rent and up to 75% of rent for a further

2   five months.  The City Moratorium includes no comparable

3   "forgiveness" provisions.

4          Notwithstanding the seemingly greater impacts of the State

5   Law, AAGLA does not challenge the constitutionality of the State

6   Law.  To the contrary, AAGLA argues that the State Law is <u>more</u>

7   reasonable than the Moratorium and, at that "we can certainly

8   assume that the state law is constitutional."  Against the backdrop

9   of a presumptively valid State Law, however, it is unclear to the

10  court how a preliminary injunction setting aside the Moratorium

11  would aid Los Angeles landlords or, by the same token, how denial

12  of such relief would put landlords in a materially worse position

13  than that in which they would otherwise be.  In arguing that the

14  Moratorium is unreasonable, AAGLA made much of the fact that the

15  City Ordinance does not guarantee landlords even partial payments

16  contemporaneous with occupancy.  But neither does the State Law.

17  Under the State Law, for example, a qualifying tenant who paid zero

18  rent for the month of September, and pays zero rent for four months

19  thereafter, cannot be evicted until February.  AAGLA's members will

20  not possibly suffer irreparable harm in the absence of an order

21  preliminarily enjoining a Moratorium that, at the current juncture,

22  does essentially the same thing as the admittedly reasonable and

23  presumptively valid State Law.[39]

24  ————————————

25       [39] Of course, as discussed above, the City Moratorium and the
    State Law are not coterminous.  But none of the most salient
26  differences changes the result here.  Although the State law does
    not restrict landlords' ability to seek late fees or interest at
27  some point in the future, neither does it allow them to pursue
    evictions for such sums now.  Furthermore, such purely economic
28  damages cannot constitute irreparable harm, as explained above.
                                              (continued...)

1     For these reasons, AAGLA has failed to demonstrate any

2  likelihood of irreparable harm.

3     **C.**   Balance of equities and the public interest

4     "Where the government is a party to a case in which a

5  preliminary injunction is sought, the balance of the equities and

6  public interest factors merge." <u>Padilla v. Immigration & Customs</u>

7  <u>Enf't</u>, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing <u>Drakes Bay</u>

8  <u>Oyster Co. v. Jewell</u>, 747 F.3d 1073, 1092 (9th Cir. 2014)).  As the

9  court's prior discussion makes clear, the COVID-19 crisis is

10  unparalleled in this country's modern history.  It is, quite

11  literally, a matter of life and death.  The economic damage the

12  pandemic has wrought, if left unmediated by measures such as the

13  City Moratorium, would likely trigger a tidal wave of evictions

14  that would not only inflict misery upon many thousands of displaced

15  residents, but also exacerbate a public health emergency that has

16  already radically altered the daily life of every city resident,

17  and even now threatens to overwhelm community resources.  The

18  hardships wrought upon residential landlords as an unintended

19  consequence of the City's efforts are real, and are significant,

20  but must yield precedence to the vital interests of the public as a

21  whole.

22     This Court will defer to the judgment of local authorities,

23  who have the unenviable task of weighing all of the relevant

24  considerations and choosing the least of all possible evils.

25

26     [39](...continued)

27  And, although AAGLA makes much of the Moratorium's lack of an
attestation requirement, AAGLA does not explain how that lack

28  "deprive[s] landlords of meaningful tools and resources" in a way
that causes immediate, irreparable harm.  (Reply at 26:6-7.)

1  It bears repeating, however, that the COVID-19 crisis is national

2  in scope, and demands a national response.

3      Landlords and tenants alike are victims of the virus, both

4  literally and economically.  Tenants should not have to live in

5  fear of eviction because of a calamity that was not of their

6  making.  Landlords should not have to live in fear of losing their

7  hard-earned investments in our community because of a calamity that

8  was not of their making.  Our citizens should not have to fight

9  each other to avoid economic and personal ruin.

10      Courts are an imperfect tool to resolve such conflicts.  So

11  too are ordinances and statutes that shift economic burdens from

12  one group to another.  The court respectfully implores our

13  lawmakers to treat this calamity with the attention it deserves.

14  It is, but for the shooting, a war in every real sense.  Hundreds

15  of thousands of tenants pitted against tens of thousands of

16  landlords - that is the tragedy that brings us here.  It is the

17  court's reverent hope, expressed with great respect for the

18  magnitude of the task at hand, that our leaders, and not the

19  courts, lead us to a speedy and fair solution.

20  IV.  Conclusion

21      Although it appears at this stage of proceedings that the City

22  Moratorium substantially affects landlords' contract rights, the

23  manner in and extent to which it does so appears reasonable under

24  the circumstances.  AAGLA has not, therefore, demonstrated a

25  likelihood of success on the merits of its constitutional claims.

26  Nor has AAGLA demonstrated a likelihood of irreparable harm, or

27  that the balance of the equities or the public interest weigh in

28

favor of preliminary relief.  Accordingly, AAGLA's motion for a preliminary injunction is DENIED, without prejudice.

IT IS SO ORDERED.

Dated: November 13, 2020

DEAN D. PREGERSON
United States District Judge